FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2020 NOV 25  PM 2: 09

MARGARET BOTKINS, CLERK
CHEYENNE

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mike@hkwyolaw.com
nnicholas@hkwyolaw.com

Brice M. Timmons (TN Bar #29582)
Bryce Ashby (TN Bar #026179)
Craig Edgington (TN Bar #038205)
*Pro Hac Vice Pending*
Donati Law, PLLC
1545 Union Ave.
Memphis, TN  38104
(901) 209-5500
Fax: (901) 278-3111
brice@donatilaw.com
bryce@donatilaw.com
craig@donatilaw.com

Frank L. Watson, III (TN Bar #015073)
*Pro Hac Vice Pending*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN  38104
(901) 529-7996
Fax: (901) 529-7998
fwatson@watsonburns.com

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN, ANNA GOZUN, AMANDA NASH**, and **JOHN DOE** on behalf of themselves and all similarly situated persons, <br><br> PLAINTIFFS, <br> v. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **Case No.** _20 - CV - 215 - S_ |

| | |
|---|---|
| TRINITY TEEN SOLUTIONS, INC., a Wyoming corporation; **TRIANGLE CROSS RANCH, LLC**, a Wyoming limited liability corporation; **MONKS OF THE MOST BLESSED VIRGIN MARY OF MOUNT CARMEL, d/b/a MYSTIC MONK COFFEE**, a Wyoming corporation; **GERALD E. SCHNEIDER; MICHAELEEN P. SCHNEIDER; ANGELA C. WOODWARD; JERRY D. WOODWARD; DANIEL SCHNEIDER; MATHEW SCHNEIDER; MARK SCHNEIDER; KARA WOODWARD; KYLE WOODWARD; THOMAS GEORGE; JUDITH D. JEFFERIS; DALLY-UP, LLC**, a Wyoming limited liability corporation; **ROCK CREEK RANCH, INC.**, a Delaware corporation; **DIOCESE OF CHEYENNE**, a Wyoming corporation; and the **SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY**, a Texas corporation; and **NEW MOUNT CARMEL FOUNDATION, INC.**, a Wyoming corporation, | ) ) ) ) ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF THE TRAFFICKING** ) **VICTIMS PROTECTION** ) **REAUTHORIZATION ACT, 18 U.S.C. §** ) **1595, FEDERAL RACKETEER** ) **INFLUENCED AND CORRUPT** ) **ORGANIZATIONS ACT, 18 U.S.C. § 1964,** ) **AND WYOMING COMMON LAW** ) ) ) **JURY TRIAL DEMANDED** ) **PURSUANT TO FED. R. CIV. PRO. 38(a)** ) **& (b)** ) ) ) ) ) |
| DEFENDANTS. | ) ) |

---

## CLASS ACTION COMPLAINT

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiffs Carlie Sherman, Anna Gozun, Amanda Nash, and John Doe (hereinafter collectively "Plaintiffs") on behalf of themselves and all other similarly situated persons, by and through their designated attorneys, bring this action against Defendants Trinity Teen Solutions, Inc., Triangle Cross Ranch, LLC., Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee, Gerald ("Jerry") Schneider, Michaeleen P. Schneider, Angela

2

("Angie") Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas ("Tom") George, Judith Jefferis, Dally-Up, LLC, Rock Creek Ranch, Inc., Diocese of Cheyenne, Society of Our Lady of the Most Holy Trinity, and the New Mount Carmel Foundation, Inc. (hereinafter collectively "Defendants"). Plaintiffs allege as follows:

## I.

## NATURE OF THE ACTION

1.      Human trafficking remains a shockingly prevalent practice throughout the world. It has become an epidemic in the United States.  Human trafficking victimizes vulnerable persons by forcing, defrauding, or otherwise coercing them into sexual or labor exploitation. In 2000, Congress first enacted the Trafficking Victims Protection Act to combat the exploitation of individuals, especially women and children, coerced into the sex trade, slavery, and involuntary servitude. The act takes an expansive view of trafficking ranging from violent coercion into the sex trade to the use of psychological, financial, and legal means to frighten individuals into providing labor without compensation.

2.      The "troubled teen industry" is a predatory industry that operates across the United States, especially in rural areas where the oversight of mental health facilities and residential facilities for minors is difficult or impracticable. These companies promise the parents of teens with mental and emotional disturbances, problems with delinquency, and addiction issues respite from the challenges of treatment and parenting their children with too-good-to-be-true promises of cutting-edge therapies and education in a residential setting. Often these facilities are unlicensed

and unregulated or operate in legal gray areas. These companies charge desperate parents shockingly high prices while simultaneously providing little to no actual treatment and substandard education. The legal status of these facilities varies from state to state, and not all such facilities are created equal. While some are well-intentioned, others are riddled with abusive conduct and cause serious harm to their residents. The dangers posed by these companies are so serious that the University of South Florida and the Bazelon Center for Mental Health Law founded the Alliance for the Safe, Therapeutic, Appropriate use of Residential Treatment in response to this growing industry that profits over $1 Billion dollars annually housing between ten and fourteen thousand minor children a year.

3.      This is an action brought by and on behalf of human trafficking victims the troubled teen industry.  Defendants Gerald ("Jerry") Schneider and Michaeleen P. Schneider (hereinafter "Defendant Triangle Owners") have owned the property now operated as the Triangle Cross Ranch, Inc. (hereinafter the "Triangle Ranch" or "TCR") since 1973.  The Triangle Ranch is advertised as a fifty thousand (50,000) acre working ranch with over one thousand (1,000) head of cattle which is believed to cross state lines between Wyoming and Montana. Defendant Triangle Owners founded Mount Carmel Youth Ranch (hereinafter "Mount Carmel"), a Wyoming nonprofit corporation, which operated at the same location to provide group home licensed services to troubled teens. When the Mount Carmel board of directors decided to close the facility and turn in their license in November 2012, Defendant Triangle Owners wanted to "continue the

good work that had been going on at Mount Carmel,"[1] so in December 2012, Defendant Triangle

Owners applied to the Wyoming Department of Family Services (hereinafter "DFS") for a license

in the name of Triangle Cross.   That application process closed March 6, 2013, due to the

Defendant Triangle Owners failure to provide the necessary information for its completion to DFS.

Defendant Triangle Owners operated the Triangle Cross Ranch for nearly two (2) years without a

license as required by Wyoming law until the Wyoming Supreme Court enjoined Defendant

Triangle Owners from continuing to operate the Triangle Ranch. *See Triangle Cross Ranch, Inc.*

*v. State*, 2015 WY 47, ¶ 21, 345 P. 890, 895 (Wyo. 2015).   DFS allegedly received information

that Defendant Triangle Owners were operating the Triangle Ranch without the appropriate license

and sent a cease and desist letter to Defendant Triangle Owners on July 27, 2013.   Upon

information and belief, Defendant Gerald Schneider informed DFS on August 27, 2013, that

Defendant Triangle Owners relocated all operations related to minor children to portions of the

ranch located in Montana to avoid Wyoming State certification and regulatory oversight rather

than obtain the proper certifications in Wyoming. Defendant Triangle Owners re-opened the

Triangle Ranch in Wyoming in 2018 under the guise of a Wyoming group home and began

continuing their pattern of systematic abuse and exploitation of delinquent teenage boys for their

labor.

---

[1]  Plaintiffs aver Defendant Triangle Owners' true desire for licensing was to continue the exploitation of troubled minor teenage boys by charging their parents upwards of $6,000 a month for services that Defendant Triangle Owners had no intention of providing while forcing troubled minors to engage in forced labor.

4.     Upon information and belief, Defendant Jerry Schneider had his daughter, Defendant Angela ("Angie") Woodward and her husband set up a similar ranch for troubled teenage girls beginning in 2002. Defendants Angela ("Angie") Woodward and Jerry Woodward (hereinafter "Defendant Trinity Owners") own and operate Trinity Teen Solutions, Inc. (hereinafter "Trinity Ranch" or "TTS"), a Wyoming corporation which operates as a working ranch under the guise of a Residential Treatment Center in Park County, Wyoming. While registered with DFS as a "residential treatment center," they hold no licensure through the Wyoming Department of Health, nor are they licensed as a school. To obtain cheap and easily exploited labor for all Defendants, Defendant Triangle Owners and Defendant Trinity Owners (hereinafter collectively "Defendant Owners") engaged in a recruitment scheme whereby they induced and continue to induce parents of troubled minors to pay substantial sums of money under the guise that their children would receive cutting edge residential treatment, therapy, and continuing education.  Defendant Trinity Owners learned from and improved upon Defendant Gerald Schneider's model to better evade regulation and defraud not only parents but also private insurance companies.

5.     The TTS's Parent's Handbook, attached hereto as **Exhibit A,** lists just some of the following "treatment" modalities and activities that Plaintiffs or the putative class members would purportedly receive: wilderness therapy/outdoor behavior healthcare, reality therapy, experiential therapy, strategic therapy, animal assisted therapy, group therapy, individual therapy, Christ-centered counseling, rational emotive behavioral therapy, Eye Movement Desensitization Reprocessing, personality assessment, nutritional therapy, crisis intervention, art therapy,

6

relationship therapy, Bibliotherapy, cognitive restructuring, confrontive therapy, insight therapy, behavior modification, solution oriented therapy, symptom focused education, ordeal therapy, career counseling, and personality inventories/assessments. Very few if any mental health facilities in the United States actually offer this vast array of therapeutic interventions, which range from cutting-edge proprietary, manualized therapies requiring certifications and training that the underqualified staff of TTS have never received, to "therapies" that are simply made up for the purposes of marketing TTS.

6.      For example, Dialectical Behavioral Therapy ("DBT") and Eye Movement Desensitization Reprocessing ("EMDR") are cutting-edge, manualized therapies used to treat a variety of disorders. DBT is among the only therapy models clinically demonstrated to effectively treat borderline personality disorder and narcissistic personality disorder. EDMR is used in the treatment of PTSD. These therapies require extensive training and certification, and TTS does not actually offer these therapies while misrepresenting that it does so.

7.      For example, "Reality Therapy" was described in the July 2013 Triangle Ranch website as "an approach to psychotherapy and counseling . . . Reality therapy is considered a cognitive behavioral approach to treatment."

8.      In fact, "Reality Therapy," is a real therapy method developed during the Vietnam War at the Veterans Administration hospital in Los Angeles by Dr. William Glasser. It refers to a process that is people-friendly and people-centered, focusing on teaching them how fantasy can distract people from choices that are within their control in life. It has nothing to do with giving someone a "dose of reality" or the threat of punishment. By contrast, as practiced by TTS and its

co-conspirators at TCR, reality therapy is merely abuse. Defendant Gerald Schneider himself described "reality therapy" as practiced by TTS and its co-conspirators at the Triangle Cross Ranch trial.

> Reality therapy is kind of self-explaining, really. I mean on a ranch, okay, you can't control mother nature. You can only work with her. Okay? That's reality. Okay? Now, a young man can get pretty frustrated because it's so stinkin[g] cold out. Okay?
>
> And getting dressed and being prepared and that kind of thing is a -- is a reality of the therapy. Maybe I've told him, don't you come out without your boots and your coveralls on, and then I catch him out there. Okay? Uh-huh. You turn around and go back to the house. He's going to listen to me because he's cold.

The Wyoming Supreme Court's response to this testimony was to state: "The reality is that healthy people do not pay for the privilege of stacking hay." *Triangle Cross Ranch, Inc. v. State of Wyoming*, 2015 WY 47 at ¶16. This, of course, is not actually therapy. It is merely the forced labor of children in hazardous conditions.

9.    To obtain this labor, Plaintiffs and putative class members or their parents were promised an atmosphere in which troubled teenage minors could grow physically, academically, mentally, emotionally, socially, and spiritually through therapy and treatment. Instead of the atmosphere and treatment they were promised, Plaintiffs and others similarly situated were transported to Wyoming, often through legal kidnapping at the suggestion of Defendant Owners, and forced to work in unfathomable conditions while receiving little to no formal education, behavioral treatment, or therapy. They were made to labor from early morning until late at night, without pay, under the constant threat of physical and emotional punishment and further confinement.

10.     Defendant Owners and their recruitment agents defrauded Plaintiffs, other putative class members, and their parents throughout the recruitment process, inducing them into paying substantial fees for residential treatment, under promises of receiving full-time cutting edge therapies and while maintaining proper education towards high school graduation. Defendant Owners actually forced Plaintiffs and putative class members to work without pay for periods of time lasting between months and years.[2] Defendant Owners and/or their agents caused Plaintiffs and the putative class members to believe that if they did not work for Defendants, they would suffer physical or emotional abuse and prolonged confinement.

11.     Immediately upon Plaintiffs' and the putative class members' arrival at TCR and TTS, Defendant Owners and their agents blatantly disregarded the terms of residential or group treatment they had promised Plaintiffs, putative class members, and their parents and Defendant Owners immediately began exploiting Plaintiffs and the putative class members.

12.     Plaintiffs and the putative class members were immediately subjected to a jail style strip search upon arrival at both TCR and TTS. Defendant Trinity Owners and/or their agents required Plaintiffs or the putative class members to read the *Holy Cowgirl Manual* and forced Plaintiffs and the putative class members to sign the TTS Policies, Rules, Responsibilities, and Procedures Youth Contract agreeing to the abusive policies, rules, responsibilities, and procedures including, critically, submitting to the censorship of ingoing and outgoing mail and the monitoring of all telephone calls with their parents. The *Holy Cowgirl Manual* informed girls of a six (6) level

---

[2] TCR's website states most boys stay for 9-18 months, while TTS's Parents Handbook states the minimum length of stay is 45 days, and the average girl is at TTS for between 12 -18 months.

system that was required to be completed to obtain discharge from TTS. Defendant Owners and/or their agents began the systematic control of Plaintiffs and the putative class members by the threat of further confinement unless Plaintiffs and the putative class members completed all chores and ranch duties, including, but not limited to, running miles of irrigation lines, picking rocks out of fields for days at a time, setting thousands of fence posts, loading massive trucks of hay daily, repairing barbed wire fencing, cleaning, cooking, tending farm animals, birthing livestock, maintaining fires throughout the night due to Defendant Owners failure to provide heat, and performing labor for the other Defendants. Laboring conditions were hazardous, causing numerous injuries and even frostbite.

13.     Upon arrival at TTS, Plaintiffs and the putative class members were then transported to the cook cabin or the school room and each of the other exploited girls were required to state their name, level, and how long they had been at the facility.[3]

14.     Upon arrival at TCR, Plaintiffs and the putative class members were forced to watch the 2003 movie "Holes" starring Shia LaBeouf, which is a story about a wrongfully convicted boy who is sent to a brutal desert detention camp where he joins the job of digging holes for some mysterious reason without the chance of escape or freedom in sight. After having their will broken by the indoctrination video, Plaintiffs and the putative class members were subject to immediate forced labor after their initial jail style strip search.

---

[3] Plaintiffs aver that this introduction was another form of control by Defendants. When other workers would introduce themselves and state they had been level 1 for years Plaintiffs and the putative class members were immediately overcome with fear regarding the seriousness of complying with all labor requirements.

15.     Plaintiffs and the putative class members at TTS were then subjected to or threatened with food and sleep deprivation, physical punishment, emotional abuse, and humiliation, to include, but not limited to, being leashed to other exploited girls, staff members, and/or farm animals, carrying around a folding chair[4] as punishment for twenty-four (24) hours a day for months on end, forced silence for weeks at a time, being forced to run up and down a massive hill covered in sharp rocks and rattlesnakes, being forced to eat only small quantities of cold kidney beans for weeks at a time, participation in "group therapy" without a licensed therapist with the sole purpose of staff and other exploited girls degrading and humiliating the participant, to force compliance with mandated labor assignments. Plaintiffs and the putative class members were observed by staff members in the bathrooms, showers, and forced to sleep on the floor next to Defendant Owner's agents until they reached level two (2).[5]

16.     Plaintiffs and the putative class members at TCR were then subjected to or threatened with food and sleep deprivation, physical punishment, assault and battery, and emotional abuse.  Plaintiffs and the putative class members at TCR where provided a single pair of pants, a single shirt, two pairs of socks, and one pair of underwear. Defendant Triangle Owners created a dual tier system.  Plaintiffs and the putative class members at TCR were housed in rudimentary uninsulated sheds without any form of heat source, but equipped with solar powered

---

[4] This was known as "solitary confinement" and "life review." It would often involve sitting in a chair facing a cabin wall for up to 16 hours a day without the ability to speak to other class members. Girls were only allowed to carry the chair when moving to their next labor task.

[5] Upon information and belief, at least one girl remained level one (1) for a three-year period and it was not uncommon for girls to remain level one (1) for months.

alarms to prevent them from leaving.  While they were considered "Wilderness Level" they were locked into these sheds without access to a latrine for extended periods and overnight and forced to urinate into jugs. Defecation presented a difficult problem in that most class members were unable to defecate into the jugs and simply had to defecate wherever they could. Plaintiffs and the putative class members at TCR could get upgraded to the Bunkhouse Level if they abided by all physical labor standards and chores. This would entitle them to better food, clothing, living inside with a heat source or window A/C unit and running water.  If a Plaintiff or putative class member failed to abide by Defendant Triangle Owners' physical labor or chore demands they would be returned to "Wilderness Level."

17.     Plaintiffs and the putative class members at both facilities were immediately cut off from communicating with their parents about conditions at TCR and TTS. All mail incoming and outgoing was read by staff members and Plaintiffs and the putative class members were forced to re-write communication to their parents if they stated anything negative about TCR or TTS. Furthermore, once telephone communication was authorized a TCR or TTS staff member observed all telephone communications and at all times had the ability to terminate the communication.

18.     Finally, Defendant Trinity Owners and/or their agents forced Plaintiffs and the putative class members to write testimonials for use in advertising prior to authorizing their release from TTS and would often prevent a Plaintiff's or putative class member's release until a positive review was submitted to perpetuate the vicious cycle of victimization. When residents would speak out publicly about their abuse, TTS would threaten them with defamation lawsuits and utilize these positive testimonials as "evidence" that the abuse had not, in fact, occurred. In 2016, TTS did

actually file a strategic lawsuit against public participation alleging defamation against three of its victims. That matter was removed to this Court and assigned to The Honorable Nancy D. Freudenthal before being dismissed by consent before any record was developed. Through their lawyer, Joseph Darrah, TTS made further threats to bring frivolous lawsuits against class members and Plaintiffs. Darrah sent a letter to counsel for class member Mollie Lynch threatening, "If we need to move forward formally with [filing a lawsuit against Mollie Lynch], we will not only bring an action against Mollie Lynch, we will likewise sue the girls she and Ms. Plander may have recruited who are also participants in the video [sharing their experience at TTS]."

19.     Defendant Owners' scheme was designed to make Plaintiffs and other putative class members afraid, intimidated, and powerless to leave Defendant Owners' employment while all Defendants profited or knowingly benefitted, financially or through receipt of free labor, from participation in a venture which all Defendants knew or should have known was unlawful.

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

20.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §§ 1589 *et seq.*) (hereinafter "TVPRA") and the Racketeer Influences and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*).

21.     With respect to the state law claims against Defendant Trinity Teen Solutions, Inc., Dally-Up, SOLT, and the Diocese of Cheyanne, this Court also has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §

1332(d)(2).  Pursuant to § 1332(c)(2), the named Plaintiffs Carlie Sherman, Anna Gozun, and Amanda Nash are citizens of Illinois, South Carolina, and Minnesota, respectively. Pursuant to § 1332(d)(10), Defendant Trinity Teen Solutions, Inc. is a corporation organized under the laws of Wyoming, with its principal place of business in Powell, Wyoming, and, as such, is a citizen of the State of Wyoming.  As a result, the named Plaintiffs and Defendant are citizens of different States, pursuant to § 1332(d)(2)(A).

22.    Upon information and belief, the proposed Class exceeds 100 persons.  Pursuant to the 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00 and, thus, exceeds the requisite amount in controversy set forth in § 1332(d)(2).

23.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

### III.

### THE PARTIES AND PERSONAL JURISDICTION

24.    Plaintiff Carlie Sherman (hereinafter "Plaintiff Sherman") is an individual with an established residency in Lee County, Illinois.

25.    Plaintiff Anna Gozun (hereinafter "Plaintiff Gozun") is an individual residing in Greenville County, South Carolina.

26.    Plaintiff Amanda Nash (hereinafter "Plaintiff Nash") is an individual residing in Scott County, Minnesota.

27.     Plaintiff John Doe (hereinafter "Plaintiff Doe") is an individual residing in Escambia County, Florida.

28.     The putative class members (hereinafter "Class Members") are all of the individuals confined at either TTS or TCR during the relevant statute of limitations period.

29.     Defendant Trinity Teen Solutions, Inc. (hereinafter "Defendant TTS" or "TTS") is a Wyoming corporation which operates a Wyoming State Residential Treatment Center in Park County, Wyoming with its principal place of business of at 112 Safe Haven, Powell, WY 82435. It may be served with process through its registered agent Defendant Angela C. Woodward at 64 Safe Haven, Powell, WY 82435.

30.     Defendant Triangle Cross Ranch, LLC[6] is a Wyoming limited liability company. Its principal place of business is 423 Road 1AF, Powell, WY 82435 and may be served with process through its registered agent Timothy D. Stewart at 1222 11th St., P.O. Box 1628, Cody, WY 82414. Defendant Gerald Schneider is listed as the Organizer with the Wyoming Secretary of State.

31.     Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee (hereinafter "Mystic Monk Coffee" or "MMC"), is a Wyoming Religious Corporation which packages and sells coffee and accessories. Mystic Monk Coffee's principal

---

[6] Triangle Cross Ranch, LLC operated without a license between 2012 – 2018. It was originally formed in 2012 as Triangle Cross Ranch, Inc. which was administratively dissolved in 2015. Gerald Schneider was at all times listed with the Wyoming Secretary of State as the Director.

place of business is 1079 Meeteetse Creek Rd., Meeteetse, WY 82433. It may be served with

process through its registered agent Daniel Schneider[7] at 31 Rd AFW, Powell, WY 82435.

      32.    Defendant Gerald ("Jerry") Schneider (hereinafter "Gerald Schneider") may be

served with process at 423 Road 1AF, Powell, WY 82435.

      33.    Defendant Michaeleen Schneider (hereinafter "Michaeleen Schneider") is the wife

of Gerald Schneider. She may be served with process at 423 Road 1AF, Powell, WY 82435.

      34.    Defendant Angela C. Woodward (hereinafter "Angela Woodard") may be served

with process at 64 or 112 Safe Haven, Powell, WY 82435. Angela Woodward is as an owner,

manager, and/or member of TTS and Dally-Up.

      35.    Defendant Jerry D. Woodward (hereinafter "Jerry Woodard") may be served with

process at 64 or 112 Safe Haven, Powell, WY 82435, and/or 89 Road 8RA, Powell, WY 82435.

Defendant Jerry is an owner, manager, and/or member of TTS and Dally-Up.

      36.    Defendant Father Daniel Schneider (hereinafter "Fr. Daniel Schneider") is the son

of Defendant Gerald Schneider and brother of Angela Woodward.  He is a monk and registered

agent of Mystic Monk Coffee. Additionally, Fr. Daniel Schneider is the President of the Monks of

the Most Blessed Virgin Mary of Mount Carmel.  Fr. Daniel Schneider may be served at 31 Rd

AFW, Powell, WY 82435.

      37.    Defendant Mathew Schneider (hereinafter "Mathew Schneider") is the son of

Gerald Schneider and may be served with process at either 423 Road 1AF, Powell, WY 82435 or

---

[7] Of note is the fact that Mystic Monk Coffee's registered agent is Defendant Gerald Schneider's son and Defendant
    Angela Woodward's brother.

402 Road 8VE, Powell, WY 82435. He is the Program Director and co-founder at both Mount Carmel Youth Ranch and at TCR[8].

38.     Defendant Mark Schneider (hereinafter "Mark Schneider") is the son of Gerald Schneider and may be served with process at 423 Road 1AF, Powell, WY 82435. He is the Ranch Manager at TCR.

39.     Defendant Kara Woodward (hereinafter "Kara Woodward") may be served at either 64 or 112 Safe Haven, Powell, WY 82435. Defendant Kara Woodward is an owner, manager, and/or member of TTS and Dally-Up. Also, Defendant Kara Woodward serves as the Staff Supervisor of TTS.

40.     Defendant Kyle Woodward (hereinafter "Kyle Woodward") may be served at either 64 or 112 Safe Haven, Powell, WY 82435. Defendant Kyle Woodward is an owner, manager, and/or member of TTS and Dally-Up. Also, Defendant Kyle Woodward is the Assistant Director and Marketing Director of TTS.

41.     Defendant Thomas George (hereinafter "Thomas George" or "Tom") may be served at 391 Road 1AF, Powell, WY 82435.  Thomas George served as Executive Director of Mount Carmel Youth Ranch and TCR.  Additionally, he served as Special Projects Manager and a Family Life Coach.

---

[8] Of note is the fact that Mathew Schneider runs Rocky Mountain Frontier, LLC, a Wyoming limited liability company that operates as another boys' ranch on the same land as TCR.

42.     Defendant Judith Jefferis (hereinafter "Judith Jefferis") may be served at 108 Road 8RA, Powell, WY 82435 or 2300 Hilltop View Road, PA 19320. Judith Jefferis is the owner/operator of Rock Creek Ranch.

43.     Defendant Dally-Up, LLC (hereinafter "Dally-Up"), is a Wyoming limited liability company which owns the land on which Trinity Teen Solutions, Inc. operates. Its principal place of business is 64 Safe Haven, Powell, WY 82435 and may be served with process through its registered agent Defendant Jerry D. Woodward at 89 Road 8RA, Powell, WY 82435. Defendant Angela Woodward is an owner and operator of Defendant TTS.

44.     Defendant Rock Creek Ranch, Inc. (hereinafter "Rock Creek Ranch" or "RCR"), is a Delaware corporation which operates the adjacent ranch to TTS in Wyoming. Its principal place of business is 108 Road 8RA, Powell, WY 82435. It may be served with process through its registered agent Marshall Hesson at 142 Road 8RA, Powell, WY 82435.[9]

45.     Defendant Diocese of Cheyenne is a Wyoming nonprofit corporation and a United States diocese of the Roman Catholic Church, with its principal place of business in Cheyenne, Wyoming. Its principal place of business is 2121 Capital Avenue, Cheyenne, WY 82001. It may be served with process to Jeffrey V. Nieters at the same address.

46.     Defendant Society of Our Lady of the Most Holy Trinity (hereinafter "SOLT") is a Texas corporation, and a Roman Catholic Religious Institute of Men, with its principal place of

---

[9]  While the Wyoming Secretary of State Business Entity Search lists Marshall Hesson as the registered agent for Rock Creek Ranch, Inc., Plaintiffs aver that Marshall Hesson no longer works for Rock Creek Ranch and now is self-employed at Beartooth M Cavvy and Kennel. Plaintiffs' aver that Judith Jefferis, the President/Director of Rock Creek Ranch, Inc. is more likely currently the proper agent to serve process upon.

business in Robstown, Texas. At all times material herein, SOLT operated ministries in and conducted activities through the Diocese of Cheyenne. It may be served with process to Father John P. Gaffney[10] at 1200 Lantthana, Corpus Christi, TX 78407.

47.     Defendant New Mount Carmel Foundation, Inc.[11] (hereinafter the "Foundation") is a Wyoming nonprofit corporation.  Its principal place of business is 1079 Meeteetse Creek Rd., Meeteetse, WY 82435. It may be served with process through its registered agent Father Nicholas T. Maroney (hereinafter "Fr. Maroney") at 31 Road AFW, Powell, WY 82435.  Additionally, Fr. Maroney is the Secretary and Director of the Monks of the Most Blessed Virgin Mary of Mount Carmel.

48.     This Court has both general and specific personal jurisdiction over Defendants because each Defendant has had substantial and continuous contact with Wyoming, the grounds that the claims asserted against it arise from its transaction of business within Wyoming and on the grounds that it has committed a tortious act within Wyoming.  Furthermore, Defendants' contacts and actions were directed toward Wyoming and thus warrant the exercise of personal jurisdiction over it.

---

[10] Of note is that Thomas George was the registered Agent of SOLT between 2006 – 2010 at 402 Rd 8ve, Powell, WY 82435 according to the Wyoming Secretary of State until SOLT allowed its status to shift to inactive as it chose to operate under its Texas business filings.

[11] Plaintiff avers that the sole purpose of the Foundation is the support of the monastery and that it is the sole source of significant support, therefore each hour of coerced child labor directly benefitted the Foundation with the knowledge and consent of its president, director, secretary, and other officers.

# IV.

## FACTUAL ALLEGATIONS

### A.    Summary of Class Allegations

49.    On, or about, May 1, 1997, Defendants Gerald and Michaeleen Schneider, established Mount Carmel Youth Ranch (hereinafter "MCYR"), which had a history of problems to include, but not limited to, staff and residents suffering severe and permanent injuries, multiple failures to report serious incidents to Department of Family Services, and serious questions regarding its interlocked profit-making and nonprofit operations. Mount Carmel Youth Ranch, later rebranded as TCR, depriving its minor residents of basic human necessities. The Schneiders forced residents to conduct mechanical work[12], construction work[13], or agricultural work[14] depending on the resident's skill set and the time of year. The Schneiders forced residents to work their separate horse and cattle businesses, which raised between 250 and 1,000 calves per year.

50.    Upon information and belief, Defendant Thomas George at all times relevant to this matter served as Executive Director of Mount Carmel Youth Ranch and TCR.   Additionally, he served as Special Projects Manager and a Family Life Coach.   Finally, he served the Catholic

---

[12] Mechanical work consisted of small engine repair, diesel mechanical work, installation of new transmissions, greasing vehicles, and general vehicle preventive maintenance and upkeep.

[13] Construction work consisted of constructing sheds and other permanent structures on the Triangle Ranch without any safety harnesses, equipment, or proper supervision.

[14] Agricultural work at TCR consisted mainly of feeding, grooming, branding, birthing, training, and overall taking care of hundreds to thousands of cattle, horses, and chickens daily.   Residents were responsible for branding, herding, inoculation, and general veterinary care of all TCR's animals to include Defendant Gerald Schneider's personal herd of cattle.

Church as a lay missionary member of SOLT for over twenty years. For six of those years as the International Regional Director of SOLT, directing the activities of Priests, Religious and Lay faithful within the Society. At all times relevant to these proceedings, he coordinated, approved, directed, and facilitated the use of child labor from MCYR and TCR at SOLT and other Catholic Church facilities.

51.     Upon information and belief, Defendant Gerald Schneider and Defendant Angela Woodward developed a joint scheme of operating for-profit businesses utilizing fraudulently obtained child labor under the guise of "Residential Treatment Centers" or "Group Homes," authorized to provide services to delinquent children by the Wyoming Department of Family Services.

52.     On or about, March 27, 2002, Defendants Angela Woodward and Jerry Woodard established TTS[15], a Wyoming corporation in Park County, following in Gerald Schneider's footsteps by depriving residents of basic human necessities while forcing residents to provide their labor through fear of physical and emotional harm and continued confinement.

53.     Defendants Angela Woodward and Jerry Woodward are the owners and operators of TTS. TTS sits on a 160-acre parcel located at 64 Safe Haven Road, Powell, WY 82435.

54.     Prior to 2010, Defendant Owners and TTS leased 64 Safe Haven Road from Judith Jefferis. The land was purchased by Defendant Dally-Up, LLC and its registered agent Defendant

---

[15] Defendant Angela also established Heavens Peak Behavioral Services, Inc. and operates it at the same principal address as TTS.  Upon information and belief, this for-profit corporation was set up as another means to bypass and defraud resident's insurance companies.

Jerry D. Woodward. Upon information and belief, the land was purchased through this shell company to avoid liability for Defendant Owners egregious conduct.

55.     Upon information and belief, in 2010 Defendant Owners and Defendant Judith Jefferis entered into a sale agreement, which included free labor and maintenance on Defendant Judith Jefferis' separate property located at 108 Road 8RA, Powell, WY 82435, and formally known as Rock Creek Ranch, in perpetuity. Plaintiffs and the putative class members have consistently provided forced labor to Defendant Judith Jefferis and Defendant Rock Creek Ranch since the 2010 sale, this labor includes, but is not limited to, fence repair, cattle branding, tagging cattle, cattle drives, and stacking hay. Plaintiffs and the putative class members never received any compensation for their work for Plaintiff Judith Jefferis or Rock Creek Ranch.

56.     At all times, Defendant Owners engaged in a recruitment scheme, whereby enticing parents of troubled minor teenagers across the United States and World to pay substantial sums of money under the guise that their children would receive cutting edge residential treatment, therapy, and continuing education. Defendant Owners failed to provide the requisite treatment, therapy, continuing education, or even basic human necessities[16].

---

[16] Plaintiffs and the putative class members were not even provided a restroom in their sleeping cabin at either facility. Plaintiffs and the putative class members were punished if they attempted to use the restroom at night. Class members were often forced to urinate on themselves in the middle of the night to avoid receiving a harsh punishment. Plaintiffs were limited to irregular five (5) minute showers, rarely more than every three (3) to four (4) days, for the vast majority of their time at both facilities. This led to constant UTIs, infections, and illnesses at TTS which were untreated because TTS had no medical physicians on staff. One class member was head butted by a horse, lost consciousness, chipped a tooth, and was never taken to a medical provider, despite requesting treatment. That same girl developed frost bite on her toes and TTS failed to take her to a doctor for months. Severe burns were common occurrences that were left untreated.

57.     Defendant Owners developed a relationship with Touchdown, Inc. a transport agency which, if used, would enter a class member's home in the middle of the night and legally abduct a minor child to transport them across the United States to Wyoming to force their labor to be used for the benefit or profit of Defendants. Class members would routinely have a medical or cement boot placed on their foot and leg or another apparatus to hinder their possibility of an escape.

58.     Defendant Trinity Owners and their agents developed and implemented a six (6) level system that was required to be completed to obtain discharge from TTS. Defendant Triangle Owners developed and implemented a two (2) level system that required obedience to obtain slightly improved food, clothing, and basic housing[17]. Defendant Owners and/or their agents began the systematic control of Plaintiffs and the putative class members by the threat of further confinement unless Plaintiffs and the putative class members completed all chores and ranch duties from day one. If Plaintiffs or putative class members failed to complete a single physical labor duty or chore, regardless of the reason, they would be subjected to a decrease in their level designation, which would lead to months of continued forced labor.

59.     Following introductions on their first day, Plaintiffs and the putative class members at TCR would immediately begin their forced labor for Defendants, while Plaintiffs and the putative class members at TTS immediately began their forced labor for Defendants for physical tasks not requiring the completion of the Ranch Safety Test.

_____

[17] When Plaintiffs and putative class members were upgraded to the Bunkhouse level they would have indoor plumbing, insulation, heat, and air.

60.     After day one, Plaintiffs and the putative class members at TTS would begin studying for the Ranch Safety Test all day, every day, until they passed in order for the Plaintiffs' and putative class members' labor to be fully exploited by Defendant Trinity Owners. During this time of focused study on the Ranch Safety Test, Plaintiffs and the putative class members at TTS received no residential treatment other than a single weekly meeting with a counselor and received no educational training related to school. Even after passing the Ranch Safety Test, Plaintiffs and the putative class members at TTS received no instructions from a certified educational teacher during crucial years of their educational development. Defendant Owners provided between zero and two hours of education daily which consisted only of online videos and coursework, not instructed by an in-person teacher[18].

61.     Plaintiffs and the putative class members conducted manual labor every day during their stay. The manual labor they performed varied daily but lasted the vast majority of the day and included the following: mucking out livestock stalls[19], irrigation, fixing damaged fence posts and restoring barbed wire fences on TTS and surrounding ranches, cleaning up after church events, cleaning multiple office buildings at TTS, cleaning all ranch equipment such as feeders, corrals, and troughs daily, cleaning the steel barn and animal barns, grooming all animals (cows, sheep,

[18] While it was possible to send a direct message to an instructor when a question regarding course work arose, using direct communication through the program's chat function would lead to immediate physical punishment. Plaintiff Nash avers that she witnessed another girl request assistance once and that girl was punished with 100 step ups and placed on a watch list to prevent her from messaging the instructor again. Additionally, no classwork completed by the class members was transferable and often class members had to repeat grades after leaving TCR and TTS.

[19] This was often referred to as the "Shrek Buffet" challenge. Girls would be forced to shovel a certain amount of manure by themselves for four hours straight. This occurred for some girls daily for months on end.

pigs, horses, dogs, goats, chickens, and cats) daily, physical animal showmanship, managing the

fires at the ranch, splitting fire wood, cooking all meals, doing all laundry, and cleaning all dishes

for staff and other class members, cleaning all living areas, and being forced to wash the feet of

staff and other class members nightly.

62.     Without proper training or oversight, the girls were forced to play an integral role

in the lambing and calving operations, including the late night and early morning checks during

the heart of winter. This included "preg checks," putting their arms elbow deep into the birth canal

of livestock to check for a fetus, providing medical attention to all animals, including, but not

limited to, lancing cysts on animals, tending to bloody, injured animals without gloves or proper

safety equipment, providing animals with vaccines and medications, castrating animals, and de-

tailing lambs, and other tasks that should be performed by an experienced ranch hand, not an

untrained, unsupervised teen with no prior farm or ranch experience. Plaintiffs and the putative

class members faced consequences if they refused to complete any of the tasks assigned to them.

63.     Defendants TTS, TCR, and Defendant Owners and/or their agents used or

threatened food and sleep deprivation, physical punishment, emotional abuse, and humiliation

daily to ensure compliance with the labor requirements.

64.     Plaintiffs and the putative class members felt as though they had no other choice

but to continue working for Defendants because any refusal or minor infraction would result in a

decrease in level classification, which caused additional months of forced labor, food or sleep deprivation, physical[20] or emotional punishment, or humiliation.

65. Defendant Gerald Schneider's son and Defendant Angela's brother, Fr. Daniel Schneider, is the registered agent and President of Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel, who do business as Mystic Monk Coffee. Fr. Daniel Schneider would arrive at TCR and request from his father, Defendant Gerald Schneider, labor that was needed at the monastery and he would transport TCR residents for forced labor at the monastery. Quite often Fr. Daniel Schneider would deliver pressure washers and other machines requiring small engine repair for boys assigned to mechanical work at TCR to complete at the Triangle Ranch.

66. Defendant Owners coordinated for the use of Plaintiffs' and the putative class members' labor to provide weekly cleaning and event set up services for the local churches and facilities owned by both Defendant Diocese of Cheyenne and Defendant SOLT.

67. Upon information and belief, Defendant Trinity Owner's children, Defendants Kara Woodward and Kyle Woodward, became active employees of TTS and at all times benefitted from the forced labor and human trafficking executed by Defendant Owners and TTS.

---

[20] The physical punishment that Plaintiffs and the putative class members at TTS would suffer included, but was not limited to, running miles on uneven terrain regardless of physical condition or weather, running up the "hill" which was covered with sharp rocks and rattle snakes, increased ranch duties or chores, reduced rations, sleep deprivation, and shoveling manure for hours at a time. The physical punishment that Plaintiffs and the putative class members at TCR would suffer included, but was not limited to, actual assault and battery,

68.     Upon information and belief, Defendant Triangle owner's children, Defendants Mathew Schneider and Mark Schneider, became active employees of TCR and at all times benefitted from the forced labor and human trafficking executed by Defendant Owners and TCR.

**B.     Violations of the named Plaintiffs' Rights.**

**i.     Plaintiff Sherman**

69.     Plaintiff Sherman was a resident at TTS on two separate occasions. Her first stay began May 2012 and lasted until July 2013. Her second stay began July 2014 and lasted until October 2015.

70.     A non-exclusive list of examples of the labor Plaintiff Sherman was forced to complete is as follows:

(a)     Cooking for twenty (20) people daily;

(b)     Shoveling manure for four hours a day every day by herself for a month and a half;

(c)     Picking rocks for multiple hours a day during the summer;

(d)     Completed hay runs and manually loading and unloading hay trucks every week and a half in the winter months;

(e)     Running irrigation pipes for multiple hours a day during the summer;

(f)     Frequently, but at irregular dates and times, fixing broken fencing and barbed wire;

(g)     Cleaning all ranch equipment daily, year round;

(h)     Cleaning office buildings, several daily, year round;

(i)     Cleaning steel barn and animal barns, daily;

(j)     Shoveling manure, daily;

(k)    Lambing shifts, every night in the winter months;

(l)    Feeding all animals (cows, sheep, pigs, horses, dogs, goats, chickens, cats), daily;

(m)    Grooming all animals (cows, sheep, pigs, horses, dogs, goats, chickens, cats), daily;

(n)    Providing medical attention to all animals, daily;

(o)    Cleaning ranch vehicles when forced;

(p)    Animal husbandry on Defendant Owners' children's 4H sheep; and

(q)    Cleaning at MMC.

71.    Plaintiff Sherman's forced labor occurred at TTS, Rock Creek Ranch, Maci Lucht's family ranch, Our Lady of the Valley Church, the monastery at which Defendant MMC was located, and the community recreation center.

72.    Plaintiff Sherman suffered mild frostbite on her fingers and still has capillary damage. She suffered multiple twisted ankles, ingrown toenails, yeast infections[21], lice, and she sustained injuries from falling on a cactus after being forced to run the hill. She did not receive medical treatment for her frostbite, first twisted ankle, first ingrown toenail, any yeast infections, lice, or lacerations from falling on rocks and cacti. She received medical treatment for the second ingrown toenail, but only after six weeks. She lost the toenail because of the medical treatment delay[22]. Plaintiff Sherman was routinely denied access to a restroom or latrine such that she was

---

[21] Plaintiff Sherman avers she only developed yeast infections occasionally on her first stay at TTS. However, she received them bi-monthly her entire second stay at TTS because the generator and washing machine kept breaking so class members could not shower and had no clean clothes for periods of time as long as two weeks at a time.

[22] Plaintiff Sherman attempted to document injuries with a disposable camera Defendant TTS staff provided her.

sometimes forced to urinate on herself while performing labor. When she did this, TTS staff would force the other residents to ridicule her while pointing and laughing.

73.     Plaintiff Sherman was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Sherman was threatened with, *inter alia*,:

(a)     Not being allowed to progress through the "levels" and thereby leave TTS;

(b)     Being made to perform additional labor;

(c)     Being made to perform even more undesirable tasks like shoveling manure;

(d)     Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

(e)     Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

(f)     Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours, weeks, or months;

(g)     Being deprived of sleep;

(h)     Being forced to wear signs around her neck containing humiliating statements;

(i)     Being subjected to verbal, psychological, and emotional abuse; and

(j)     When Plaintiff Sherman's mother[23] attempted to intervene on her behalf

---

However, Defendant TTS's staff would confiscate any pictures of her injuries after the disposable camera film was developed.

[23] Plaintiff Sherman's mother did not have the custodial right to remove Plaintiff Sherman from TTS.

Angela Woodard contacted the department of children's services in her home state and made allegations[24] of abuse against her in order to undermine her credibility and to continue coercing labor from Plaintiff Sherman. This action constitutes coercion through abuse of the legal process in violation of 22 U.S.C. §7102(1) & (3)(c).

**ii.      Plaintiff Gozun**

74.      Plaintiff Gozun was a resident at TTS on one occasion. Her stay began February 2, 2012 and lasted until August 1, 2012.

75.      Plaintiff Gozun's labor list[25] substantially mirrors Plaintiff Sherman's list.

76.      Plaintiff Gozun's forced labor occurred at TTS, Rock Creek Ranch, the local Catholic Church, Our Lady of the Valley Church, the Monastery, and the community recreation center.

77.      Plaintiff Gozun's stay was shorter than the typical class member's stay. Despite being informed by Plaintiff Gozun of her prior ankle surgeries and that she couldn't run on uneven ground, Plaintiff Gozun was forced to run miles over the rough terrain for her first month until her mother confronted TTS on the topic. Plaintiff Gozun frequently rolled her ankle during her stay at the ranch and was still required to continue hard labor, including, but not limited to running heavy irrigation pipes through uneven terrain. Additionally, Plaintiff Gozun suffered frequent burns and cuts from working the ranch and would be punished for becoming injured. Finally, Plaintiff Gozun

---

[24] Plaintiff Sherman avers these allegations were true. However, Plaintiff Angela has knowledge about the abuse for two (2) years and never reported it. Defendant Angela Woodward only reported the abuse when Plaintiff Sherman's mother began advocating for the proper treatment and release of her daughter from TTS.

[25] Additionally, Plaintiff Gozun was required to chop fire wood with an axe and participate in the "Fire Challenge" for weeks at a time where it was her responsibility to ensure the fire continued throughout the night which caused her to be sleep deprived.

suffered frequent UTIs from what she believes in the combination of holding her urine at night and the lack of adequate showers. Plaintiff was diagnosed with Hydronephrosis, which is often referred to as "Pilot's Bladder" from holding her urine. The only time she was required to hold her urine in her life was when she was at TTS. Finally, upon her release from TTS she was diagnosed with PTSD.

78.     Plaintiff Gozun was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Gozun was threatened with, *inter alia*:

(a)     Not being allowed to progress through the "levels" and thereby leave TTS;

(b)     Being made to perform additional labor;

(c)     Being made to perform even more undesirable tasks like shoveling manure;

(d)     Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

(e)     Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

(f)     Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours;

(g)     Being deprived of sleep;

(h)     Being forced to wear signs around her neck containing humiliating statements; and

      (i)      Being subjected to verbal, psychological, and emotional abuse.

### iii.    __Plaintiff Nash__

79.    Plaintiff Nash was a resident at TTS on one occasion. Her stay began May 7, 2015 and lasted until November 2015.

80.    A non-exclusive list of examples of the labor Plaintiff Nash was forced to complete is as follows:

      (a)      Cleaning[26] and laundry in all cabins, daily for three (3) separate two (2) week periods between May 2015 and November 2015;

      (b)      Cooking[27] for twenty (20) people daily for three (3) separate two (2) week periods between May 2015 and November 2015;

      (c)      Shoveling mostly sheep feces for multiple hours a day every day from May 2015 until November 2015;

      (d)      Completed hay runs and manually loading and unloading hay trucks during July 2015 for approximately one (1) week;

      (e)      Running irrigation pipes[28] for multiple hours a day from June 2015 until August 2015;

---

[26] Plaintiff Nash avers that all cleaning had to be done prior to bed and she could not go to sleep unless her tasks were completed. She had to clean a single pan for approximately three (3) hours one night even though the pan had reached the end of its life span. She would suffer physical punishment if she failed to or refused to complete her cleaning chores timely. At all times, the fear of having her level dropped to continue her imprisonment was also present. During this time she was also responsible for cleaning all the toilets and showers.

[27] Plaintiff Nash avers that without any training or food ordering experience she was required to calculate the Sysco food order based off portion sizes for all girls present during her time and staff members. Without any supervision she executed a nearly perfect Sysco food order, only ordering a single additional can of tomato sauce. She was forced to run the dangerous hill as physical punishment for nearly being perfect in a task that she received no training or supervision. Defendant Trinity Owners followed a strict portioning guideline providing each girl with the exact same amount of substandard food. In the event food handler exceeded the exact food proportions they were physically punished.

[28] Plaintiff Nash avers that she suffered cuts on her legs and arms from the irrigation pipes. She was designated the leader operating the dangerous high-pressure connections of the irrigation pipes without training or supervision.

(f)     Picking rocks for multiple hours a day during the summer;

(g)     Plaintiff Nash was a member of the dead animal disposal team and was responsible for transporting deceased animals to the dead animal pit without any training, supervision, or safety equipment such as masks or gloves; and

81.     Plaintiff Nash's forced labor occurred predominately at TTS.

82.     Plaintiff Nash was assigned the duty of taking care of full-size goat for a three-month[29] period during the summer of 2015. This care consisted of daily feeding, cleaning, mucking out its cage, walking it to and from her school classes and overall being responsible for the goat for 24 hours a day. Plaintiff Nash had no previous animal handling experience. The goat would quite often drag her, headbutt her, and bite her. On multiple occasions she informed staff of the physical injuries she was suffering from the animal and was dismissed, humiliated, and belittled.

83.     For physical punishment Plaintiff Nash was forced to run up and down the small hill every morning and afternoon from May 2015 until November 2015. Plaintiff Nash was forced to run up and down the larger hillside in July 2015. She was also subjected to constant step-ups and pushups.

84.     Plaintiff Nash was under the disability of minority until November 28, 2017. Accordingly, Plaintiff Nash's statute of limitations was tolled until that date. As such she had three years from that date in which to bring state law tort claims.

85.     Plaintiff Nash specifically alleges that Defendants TTS and all of the Woodard Defendants owed her a duty of care as a child placed exclusively in their care, custody, and control.

---

[29] Generally, a chore would last for approximately two weeks and then rotate to a new chore. Plaintiff Nash was told she was assigned the Goat Duty chore because the goat was stubborn, just like her.

She further alleges that Defendants TTS and all of the Woodard Defendants breached that duty when they permitted TTS staff and others to subject her to the abusive conduct described above[30]. Further, as a direct and proximate result of said breach, Plaintiff Nash suffered damages including to include Post-Traumatic Stress Disorder and physical and psychological pain and suffering.

86.    Plaintiff Nash was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause her to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Nash was threatened with, *inter alia*:

(a)    Not being allowed to progress through the "levels" and thereby leave TTS;

(b)    Being made to perform additional labor;

(c)    Being made to perform even more undesirable tasks like shoveling manure;

(d)    Being forced to subsist on a diet of only half a can of cold kidney beans and half a can of olives for every meal;

(e)    Being forced to run "the hill," which was a dangerous, rocky, and steep hill inhabited by rattlesnakes on which she and others routinely injured themselves;

(f)    Being forced to sit in a chair staring at a wall for extended periods of time, sometimes many hours;

(g)    Being deprived of sleep;

(h)    Being forced to wear signs around her neck containing humiliating

---

[30] Plaintiff Nash has grown and matured since the traumatic experiences she suffered at the hands of Defendants. She is a Child Development Association Certified lead teacher dealing with toddlers. She is a mandatory reporter now and avers that she would have a legal duty to report all the events that occurred to her and other class members if she were to even catch wind of such allegations.

statements; and

(i)      Being subjected to verbal, psychological[31], and emotional abuse[32].

**iv.      Plaintiff Doe**

87.      Plaintiff Doe was a resident at TCR on one occasion. His stay began mid May 2011[33] and lasted until December 20, 2011.

88.      A non-exclusive list of examples of the labor Plaintiff Doe was forced to complete is as follows:

(a)      Welding every day during the three (3) month harvest season;

(b)      Daily mechanical repairs to include, but not limited to, repairs on tractors, greasing vehicles, rebuilding, and installing transmissions, and repairing pressure washers on both TCR and monastery equipment;

(c)      Running irrigation pipes for multiple hours a day for six days a week including but not limited to ditch irrigation, dam irrigation, and gate irrigation;

(d)      Constructing a 40 x 60 steel barn with no safety equipment or harnesses;

(e)      Shoveling manure, daily;

(f)      Feeding all animals (cows, horses, and chickens), daily;

---

[31] The girls showered inconsistently, but rarely more than once every 3-4 days. She asked a TCS staff member, Jill, if she could use the restroom at night and was told no and belittled. Having no control over the situation she was forced to urinate on herself and had to wear her urine-soaked clothes for multiple days until it was her day to shower.

[32] Plaintiff Nash avers that changing feminine products was a major issue as staff controlled their ability to use the restroom and would routinely deny residents the ability to change their feminine products.

[33] Of note is the traumatic experience Plaintiff Doe suffered at the hands of his transportation services which was believed to be recommended by Defendant Triangle Owners. He was placed in a cement boot and forced to wear a four point restraint consisting of a belt and attached handcuffs and ankle restraints despite not being a delinquent and there being no legitimate reason to treat him as a delinquent or a flight risk.

(g)     Grooming all animals, daily;

(h)     Working for Tom George's seed business, Big Horn Saindfoint; and

(i)     Providing medical attention to all animals, daily.

89.     Plaintiff Doe's forced labor occurred at TCS and he provided mechanical labor to the Monastery.

90.     Plaintiff Doe's stay was shorter than the typical class member's stay. Despite being informed by Plaintiff Doe of his excruciating anal pain for months Defendant Triangle Owners forced Plaintiff Doe to work for months without proper medical treatment. Plaintiff Doe eventually required an Anal Sphincteroplasty to repair his chronic anal sphincter muscle tear. Rather than properly treat Plaintiff Doe, Defendant Triangle Owners attempted to medicate Plaintiff Doe with Diphenhydramine[34] to keep him docile. After his surgery, Plaintiff Doe served as Defendant Triangle Owners' personal aide during his recovery.

91.     Plaintiff Doe was coerced into performing the labor in question by coercion within the meaning of 22 U.S.C. § 7102 through threats of serious harm to or physical restraint and through a scheme, plan, or pattern intended to cause him to believe that failure to perform an act would result in serious harm or physical restraint. Specifically, Plaintiff Doe was threatened with, *inter alia*:

(a)     Not being allowed to progress to the "Bunkhouse level" and thereby obtain basic human living standards or obtaining the possibility of leaving TCR early;

---

[34] Diphenhydramine is an over the counter substitute for Benadryl. A recommended therapeutic dose is 25 – 30 mg. It is not clinically recommended to exceed 300 mg daily, yet Defendant Triangle Owners forced Plaintiff Doe to consume between a 200 – 300 mg morning does and a 500 – 1000 mg nightly dose.

(b)     Being made to perform additional labor;

(c)     Being made to perform even more undesirable tasks like shoveling manure;

(d)     Being forced to subsist on a diet of insects[35];

(e)     Being deprived of sleep;

(f)     Being deprived of basic human living needs, such as heat, air, running water, and a mattress; and

(g)     Being subjected to physical[36], verbal, psychological, and emotional abuse[37].

**C.     Uniform Damages to the Plaintiffs and the Class Members for Forced Labor.**

92.     Plaintiffs and the putative class members have sustained damages as the result of the unlawful use of their labor proximately caused by Defendants' acts. These damages include two three types.

93.     First, Plaintiffs and the putative class members are entitled to recover restitution damages under the TVPRA at least at the prevailing wage rate. Limiting TVPRA victims to the FLSA remedy would *inappropriately* afford criminals engaged in egregious practices the benefit of the lowest common-denominator minimum wage for legitimate employers. Plaintiffs and the putative class members are entitled to compensation for services provided at the same rates

---

[35] Plaintiff Doe avers that he was 23 years old before he realized that most people in America had never had to eat insects. Plaintiff Doe recalls the flavors of different bugs that he had to consume because he and other residents were so hungry. Plaintiff Doe would throw up and swallow it back down just to make himself feel full. Plaintiff Doe lost 90 lbs. in eight (8) months going from 255 lbs. to 155 lbs. due to the malnutrition.

[36] Plaintiff Doe avers he was physically assaulted by Defendant TCR's agent Tom on two separate occasions.

[37] Each staff member had the discretion to punish Plaintiff Doe at his own discretion and staff changed often.

received by others who voluntarily provide those same services. *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1172 (D. Kan. 2018).

94.     Plaintiffs assert that each named Plaintiff and each Class Member is entitled to $16.31[38] per hour of labor for the first forty hours per week and $24.47 per hour for every hour afterwards. Plaintiffs allege that a typical day consisted of ten to twelve hours of labor, two to five hours of sham therapy and/or education, and approximately two-and-one-half hours of hygiene and meals.

95.     Upon information and belief, Plaintiffs anticipate that at least 100 Class Members were unlawfully forced to work an average of eleven-and-one-half hours per day.  Plaintiffs contend that at any given time approximately twelve girls were forced to labor at TTS. Additionally, Plaintiffs contend that at any given time approximately twenty-three boys were forced to labor at TCR.

96.     Second, Plaintiffs and the Class Members are entitled to recover compensatory damages for emotional distress to redress noneconomic harm related to the squalid, restricted, and threatening working/living conditions imposed on TVPRA victims. Courts have awarded damages to trafficking victims subjected to forced labor in amounts ranging from $415 to $780 per day. *Id.* at 1173-74. Plaintiffs contend that they should be awarded $780 per day due to the especially vulnerable nature of the Class, all of whom were minor children suffering from mental and emotional health problems, family distress, or addiction issues that rendered them especially

---

[38] Prevailing hourly wage for farm labor based on the May 2019 Department of Labor's office of Occupational and Employment Statistics.

vulnerable to abuse. Plaintiffs and the Class seek an award of such compensatory damages in amount to be proven at the trial.

97.     Plaintiffs allege that they and the Class should also be permitted to recover any sums that TTS and TCR were paid during their residence at either TTS or TCR relative to their putative "treatment" or housing. Plaintiffs are without knowledge of the precise sums in issue, but, on information and belief, these sums ranged between $6,000 and $9,000 per month per child.

98.     Plaintiff Nash and those similarly situated have, in addition, been diagnosed with Post-Traumatic stress disorder which is the direct and proximate result of negligence described herein. Their damages, in an amount to be shown to the Court, are substantially similar as the cost of treatment and therapy for Post-Traumatic Stress Disorder is relatively uniform. The types of symptoms that she and others similarly situated experience are similar enough that the Court can effectively compensate them as a subclass. Further, due to the fact that the TVPRA damages in this case are well into the tens of millions of dollars, Plaintiffs allege that their damages would need to be recovered from limited funds of the type contemplated by the Supreme Court in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

99.     Plaintiffs reserve the right to amend this allegation based upon the discovery that will be conducted in this action.

**V.**

**CLASS ACTION ALLEGATIONS**

100.    The named Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) of

the Federal Rules of Civil Procedure, and pursuant to Rules 23(b)(1), 23(b)(2) and/or 23(b)(3)

defines the class as follows:

> From November 27, 2010 to the present, Plaintiffs, and all similarly situated
> persons who were housed at either Defendant Trinity Teen Solutions, Inc. or
> Defendant Triangle Cross Ranch, LLC and forced to provide manual labor to
> one or more of the Defendants.

101.    Plaintiff Nash represents a subclass defined as:

> From November 27, 2017 to the present, Plaintiffs, and all similarly situated
> persons within the applicable statute of limitations who were housed at
> Defendant Trinity Teen Solutions, Inc. who, due to the negligence of Defendant
> TTS, have been diagnosed with or suffer from Post-Traumatic Stress Disorder.

102.    **Numerosity.** The requirements of Rule 23(a)(1) are satisfied in that there are too

many Class Members for joinder of all of them to be practicable.  Upon information and belief,

these Class Members exceed at least 100 in number. Upon information and belief, the Subclass

Members exceed at least 50 in number.  This Class and Subclass, as defined above, meet the

numerosity requirement.

103.    **Commonality.** The claims of the Class Members raise numerous common issues

of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and

factual questions, which may be determined without the necessity of resolving individualized

factual disputes concerning any Class Member.

104.    This action involves questions of law common to the class, including:

(i)     Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1589, 1590, 1593A, and 1594);

(ii)    Whether Defendants' are associated in fact and an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

(iii)   Whether Defendants' engaged in a pattern and practice of human trafficking and forced labor in violation of 18 U.S.C. §§ 1589 & 1590;

(iv)    Whether Defendants' activities constituted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5);

(v)     Whether Plaintiffs and members of the putative class are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c);

(vi)    As to the subclass, whether Defendants negligent conduct caused psychological injuries to Plaintiffs within the subclass;

(vii)   Whether Defendants regularly advertised and moved goods and people across state lines and engaged in interstate commerce; and

(viii)  The nature of damages available to Plaintiffs and members of the putative class, including the applicability of compensatory and/or punitive damages.

105.    This action involves questions of fact common to the class, including:

(i)     Whether Defendants used and/or threatened Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

(ii)   Whether Defendants' recruited, harbored, transported, obtained and/or provided Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

(iii)  Whether Defendants' knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through physical restraint, serious harm, and/or abuse of the legal process;

(iv)   Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

(v)    Whether Defendants used standardized recruitment, record-keeping, and employment policies and practices for Plaintiffs and putative class members; and

(vi)   The source and amount of Plaintiffs' and other class members' damages.

106.   **Typicality**.  The claim of the named Plaintiffs is typical of the unnamed Class Members because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3). For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendant engaged.

107.   **Adequacy of Representation.**  The requirements of Rule 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims

on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class and has no conflict with any other member of the Class.

108.    Further, Plaintiffs have retained competent counsel experienced in class action litigation, to represent them and the Class Members in this litigation. To wit, Plaintiffs' chosen counsel consists of:

(a)     Michael Rosenthal and Nathan Nicholas of Hathaway & Kunz, LLP are licensed members of the Wyoming State Bar in good standing and will serve as Local Counsel for this action. For more than 35 years Mr. Rosenthal's practice has primarily been focused on personal injury, representing both plaintiffs and defendants in litigation, trials and appeals. He has appeared in litigation before all of Wyoming's Federal Court Judges and Magistrate Judges, as well as in every state judicial district court. His experience includes involvement in several class action lawsuits in both federal and state courts within Wyoming. He is well-versed in local practices, rules and procedures. Mr. Rosenthal and the rest of the Plaintiffs' counsel will be assisted by Nathan Nicholas, an associate and litigator at Hathaway & Kunz, LLP.

(b)     Frank Watson of Watson Burns, PLLC has successfully prosecuted class actions in numerous matters, including, but not limited to, class action suits brought against law

firms for charging and collecting unlawful fees and expenses. *See, e.g., Howard et al v. Wilkes & McHugh, P.A.*, Case No. 2:06-cv-02833-JMP-cgc (W.D. Tenn. Filed 2006)(appointing Watson Burns, PLLC as Class Counsel and ultimately approving $4 million settlement in connection with overcharged legal fee); *Manjunatha A. Gokare, P.C. and Goldstein, Borgen, Dardarian & Ho, P.C. v. Federal Express Corporation, et al.*, Case No. 2:11-cv-2131-JTF-cgc (W.D. Tenn. Filed Nov. 11, 2011)(appointing Watson Burns co-lead class counsel representing nationwide class in breach of contract and RICO claims against international freight shipper alleging overcharging for residential delivery surcharge fees for delivers made to non-residential locations; nationwide class was certified and a settlement of $26 million was approved); *Youngblood v. Linebarger, Goggan, Blair & Sampson, LLP*, Case No. 10-cv-2304 SHM-tmp (W.D. Tenn. filed Mar 10, 2010)(Watson Burns appointed lead class counsel representing plaintiff class of 48,000 delinquent taxpayers against Texas law firm alleging that Linebarger charged and received an unlawful legal fee from taxpayers when pursuing property tax collection suits on behalf of the City of Memphis; the class was certified and ultimately settled for $7.4 million); *Ham v. Swift Transportation Co., Inc.*, 275 F.R.D. 475 (W.D. Tenn. 2011)(Watson Burns appointed co-lead class counsel representing plaintiff class against national trucking company challenging the testing practices of a commercial truck driving; class-wide settlement case achieved for compensatory damages and debt write off valued in excess of $17 million).

(c)     Additionally, Plaintiffs' chosen counsel includes Brice M. Timmons of Donati

Law, PLLC. Mr. Timmons is a distinguished member of the Tennessee Bar, the Memphis

Bar, and the American Bar Associations. His practice focuses almost exclusively on civil

rights violations committed by public and private actors specifically including municipal

governments, jails, prisons, private prison contractors, and educational institutions. Mr.

Timmons has significant experience representing disabled, minor plaintiffs in suits against

their caregivers and educational institutions. Mr. Timmons has handled and/or tried

hundreds of cases during that time period. Mr. Timmons has also been appointed class

counsel in two civil rights actions, specifically *Busby v. Bonner*, 2:20-cv-02359 (TNWD,

2020), in which, along with the American Civil Liberties Union and others, he represents

a class of incarcerated persons who are especially vulnerable to COVID-19 on claims

arising under various federal civil rights statutes; and *Turnage v. Oldham*, 2:16-cv-02907

(TNWD, 2016) in which he represents a class of persons subjected to over detention due

to the employment of a faulty software package to operate the county jail and criminal

courts in claims arising under 42 U.S.C. §1983 and Tennessee common law.

109.   **Predominance and Superiority.**  All of the requirements for Rule 23(b)(3) are

satisfied because the common factual and legal issues identified above are sufficiently cohesive to

warrant adjudication by representation.  In particular, the Plaintiffs and the Class Members have

suffered a common cause of injury, namely the forced labor of Plaintiffs and the Class Members,

caused by the common course of conduct engaged in by Defendants. The Class Members' legal

claims arise under 18 U.S.C. § 1581 *et seq.* and 18 U.S.C. § 1961 and Wyoming law and, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. *Zuccarini v. Hoechst (In re Cardizem CD Antitrust Litig.)*, 200 F.R.D. 326, 335 (E.D. Mich. 2001)("Differences in damages sustained by individual class members does not preclude a showing of typicality nor defeat class certification"); *Bremiller v. Cleveland Psychiatric Inst.*, 898 F. Supp. 572, 579 (N.D. Ohio 1995)("The above-cited caselaw demonstrates that the existence of individual damages is not enough to defeat class certification on the commonality element. Therefore, the court declines to decertify the class on this basis") As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

# VI.

## CAUSES OF ACTION

### COUNT 1 – CIVIL ACTION UNDER FEDERAL LAW FOR FORCED LABOR
### 18 U.S.C. § 1589(a)

### (AGAINST DEFENDANTS TTS, TCR, GERALD SCHNEIDER, MICHAELEEN SCHNEIDER, ANGIE WOODWARD, JERRY WOODWARD, DANIEL SCHNEIDER, MATHEW SCHNEIDER, MARK SCHNEIDER, KARA WOODWARD, AND KYLE WOODWARD)

110.   Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

111.   Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq*.

112.   Defendants knowingly provided or obtained the labor services of Plaintiffs and members of the putative class by means of force, threats of force, physical restraint, or threats of physical restraint in violation of 18 U.S.C. § 1589(a).

113.   Defendants knowingly provided or obtained the labor services of Plaintiffs and members of the putative class by means of serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a).

114.   Defendants knowingly provided or obtained the labor services of services of Plaintiffs and members of the putative class by means of a scheme, plan, or pattern intended to cause services of Plaintiffs and members of the putative class by means to believe that, if they did

not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a).

115.   As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

116.   As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT 2 – CIVIL ACTION UNDER FEDERAL LAW FOR FORCED LABOR
### 18 U.S.C. § 1589 (b)

### (AGAINST ALL DEFENDANTS)

117.   Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

118.   Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq.* and may recover reasonable attorney's fees.

119.   Defendants knowingly benefitted financially and/or received things of value from participating in a venture which had engaged in the providing or obtaining of forced labor or services, knowing or in reckless disregard of the fact that the venture had engaged in the providing or obtaining of forced labor or services in violation of 18 U.S.C. § 1589(b).

120.     As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

121.     As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT 3 – CIVIL ACTION UNDER FEDERAL LAW FOR TRAFFICKING
### 18 U.S.C. § 1590(a)

### (AGAINST ALL DEFENDANTS)

122.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

123.     Pursuant to 18 U.S.C. § 1595(a), Plaintiffs and members of the putative class are entitled to bring a civil action against the perpetrator (or whoever knowingly benefits financially or by receiving anything of value from participating in a venture which that persons knew or should have known engaged in an act in violation of 18 U.S.C. § 1581 *et seq.* and may recover reasonable attorney's fees.

124.     Defendants knowingly recruited, harbored, transported, provided, and/or obtained by any means Plaintiffs and members of the putative class for their labor or services in violation of 18 U.S.C. § 1590(a).

125.     Defendants knowingly benefitted financially and/or by receiving things of value from participating in a venture which engaged in the trafficking of forced labor by any of the means described herein, knowing or in reckless disregard of the fact that the venture was engaged in the trafficking of forced labor or services by any of such means.

126.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

**COUNT 4 – CIVIL ACTION FOR VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. S 1961 *ET SEQ.***

**(AGAINST DEFENDANTS TTS, TCR, GERALD SCHNEIDER, MICHAELEEN P. SCHNEIDER, ANGELA WOODWARD, JERRY D. WOODWARD, DANIEL SCHNEIDER, MATHEW SCHNEIDER, MARK SCHNEIDER, KARA WOODWARD, KYLE WOODWARD, THOMAS GEORGE, JUDITH JEFFERIS)**

127.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

**A.    Prohibited Conduct and Civil Remedies under RICO**

128.    Pursuant to 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO), "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity..."

129.    Pursuant to 18 U.S.C. § 1964(c) "any person injured in his business or property by reason of a violation of section 1962 of [RICO] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee..."

130.    The essential elements of a civil RICO claim require that the plaintiff plausibly allege that each defendant (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.

131.    As alleged herein, Defendants Gerald Schneider, Michaeleen P. Schneider, Angela Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas George, Judith Jefferis (hereinafter referred to collectively as the "Individual RICO Defendants") each conducted the affairs of TTS and TCR through a pattern of racketeering activity by repeatedly violating 18 U.S.C. §§ 1589 & 1590.

132.    Each of the Individual RICO Defendants constitute a "person" within the meaning of 18 U.S.C. § 1961(3).

**B.    The RICO Enterprises**

133.    TTS is a corporation which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4)

134.    TCR is a limited liability company which is distinct, separate and apart from the Individual RICO Defendants and thus constitutes a RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4)

135.    Pleading in the alternative, the Individual RICO Defendants in combination with Defendants TTS and TCR formed an associated in fact enterprise (hereinafter referred to as the "Association In Fact Enterprise") and as such  constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4). With respect to the Association In Fact Enterprise, Defendants TTS and TCR both constitute a "person" within the meaning of 18 U.S.C. § 1961(3).

136.    At all relevant times as described in this Complaint, the Individual RICO Defendants have engaged in operating the affairs of TTS and TCR for over ten (10 years for the

purpose of executing essential aspects of a criminal worker exploitation scheme in violation of 18 U.S.C. §§ 1589 & 1590.

137. Pleading in the alternative, the Individual RICO Defendants in combination with Defendants TTS and TCR have engaged in operating the affairs of the Association In Fact Enterprise for over ten (10) years for the purpose of executing essential aspects of a criminal worker exploitation scheme in violation of 18 U.S.C. §§ 1589 & 1590.

**C.    The Pattern of RICO Predicate Acts**

138. Defendants named herein, through TTS and TCR and through the Association In Fact Enterprise have been engaged in the pattern and practice of human trafficking and forced labor as described in this Complaint in violation of, among other laws, 18 U.S.C. §§ 1589 & 1590.

139. The predicate acts of criminal racketeering activity as described in this Complaint constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Defendants repeatedly committed the RICO predicate act of human trafficking and forced labor as alleged above and profited from same.

140. The Defendants named herein regularly moved goods and people across state lines and therefore were engaged in interstate commerce.

**D.    Continuity of the Criminal Activity**

141. The Defendants' pattern of racketeering activity alleged above has lasted in duration since at least 2012, injuring hundreds if not thousands of minors. These predicate act violations are in no way isolated nor were they directed at a small, finite number of persons. To the contrary, Defendants' predicate acts have not only continued without interruption for approximately ten (1)

years or more, but their unlawful activities can and will extended to future victims unless and until they are brought to justice. Thus, the pattern of racketeering in this matter constitutes "open ended continuity."

**E.      RICO Injury to Plaintiffs and the Putative Class**

142.    Plaintiffs and members of the putative class are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c) because Defendants trafficked Plaintiffs and members of the putative class around the United States and forced them to perform labor services without compensation.

143.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and members of the putative class are entitled to threefold the damages they sustained and the cost of the suit, including a reasonable attorney's fees.

144.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

145.    As a result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT 5 – NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## (AGAINST DEFENDANT TRINITY TEEN SOLUTIONS, DALLY-UP, LLC, DIOCESE OF CHEYENNE, AND SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY)

146.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

147.    Defendants TTS, Dally-up, SOLT, and the Diocese of Cheyenne owed Plaintiff Nash and the Subclass a duty of care and did breach that duty of care through the acts complained of herein.

148.    Defendant TTS, acting through its employees and agents, by extreme and outrageous conduct recklessly caused Plaintiff Nash and others similarly situated severe emotional distress and/or bodily harm through conduct described herein that goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community. She, and others similarly situated, suffered as distress so severe that no reasonable person could be expected to endure it and she and others similarly situated have, in fact, suffered from and required treatment for Post-Traumatic Stress Disorder..

149.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the putative class suffered economic damages, for which they should be compensated.

150.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the putative class suffered emotional and physical pain and suffering for which they should be compensated.

## VII.

### **PRAYER FOR RELIEF**

WHEREFORE, the named Plaintiffs and the Class Members demand judgment against Defendants Trinity Teen Solutions, Inc., Triangle Cross Ranch, LLC., Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee, Gerald ("Jerry") Schneider, Michaeleen P. Schneider, Angela ("Angie") Woodward, Jerry D. Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas George, Jefferis Jefferis, Dally-Up, LLC, Rock Creek Ranch, Inc., Diocese of Cheyenne, Society of Our Lady of the Most Holy Trinity, and the New Mount Carmel Foundation, Inc., on each Count of the Complaint and pray for the following relief:

1.  Issue an Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel to represent the Class, and directing that reasonable notice of this action be given by Defendants to all Class Members;

2.  Grant any reasonable request to Amend Plaintiffs' Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

3.  Empanel a jury to try this matter;

4.  Award each plaintiff Class Member and Subclass Member compensatory damages who has suffered same in an aggregate amount to be proven at the trial;

5.  Award Plaintiff Nash and each Subclass Member additional compensatory damages who has suffered same in an aggregate amount of not less than $5,000,000.

6.     Award Plaintiffs threefold damages and reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

7.     Award Plaintiffs' their reasonable attorney's fees, pursuant to 18 U.S.C. § 1595;

8.     Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

9.     Award pre-and post-judgment interest in the amount of 10% per annum in an amount according to the proof at trial; and

10.     Grant the Plaintiff and Class Members such further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

PURSUANT TO RULE 38 F.R.C.P., PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES TRIABLE OF RIGHT BY A JURY.

DATED this **25th** day of November, 2020.

> Carlie Sherman, Anna Gozun, Amanda Nash, and John Doe, on behalf of themselves and all similarly situated persons, PLAINTIFFS
>
> By: _____
>     Michael Rosenthal, WSB #5-2099
>     Nathan Nicholas, WSB #7-5078
>     Hathaway & Kunz, LLP
>     P.O. Box 1208
>     Cheyenne, WY  82003-1208
>     (307) 634-7723
>     Fax: (307) 634-0985
>     mike@hkwyolaw.com
>     nnicholas@hkwyolaw.com

Brice M. Timmons (TN Bar #29582)
Bryce Ashby (TN Bar #026179)
Craig Edgington (TN Bar #038205)
*Pro Hac Vice Pending*
Donati Law, PLLC
1545 Union Ave.
Memphis, TN  38104
(901) 209-5500
Fax: (901) 278-3111
brice@donatilaw.com
bryce@donatilaw.com
craig@donatilaw.com

Frank L. Watson, III (TN Bar #015073)
*Pro Hac Vice Pending*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN  38104
(901) 529-7996
Fax: (901) 529-7998
fwatson@watsonburns.com

ATTORNEYS FOR PLAINTIFFS AND
PUTATIVE CLASS MEMBERS

# EXHIBIT A



# TRINITY TEEN SOLUTIONS, INC.

*A journey that enriches her mind, body, and soul*



This handbook does not constitute a contract with Trinity Teen Solutions, Inc., either express or implied, and Trinity Teen Solutions, Inc. reserves the right at any time to change, delete, or add to any of the provisions at its sole discretion. Furthermore, the provisions of this handbook are designed by Trinity Teen Solutions, Inc. to serve as guidelines rather than absolute rules, and exceptions may be made from time to time on the basis of particular circumstances.

# Parent Handbook

**Trinity Teen Solutions, Inc.**
89 Road 8 RA   Powell, WY 82435
Phone (307) 645-3384   Fax (307) 645-3385
Email: admissions@trinityteensolutions.com
Web page:  www.trinityteensolutions.com

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

Parents are striving to help their daughter's from their self-destructive path.  You are responding to only what she has not been able to successfully hide from you.  You asked for help knowing only the tip of the ICEBERG! Trinity's goal is to discover and heal the hidden part of the iceberg.

*"No person can consistently behave in a way that's inconsistent with the way they perceive themselves"*

This picture of an iceberg illustrates nicely the work that we have in store for us.



Now you know why the Titanic sank.
This photograph came from a Rig manager for Global Marine Drilling in St. John, Newfoundland.
They actually have to divert the path of these things away from the rig by towing them with ships.
In this particular case the water was calm and the sun was almost directly overhead so that the diver was able to get into the water and click this picture.
They estimated the weight at 300,000,000 tons

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# PARENT HANDBOOK
# TABLE OF CONTENTS

WELCOME TO TRINITY TEEN SOLUTIONS..............................................................- 5 -

HOW TO CONTACT TRINITY ..............................................................................- 6 -

WHAT YOU CAN EXPECT FROM TRINITY............................................................- 8 -

PROGRAM PHILOSOPHIES .................................................................................- 9 -

TREATMENT APPROACHES ...............................................................................- 12 -

FAMILY SYSTEM THERAPY ...............................................................................- 14 -

GROUP THERAPY TOPICS ................................................................................- 16 -

ACADEMIC PROGRAM.......................................................................................- 17 -

NUTRITION: A VALUABLE COMPONENT...........................................................- 18 -

SUGAR'S IMPACT ON BEHAVIOR......................................................................- 19 -

GIRL'S TYPICAL DIET .......................................................................................- 20 -

NUTRITIONAL SUPPLEMENT PROGRAM ..........................................................- 21 -

PHYSICAL ACTIVITY .........................................................................................- 22 -

SPIRITUAL PROGRAM ......................................................................................- 23 -

YOUR DAUGHTER'S JOURNEY .........................................................................- 25 -

WHAT IS MY PART AS A PARENT .....................................................................- 28 -

PARENTAL INVOLVEMENT IN TREATMENT.......................................................- 29 -

WHAT MAKES A PERSON CHANGE?.................................................................- 30 -

THE CORRIDOR OF SUCCESS...........................................................................- 33 -

AVOIDING PITFALL DURING HER TREATMENT.................................................- 34 -

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

PHONE CALLS ....................................................................................... - 38 -

RULES OF PARTICIPATION FOR PHONE CALLS ............................................ - 39 -

MAIL AND PHOTOS ............................................................................... - 41 -

GIFTS .................................................................................................. - 43 -

VISITATION .......................................................................................... - 44 -

CLOTHING AND PERSONAL POSSESSIONS ................................................ - 47 -

MEDICAL CONCERNS ............................................................................ - 48 -

COMMON MISTAKES PARENTS MAKE AFTER DISCHARGE........................... - 49 -

RECOMMENDED READING FOR PARENTS .................................................. - 51 -

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Welcome to Trinity Teen Solutions!

Dear Parents:

We would like to welcome you, your daughter, and your entire family to Trinity Teen Solutions, Inc. We want you to know that we understand how difficult it is for parents to make this decision to have their daughter placed outside their home, and it is therefore, our goal to be of service to both you and your daughter.

This handbook has been created to give you and your family some information, guidelines and methods of handling at-risk girls which we have found to be successful.  These methods have helped us to bring about behavioral changes in the girls we treat.  We feel that this information will provide you with some tools that will help you to create a similar environment and structure to the one at Trinity, through which your daughter will encounter and embrace the wonder of transformation.  With your commitment and active participation in this process, your daughter will be able to work through the program with greater efficacy, and will transition back into your home more smoothly and successfully.

We encourage you to read this handbook thoroughly, and try to follow the suggestions in it.  We understand that it may be difficult for you to imagine your daughter forgiving you after such a drastic decision on your part, or to imagine she will understand that "tough love" works for her ultimate good whether she likes it or not.  You may be tempted to want to ease the pain that you imagine she must surely be going through.  We want to encourage and support you through this trying time.  We also want to assure you that your daughter will understand that you made this decision because you want only her success as she grows into adulthood.  As her understanding and appreciation grows, she will respect and love you even more for the risk you were willing to take for her well-being.  As you follow the suggestions in this Parent Handbook, she will also know that she will not be able to continue the patterns of behavior that forced you to look at placement outside your home.  With your participation and willingness to implement changes in your own life and in your parenting style, her long-term success is virtually guaranteed!

If you have any questions, please call the office.  If you have questions regarding the things your daughter is writing to you in her letters or what to write in your own, we encourage you to speak freely and openly with us.  We always strive to have open communication with you.

Again, we want to welcome you to our family.  With your help and support, your daughter will be coming home soon, and hopefully making good choices in her life.

God Bless,


Jerry and Angie Woodward
Directors

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# How to Contact Trinity

You may call Trinity Teen Solutions, Inc. and ask for your daughter's therapist and/or advisor by calling  (307)645-3370, or you may call Jerry or Angie Woodward by calling, (307) 645-3384.  You can also email, fax or write, see below contact information.

**Remember:**  we are a residential treatment center that utilizes outdoor behavioral health; therefore, we are out in the field most of the time working with the girls.  Please be patient with us.  Leave a message on voice mail when you call and we will get back to you just as soon as we can.

NEVER GIVE OUT YOUR DAUGHTER'S WHERE ABOUTS TO ANYONE!  THIS IS FOR HER SAFETY AND FOR ALL OF TRINITY.

# Contact Information:

**Jerry and Angie Woodward**
**Trinity Teen Solutions, Inc.**
**89 Road 8 RA**
**Powell, WY 82435**

**Phone (307) 645-3384** (confidential)
**Fax (307) 645-3385** (confidential)

**Email: admissions@trinityteensolutions.com** (confidential)
Email your daughter's advisor at
Insert first name of advisor@trinityteensolutions.com

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Trinity Teen Solutions

# Who Are We?

# &

# What Are We About?

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# What you can expect from Trinity

At Trinity Teen Solutions, Inc we strive for excellence in education, attitude, holiness, and service.  We hope to instill into the youth a sense of belonging to something bigger than themselves and an understanding that a life of giving rather than taking will ultimately make them complete.  It is our goal to teach each girl respect for the dignity of human life and a responsibility toward others.

We will do our best in every way possible to work with your child and with your family to make changes that will help eliminate the problems that caused you to look to Trinity for help.

We will strive to provide the best care possible for your daughter while she is at the Ranch, and provide an atmosphere in which she can grow physically, mentally, emotionally, socially and spiritually.

We will attempt to teach her skills that will help her have positive relationships in life and help her in communicating with others.  We will strive to help her learn and apply everyday living skills, and to adapt problem-solving techniques in meeting the demands life places on her.

We will strive to be open in our communication, honest in trying to work with you and your child, and trustworthy to strive to complete the task you have placed in our hands.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Program Philosophies

## Philosophy

By removing young women from their usual surroundings, we challenge old problematic behaviors and promote personal growth. By changing their settings, daily routines, manner of dress and relationship with God, they are able to redefine and rediscover their unique identity with emphasis upon God-given dignity, personal responsibility and right action.

## Mission Statement

Trinity Teen Solutions focuses on each young woman's uniqueness, helping her to find the beauty within, heal past wounds, grow inner strength, instill a conscience and learn to manage herself in today's society.

## Objectives

- To develop a strong sense of self, including strengths and limitations
- To be respectful to self and others
- To develop a relationship with God
- To increase attention to conscience
- To increase taking responsibility for own action
- To improve how she values herself, including protection from assault or exploitation
- To increase motivation for normal, wholesome adolescent activities such as school, family, work, peer relationships and extracurricular activities

## Clinical Assessment

We use various evaluations such as: psychological history, psychiatric evaluation, physical examination, standard clinical interview, previous psychological evaluations, group home/residential reports, monitoring of medication, previous individual therapy, discussion with previous therapists, school reports, parent consultation, consultation with relevant physicians, nutritional assessment, day-to-day observation of student, substance abuse history. These combine to form the basis of the individual care plan.

## Individual Care Plans

An individual care plan is developed for each young woman in the first week. This plan addresses the unique needs of the student and her family. The care plan is written by a licensed professional assigned to work with the student. Care plans are reviewed and approved by the treatment team. The plan is used to help her identify and solve problems and is reviewed by staff as needed.

## Medications

Our philosophy is to manage symptoms and behaviors naturally without medications. We prefer to use the minimal amount of medication possible if necessary to manage symptoms. If your daughter is admitted on medications we will evaluate to decrease medications and hopefully discontinue them prior to discharge if in the Holy Cowgirl Program.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Program Philosophies, cont.

## MIND

"Do not be conformed to this world but be transformed by the renewal of your mind, that you may prove what is the will of God, what is good and acceptable and perfect" (Rom 12:2)

There is a healing process that takes place for troubled girls when you combine wilderness therapy, animal therapy, emotional growth and experiential therapy in the beauty of nature. Young women will gain strengths, develop the importance of trust in relationships and build self esteem from the accomplishments that they personally will achieve.

The wilderness environment eliminates the negative distractions and pressures that previously influenced her. In addition, behavior, attentiveness, teamwork and willingness to work have a correlation to life's basic needs such as: food, shelter, and comfort.

Through animal therapy young women begin to find the loving, gentle person they used to be. Taking care of and meeting the basic needs of animals, encourages her to be less selfish, and respectful to relationships. This process will increase motivation, self-discipline, self-reliance, personal accountability, and self-sacrifice. These are virtues that are emphasized throughout the program. These lessons are taught in a variety of ways by coexisting with a group of peers, instructors, animals and Mother Nature.

The instructors/therapists are able to reach students more effectively while living, working and dealing with life's obstacles in the wilderness. They become more "human-like" to the young women. This is a key factor in helping girls. They see the therapist as approachable, empathetic, and honest. She will directly observe the treatment team as living, eating and communicating in the same environment as she is. This facilitates a connection, which enhances genuineness between the young women and the therapist. By providing therapy in the wilderness this also permits the treatment team to step back from their traditional roles as authority figures, allowing natural consequences to provide reinforcement and punishment of appropriate or inappropriate behaviors.

## BODY

"Do you not know that your body is a temple of the Holy Spirit? Within you, which you have from God? You are not your own, you were bought with a price. So glorify God in your body." (1 Cor 6:19-20)

Young women are preoccupied with their appearances because of the American culture. Society is focusing on "lookism". Everything from toothpaste to a house is advertised with some kind of sex appeal. Your daughter is bombarded with the pressure of looking "in". Because of this preoccupation with "fitting-in" most young women are depriving their bodies of the nutrients it needs. They have poor eating habits or addictions that prevent their bodies from being healthy. We help your daughter to value herself and to find the beauty that lies within.

We will provide your daughter with pharmaceutical grade nutritional supplements to help cleanse and rebuild her cells, and a high protein, complex carbohydrate diet that will aid in the healing process. This nutritional support will decrease mood swings, help curb addictions, and provide her with long term benefits for her arrival home.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

Due to the fast paced, high processed, nutrient depleted American diets, we are seeing more and more physical and emotional problems in adolescents. A diet that is made up of high processed foods, refined sugars, aspartame and low in protein is a recipe for disaster. This eventually will have devastating effects on one's emotions.

Simple sugars breakdown quickly in the blood stream causing a cascade of hormonal responses. The yo-yo effect of frequent ups and downs in one's blood sugar causes hormonal responses that affect the brain. These ups and downs then will create food cravings that are very difficult to overcome. These cravings are so powerful, they are stronger than any drugs or alcohol.

That's why at Trinity Teen Solutions we will help her get off of the roller coaster ride. We accomplish this by:
1. High protein diet to supply her with the important amino acids necessary for neurotransmission or chemical reactions in the brain.
2. Complex carbohydrates to stabilize her blood sugar.
3. Pharmaceutical grade nutritional supplements-vitamins, minerals, amino acids and essential fatty acids. Providing the important mood stabilizing, nervous system nutrients: Magnesium, Calcium, B Complex, Essential Fatty acids and much more.

## SOUL

"I have come that they may have life, and have it abundantly." (Jn 10:10)

Struggling teens are constantly battling to "belong to something." Our culture has become one of gangs, cliques, clubs, and cults. The cost to join is changing your daughter's values and moral beliefs.  Girls desperately need something or someone to believe in, and someone to believe in them.  We will gently guide her into a relationship with God and help her open her heart to His kindness in the serenity of His creation.  As her relationship with God grows and develops, this need for belonging will be satisfied in seeing God as her Father and others as her brothers and sisters in Christ.  Thus, she now belongs to the greater family of God.  Alcoholics Anonymous and Narcotics Anonymous have demonstrated and proven that this is the only approach for long term success in overcoming behavioral issues.

Through Trinity Teen Solution's Christian-based philosophy and our "Program of Life", we are able to restore in her the awareness of right and wrong actions and improve her ability to listen to her conscience throughout the day.  We have found that softening their hearts and minds through daily prayer and Christian counseling, role-modeling a living faith and prayerfully reflecting on Scripture, teaches young women that they are helpless to overcome the negative influences in their lives without God.  The serenity and beauty of God's creation in the wilderness encourages the softening process in the young women and reinforces this understanding that God is the Master of Life.

The most important lesson that we can impart in the girls is an appreciation for the Truth found in Christianity.  Daily readings from the Bible and discussions of how they can utilize the wisdom exemplified in these readings in their own lives, are aimed at giving her a much needed source of direction in life and instilling a personal relationship with Christ. This gives the young women the strength to overcome the negative and destructive patterns that lead them to Trinity Teen Solutions.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Treatment Approaches

By using a wilderness ranch setting, animal assisted therapy and an individual care plan tailored to the needs of each person we challenge young women to create healthier lives and make appropriate choices, which honor God, self and others.  The minimum length of stay is 45 days, the average girl is at Trinity 12 - 18 months.

## Modalities and Activities

We use the following treatment modalities and activities:

1. **Wilderness Therapy/Outdoor Behavioral Healthcare:** By changing the setting of young women, we challenge their comfort level, promote a sense of God's presence and peace, and invent new ways to handle their personal needs and problems.
2. **Reality Therapy:** We use confrontation, personal choices and natural consequences as challenges for growth.
3. **Family Systems:** We examine the individual in her context, including family and peer relationships, relationships to authority, relationships with self and relationship to God. We use intensive family therapy (usually 4 hours long), weekly updates and scheduled telephone conferences.
4. **Experiential Therapy:** We use the ranch and wilderness contexts using nature and animal behaviors providing opportunities to rethink behaviors, solutions and attitudes.
5. **Strategic Therapy:** We use therapeutic directives to reduce uncontrollable or destructive behaviors. These directives are specifically tailored to the individual, her family and peers.
6. **Animal Assisted Therapy:** We use horses, cows, pigs, cats, dogs etc. to help young women examine their own behaviors, and needs, and to take responsibility for their actions and choices in relationships.
7. **Group Therapy:** We use group therapy in the wilderness ranch setting to help young women invent new solutions to old problems, see personal strength, identify needs and encourage progress. Group therapy takes place at least once per day and as needed by group members.
8. **Individual Therapy:** We use individual therapy and develop individual care plans to identify problems, invent solutions, evaluate progress, and prepare to re-enter communities.
9. **Christ-Centered Counseling:** We use the life of Christ and the Bible to instill personal conscience, and a sense of right action in communion with God, self and others.
10. **Rational Emotive Behavior Therapy:** We use direct examination of thought, feelings and action, and resulting problems from poor choices to teach her how to monitor and control her behavior.
11. **Eye Movement Desensitization Reprocessing (EMDR):** Eye Movement Desensitization and Reprocessing (EMDR) integrates elements of many effective psychotherapies in structured protocols that are designed to maximize treatment effects. These include psychodynamic, cognitive behavioral, interpersonal, experiential, and body-centered therapies. EMDR is an information processing therapy and uses an eight phase approach.
12. **Personality Assessment:** We use the Myers-Brigg to assess personality type, how a young woman sees her world, moves in it and solves problems. We also outline her strengths and limitations.
13. **Nutritional Therapy:** We use a complex carbohydrate/high protein diet, and pharmaceutical grade supplements to cleanse and improve physical and emotional health.
14. **Crisis Intervention:** We deal with crises as these arise on the ranch. We model techniques for resolution with the young women.
15. **Art Therapy:** We use art therapy to identify body image problems, future goals, expressing problems and group sharing to enhance personal insight.
16. **Exercise:** Reasonable amounts of physical activity to promote health, induce expression of emotions and solve underlying problems, such as walking, jogging, and calisthenics.
17. **Use of daily routine:** We use the daily routines to enhance the care of self, encourage independent problem solving, increase organizational skills, and improve motivation.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

18. **Relationship therapy:** We use dynamics of relationships to encourage participation in emotional and spiritual growth. Our central philosophy is "the family teaches right action through example, teaching and role models." The family is the safe place where adolescent girls hear and understand values they need in order to thrive. As a staff, we provide such a family setting; where the girls know they are loved. They reciprocate those feelings. We lead, guide, teach by example.

19. **Bibliotherapy:** We provide the young women and their parents with relevant books and tapes to create self-awareness and to learn from the problem-solving skills of others. We use, <u>Reviving Ophelia</u>, The Bible, <u>Seven Habits of Highly Effective Teens</u>, <u>Parent in Control</u>, <u>Back in Control</u>, <u>Hinds feet on High Places</u>, <u>Rachel's Tears</u>, <u>Screwtape Letters</u>, <u>Over-Indulged Children</u>, just to name a few.

20. **Spiritual Activities:** We use prayer, daily Mass, Scripture reading, group discussion, role-play and modeling to enhance the young woman's relationship with her Creator.

21. **Journaling:** Journals are used to express feelings and reactions to events, and to map progress.

22. **Aftercare/Referral:** The family helps plan aftercare responsibilities. Roles are clarified; an agreement on rules and responsibilities, supervision, and privileges is reached.

23. **Cognitive Restructuring:** We have the student examine the way she thinks about her self and her issues, and to identify her emotions. When you change the way the person thinks, you will change the way she feels, and change the way she responds.

24. **Confrontive Therapy:** We confront negative behaviors by stating the facts about her negative behaviors.

25. **Insight therapy:** We get her to understand what is going on with her and facilitate an understanding of the cause of her behaviors.

26. **Behavior Modification:** We use behavioral contracts that target problems behaviors and attitudes in a 6 level system. Levels of all girls are reviewed weekly in staff meeting and in Holy Cowgirl. As levels increase so do responsibilities and privileges.

27. **Solution Oriented Therapy:** We identify her and your family strengths. We find out what has worked in the past and find away to use it today.

28. **Supportive Maintenance:** We use the activities of the daily schedule as opportunities to promote growth in targeted behaviors. Ranch life and daily schedule present new challenges and chances to choose different behaviors.

29. **Symptom Focused Education:** We provide the most current information on symptoms, disorders and treatment. Specific strategies are offered to each family.

30. **Ordeal Therapy:** We frequently will make something an ordeal to impact behavior. When a student goes through an ordeal it will impact behavior and change the student.

31. **Psychiatric Consultation:** We incorporate psychiatric consultation into behavioral objectives, therapeutic directives, spiritual tasks, and homework assignments for each girl and family. This is a bio-psychosocial approach that reaches a girl's mind, body and soul.

32. **Career Counseling:** We address career choices when age appropriate. We use career tests such as the Self Directed Search, and the Myers-Briggs, in addition to individual therapy and group therapy.

33. **Personality Inventories/Assessments:** We do the following assessments:
    1. **Adolescent Psychological Inventory (APS):** To identify psychotherapy in adolescent.
    2. **Kiersey Temperment:** To identify personality type of each girl and use her unique problem solving style to teach her.
    3. **Substance Abuse Inventory (SASSI):** To identify frequency of substance abuse and related stressors.
    4. **Youth Outcome Questionnaire (YOQ):** To identify problem attitudes and behaviors from parental and daughter's point of view.
    5. **Wide Range Achievement Test 4 (WRAT):** Measure the development of reading, spelling, and arithmetic skills.
    6. **Wide Range Intelligence Test (WRIT):** Measures verbal, visual and general IQ.
    7. **Parenting Alliance Measure (PAM):** Measures the strength of the child-rearing alliance between parents.
    8. **Marital Satisfaction Inventory (MSI):** Assess conflict within a relationship

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Family Systems Therapy

## Family Systems Theory

One of our treatment philosophy's that is the backbone to Trinity is that we utilize a Family Systems approach to treating the client in treatment. We believe that by focusing treatment only on the client or identified patient and not focusing treatment on the entire family, that the clients treatment objectives/goals are almost impossible to obtain, especially when dealing with adolescents. We have found that if all parent(s) that have the duty of supervising and parenting the child do not partake in the clients treatment that they will undermined their daughter's therapy and treatment goals. Here is some information so that you are fully aware of what a Family Systems approach entails.

### Definition

Family therapy is based on family systems theory, which understands the family to be a living organism that is more than the sum of its individual members. Family therapy uses "systems" theory to evaluate family members in terms of their position or role within the system as a whole. Problems are treated by changing the way the system works rather than trying to "fix" a specific member.

### Purpose

Family therapy is often recommended in the following situations:

1. Treatment of a family member with schizophrenia or multiple personality disorder (MPD). Family therapy helps other family members understand their relative's disorder and adjust to the psychological changes that may be occurring in the relative.
2. Families with problems across generational boundaries. These would include problems caused by parents sharing housing with grandparents, or children being reared by grandparents.
3. Families that deviate from social norms (common-law relationships, gay couples rearing children, etc.). These families may not have internal problems but may be troubled by outsiders' judgmental attitudes.
4. Families with members from a mixture of racial, cultural, or religious backgrounds.
5. Families who are scapegoating a member or undermining the treatment of a member in individual therapy.
6. Families where the identified patient's problems seem inextricably tied to problems with other family members.
7. Blended families with adjustment difficulties.

### Descriptions

#### The identified patient

The identified patient (IP) is the family member with the symptom that has brought the family into treatment. The concept of the IP is used by family therapists to keep the family from scapegoating the IP or using him or her as a way of avoiding problems in the rest of the system.

#### Homeostasis (balance)

The concept of homeostasis means that the family system seeks to maintain its customary organization and functioning over time. It tends to resist change. The family therapist can use the concept of homeostasis to explain why a certain family symptom has surfaced at a given time, why a specific member has become the IP, and what is likely to happen when the family begins to change.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

**The extended family field**

The extended family field refers to the nuclear family, plus the network of grandparents and other members of the extended family. This concept is used to explain the intergenerational transmission of attitudes, problems, behaviors, and other issues.

**Differentiation**

Differentiation refers to the ability of each family member to maintain his or her own sense of self, while remaining emotionally connected to the family. One mark of a healthy family is its capacity to allow members to differentiate, while family members still feel that they are "members in good standing" of the family.

**Triangular relationships**

Family systems theory maintains that emotional relationships in families are usually triangular. Whenever any two persons in the family system have problems with each other, they will "triangle in" a third member as a way of stabilizing their own relationship. The triangles in a family system usually interlock in a way that maintains family homeostasis. Common family triangles include a child and its parents; two children and one parent; a parent, a child, and a grandparent; three siblings; or, husband, wife, and an in-law.

**Risks**

The chief risk in family therapy is the possible unsettling of rigid personality defenses in individuals, or couple relationships that had been fragile before the beginning of therapy. Intensive family therapy may also be difficult for psychotic family members.

**Normal results**

Normal results vary, but in good circumstances, they include greater insight, increased differentiation of individual family members, improved communication within the family, loosening of previously automatic behavior patterns, and resolution of the problem that led the family to seek treatment.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Examples of Group Therapy Topics

Healthy Body Image
Dealing with authority
Respecting parents
Dealing with pressure
Building self-worth
Generosity
Pride
Identifying weaknesses and dealing
    with them
Proper use of the gifts God gave us
What are values, morals and virtues
Lies hurt
Tips to prevent relapse
Dignity of Women
Traits of a good boyfriend/husband
How to pick friends
How to handle the pressures out there
How to manage Anger and pain
Healthy outlets for our emotions
What was your identity before?
What is your new identity?
What signals do the way we dress and
    act send?
What would I like said at my Eulogy?
Stop-Think-Pray
What is true freedom?
Breaking violent tendencies
No more victim role
Looking at 5 positive things in every
    situation

Respect
Obedience
Humility
Honesty
Self-Discipline
Selflessness
Compassion
Mercy
Marriage
Rules for Dating
Purity
Chastity
Who is God?
How to talk to God?
Growth in Silence
Living a simple life
Influence of Media on our culture and
    on us
How to handle temptation
Building trust in relationships
How to have good clean fun
Controlling emotions so that they don't
    control you
Controlling Addictions
Changing your perspective
Healthy Body Image
Dealing with authority
Respecting parents
Dealing with pressure
Building self-worth
Generosity
Pride

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13



# Academic Program



The academic program of Trinity Teen Solutions, Inc. is designed to promote self-discovery, constructive interaction with others and a deeper understanding of nature through experiential, adventure, and environmental education, as well as course work for high school credit.

Our educational philosophy emphasizes the use of experiential education. We provide participants with outdoor learning experiences that are reflected upon, processed, and analyzed, emotionally and intellectually.

We believe that challenges are inherent to the experiential learning process. Using the natural world as a classroom affords us many opportunities to expand the participant's life experiences and encourages personal growth. Support, trust and respect are valued and promoted throughout all phases of instruction, management, and administration.

We use an independent study course that is accredited by the Northwest Association of Schools, Colleges, Universities (NASCU), and the Commission on International and Trans-Regional Accreditation (CITA). This accreditation source is reciprocal with other accreditation agencies, meaning that earned credits are generally transferable. However it is always best to make sure that her school will honor the credits.

When enrolling your daughter you will need to provide Trinity Teen Solutions with her high school's ACT Code, high school name and address. An ACT code is only required for high school students. You can get this number from her high school's counseling office. By supplying an ACT code, you give permission to inform her high school of her activity and grades in the courses.

As part of our unique therapeutic approach your daughter will be earning credits in school for the personal goals and changes that she is making in herself.  For example, the first three classes that she will be taking are entitled, "Character Education- Exploring Values."

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13





# Nutrition: A Valuable Component

During adolescence, girls are growing by leaps and bounds. Within 18 months her internal organs will double even triple in size.  She will grow on average 2 to 4 inches, seriously stretching her muscles and tendons.  Her brain and nervous system undergo enormous expansion and development.  She will develop twice as much fatty tissue in her breasts, hips, thighs and stomach.  Her metabolism is frequently out of balance, causing emotional highs and lows, and periods of hyperactivity and exhaustive rest.  Her physical and emotional well being are very susceptible to poor nutrition during this stage of development.

Girls need to consume at least 2500 calories per day from good nutritional sources just to keep up with these demands.  However teenagers' busy lifestyles almost inevitably lead to irregular eating habits-missing meals and binging on junk food- which may cause serious dietary deficiencies.  The fast food that teenagers love to eat tends to be high in calories, fat and sodium, and low in fiber, vitamins, minerals and antioxidants.  Also, because of society's pressure of "look-ism" and sexism, adolescent girls receive more peer pressure than any other age group.  Most girls want to weigh less and begin low calorie dieting, skipping meals, restricting foods, fasting, excessive exercise, and using diet pills and laxatives.

Nutrition plays an important role in physical and emotional well-being.  Moods and behavior are quickly affected by refined simple sugars, caffeine and nutritional deficiencies.  During the complexities of raising a teenager in today's society nutrition ends up a low priority.  However during these growth spurts she is developing internal organs, tissues, bone, brain, and skin off of nutritionally devoid foods.  It is imperative to supply the growing teen with the proper building blocks for these organs.  She needs to consume a healthy diet that is high in complex carbohydrates, protein, monounsaturated and polyunsaturated fats, and therapeutic multivitamins, minerals and potent antioxidants.

Due to high processed foods which destroy the nutritional properties, improper food storage and handling she cannot get the nutrients she needs by eating a healthy diet.  The Recommended Daily Allowance of vitamins and minerals is not enough to provide the necessary nutrition to a rapidly growing body.  The RDA was formulated to prevent diseases caused by nutritional deficiencies not to promote optimal heath.  Trinity recommends nutritional supplements that are developed off of credible science in proper ratios and quantities to develop and promote optimal health for the rapidly growing teenager in a fast-paced toxic world.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13



# Sugar's Impact on Behavior



Her body and brain are built of protein, water, fat, minerals and vitamins. Like auto parts that must be made from solid materials (metal and rubber), body parts, muscles, hormones, nerves, and bones can be made only from water and solid foods like protein, vitamins, minerals, and fat. Without them, her body doesn't have the building blocks to replenish itself and replace worn out cells. Carbohydrates have a very different function. They are the fuel that her body uses. Yes, they're important, but just as you cannot build an engine or a tire out of gasoline, she cannot make muscle or hormones or bones out of carbs. Imagine a car that did not get its oil replaced or its tires repaired. How far could it go on gasoline alone?

Her body does need high-quality carbohydrate "gas", but the amount depends on how much "driving" her body is doing. Athletes and fast metabolizers need more carbohydrates. Less-active people need fewer. And not just any carbohydrate will do the job. She needs high-quality ones, like vegetables, beans, and brown rice; not low-quality carbohydrates, highly sweetened with sugar, or starchy ones like white bread or bagels and pasta, which are converted into sugars in seconds in her mouth. If she is a carbohydrate junkie she is frequently running low on glucose, the blood sugar fuel made from carbs that keeps her brain and body going.

But if glucose is made from carbohydrates and she is regularly eating lots of sweet and starchy carbs, how can she be running so low on blood sugar? Paradoxically, it's because she is eating so many high-carbohydrate foods! Her body can't tolerate the amount of carbohydrates in highly processed foods like candy, cookies, or even bagels, especially if she eats her carbohydrates without lots of balancing protein, fiber and fat. If she had lox and cream cheese on her bagel, she'd be all right. If she ate salmon steak every time she had a candy bar, she'd probably be okay, too! But she doesn't, of course. And some people are so sensitive to sweets that no matter what they eat with them (even if they eat a full meal), they'll get a headache and feel irritable after the initial pleasure injection wears off.

So what happens to all sweets and starches she eats? They turn into blood sugar (glucose) in seconds while still in her mouth, shocking and alarming her whole system. "Get rid of it, fast!" shrieks her body. Out rushes insulin, made by her pancreas, for just such occasions, from whatever protein she is eating. Insulin knocks every bit of that high glucose out of her bloodstream and quickly stores it as fat, where it gathers in her body, crowding her muscles, and clogging her arteries.

Blood sugar or glucose is the brain's only fuel source. When she creates these highs and lows in her blood sugar by eating refined sugars she will have uncontrollable mood swings and cravings. There have been studies that show that adolescents who are "junk food junkies" are at risk for becoming alcoholics. Alcohol is a sugar that reaches the brain quite rapidly and provides energy and euphoria. After a night of drinking, your blood sugar drops creating hypoglycemia or low blood sugar, then the craving for sugars in alcohol, candy and pop to elevate the blood sugar begins. This is the initial stage of alcoholism, the physiological and emotional addiction to refined sugars. There are very few alcoholics that became alcoholics at 40. They started drinking in their teens and twenties and began the blood sugar yo-yo. Trinity provides girls with the necessary macronutrients (protein, fats, carbohydrates), and optimal levels of micronutrients (vitamins and minerals) to enhance emotional and physical health. We will stop the cravings and level out her moods through proper nutrition; we highly recommend that she continues this on discharge.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# A Girl's Typical Diet

The family meal time is an important time in developing values and relationships.  We strive to make meal times therapeutic, comfortable, relaxing and something they all look forward to. The girls that come to Trinity are compulsive, selfish, do not think before they act, are disorganized, do not follow directions, and do not plan for the future.  We have found that having the girls responsible for organizing, preparing and cooking meals provides much needed experiential therapy.  If they do not plan for the ingredients and the meal preparation, think before they act, take time to do something, get organized, and follow directions and recipes, the meal will flop. The natural consequence is a poor meal that all have to eat.

The girls take turns cooking for the camp.  Each girl is expected to plan and prepare meals, using proper nutrition and proper ratios.  There are no prepared boxed meals allowed.  It is amazing what the girls come up with to cook and how much they get into cooking on the wood burning camp stove.  One girl totally amazed us; at first her meals were awful.  She learned that she needed to follow instructions, ask for help, read the recipes, and think of consequences of her actions.  As she grew in these areas she became an excellent cook and got excited about trying new and exciting recipes.  One night she decided to make homemade pizza on the wood-burning stove (no oven).  She made it with whole wheat flour, lean ground elk burger, home made pizza sauce, and cheese. She cooked it in a Dutch-oven on top of the camp stove, regulating the heat with how hot the wood was burning.  She served a fresh fruit salad for an appetizer and a lettuce salad with the meal.  We were amazed at how complicated this meal was and how well it turned out.

Parents always talk about how their daughters come home and are a great help in the kitchen.  Cooking and talking during meal preparation, then sitting down and eating the creation with a family begins the process of building trust and communication.

The proper nutrition that the girls need to adhere to in meal planning and preparation is one that is high in lean protein, complex carbohydrates from fresh fruit (eaten before the meal for proper digestion), fresh vegetables (preferably raw or steamed),  whole grains from brown rice, and whole wheat tortillas, bread, cereals or pasta.  Here is a sample menu:

- **Fresh water in plenty supply.**
- **Breakfast:**  Slow-cooked old-fashioned oatmeal with soy protein and fresh fruit or eggs, whole wheat toast and yogurt.
- **Lunch:** Tuna fish sandwich made with 100% whole wheat bread, fresh fruit, fresh vegetables, raw trail mix or left-overs from dinner.
- **Snacks**: Nutritional bars that contain a healthful ratio of carbohydrate, protein and fat, that are free from genetically modified soy protein or fresh fruit, cheese or vegetables.
- **Dinner:** Fruit as an appetizer, Cajun black beans, rice with chicken. Made from slow cooked whole beans and long grain brown rice, fresh vegetables and boneless, skinless chicken breasts or Salisbury steak from lean ground elk burger or home grown beef with steamed broccoli and long grain brown rice.
- **Herbal Teas:**  The girls really enjoy drinking herbal teas while doing their journaling and assignments.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Nutritional Supplement Program

*OUR GOAL IS EMOTIONAL WELL-BEING THROUGH PHARMACEUTICAL-GRADE NUTRITIONAL SUPPLEMENTS*

Angie Woodward, the Director of Trinity Teen Solutions, has been a nurse for 15 years and has seen first-hand the diseases that plague our nation in relation to nutritional deficiencies, poor American diets and lack of exercise.  Look at the 3 leading killers: Heart disease, Cancer and diabetes; they are all related to exercise and nutrition.  The medical field now understands the importance of nutritional supplementation.  It's not the old adage; "All you have to do is eat right" anymore

It is overwhelming and complicated when you start searching for what to take, how much to take, what are the best products for their money, are they manufactured properly to deliver adequate nutrition, what is the latest research (based off of sound science not just a fad).  Nutrition must be complete and balanced, that is why Trinity uses only top quality pharmaceutical grade nutritional supplements that are in the right ratios.  We use supplements manufactured by USANA Health Sciences.

USANA Health Sciences are nutritionals you can trust.  They will provide your family with optimal level of balanced nutrition, in proper ratios, and in high enough quantities, to not just curb disease, but to promote optimal emotional and physical well-being.  We have done extensive research to find nutritionals of this quality that we would recommend and use in our program.  For more information you can find USANA in the PDR (Physician Desk Reference).

Poor manufacturing can destroy great science.  For this reason, USANA Health Sciences is one of the few companies in its industry to manufacture its own products.  To ensure that the formulas they develop in their laboratories remain at the same high quality for their customers, USANA voluntarily meets Good Manufacturing Practices (GMP) for pharmaceutical-grade products much higher than what law requires, and eclipsing the standards followed by most nutritional product manufacturers.

To adhere to these exacting standards, USANA tests the raw ingredients, tests the product during manufacturing, and tests everything once again before it goes out the door.  USANA's quality assurance team keeps track of every excruciating detail, from the elaborate testing and evaluation of raw materials, to what happens to the products during shipping and storage.

Your daughter will be placed on USANA nutritionals during her stay at Trinity.  Here is a list of products that she will be taking.  We recommend that she continues when she is discharged:

1) **Body Rox**- A multi-vitamin, multi-mineral, potent antioxidant therapy.
    - Delivers a comprehensive, high-potency formula with the full spectrum of vitamins, minerals, antioxidants, and cofactors needed for long-term optimal health and to support a robust and vigorous metabolism..
    - Contains 15 antioxidant ingredients to give comprehensive, "full-body protection" from oxidative stress.
    - Is laboratory tested for guaranteed quality.  Meets U.S.P. specifications for potency, uniformity and disintegration.
2) **BiOmega 3**- Fish oil capsules provides essential omega-3 fatty acids.
    - Helps promote optimal cardiovascular health, proper brain and neural development and decrease symptoms of ADD/ADHD.
3) **Proflavanol**- Grape seed extract; antioxidant that crosses the blood brain barrier.
4) **Active Calcium**- Calcium and Magnesium supplement.
5) **B-Complex**- High potency

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13



# PHYSICAL ACTIVITY

The exercise program is designed to increase self esteem, self-motivation, self-discipline, obedience to authority and energy. When therapeutic approaches involve the entire person (mind, body and soul), they are much more effective. When the girls are doing a lot of internal, emotional and spiritual work, they need to have a physical outlet to decrease anger and aggressive behaviors. Thus, with so much going in, something needs to come out. The girls walk 4-6 miles per day as they are training and exercising animals; they also chop wood, build fence, ride horses and other various forms of good old-fashioned ranch work. In addition, the girls have their physical challenges which may involve jumping rope, running, sit-ups, push-ups, wall-sits, etc. For more information on the physical challenges, please see the "Changes and challenges" section of the Holy Cowgirl Manual.

Teenagers always learn more when they use all their senses. For example: walking a dog and pulling back on the dog's leash to keep the dog in control, touching a dog's fur, talking to the dog and giving commands, watching and listening for the dog's response, and showing affection to a dog who is eager to please her. Girls bond with the animals and begin to relate the animals' behavior to their own; this is the process that starts to soften their hearts. They write about the animals in journals and talk about them in group therapy. For example: seeing the similarities of animals having a strong will and wanting to do whatever they want, but because of respect, love and obedience they do what authority asks them to do.

The girls' physical activity allows them to grow in self-motivation, self-discipline, and selflessness in order to properly care for the animals. Since it all has purpose and is meaningful work, the girls push themselves on their own, so we do not have to become drill sergeants forcing them to exercise like a boot camp.

There are tremendous emotional and physical benefits from exercising outdoors. Exercise and sunshine increases serotonin levels in the brain. Serotonin is responsible for stabilizing moods, creating a sense of well-being and preventing depression.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13



# Spiritual Program



Trinity Teen Solutions, Inc. is a Christian-based, wilderness, animal therapy program. Thus, the spiritual program at Trinity Teen Solutions is central to the entire program and reflects the same journey the girls embark upon emotionally, intellectually, and psychologically. Therefore, the girls are encouraged to identify their spiritual "problems" and accept responsibility for their actions. Thus, Trinity emphasizes the need for continual conversion of heart and a growing relationship with Jesus Christ.

As it was just mentioned above, the primary focus of Trinity's spiritual program is conversion to Jesus Christ. There is a strong emphasis upon the impact and consequences of sin in our lives and the lives of others around us, the need for conversion and a life-time commitment to Jesus Christ—and through that commitment, there must be a greater imitation of Jesus' life in our own lives . . . thus, the ongoing growth in virtue in our lives. In order to work on these principles everyday, the girls will examine their consciences frequently throughout each day and identify virtues that they will work on practicing each week. This process of eliminating sin and growing in virtue makes up the heart of the Program of Life (see Holy Cowgirl Manual for greater detail).

The Christian beliefs of TTS are interwoven into every aspect of the girls' lives—we often use physical realities and ranch experiences as analogies of what is true of the spiritual life in general or the girl's particular relationship with God. The girls are challenged to consider their past behaviors in light of how they have offended God, to assess the present and past relationships according to God's standard of love and forgiveness, and to respect themselves according to the dignity in which God has created them. Group discussions often arise during evening meals or liturgy in which the girls must consider the values they formerly held versus the values in which God would like them to grow. They are often asked to analyze the messages portrayed in the media in light of the Gospel—are these messages supported by God or not? Which of their past behaviors and attitudes do not reflect the mind of a true follower of Christ? Thus, the girls learn to invite God into their hearts and minds throughout the day—allowing Him to sanctify their work, relationships and themselves! In addition to the physical realities that the girls encounter on the ranch, the work and example of the staff also provide a living witness of the Christian life.

The spiritual dimension of Trinity Teen Solutions also takes on very concrete means as well. Each child will be required to attend church at least every Sunday with the staff, but will most likely be more often. Staff members also lead a time of prayer and reflection on the Psalms and other Scriptural readings for the girls every evening—this is called the Liturgy of the Hours. Through this reflection on the psalms and other passages from Scripture, the girls encounter the Word of God daily and its impact on their lives. Prayer before meals (which includes an examination of conscience at lunch and dinner) is another regular practice in our program. All of the girls will participate in this through quiet attention to what is being said by whoever is leading the prayer. The child may have the option of declining to lead the prayer if they are chosen to do so. However, it is strongly encouraged that they learn to do this.

Because we believe a personal relationship with Jesus Christ is essential in life for true success and satisfaction, each girl in the program will be encouraged to develop such a relationship. They will not be requested to choose one denomination or church over another, but the girls must attend church with the ranch family. Nor will they be asked to reject their parents' opinions and beliefs regarding religious practices.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13



© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Your Daughter's Journey

All struggling teenage girls have similar patterns of behavior.  With these patterns in mind, Trinity is designed to minimize the behaviors that are destroying your daughter's life and at the same time, enhance her unique personality and undiscovered gifts.  We have found that "talk" therapy alone is ineffective.  Parents agree, they have talked till they are blue in the face, and have tried an array of counseling and therapy techniques.   To approach at-risk girls, we use a variety approaches that will ensure her compliance with minimal resistance.

Your daughter will want to comply just to increase her comfort level and meet her needs.   Living in rustic cabins, working with and riding horses, performing ranch work and daily chores, and taking care of animals is a foreign way of life for most girls.  She will need to depend on the staff to learn; if she resists, then her discomfort increases. This process immediately brings her closer to the staff and more receptive to learn new templates of behavior.  This process builds trust and a loving relationship within the "community" which is made up of staff and clients.

Let me explain a typical girl's journey at Trinity.  Each girl needs to go through these stages in order to internalize the changes that she needs to make. The length of time that each girl is in the different stages varies according to her unique situation and background.  The minimal length of stay is 45 days; however, the girls that have only stayed for that short of a period of time have gone on to a long-term program upon discharge.  The average girl takes 12 - 18 months to move through these stages effectively.

First, she will be in **shock** and disbelief that her parents did something about her behavior.  This shock is the greatest consequence for her out-of-control behavior.  You are sending a clear signal that this kind of behavior is unacceptable and will not be tolerated.

When she first arrives at Trinity her emotions and behavior will vary from anger, loneliness, sadness, remorse, manipulation, lying, and depression.  During this time, she is the most vulnerable and will reach for something to make her comfortable.   It is amazing how even the hardest heart softens when they are distraught.  We will encourage her to turn to God during this time to ease this discomfort.  This is an important stage in preparing her to internalize the changes that she needs to make.  She will want to make changes in her behavior because of her relationship with God, not because she was told to.

The next step is **anger**.  She will blame her parents, family, school, friends and everyone around her for her actions.  The length of time that a girl spends in anger varies from 1 week up to months, depending on the history.  Our mission is to get her to move from anger and blame to accountability.  In order for her to begin to change her behavior she needs to be accountable for it.

We use a variety of approaches to eradicate anger and blame.  First, we will use her desire to be comfortable in the "Changes and Challenges" Program (see Holy Cowgirl Manual).  In order to sleep on a bed or have butter for meals she will need to start looking inward at her behaviors and begin working on changing them.  At first she will manipulate and fake her way through this part.  Over time her actions will speak louder than words.  Animal, equine therapy and Christian counseling all combine to soften her heart and regain her conscience.  Dealing with animals and riding horses encourages selflessness and compassion.  This slowly opens her heart and flows over into her relationships with God, self and others.  We can measure internal change by assessing her interactions with animals and the animals' response.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

The next stage is **remorse**.  This occurs when she feels sadness and remorse for her behavior.   At this time, she takes accountability for her actions and sees the impact she has had on her loved ones and self.  When a girl feels remorse and processes the magnitude of her behavior she hopefully will not want to repeat them.  This is when she is seeking to change and wants to learn the tools to change.  We feel that this is an important stage to turn the dial up on her conscience so that she is less apt to repeat these behaviors.

When a girl is going through this stage it is imperative to allow healthy outlets for remorse by crying, talking with staff, writing letters, physical work and being with animals that she has bonded with.  We also focus on activities that she enjoys to build self-esteem and hope for the future.

After remorse the girl now moves into **action**.  Developing new habits of behavior on the old destructive behavioral templates takes time.  This stage is lengthy and will give her the tools and values that she will need for her discharge.  Most girls during this stage have successes and failures.  It is important for them to fail so that they can learn how to pick themselves back up again.  During this stage she will become over-confident and think that she has nothing more to learn.  Usually this is when she fails and repeats some of the behaviors that got her here, like lying or manipulating.  We think that this failure is important for her development to really drive inward some of the basic values that she needs.  For example:  she would repeat working on self-discipline, by controlling her emotions and using her intellect to make decisions, not just doing what feels good.

The longer that we can work with a girl in this stage the better she will be able to handle the pressures of society on discharge.


Please see the "Holy Cowgirl Manual" for a more thorough explanation of the girls' responsibilities and requirements.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Parents:

# What's Your Part?

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Parent Assignments

Once your daughter is admitted to Trinity, peace will be restored to your home and you can begin to think straight.  Now is the time to focus on you and your family to begin making the changes necessary for when she comes home.  It has been demonstrated time and time again throughout the nation and in a variety of programs, that parents are *the most important part* of the formula for lasting success!

The best time to make these changes in your parenting style is during the time of her stay with us at Trinity.   Through your letters, phone calls and visits and your own personal growth you will impact her deeply.   These techniques are utilized at Trinity and should assist in an easier transition when the time comes for your daughter's arrival home.

By this time you are already familiar with TTS's FamilyIQ web site and the Family Soulutions level system. These tools are the best in the industry and are the backbone to restoring your family.  We approach healing your daughter, by healing the family.  This family systems approach heals the marriage, heals the wounded parent(s) and strengthens parenting skills.  This ensures your parenting success.



© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# Parental Involvement

The goal of Trinity Teen Solutions, Inc. is to develop, maintain and/or strengthen the ties between the student and her family/caretakers.

In order to accomplish this goal of strengthening family ties, Trinity Teen Solutions will use the following means:

A.  Parents will be provided with weekly written progress summaries and bi-weekly phone conferencing with their daughter's therapist in which her behavior and progress can be discussed.

B.  The student and parent/guardian are able to communicate back and forth by phone and mail.

C.  When appropriate, Trinity Teen Solutions, Inc. will involve the family and/or caretakers in components of the program, to include family counseling and inclusion in the treatment planning.

D.  Each parent will receive there own TTS/Family IQ web site and a Testing Packet after their daughter is admitted.  This web site and packet will provide instructions for the parents/guardians to assess your family's strengths and weakness and utilize both to prepare for their daughter's discharge.

E.  The student will participate in a family therapy session as often as needed per Plan of Treatment.
    Trinity Teen Solutions highly recommends that parents participate in family therapy with their daughters. We offer interim family therapy sessions at appropriate times for your daughter and as determined for her growth throughout her treatment.  These sessions help to reunite and reintroduce families to their "new" daughter.  We have found that families and their daughters are always nervous about how to reunite and start their "new lives."  Therefore, our family therapy sessions are designed to help families acquire the valuable tools and unity they need for their daughter's arrival home.  Families will be provided with parenting tips, tools to help keep their homes and daughters in control, steps to rebuild trust and gain forgiveness, and methods of learning how to appreciate each other again.  The valuable time spent with your daughter will provide long term benefits by helping you discover the weaknesses and strengths that are unique to your family unit.

F.  The student may leave Trinity Teen Solutions, Inc. as approved by treatment team to participate in family activities.

© Trinity Teen Solutions, Inc., 2002, Rev8/28/13

# What makes a person change?

"'My son, do not regard lightly the discipline of the Lord, nor lose courage when you are punished by Him.  For the Lord disciplines him whom He loves, and chastises every son [daughter] whom He receives.'  It is for discipline that you have to endure.  … He disciplines us for our good, that we may share His holiness. *For the moment all discipline seems painful rather than pleasant; later it yields the peaceful fruit of righteousness to those who have been trained by it.*  Therefore, lift your drooping hands and strengthen your weak knees, and make straight paths for your feet, so that what is lame may not be put out of joint but rather be healed.  Strive for peace with all men, and for the holiness without which no one will see the Lord."  (Hebr 12: 5b-7a, 10b-14)

"When we are no longer able to change a situation,
we are challenged to change ourselves."
—Victor Frankl, Man's Search for Meaning

At the heart of these two quotations is an understanding that people will not change the direction of their behavior, attitudes, and ultimately, themselves, unless they do not have any other options.  In fact, we won't change until it is painful—painful remaining in the state we are in or continuing in the direction we were headed!  This sentiment is a key principle of Trinity's philosophy: People only change when they are uncomfortable!  When a person hurts physically or emotionally, when he/she truly feels remorse or sadness for what he/she has done, when he/she has to suffer the full impact of the consequences from their decisions—only then does one change, because it has become too painful/uncomfortable to remain in the same place.

This principle is even more evident when it comes to addicts.  It has been seen over and over again in therapeutic circles (and even by the common observer) that most addicts don't change until they hit "rock bottom."  Therefore, it is usually required that the family and support system must allow them to get there.  This process of "hitting rock bottom" is the only means by which the addict finally "learns" that his/her lifestyle cannot continue any longer.  Thus, some of life's most valuable "lessons" are only learned the "hard way"—through pain and discomfort.

This principle of change is what drives much of our program—the level system, the timing of when privileges are given, the consequences for misbehavior, etc.  Thus, the "environment of discomfort" is gradually diminished as your daughter begins to move away from her past behaviors and attitudes, and begins to move in a positive direction toward a more Christ-like life.  With this in mind, you play a big part in the "environment of discomfort" that surrounds your daughter.  For example, the tone of your letters, the things sent to her, etc.—these can all serve to strengthen or weaken this "environment of discomfort" for your daughter.  The more it is maintained, the more likely she is to change herself and in a more timely manner.

This collaboration in maintaining discomfort for your daughter is often extremely difficult for parents.  From the very first day of your daughter's life, you have had a deep desire for her happiness and have wanted to protect her from many of life's dangers and sufferings.  While this is a very natural and good desire in a parental heart, sometimes, as limited human beings, our understanding of our children's ultimate good is also limited.  Often we trade eternal happiness for temporary happiness—we so desire their happiness and comfort *now*, that we prevent our children from learning the necessary "hard lessons of life" and feeling the consequences of their poor choices that will provide them with the tools they need to attain eternal happiness and comfort!!

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

Clinical research is now more than ever supporting this principle of healthy parenting. It has been demonstrated that adolescent growth is inhibited when a child does not have to deal with the consequences of their own actions and behaviors. While it is normal and, to a degree, expected for a parent to protect a child, some parents literally "protect their child" into profound psycho-social pathology. How do they do that? By mitigating and rescuing the child from experiencing the natural consequences for maladaptive behavior—often, the very behavior for which the parent is seeking treatment for the child.

Some parents find this so disturbing that they will fight for their comfortable, indulgent parenting style to the end. They will attempt to use such rationalizations as: "God is Love. He wants us to be happy. Suffering is not from God. How could God want us to sit back and watch our children suffer?" and "God loves us right where we are at. He wouldn't purposefully make us miserable. What kind of loving God is that?" While there may be some elements of truth in such rationalizations, God does love us infinitely and right where we are at and He does want us to be happy—but God loves us so much He doesn't want us to stay where we are at and He wants our eternal happiness. As Max Lucado has written in his book, A Heart Like Jesus, "God loves you just the way you are, but He refuses to leave you that way. He wants you to have a heart like Jesus."

Remember: this "environment of discomfort" is not a new principle! This is the very manner in which God Himself formed Israel into His chosen People—He led them into the desert, stripped them of all their former luxuries and comforts, and as a consequence of their disobedience and lack of trust in Him, He allowed them to wander aimlessly through the desert for 40 years, so that they might finally turn to Him and rely on Him as their strength. "And you shall remember all the way which the Lord your God has led you these forty years in the wilderness, that he might humble you, testing you to know what was in your heart, whether you would keep his commandments, or not. And he humbled you and let you hunger and fed you with manna, which you did not know, nor did your fathers know; that he might make you know that man does not live by bread alone, but that man lives by everything that proceeds out of the mouth of the Lord" (Dt 8:2-3). Thus, God had a more important lesson in mind that He would even allow His people to endure suffering for a period of time that they would learn this lesson.

Trinity Teen Solutions, therefore, seeks to imitate the manner in which God has dealt with His people throughout history—by allowing them to feel the consequences of their actions. But we can only be successful if you, the parents, are completely on board with this approach. Some parents feel that they don't have "the stomach" to assist the treatment team to bring about these significant changes. Some are afraid that if they completely align themselves on the side of the treatment team they will have in a certain sense rejected their daughter, or she will at least perceive it that way and then completely reject her parents as a result. Some parents feel that if their daughter is uncomfortable or experiences pain (the pain of true change) or she perceives some injustice has been done, then they must at the very least sympathize with her pain and discomfort. This type of thinking is fueled by the devastating misconception that "if I don't sympathize, my child will hate me and reject me forever."

Nothing could be further from the truth!! As we have already mentioned in the section "Your Daughter's Journey," she may express some anger in the beginning and some feelings of resentment, but as you continue to reinforce the message that this is simply a response to her choices and she has the power to choose differently, she will grow to understand her own responsibility in this process and will respect you even more for your willingness to risk rejection for the sake of her ultimate good. This being the case, when parents give in and placate their child by removing discomfort and struggle, they end up simply feeding their own insecurities, removing their own uncomfortable feelings of guilt, and attempting to maintain a distorted sense of intimacy and closeness. Thus, one must be willing to look at oneself seriously and ask the question, "Is this really for her good or is it for my own comfort?"

At this point you may be wondering, what actions would be considered "comforting" or taking away from my daughter's discomfort and the pressure that she needs to feel in order to embrace a real change of heart? Here are some ways through which parents often make their daughters feel comfortable:

1) Gifts, food, cosmetics, pictures, clothes, excessive beauty treatments, etc.—either sent through the mail or given on visits
2) Letters that talk about the "weather" or what is going on at home, distracting her from her own work and consequences.
3) Lots of mail from many different family members "cheering her on or cheering her up," this only makes her think "I can do whatever I want and everyone is sweeping the real issues under the carpet."
4) Letters that are all about how wonderful she is, how loved she is and how you will always be there for her no matter what. She thinks, "so if that's the case why am I here?"
5) Taking blame or blaming a spouse for the daughter's behavior.

This is a fragile time. Your daughter needs to focus on her deep-seated issues and behaviors that forced you to take action. Interrupting that process by band-aiding her hinders the process and at times stops it dead in its tracks! This is not to

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

say that parents shouldn't lovingly support their children—but do not "love" them so much that they are unable to see the truth of the situation at hand.  Your daughter should be able to echo the words of the psalmist:

> O Lord, do not rebuke me in your anger;
> Do not punish me, Lord, in your rage.
> Your arrows have sunk deep in me;
> Your hand has come down upon me.
>
> Through your anger all my body is sick;
> Through my sin, there is no health in my limbs.
> My guilt towers higher than my head;
> It is a weight too heavy to bear.
>
> My wounds are foul and festering,
> The result of my own folly.
> I am bowed and brought to my knees.
> I go mourning all the day long.
>
> For I am on the point of falling
> And my pain is always before me.
> I confess that I am guilty
> And my sin fills me with dismay.
>
> O Lord, do not forsake me!
> My God do not stay afar off!
> Make haste and come to my help,
> O Lord, my God, my savior!
>     (Psalm 38:1-8, 17-18, 21-22)

Once she has felt the painful effects of her sinfulness and experiences genuine remorse, then she will be able to reach out to God in authentic repentance and begin working on rebuilding her broken relationships both with herself and her family members.  At this point forgiveness is appropriate.  If she feels she is forgiven too early in this process, she will never get to the depths of the pain she has caused and not be as convicted to never want to go back there again!

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08




Imagine your daughter standing in a corridor with both sides lined with doors. There is a door at the other end of the corridor. That's the door you want your child to go through. It is the door that leads to success, well-being and personal happiness. Unfortunately, your child thinks that walking through the door is stupid, impractical, lame, not cool and utterly ridiculous.

Perhaps at some conscious or unconscious level, she may have a desire to walk through the door but fear of the unknown, effort to get to the door, or any other underlying issues may make it impossible for her to walk through this door without some sort of assistance.

The problem is that she is being distracted by all the other doors that are lining the corridor. To you the signs on the doors read: "Partying, Drugs, Negative Friends, Hanging out, School failure, Depression, Psycho-neurological problems, Learning difficulties, Manipulation, Excuses, "You don't understand," Loss of a Close Friend, Divorce, Low Self-Esteem, Adoption reaction, etc., etc.

Your child, distracted or mitigated by these doors will opt to slip through one or more of them. If we let her do so, will she ever get through the door at the end of the hall? Maybe, but when? This year, next year, when she is 20? The reason you placed her with TTS is that you thought that the time is NOW to make the change.

The best way to make it happen NOW is to shut all the other doors so that the only door that can be opened is the one you want her to walk through—the one at the end of the hall.

Initially, your child is putting up a stink. She will try to get through every door possible. She will bang on some doors and attempt to kick in others. Some, she will attack with her bare hands, while in front of others she will whine and whimper. She most assuredly will try to convince you that if you are not letting her out through one of those side doors, disaster will be imminent. As she is slowly making it down the hallway toward the desired door, she will perhaps lie down and act discontented, overcome and/or wronged. She will attempt to make you a partner in crime or convince you that what we think is possible is an utter impossibility.

If you open one of those doors for her, because you feel bad for her or you think you want to help her, both you and TTS stand defeated. At that point, both you and we need to run after her, get her back into the corridor, be sure that door is locked and work on getting her down the hall toward the right door. All of that takes time and resources.

If you fall prey to opening one of those doors time and time again, your child will not go through the desired door in the foreseeable future. Thus, the child is not internalizing any changes, and as a result, you likely will feel disappointed in either the child, the facility or in the process. You are right back where you started from, with one exception—you have taught your child another powerful lesson: "If I push the right buttons even longer than before, Mom, Dad or both will get me off the hook."

Shutting the door may simply sound something like this: "Debbie, we know this is tough. We know this is not easy. This is hard work. Since we are not residents there, we obviously lack the full understanding of what you are going through. But you must know that we are behind you all the way. We love you. We want the best for you. We will help you in anyway we can, but you must understand that we will not return to old behaviors. And remember, we aren't going to bail you out. You must work through all the issues. We love you."

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



# Avoiding Pitfalls
## DURING your daughter's stay at Trinity

I.
**AVOID BEING TAKEN ON A "GUILT-TRIP"!**
Avoid falling into one of her manipulative traps designed to make you feel guilty and then, want to RESCUE her from this horrible experience!



Since we have already mentioned that your daughter's first response will be that of shock and anger, we would like to give you an idea of the forms in which this anger will be made manifest—so you are not blind-sided, caught off-guard, and then quite possibly manipulated into one of her traps.

The primary tactic is to make you feel guilty. If she can play upon your love for her and your sensitivities in this difficult time, your compassion and kindness, and your instinctive role as care-taker being that you are her parent, she will arouse such feelings of guilt and concern for her well-being that you will play right into her hands. The goal in mind . . . to come to her rescue and bring her home. This attempt at trying to make you feel guilty will take on many forms: the blatant guilt-trip, the bargain, triangulation, and exaggeration. The blatant guilt-trip confronts you with statements such as, "If you really loved me, you would get me out of here." The bargain sounds like, "if you take me home now, I promise I will change." In triangulation, your daughter will attempt to involve a third person (such as, the advisor, the therapist, the other separated parent, etc.) in a manner such as telling half-truths about that third person so as to get him/her "in trouble." By creating an unpleasant picture of the third person, the heat is taken off of her and placed somewhere else. Similarly, the exaggeration method creates a story about the experience that is so horrible that you must come to their rescue. Oftentimes, the girls will also purposefully put a miserable, painful expression on their faces when we attempt to take pictures just to play the part of the victim.

**These tactics are designed to make you feel guilty, to weaken your resolve,
and to get you to rescue her.**

Do not let the weight of the "guilt-trip" overpower you. As long as your daughter thinks there is a chance to control you by these manipulative techniques, she will continue to work on you until she attains her goal—going home. The sooner she realizes that this tactic will not work, the sooner she will buckle down and actually begin working on herself! **Therefore, you must clearly communicate to her that it is up to her to work through her issues and that you will not bail her out.** You will help your daughter the most by no longer allowing her to manipulate her way out of consequences.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

II    **AVOID MAKING DEALS UNDER THE TABLE!!**
**Avoid feeling compelled to "hold a carrot" in**
**front of your daughter—she can be motivated**
**without a goal!**



Another one of her tactics may involve an attempt to get you to either commit to a discharge date or to promise to take her home by a certain level.  This type of deal-making often occurs during a parent visit.  Your daughter may try to impress you with her good behavior and get you to feel guilty for not wanting to take her home right away.  Do not feel like you have to reward her behavior and some positive changes that she may have made thus far—remember:  you have been down this road before!  Keep in mind the many times she has promised change or said, "I'm sorry", when in fact, she had no intention of permanent change.  Remember she has had many years of experience building up her collection of bad habits and practicing her skills at manipulating you, but has only had a few months of experience (if even that long) developing positive changes to her attitudes and behaviors—these changes are not rooted deep enough into her personality to be considered habits yet!

Also, you are a vital part of the treatment team, if your daughter is trying to get information out of you that the treatment team has agreed not to share with her at the present time or does not know definitively at the moment, recognize this as a manipulation tactic—"DIVIDE AND CONQUER."  I am certain that this sounds familiar to you and may be one of her favorite tactics to use at home as well—to divide both parents and get you working against each other.  Since she is in a different environment, her attempts at division most likely will be to get the parents divided from the TTS staff.  Also, do not attempt to "coach" your daughter on how to perform for the staff, or which hoops to jump through in order to get out of here sooner—this, too, results in the parents working against the treatment team instead of with it.  Ultimately, the result of this kind of deal-making is a short-term adjustment of behavior without a lasting internalization and genuine change.

III.    **AVOID "ENABLING"!!!**
**Avoid feeling like you have to shield your**
**daughter from experiencing the full impact**
**of her harmful behaviors!**



Another common pitfall for parents is enabling.  It is a common fault of parents since it flows out of their natural desire to love and protect their children.  What is enabling?  It is when a person reacts to another person in such a way as to shield that other person from experiencing the full impact of their harmful behaviors.  We assist, we encourage, we are loyal, we support, we accommodate, we fix, we protect, we take care of, we help, we stand by, we work for, we befriend, we nurse, we serve, we do it all.  Why do we do this?  Because we care.

So what is the problem with all of these seemingly unselfish, altruistic behaviors?
They rescue your daughter from feeling the consequences of her misbehaviors!

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

When the family or one parent in particular takes responsibility for the misbehaving child's actions, then the child doesn't have to!  Since a child in this type of situation never feels the negative consequences of her misbehavior, she will never be motivated to change.

Mental health professionals have seen the destructive influence of enabling for decades particularly in families involving drug/alcohol addictions.  Although this has been identified by professionals as destructive, there seems to be conflicting views regarding parenting as a whole.  Due to the secularized and pluralistic culture that we live in, individualism and subjectivist philosophies have made their mark upon psychology, parenting philosophies, as well as other related fields of study.  Thus, these philosophies are represented by such statements as: "I cannot impose my morals on others,"  "What is true for me may not be true for you," "We each have a right to do what we want and pursue our own personal happiness (regardless of the impact that it has on others)," etc.

In light of these prevalent beliefs and philosophies of our culture, parents are reduced to nothing more than "older friends" to their children—they are made to believe that they should not "impose their beliefs or moral preferences" upon their children and that any form of discipline can be construed as "abusive" or damaging to the child's rights and/or self-esteem.  Psychologists and therapists across the nation are now seeing the errors of the recent decades in family therapy in which this "children first" model reigned.  This model took the authority away from the parents and put it in the hands of the children—this was largely affected through an overly exaggerated concern for the self-esteem and "rights" of the child.  Thus, the power entrusted to parents for the education and raising of their children has been reduced to nothing more than an innocuous responsibility to provide the "necessities of life" for your child, thereby reducing the parents to monetary servants to the development of their children.  This loss of parental power and the roles of educator, disciplinarian, and moral guide has left children the "right" to raise themselves and parents afraid that any discipline may be damaging to their child—this results in generations of enabling parents!

Iç.

> ## AVOID "BLURRED BOUNDARIES"!!!
> Avoid putting your daughter in a parental position! This can happen in a variety of ways:  by giving her too much information, by allowing her to make too many "parental" decisions, by giving her too much power, by responding to her every complaint or desire, etc.



 Blurred boundaries are difficult to detect since most families are unaware of boundary issues; plus, they are difficult to remedy due to the fact that boundary issues are oftentimes learned behaviors from one's own family of origin and therefore, are old habits difficult to break.  Blurred boundaries may be difficult to work on, but definitely not impossible!!  And the rewards are worth it!!

What are blurred boundaries? It is as it suggests—a family dynamic which involves indistinct, if not reversed, definitions of the parent-child roles.  In family situations in which there are blurred boundaries, the power lies in the hands of the child, rather than in its appropriate place—in the hands of the parent(s).  This can occur through the transferal of power by one or both parents—whether it is one or both, the consequences are devastating in the

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

child and lead to destructive, problematic behavior in the child.  Thus, both parents must be invested in this process and willing to work on themselves as individuals and together as a united front for the betterment of your daughter.

As we have already mentioned, blurred boundaries are often difficult to see, but we would like to give you some questions to help stimulate self-reflection and discovery of issues that need to be worked on before your daughter returns to your home.  Once addressed, this will lead to greater success for your daughter and more fulfilling relationships within the entire family.

As you read through these questions, we would invite you to prayerfully consider them (with the help of the Holy Spirit) as a sort of parental examination of conscience.  If you feel that this issue of blurred boundaries may apply to your family system in some way, please let us know so that we may provide you with greater family assistance.

Have you run to the aid of your child whenever she gets in trouble?  Do you find yourself siding with your child's version of the story more often than with the other parent, the teacher, the staff at TTS, etc.?  Do you try to rescue your child from negative consequences to her behaviors in order to try to "protect her self-esteem"?  Whenever your child gets in trouble (either with outside professionals or even the other parent), does it feel like a personal attack to your parenting skills or your own self-esteem?  Do you find that you would much rather pour your energy into your children than into your marriage?  Do your child's negative behaviors provide a welcomed distraction from marital issues?  Do you find yourself telling your child about personal struggles so that you might feel better?  Do you find yourself "venting you feelings" to your child or even just in front of your child?  Does the child know too much information about marital difficulties or problems that should be solved by the parents?  Do you find yourself fighting feelings of inadequacy whenever your child does not succeed at something?

If these examples or any others seem to fit your family dynamic, let us know so that we may help you to restore your daughter to the role of a child rather than her previously held role of "quasi-parent."

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



Trinity Teen Solutions, Inc. has strict guidelines regarding whom your daughter may contact by phone and when. This policy is to insure safety of all staff and clients that are at Trinity. Everything coming into Trinity will be subjected to a search for contraband or any other materials that are against Trinity's philosophy.

**NEVER GIVE OUT YOUR DAUGHTER'S WHERE ABOUTS TO ANYONE! THIS IS FOR HER SAFETY AND FOR ALL OF TRINITY.**

Our goal is to motivate your daughter to make internal changes. We have found that in order to get your daughter to look within herself we must minimize external distractions and contact with family.

- Phone contact is determined by the treatment team taking into consideration what is beneficial for your daughter progress in treatment and is based on the uniqueness of the client and her family. WE MAY MAKE RECOMMENDATIONS THAT DO NOT FOLLOW THESE GUIDELINES IF WE DEEM IT BENEFICIAL TO HER TREATMENT. As a general rule the following guidelines are set forth:

  ### GENERAL PHONE CALL GUIDELINES:

  ➢ **Level 1-** The therapist will be on the phone with you weekly until you get on the phone with your daughter. Phone calls are based on your daughter's compliance and if she has ceased her maladaptive ways of interacting with her parents. Usually this takes about 30-60days. Initially, all phone calls with your daughter will be facilitated weekly by the therapist. After it is determined your daughter has learned to effectively communicate with you, the phone calls will alternate between being facilitated by the therapist or by a staff member.

  ➢ **Level 2-** Weekly phone calls for 15 minutes every week, alternating between calls with the therapist and calls facilitated by a staff member. These calls are with parents and/or guardians only.

  ➢ **Level 3-** Weekly phone calls for 15 minutes, supervised by staff and with parents and/ or guardians only

  ➢ **Level 4-** Weekly phone calls for 15 minutes. If calls are productive, then the calls may be 20 minutes, supervised by staff and with parents and/or guardians only

  ➢ **Level 5-** Unsupervised weekly phone calls for 20 minutes with parents, extended family and parent-approved friends.

- The girls have no unapproved access to phones. If you find out that your daughter has made calls to anyone, call Trinity immediately and let us know.

- We have found it better for children adjusting to the ranch and its schedules that there be no phone calls to parents during the initial stages of their stay. This allows them to concentrate on learning the rules and making adjustments to living at the ranch. Your daughter's therapist will call you and give you an update about your daughter and answer any questions that you may have regarding her therapy. Also these Family Session phone calls are to help you begin to work on your parental, individual and family issues that have brought your daughter into treatment.

- As a rule, all parents/guardians that have the duty of supervising, raising and making decisions for the client will be on the Family phone calls at the same time with the therapist and their daughter. Regardless of conflict between parents,

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

there will be no separate phone calls made in order to accommodate them. TTS strives to heal the dysfunctional family systems that have brought your daughter to treatment, therefore we will not enable any dysfunctional processes. Exceptions to these rules will be considered on an individual basis and with the approval of the treatment team, taking into consideration the best interests of your daughter and her progress in the program.  This policy allows your daughter to concentrate on her own concerns.

- Phone calls are always subject to supervision and approval by the treatment team.

The most powerful and destructive event that can happen while your daughter is at TTS, are phone calls.  This can be a great therapeutic tool if used properly to help her and you grow.  Unfortunately, one of the most difficult things for parents is receiving the recommendations and implementing those recommendations in the phone calls with their daughter.

When you begin to talk to your daughter there will be many emotions involved.  That is why we have developed very detailed and very important rules for participation.  Our goal is to teach both you and her new patterns of interaction, so that when she returns home you do not revert back to your old destructive patterns of interacting with each other.  Some parents have requested to delay talking to their daughter until they have healed and dealt with their own personal issues.  If this is you, PLEASE let us know. That does not mean you are a bad parent. On contrary, it is good for your daughter to realize how she has hurt and damaged her relationships.

# Rules of participation for phone calls:

- YOUR DAUGHTER WILL NOT BE GIVEN ANY RULES OF PARTICIPATION REGARDING PHONE CALLS.  The reason is we want to see TRULY where she is in her relationship with you.  We will use what ever she presents in therapy to help her grow.

- Keep in mind that the goal is to assist your daughter to look deep within herself for her strengths, and to eradicate the weaknesses that are destroying her life.

- Phone calls are for the allotted time and frequency that is in your daughter's plan of treatment.  Refrain from going over the time.  This teaches her that rules and earned privileges do not matter.  We will terminate the call at the allotted time if you don't.

- When talking to her ensure that she remains within these guidelines in order to assist her in growing in virtue and eradicating her problematic behaviors.

- When talking to your daughter do not discuss when she returns home or possible discharge dates.  We want her to focus on each day and in the here and now, not in the future or in the past.  This keeps her dealing with the issues at hand and prevents her from living in the future.

- Keep conversations directed on your daughter and her issues. Do not talk to your daughter about issues that will distract her from focusing on herself and the changes she needs to make before being able to return home.

- It is a tendency for parents to want to ease the pain of their children and to comfort them, we have found that this enables her to continue her problematic behaviors.   Please refrain from conversation that is too "soft"—remember your participation in this process is critical—the more you stay focused on the core issues, the more she will!!!

- Refrain from talking about when she comes home, the plans for her being at home, or what is going on at home.  Talk about her and her issues.

- When receiving contact from the family, we have found it better for children not to be burdened with problems the family might be having.

- Avoid conversations that discuss the "weather" or what is going on at home, distract her from her own work and consequences.

- Avoid conversation that are "cheering her on or cheering her up," only makes her think "I can do whatever I want and everyone is sweeping the real issues under the carpet."

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

- Avoid conversations that are all about how wonderful she is, how loved she is and how you will always be there for her no matter what, and you forgive her no matter what.  She thinks, "so if that's the case why am I here?"

- Avoid conversations that take blame, blame a spouse or others for the daughter's behavior.

- Avoid being taken on a guilt trip.  Avoid falling into one of her manipulative traps designed to make you feel guilty and then motivate you to rescue her from this horrible experience.

- Clearly communicate to her that it is up to her to work through her issues and that you will not bail her out.

- Avoid making deals under the table.  Avoid feeling compelled to "hold a carrot" in front of your daughter-she can be motivated without being bribed.

- Avoid enabling her.  Avoid feeling like you have to shield your daughter from experiencing the full impact of her harmful behaviors.

- Avoid "Blurred Boundaries". Avoid putting your daughter in a parental position.  This can happen in a variety of ways:  by giving her too much information, by allowing her to make too many "parental decisions, by giving her too much power, by responding to her every complaint or desire, etc.

- You should terminate the phone call (and if you don't recognize it TTS staff will terminate the call) at anytime if your daughter becomes rude, abusive, manipulative, over-exaggerating, lying, dramatic, blaming, guilt loading parents, trying to get parents to rescue her, playing one parent against the other, and any other reason that TTS deems necessary.

- If you have any questions regarding topics of which you are unsure, please feel free to contact your daughter's therapist with these, and any questions you might have.

- Discuss concerns and issues or address any question that you may have with your therapist on the bi-weekly phone call.  Refrain from putting your daughter in the power seat over the staff, this just extends the time of her treatment because she is now above the staff.

- Refrain from siding with your daughter against one of the parents.  This is a time for all adults to come together to help her to grow.  Remember, as long as there is a door open she will take it.  Pose a united front between the parents during the phone call.

- Allow TTS staff to coach you into new ways of interacting and parenting your daughter.  That is why we are here.  It is imperative for new patterns of behavior to emerge during her treatment here, in order to allow for growth of the entire family system.

- If at anytime the parent interactions are hindering her growth, TTS reserves the right to suspend the phone calls until she or the parents have addressed the treatment issues that are interfering. This is to allow all parties to focus on their issues without being distracted by the family system issues.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



Trinity Teen Solutions, Inc. has strict guidelines for when and whom your daughter has contact with by mail. This policy is to insure safety of all staff and clients that are at Trinity. Everything coming into Trinity will be subjected to a search for contraband or any other materials that are against Trinity's philosophy.

NEVER GIVE OUT YOUR DAUGHTER'S WHERE-ABOUTS TO ANYONE! THIS IS FOR HER SAFETY AND FOR ALL OF TRINITY.

You need to insure that your mail is AT Trinity by Thursday of each week in order to be reviewed by the TTS staff and given to your daughter on Sunday of the same week. If mail is received after Thursday then it will be given to her the NEXT weeks Sunday.

Mail is encouraged always. This is the best way to begin communication with your daughter and to assess for emotional and spiritual growth. We would like to encourage you to write to your daughter and provide you with some suggestions as to how to begin communication.

Mail contact is determined by the treatment team taking into consideration what is beneficial for your daughter progress in treatment and is based on the uniqueness of the client and her family. WE MAY MAKE RECOMMENDATIONS THAT DO NOT FOLLOW THESE GUIDELINES IF WE DEEM IT BENEFICIAL TO HER TREATMENT. As a general rule the following guidelines are set forth:

- Keep in mind that the goal is to assist your daughter to look deep within herself for her strengths, and to eradicate the weaknesses that are destroying her life.

- When writing letters ensure that they stay within the guidelines to assist her to grow virtues and eradicate her problematic behaviors.

- It is a tendency for parents to want to ease the pain of their children and to comfort them, we have found that this enables her to not change behaviors. Please refrain from sending too much mail or mail that is too "soft"—remember your participation in this process is critical—the more you stay focused on the core issues, the more she will!!

- Refrain from writing about when she comes home and the plans, or what is going on at home. Write about her and her issues.

- When receiving contact from the family, we have found it better for children not to be burdened with problems the family might be having.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

- Mail is determined by what is in the best interest and need of you daughter to help her progress in treatment.  These are just guidelines but are always at the discretion of the treatment team; (*please see the Changes and Challenges section in the Holy Cowgirl Manual for more details*).

    a) level 1-she can write and receive mail to and from her parents and/or guardians

    b) level 2- If the treatment team deems it beneficial to her treatment she can write/receive mail from siblings, as well as write and receive mail to/from parents and guardians.

    c) Level 3- If the treatment team deems it beneficial to her treatment she can write/receive mail from siblings, as well as write and receive mail to/from parents and guardians and her extended family.

    d) Level 4- Same as level three

    e) Level 5- If the treatment team deems it beneficial to her treatment she can write/receive mail from siblings, as well as write and receive mail to/from parents and guardians and her extended family and from parent and treatment team approved friends.

- Your daughter's advisor will make recommendations regarding the content of the mail to help you to interact with your daughter in a manner that will encourage her emotional growth.  We will make recommendations to you, however if you refuse to comply with the recommendations the mail will be given the way that it is.  No mail will ever be withheld from the admitting parent/guardian to their daughter.

- All mail must be sent first to the parents or responsible guardian—and then the parents may forward the mail to Trinity if they so choose.

- All mail is subjected to a search and is read by Trinity staff regardless of who it is from.

- Only a few photos of immediate family that depict the changes you are praying your daughter achieves.  For example do not send photos of her high, or partying, dressed immodest, or immodest photos of other family members.  Photos are very distracting to your daughter and the other girls in the program.  Remember our goal is that she focuses every day on herself and her therapy.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

 

Trinity Teen Solutions, Inc. has strict guidelines for what your daughter can have at the ranch.  Space is limited and they live in rustic cabins with 13 other girls, so things get dirty and destroyed easily.  This policy is to insure safety of all staff and clients that are at Trinity.  Everything coming into Trinity will be subjected to a search for contraband or any other materials that are against Trinity's philosophy.

All items that your daughter will need during her stay are provided by Trinity.  Therefore the need to send gifts is limited.  Please refrain from sending gifts except for major holidays and birthdays.  REMEMBER:  A person changes only when they are uncomfortable where they are—if you swamp your daughter with gifts and presents, she will not feel the need to change!!  Remember why you sent her to us—THIS IS NOT SUMMER CAMP!!

Here are some guidelines for gifts.
- DO NOT send money to your child.
- Do not send clothing or jewelry to your child.
- Gifts need to be approved by Trinity.
- We have a nutritional program so sweets and carbohydrates are limited.
- You may send healthy nutritious snacks.
- You may send a FEW photos of immediate family members only.
- You may send stationary and pens
- You may send books approved by Trinity
- Please remember that visitation time is for talking and listening to each other, **not a time to bring gifts.  Save gifts for the special time of her birthday.**
- Any food items that are sent needs to be enough to share with all the girls and staff.

WHEN CONSIDERING WHAT ITEMS YOU MAY WANT TO SEND YOUR DAUGHTER, PLEASE KEEP IN MIND THAT YOU ARE RESPONSIBLE FOR TRANSPORTING EVERYTHING BACK TO YOUR HOME.

TOO MANY GIFTS MAY BE SENT BACK TO PARENT AT PARENT'S EXPENSE.  TRINITY WILL NOT SHIP ANY BELONGINGS AFTER DISCHARGE.

### GIFTS TO TRINITY TEEN SOLUTIONS
Most parents during their daughter's treatment and during the holidays want to send gifts to Trinity Teen Solution's staff, therapist and/or advisor.  In order to maintain objectivity and professionalism for the staff no personal gifts to individuals are allowed.  Instead we would appreciate any size of financial contributions to the Safe Haven Arena Fund to help us build our dream indoor riding arena.  Please go to http://www.fundbunch.com/hubs/trinityteensolutions.aspx to make your gift that will benefit many families and their daughters for years to come.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

 

Trinity Teen Solutions, Inc. has strict guidelines for who and what is allowed on the property.  This policy is to insure safety of all the staff and clients that are at Trinity.  Everything coming into Trinity will be subject to a search for contraband or any other materials that are against Trinity's  philosophy.

**Our goal is to motivate your daughter to make internal changes.** *As we have mentioned over and over in this handbook, a person will only change when they are too uncomfortable in the state that they are presently in.*   We have found that in order to get your daughter to look within herself, we must minimize external distractions and any opportunities she may have to feel comfortable where she is interiorly; thus, the reason why we have a visitation policy and try to limit contact with family.

The visitation policy is as follows:

- Only scheduled visitations are allowed that have been approved by the treatment team that will best benefit your daughter's progress.  This assessment will depend upon both the progress made by your family and an evaluation of the receptivity of your daughter's heart.  Visits prior to six months are rare.

- Your daughter is not allowed to leave the ranch without permission.  If your daughter does leave the ranch for visitation she will be your sole responsibility.  All of Trinity's belongings need to be returned back to Trinity.  Upon return to Trinity, your daughter will be subjected to a search for contraband.

- Only visits by parents or guardians who have legal custody are allowed.  No one else is allowed to visit.

- No personal belongings or gifts are allowed to be given to your daughter, staff or other girls in the program during visitations that have not been approved.

- All belongings and gifts will be searched for contraband.

- After your daughter has been discharged to your care there will be no visits to Trinity that are not approved by the treatment team.  No giving of gifts to staff or clients without approval from treatment team.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

## WHAT TO DO, WHERE TO GO WHEN YOU VISIT

We can give you ideas of what to do with your child while you are visiting her at the ranch.  The purpose of the visit is to re-establish communication between you and your child.

THEREFORE, DURING VISITING TIMES, THE MOST IMPORTANT THING YOU CAN DO WITH YOUR CHILD IS TO TALK WITH HER!

Find out how she is doing, both on the ranch and in school – remembering that not everything she might tell you is true. Please check with the staff for clarity.  Teenagers will manipulate adults around them to get what they want, and will use any means they can to get their own way in order to return home.

## We suggest you have your child adhere to the rules and regulations of Trinity written in this handbook.

1.  Follow the dress code—modesty, modesty, modesty!  To prepare for the visit you may bring her two changes of clothes from home. If she has grown we recommend that you get her new sizes from her advisor or she could wear her Trinity clothing.  We strongly discourage taking her shopping for clothes.

2.  Your visit to her <u>is the gift</u> in itself. However if you want to buy her something small that is fine.

3.  Remember your daughter has destroyed her trust with you, so DO NOT TRUST her on the visit.

4.  Never let your daughter be unattended at anytime, for any reason.

5.  No cigarettes, tobacco, alcohol or drugs.  If your daughter smoked and drank be aware of ash trays and cigarettes butts laying on the ground and partially empty alcohol containers in lounge or dumpster areas.

6.  Behavior:  Maintain proper respect; no foul, obscene, or abusive language; DO NOT ALLOW HER TO GET AWAY WITH ANY MANIPULATION, LYING OR BLAMING OTHERS!!

7.  A healthy dose of skepticism is a good rule of thumb.

8.  Do not leave unsupervised.  Remember they broke your trust and they need to know this.

9.  Do not send your daughter back to Trinity with any items not approved.  We have limited space and are not responsible if anything gets damaged or lost.

10. Parents may decide to call other family members and these phone calls and any phone calls made are to be monitored.

11. Do not allow her to call any of her previous friends (unless this is recommended by the TTS treatment team for treatment purposes)—this is not a time to get reconnected with friends (whether approved or unapproved friends). She is still in the program and the most important relationships that she needs to build and repair are those within your family.

12. This is not the time for pampering your daughter with trips to the spa or beauty salon, expensive gifts or outings— this is a time for difficult conversations, repairing relationships, apologies and forgiveness, and honest confrontations of what was truly going on and what needs to change in your daughter's life.  Do not waste time with activities that will be more appropriate after your daughter has completed the program.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

13. Plan events that are interactive. Remember this is a working trip not a vacation and your role is to begin relating to your daughter in a different manner. We discourage movies or other activities that do not encourage healthy communication interactions

14. No internet access or use.

15. DO NOT give them time tables of any kind.  Like when she will be coming home, or any future plans.  When a child knows these kind of time tables, they just buy time in the program and do not dig deep within themselves to change.

16. Assist us in the treatment of your daughter by observing her interactions during the visit.

17. If there are any problems you can return her early. Just bring her back to the ranch and find a staff member to leave her with.

18. Keep in mind that a substantial aspect of the program is her nutritional health. The girls are on limited sugar intake so therefore over loading of sweets may make her physically ill.

19. Your daughter also may experience sensory overload. We advise limited television use. If used monitor for moral content. Do not bring her MP 3 or IPOD player nor allow her to "lose herself" in the music.

20. Have her back by 6PM and make sure she is "handed over" to a staff member.


## Possible places to go with your daughter: (Check out Parent Portal on our web page for many visitation tips)

1. Stay in Cody, WY—visit the museum or other sites in Cody
2. Yellowstone Park
3. Red Lodge, MT, i.e. Skiing, Hiking, etc.
4. Fishing and picnicking in Clarks Fork Canyon

**Visitation is an earned privilege**.  Please do not do anything that may jeopardize this privilege for your child. (Due to insurance concerns, we cannot invite families to ride horses while at the ranch.  Unlicensed drivers who are ranch residents cannot drive vehicles belonging to relatives or friends either on or off the Ranch.)

ALWAYS ENCOURAGE YOUR CHILD TO DO HER BEST WHILE SHE IS AT THE RANCH so these attitudes will become a habit when she returns home.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



# Clothing and
# Personal Possesions

All personal belongings and clothing on admission will be subject to a search for contraband and all contraband will be destroyed.  Her personal belongings are placed in a bin and stored until discharge, so please minimize her personal possessions.

All girls are dispensed Trinity appropriate ranch wear that they will wear during their stay at Trinity. These items will be returned back to Trinity on discharge.

At discharge she will be given back her stored belongings so that she can wear them home (unless they are entirely inappropriate or they have been destroyed in her ceremony—then other provisions must be made at that time).

You may need to bring her more clothing when you pick her up for the Family Sessions and take her off the ranch.

Only glasses, glass cases, contacts, retainers, medications, or any other items that are approved by Trinity will be allowed.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



You are financially responsible for all medical/dental/eye issues for your child that may occur during her stay. This will be through your own family medical insurance or cash payment. Trinity Teen Solutions, Inc. is not responsible for any medical bills.

All of the staff are trained in First Aid, CPR, and other medical and health issues on a regular and ongoing basis. Many of our staff have had additional training through previous jobs.

You will be notified as quickly as possible, should your child be involved in an accident or a serious illness during her stay at TTS. It would be good to talk with the staff regarding your child's health if you are concerned.

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08

# Common Mistakes
## Parents Make After Discharge

In our studies on the successful transition of kids returning home from a program, we have found that when a child returns to previous behaviors it is often due to some common mistakes made by the parents when the child first arrives home.

**1.) Do not try to "make it up" to your daughter for sending her away.**
   This can take on several different forms: major shopping sprees, elaborate vacations, promises to give them a car or vacation in the future, "emotional band-aids" such as going easy on the consequences or giving too much trust too soon, etc.

**2.) Do not automatically assume that she is trustworthy since she has completed the program.**
   The first months after your daughter's return home are the most crucial—she will attempt to test the boundaries to see if you have made lasting changes to your parenting style. Your attitude of consistent rules and follow-through on consequences will set the tone for years to come. She will learn that you continue to mean business even after being sent away.

**3.) Do not pull away at any of the threads of Trinity's philosophy.**
   If you pull on one, the entire rug will unravel—this will pull the rug out from under her feet and leave her without the foundation on which she has built her new identity. This, too, can take many forms: criticizing any of the staff or practices of Trinity, questioning the religious beliefs or practices of TTS, not keeping scheduled phone appointments or following through on other discharge practices, etc.

**4.) Do not take away from your daughter's responsibility for her own behavior.**
   Often when parents see their own role in their daughter's formation they begin to feel guilty about some of their parenting mistakes in the past or one may see the errors in the other parent's ways of handling things—do not apologize so much that it takes the responsibility off of your daughter's shoulders and do not complain or criticize about the other parent in front of your daughter.

**5.) Do not give her any indication of weakness in the parental armor.**
   Teenagers (particularly at-risk teens) often make the best lawyers—they are keenly aware of loopholes in the system, or chinks in the armor of parental discipline. If parents do not provide the teen with a "unified front," she will employ the tried-and-true tactic—divide and conquer. Parents must maintain consistent and clear messages that do not change from one parent to another. Never complain about or disagree with the other parent in front of your daughter—parents you must work out your differences behind closed doors!!!

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



TRINITY TEEN SOLUTIONS, INC.

*A journey that enriches her mind, body, and soul*

# PARENT INFORMED CONSENT

*After reading this Parent Handbook, please feel free to address any questions or concerns that you may have before signing and returning the document. Both parent(s)/guardian(s) need to sign.*

## AGREE TO PARTICIPATE

I have read this informative Parent Handbook and I agree to participate in the Treatment Program, compliment the philosophies and encourage growth in myself, my spouse, and my daughter.

_____          _____
      Parent/Guardian Signature                                   Date

I have read this informative Parent Handbook and I agree to participate in the Treatment Program, compliment the philosophies and encourage growth in myself, my spouse, and my daughter

_____          _____
      Parent/Guardian Signature                                   Date

## REFUSE TO PARTICIPATE

I have read this informative Parent Handbook and I refuse to participate in the Trinity Treatment Program

_____          _____
      Parent/Guardian Signature                                   Date

I have read this informative Parent Handbook and I refuse to participate in the Trinity Treatment Program

_____          _____
      Parent/Guardian Signature                                   Date

*Please Fax to Trinity at 307-645-3385 or Mail to Trinity.* Address:  Trinity Teen Solutions, Inc
                                           89 RD 8 RA
                                           Powell, WY 82435
                                           Phone 307-645-3384

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08



# RECOMMENDED READING FOR PARENTS

## Nutrition and Addiction:
1.) <u>Depression Free Naturally</u>—Joan Mathews
2.) <u>Diet Cure</u>—Julia Ross
3.) <u>Seven Weeks to Sobriety</u>—Joan Mathews

## Necessities:
1.) The Bible
2.) Christian Prayer: The Liturgy of the Hours
3.) <u>My Daily Bread</u>-Anthony J Poane S.J.

## Virtues and Spirituality:
1.) <u>The Family Virtues Guide</u>- Linda Kavelin Popov
2.) <u>The Heart of Virtue</u>—Donald DeMarco
3.) <u>Back to Virtue</u>-Peter Kreeft
4.) <u>Prayer: The Great Conversation</u>- Peter Kreeft
5.) <u>C.S. Lewis Explores Vice and Virtue</u>—Gerard Reed
6.) <u>The 4 Temperaments</u>-C.S. Lewis
7.) <u>The Imitation of Christ</u>, Thomas à Kempis
8.) <u>Reaching Out</u>—Henri Nouwen
9.) <u>Treasury of Women Saints</u>—Ronda De Sola Chervin
10.) <u>Be Intolerant</u>—Ryan Dobson

## Parenting and Teen Issues:
1) <u>Parent in Control</u>—Gregory Bodenhamer
2) <u>Back in Control</u>—Gregory Bodenhamer
3) <u>Overindulged Children</u>—Dr. James Fogarty
4) <u>Boundaries</u>—Dr Henry Cloud, Dr John Townsend
5) <u>Safe People</u>—Dr. Henry Cloud & Dr. John Townsend
6) <u>Reviving Ophelia</u>—Dr. Mary Pipher
7) <u>A Safe Place</u>- Jan Morrison
8) <u>Love Is A Choice</u>—Frank Minirth, Dr. Robert Hemfelt, Dr. Paul Meier
9) <u>Don't Sweat the Small Stuff Workbook</u>- Richard Carlson, Ph.D.
10) <u>The Seven Habits of Highly Effective Teens</u>- Sean Covey
11) <u>Excess Baggage</u>- Judith Sills, Ph.D.

## Trinity Favorites:
1.) <u>Rachel's Tears</u>—Beth Nimmo and Darrell Scott
2.) <u>Hinds' Feet on High Places</u>—Hannah Hurnard
3.) <u>The Great Divorce</u>- C.S. Lewis
4.) <u>Screwtape Letters</u>- C.S. Lewis
5.) <u>Lessons from a Sheep Dog</u>-Phillip Keller
6.) <u>Passion and Purity</u>- Elisabeth Elliot
7.) <u>'Til We Have Faces</u>- C.S. Lewis
8.) <u>Space Trilogy</u>-C.S. Lewis (especially book 2)

© Trinity Teen Solutions, Inc. 2002
Revised 1/30/08