Thomas B. Quinn (WY:#5-2630)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Telephone: (303) 534-5160
Email: tquinn@grsm.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN**, **ANNA GOZUN**; **AMANDA NASH**; and **JOHN DOE** on behalf of themselves and all similarly situated persons,<br><br>Plaintiff,<br><br>vs.<br><br>**TRINITY TEEN SOLUTIONS, INC.,** a Wyoming corporation; **TRIANGLE CROSS RANCH, LLC,** a Wyoming limited liability corporation; **MONKS OF THE MOST BLESSED VIRGIN MARY OF MOUNT CARMEL, d/b/a MYSTIC MONK COFFEE,** a Wyoming corporation; **GERALD E. SCHNEIDER; MICHAELEEN P. SCHNEIDER; ANGELA C. WOODWARD; JERRY D. WOODWARD; DANIEL SCHNEIDER; MATHEW SCHNEIDER; MARK SCHNEIDER; KARA WOODWARD; KYLE WOODWARD; THOMAS GEORGE; JUDITH D. JEFFERIS; DALLY-UP, LLC,** a Wyoming limited liability corporation; **ROCK CREEK RANCH, INC.,** a Delaware corporation; **DIOCESE OF CHEYENNE,** a Wyoming corporation; and the **SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY,** a Texas corporation; and **NEW MOUNT CARMEL FOUNDATION, INC.,** a Wyoming corporation,<br><br>Defendants. | Civil Doc. No. 20-CV-215-SWS<br><br>**BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT BY DEFENDANTS TRINITY TEEN SOLUTIONS, ANGELA WOODWARD, JERRY WOODWARD, KARA WOODWARD, AND DALLY-UP, LLC** |

Defendants Trinity Teen Solutions, Angela Woodward, Jerry Woodward, Kara Woodward, Kyle Woodward, and Dally Up, LLC ("Trinity and Woodward Defendants"), by and through their attorneys, offer this brief in support of their motion to dismiss Plaintiffs' Class Action Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## I.      PROCEDURAL HISTORY AND BACKGROUND

Plaintiffs' parents made the presumably difficult decision to send their children to receive therapy and services at a residential treatment center. Before the Court is the issue of whether Plaintiffs can sustain their action for human trafficking, RICO, and negligence based on their parents placing them in a licensed program that includes therapeutic activities involving principles of manual labor, hard work, and self-sufficiency.

Plaintiffs Carlie Sherman, Anna Gozan, Amanda Nash, and John Doe filed this action against eleven individual defendants and eight entity defendants on November 25, 2020. [D.E. 1]. They allege five causes of action against either some or all defendants: (1) forced labor in violation of Trafficking Victims Protection Act (TVPA) provisions 18 U.S.C. §§ 1589(a), 1595(a); (2) forced labor in violation of 18 U.S.C. §§ 1589(b), 1595(a); (3) unlawful recruiting, harboring, transporting, providing and/or obtaining of labor or services in violation of 18 U.S.C. §§ 1590, 1595(a); (4) violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1961 *et seq*, and; (5) state law negligence and negligent infliction of emotional distress. As explained below, each of Plaintiffs' claims should be dismissed.

## II.      PLAINTIFFS' CLAIMS AND BACKGROUND

### A.      Plaintiffs' Recruitment Scheme Theory.

Plaintiffs allege that the Defendants operated a "recruitment scheme" or even a conspiracy whereby they allegedly made false representations about treatment and then forced Plaintiffs to

perform unpaid ranch work and other labor in order to obtain profits for their respective businesses instead of providing promised treatment. [D.E. 1 ¶¶ 4, 8, 19, 51, 56, 136, 137]. Plaintiffs generally allege that two providers of substitute childcare services operate the forced labor scheme: Triangle Cross Ranch, Inc. ("TCR") owned by Jerry and Michaeleen Schneider ("TCR Defendants") and Trinity Teen Solutions ("TTS") owned by Angie and Jerry Woodward. [D.E. 1 ¶¶ 3, 4]. TCR is a group home for boys and TTS is a residential treatment center for girls. [D.E. 1 ¶¶ 3, 4]. Plaintiffs allege that they were subjected to or threatened with sleep deprivation, physical punishment, emotional abuse, and humiliation such as being leashed to other people, carrying around a folding chair, forced silence, and being made to run. [D.E. 1 ¶ 15].

Plaintiffs' theory of forced labor depends in large part on their conclusory assertion that TCR and TTS are working ranches. Plaintiffs allege that TCR is a "50,000 acre working ranch with over 1,000 head of cattle." [D.E. 1 ¶ 3]. There are no other allegations to support Plaintiffs' theory of a working ranch that used their forced labor as to TCR.  They allege that TTS is a "working ranch" that "sits on a 160-acre parcel." [D.E. 1 ¶¶ 4, 53].  Plaintiffs offer no other allegations in support of the working ranch theory as to TTS. For example, they do not articulate what livestock TTS raises, what work is required to support TTS's alleged ranching operations, or anything else that would make it plausible that a purported working ranch would entrust the wellbeing of valuable livestock to "untrained, unsupervised teen[s] with no prior farm or ranch experience" instead of "experienced ranch hand[s]." [D.E. 1 ¶ 62]. Markedly absent is any assertion that any Defendant derives income from livestock being raised at TTS. Nor do Plaintiffs set forth information that supports their theory that a 160-acre property requires approximately twelve Plaintiffs working ten to twelve hours a day at any given time, in addition to staff, to support its alleged "working ranch" operations. [D.E. 1 ¶¶ 15, 61, 94-95].

There is also little in the way of allegations to support Plaintiffs' theory of a scheme among the defendants, which is necessary both for the forced labor and RICO causes of action. More specifically, there is no allegation that the respective operations of TCR and TTS had anything to do with one another. TCR and TTS are on separate properties located approximately 12-15 miles from one another in the Powell, Wyoming area. [D.E. 1 ¶¶ 29, 30]. Plaintiffs do not allege that Defendants forced girls from TTS to labor at TCR or that boys from TCR were forced to labor at TTS. They do not allege that there was shared ownership or control between TTS and TCR. They do not allege that owners and employees of TTS and TCR worked together in any way to operate their respective substitute childcare service businesses. Rather, Plaintiffs rely almost exclusively on some of the co-defendants' family relationships to support a scheme theory. [D.E. 1 ¶¶ 4, 32-40].  For example, family relationship is the sole basis to claim that Angela and Jerry Woodward are "following in the footsteps" of Gerald Schneider's business because this allegation is otherwise unsupported by a description of the alleged forced labor scheme that Gerald Schneider devised and that Angela and Jerry Woodward adopted. [D.E. 1, ¶ 50]. To the extent operating a substitute childcare service without certification has any bearing on the issue of forced labor, Plaintiffs do not allege – because they cannot – that the 2012-2015 litigation between TCR and the Wyoming Department of Family Services involved TTS, Dally-Up, or any Woodward defendant. [D.E. 1 ¶ 3]. Nor do they offer allegations, outside of family relationship, that connect the apparent testimony of Gerald Schneider regarding "reality therapy" during an enforcement action brought by the state of Wyoming   the TTS listing of "reality therapy" in the Parent Handbook attached to the Complaint  . [D.E. 1, ¶ 7-8, p. 70].

Similarly, the Complaint sets forth a recitation of who the various defendants are with little information about what each defendant allegedly *did* in order to carry out a forced labor

recruitment scheme or conspiracy.  For example, the apparent extent of involvement by defendants Kyle and Kara Woodward  is that they are owners, managers and employees of TTS and/or Dally-Up LLC. [D.E. 1, ¶¶ 39-40, 67]. Defendants Mathew and Mark Schneider are similarly alleged to be employees, nothing more, of TCR. [D.E. ¶ 68]. Even the allegations against Angela and Jerry Woodward, outside of "following in the footsteps" as noted above, are limited to noting that Angela Woodward is Gerald Schneider's daughter, that she and her husband, Jerry Woodward, own and operate TTS and Dally-Up, LLC. [D.E. 1, ¶¶ 4, 34-35, 43, 53-54]. Liability against Dally-UP, LLC hinges on two paragraphs alleging that it purchased the land where TTS is located in 2010 accompanied by the conclusory and irrelevant assertion of Dally-Up as being a "shell company" and an imaginative contention that an apparent term of land purchase was "free labor and maintenance" on co-defendant Judith Jefferis's separate property. [D.E. ¶¶ 54-55]. Plaintiffs offer no additional allegations in support of their extraordinary contention that a term of a land purchase included free labor and maintenance.

With respect to the claims of Plaintiff Doe against the Trinity and Woodward Defendants, there are no allegations that he was ever at TTS for any reason or that he ever interacted with or was impacted by the actions or failure to act of any Woodward defendant. The sole basis of his potential claims against the Trinity and Woodward defendants are the allegations of a forced labor recruitment scheme between the defendants. Nothing else supports his apparent claims against the Trinity and Woodward defendants. Accordingly, while the arguments in this motion focus on the contents of the Parent Handbook, which are obviously most applicable to the named Plaintiffs, the failure to articulate a scheme applies equally to Plaintiff Doe.

**B.     The TTS Parent Handbook and DFS Regulations.**

Aside from their insufficient articulation of a scheme, two additional issues undercut Plaintiffs' statement of their claims. The first is the complete contents of the Parent Handbook that Plaintiffs have appended to the Complaint when read in their entirety (and not selectively as Plaintiffs attempt to do). The second related issue is the regulated environment in which TCR and TTS operate. Both the laws applicable to substitute childcare providers and the contents of the Parent Handbook significantly impact the plausibility of Plaintiffs' theory of labor or services and compulsion under the TVPA, as well as their theory of misrepresentation of services which is relevant to both scheme liability and Plaintiffs' theory of negligence. As is described in greater detail below, the legal requirements that TTS must meet in order to be able to operate are consistent with the contents of the Parent Handbook. Read together, they erode Plaintiffs' theories of liability.

Both TTS and TCR are providers of substitute childcare services regulated by DFS pursuant to Wyo. Stat. Ann. §§ 9-2-2101, 14-4-101 *et seq*, and Department of Family Services regulations. (Attachment A). Plaintiffs confine their reference to the respective regulated provider statuses of TCR and TTS to the conclusory allegation that this is a "guise." [D.E. 1 ¶¶ 3, 4, 51, 56]. They do not offer a theory as to how TTS manages to pull off such a guise in light of the legal requirements that it must meet in order to operate. Nor do they allege that TTS ever operated without proper certification. Nor do they allege that TTS ever faced a risk of losing its certification, for example, via any complaint made to DFS by a Plaintiff, putative class member, or parent.

DFS Regulations define a group home like TCR as follows: "A Group Home offers a home-like environment where staff may be live-in parents with their own children. Therapeutic services may be provided." WY ADC 049.0029.7 § 2. Residential treatment centers (RTCs) like TTS "provide services for children who require a combination of therapeutic, educational, and

treatment services in a group care setting." *Id*. WY ADC 049.0029.10 § 2. Both types of facilities must be "certified" by DFS meaning "DFS formally recognizes the organization as meeting all of the minimum requirements of [DFS] rules that pertain to the specific services provided and compliance with applicable laws and regulations." WY ADC 049.0029.1 § 6(d). Certification is good for one or two years. WY ADC 049.0029.2 § 2(a). Facilities must support their requests for certification or recertification with documents demonstrating compliance with DFS rules. WY ADC 049.0029.2 § 1(e). Additionally, certification and recertification requires one or more on-site DFS inspections. *Id*.

Residential treatment centers like TTS are required to comply with several DFS regulatory requirements in order to obtain certification and to avoid suspension, revocation and nonrenewal of certification as well as other penalties. *See* Wyo. Stat. Ann. §§ 14-4-103, 14-4-108, 14-4-110, 14-4-111. Chief among them in terms of relevance to this case is the requirement that the facility obtain consent to treatment and/or placement from the child's parent or legal guardian "if not already addressed in a court order." WY ADC 049.0029.3 § 5(a); WY ADC 049.0029.10 § 1(b)(iii). DFS defines "informed consent" as "a child's parent or legal guardian explicitly grants permission to the organization to use a specific intervention. Consent is premised on full disclosure of the facts to enable the consumer to make a decision based on knowledge of the risks, benefits and alternatives." WY ADC 049.0029.1 § 6(l). Relatedly, the TTS Parent Handbook contains a parent informed consent signature page where the parent can either "agree to participate in the Treatment Program" as described in the rest of the Parent Handbook (discussed more below) or they can refuse. [D.E. 1, p. 108]. "Program" is another DFS regulatory term that is interchangeable with "facility" meaning "a system of services offered by an organization in a specified location." WY ADC 049.0029.1 § 6(q).

Parental consent is not all that is required in order to place and treat a child at an RTC. The child must also exhibit one of the following conditions:

(i) Child cannot function in his/her community;
(ii) Child has treatment issues requiring therapeutic intervention;
(iii) The child has received a psychiatric evaluation resulting in a diagnosed behavioral condition;
(iv) The child is only minimally accepting of the treatment process;
(v) There are documented attempts to treat the child with the maximum intensity of services available at a less intensive level of care that cannot meet or has failed to meet the needs of the child;
(vi) Without intervention, there is clear evidence that the child will likely decompensate and present a risk of serious harm to self or others; and
(vii) Child cannot attend public school.

WY ADC 049.0029.10 § 6(a). In addition to exhibiting at least one of the foregoing behaviors, children who exhibit the following behaviors may also be appropriate for placement at an RTC:

(A) Inability to follow directions and conform to structure of school, home or community;
(B) Constant, sometimes violent arguments with caretakers, peers, siblings and/or teachers;
(C) Moderate level of self-injurious behavior, risk taking, and/or sexual promiscuity;
(D) Suicidal actions/history of serious suicidal actions;
(E) Almost daily physical altercations in school, home or community;
(F) Constant verbally aggressive and provocative language;
(G) Frequent and severe property damage;
(H) Probable juvenile justice system involvement; and/or
(I) Moderate to high risk for sexually victimizing others.

*Id*. at § 6(a)(viii). Plaintiffs advance a theory that Defendants made promises to them, defrauded them, induced them to pay money, and forced them to work without their consent that references the role their parents played in placing and keeping them at TTS either minimally or not at all. [D.D. 1, ¶¶ 9-13, 15-18]. Unsurprisingly, minors like the Plaintiffs who exhibit the foregoing behaviors might not, given the choice, consent to a residential treatment program like the one operated by TTS. But theirs is not the consent contemplated by the law applicable to RTC's and as reflected in the contents of the Parent Handbook. At least some degree of adverse response to

admission on the part of the child is to be expected. To that end, the Parent Handbook explains that a parent or guardian can expect that their teenage daughter will exhibit a range of strong emotions following admission to the program, including "anger, loneliness, sadness, remorse, manipulation, lying, and depression." [D.E. 1, p. 83].

Plaintiffs' fraud theory with respect to allegedly promised treatment and the "recruitment scheme" depends in large part on representations made in advance of their admission to TTS via the Parent Handbook. [D.E. 1, ¶¶ 4-6]. They selectively allege that some of the listed potential treatments in the Parent Handbook are part of the "promise" that TTS made to them. [D.E. 1, ¶ 4-8, p. 70-71]. They do not reconcile their belief in a promise with the first page of the Parent Handbook which states, "This handbook does not constitute a contract with Trinity Teen Services, Inc., either express or implied…Furthermore, the provisions of this handbook are designed by Trinity Teen Solutions, Inc. to serve as guidelines rather than absolute rules, and exceptions may be made from time to time on the basis of particular circumstances." [D.E. 1, p. 59].

Nor do Plaintiffs allege that they actually needed any or all of the treatments listed in the Parent Handbook attached to the Complaint and that they did not receive needed treatment. They forego any reference to individualized treatment entirely. However, the individualized assessments that occur after admission govern the treatment a particular resident will receive. Indeed, at the top of the list of possible treatments at TTS, the Parent Handbook states: "By using a wilderness ranch setting, animal assisted therapy, and an *individual care plan tailored to the needs of each person* we challenge young women to create healthier lives…" [D.E. 1, p. 70] (emphasis supplied). This disclosure is consistent with Wyoming state regulations applicable to RTCs. Within 14 days of admission to an RTC the following must occur:

(i) Initial diagnostic assessment;
(ii) Medical, psychiatric and substance use history;

(iii) *Family and social assessment*;
(iv) Child assets and strengths;
(v) Developmental history and current developmental functioning with respect to physical, psychological and social areas, including age appropriate adaptive functioning and social problem-solving;
(vi) Psycho-educational assessment;
(vii) An assessment of the need for psychological testing, neurological evaluation and speech, hearing and language evaluations; and
(viii) A problem list, related to the reasons why the child was admitted to this level of care.

WY ADC 049.0029.10 § 6(b) (emphasis supplied).

Individualized plans of care contemplate family involvement. The Parent Handbook explains how family will be involved in their daughter's recovery such as assessments to identify what constitutes problem attitudes and behavior from a parent perspective and the strength of the child-rearing alliance between parents. [D.E. 1, p. 71]. The Parent Handbook discusses at length the critical importance of family participation in therapy in order to meet treatment goals, citing to such factors as the presence of certain psychological disorders within families, repeated behavior across generations, the impact of differing social, racial, cultural, and religious backgrounds, blended families, and the dynamics of extended families. [D.E. 1, p. 72-73]. This family-based approach to individualized services is consistent with the regulations applicable to RTCs. Those regulations require that RTCs also provide the following:

(i) Wyoming Department of Education approved or accredited on-grounds school, a High School Equivalency program, or a program which works with the local school district to meet the educational needs of the child;
(ii) A minimum of twenty-four (24) hours of therapeutic services per child per month, which shall include a combination of behavior modification, individual therapy, group therapy and family therapy. The specific services shall be determined by the treatment team through the creation and implementation of an [individual treatment plan of care] ITPC that is *family based*, child guided and culturally responsive; and
(iii) Ongoing discharge and continuing care planning.

9

WY ADC 049.0029.10 § 2(a)(emphasis supplied). ITPC "means a document that describes measurable, individualized therapeutic treatment goals and strategies designed to meet the child's needs as determined by the clinical assessment." WY ADC 049.0029.1 § 6(k). ITPC's must be developed for children placed at a residential treatment center within 14 days. WY ADC 049.0029.3 § 31(a). They are developed by "the organization's administrator/executive director (or designee) foster parent, professional staff, parent or legal guardian, [Department of Family Services] DFS if the child is in DFS custody, and the child (if age appropriate)." *Id*. at § 31(b). The ITPC shall include, but is limited to:

> (i) Written, measurable behavioral objectives, including how the staff will facilitate engagement of child with his/her family (to develop, maintain and strengthen relationship) of what is to be accomplished during the estimated period of service;
> (ii) Activities and tasks assigned to the organization or foster parent, child and family members (others as indicated) along with time frames for achievement of each task and clearly stated expectations and resources to be provided by the organization, child, family members, or other agencies or community organizations;
> (iii) Delivery of competent, regular and emergency medical, dental and optical care, with attention to special medical needs (the child's health and safety plan shall be integrated into the ITPC, when available);
> (iv) Discharge plan to include a time-line, anticipated discharge date, and continuing care plan with other programs and/or community service providers identified as appropriate;
> (v) Time frames for the periodic review of progress toward the objectives;
> (vi) Description of the potential benefits of achieving the ITPC objectives and a description of potential ramifications of not achieving the ITPC objectives;
> (vii) When age appropriate, independent living skill building; and
> (viii) A description of any Reasonable and Prudent Parent decisions made by the designated official (executive director) or his/her designee.

WY ADC 049.0029.3 § 31(d); WY ADC 049.0029.10 § 1(b)(iii). Consistent with the foregoing regulatory requirements applicable to RTCs, the TTS Parent Handbook contemplates and describes individualized assessment and treatment plans. It explains that "[a]n individual care plan is developed for each young woman in the first week" that is "written by a licensed professional

assigned to work with the student" and "reviewed and approved by the treatment team." [D.E. 1, p. 67]. The Parent Handbook also describes information that TTS may use to develop the individual care plan such as "psychological history, psychiatric evaluation, physical examination, standard clinical interview, previous psychological evaluations, group home/residential reports, monitoring of medication, previous individual therapy, discussion with previous therapists, school reports, parent consultation, consultation with relevant physicians, nutritional assessment, day-to-day observation of student, [and] substance abuse history." [D.E. 1, p. 67]. It also lists 8 different assessments that TTS conducts and which are consistent with Wyoming state ITPC requirements. [D.E. 1, p. 71]. The Parent Handbook contemplates continuous parental involvement. It explains that parents will receive weekly progress summaries, bi-weekly telephone conferences with their daughter's therapist, communication via telephone and e-mail with their daughter, and family counseling and/or inclusion in treatment as appropriate. [D.E. 1, p. 87]. Parents are also asked to complete an assessment of family strengths and weaknesses. [D.E. 1, p. 87]. In short, ongoing parental consent and involvement are legally and logistically required through the course of a child's admission to and stay at TTS.

Where limits on parental communication are concerned, TTS communicates the limitations, as well as the practice of conducting searches for contraband and its rules regarding visits in advance of admission via the Parent Handbook [D.E. 1, ¶¶ 12, 17, pp. 86, 96]; WY ADC 049.0029.3 § 23(j)(3). Where telephone calls are concerned, the Parent Handbook provides a detailed disclosure describing five "Levels" that the child can achieve, and the level of parental communication, ranging from supervised to unsupervised, that accompanies each level. [D.E. 1, p. 96]. It states: "The girls have no unapproved access to phones." It discusses at length the TTS supervision of calls that will occur and the reasons for the level of supervision, the most notable

11

reason being that "[t]he most powerful and destructive event that can happen while your daughter is at TTS, is phone calls." [D.E. 1, pp. 96-97]. It also sets forth the rules of participation for calls, all of which are tied to therapeutic reasons for the rules. [D.E. 1, p. 97-98].

TTS also provides guidelines for mail communication between parents and children in advance, including review by staff of mail prior to distribution to or from the children. [D.E. 1, p. 99]. The communication guidelines are similar to those applicable to telephone calls and also reference the five "Levels" in connection with the number of people with whom the child can correspond. [D.E. 1, p. 99-100]. The Parent Handbook notes that while TTS will make recommendations to parents as to the content of mail sent to their children that "[n]o mail will ever be withheld from the admitting parent/guardian to their daughter." [D.E. 1, p. 100]. Plaintiffs do not allege that TTS or any Woodward defendant withheld mail from their parents or guardians.

The Parent Handbook also describes guidelines for visitation. It describes that visits must be scheduled and other conditions, such as all belongings being subject to search and that visitations are limited to parents and guardians. [D.E. 1, p. 102]. The visitation guidelines do not contemplate that staff will be present to supervise visits. Rather, the parent or guardian visits their daughter on their own, even off the TTS property at times. [D.E. 1, pp. 102-04]. Such visitations would provide an opportunity to discuss concerns about the conditions at TTS.

The TTS program's incorporation of physical activity, including chores like cooking, cleaning, and caring for animals, is also communicated in advance. [D.E. 1, ¶¶ 12, 70, 73, 75, 78, 79, 82; p. 68; p. 78] As are the rustic living conditions, dietary aspects of the program, the use of discipline, and the use of progression through different levels in order to access improved conditions and comforts. [D.E. 1, ¶¶ 12, 15, 16, 73; p. 83]. For example, Parent Handbook discusses the program's objective correlating positive behavior with "life's basic needs such as:

12

food, shelter, and comfort" and "allowing natural consequences to provide reinforcement and punishment of appropriate or inappropriate behaviors." [D.E. 1, p. 68] It discloses that TTS "frequently will make something an ordeal in order to impact behavior." [D.E. 1, p. 71]. It discusses the challenges of working with addicts in particular and the philosophy of compelling a change by causing addicts to "hit rock bottom." [D.E. 1, p. 88]. It describes a core TTS philosophy as "people only change when they are uncomfortable." [D.E. 1, p. 88]. TTS repeatedly communicates the unvarnished reality of the challenges of the TTS program for everyone involved in advance to parents via statements like these from the Parent Handbook:

- This principle of change is what drives much of our program—the level system, the timing of when privileges are given, the consequences for misbehavior, etc.

- …you play a big part in the "environment of discomfort" that surrounds your daughter.

- This collaboration in maintaining discomfort for your daughter is often extremely difficult for parents.

- Often we trade eternal happiness for temporary happiness—we so desire their happiness and comfort *now,* that we prevent our children from learning the necessary "hard lessons of life" and feeling the consequences of their poor choices.

- Trinity Teen Solutions, therefore, seeks to imitate the manner in which God has dealt with His people throughout history—by allowing them to feel the consequences of their actions. But we can only be successful if you, the parents, are completely on board with this approach

13

- Once she has felt the painful effects of her sinfulness and experiences genuine remorse, then she will be able to reach out to God in authentic repentance and begin working on rebuilding her broken relationships both with herself and her family members.

- Shutting the door may simply sound something like this: "Debbie, we know this is tough. We know this is not easy. This is hard work. Since we are not residents there, we obviously lack the full understanding of what you are going through. But you must know that we are behind you all the way. We love you. We want the best for you. We will help you in anyway we can, but you must understand that we will not return to old behaviors. And remember, we aren't going to bail you out. You must work through all the issues. We love you."

- Therefore, **you** must clearly communicate to her that it is up to her to work through her issues and that you will not bail her out.

- This loss of parental power and the roles of educator, disciplinarian, and moral guide has left children the "right" to raise themselves and parents afraid that any discipline may be damaging to their child—this results in generations of enabling parents!

[D.E. 1, pp. 88-94].

TTS provides extensive advance disclosure to parents and guardians about other aspects of the program that are likely to be challenging for their children that are reflected in Plaintiffs' forced labor claims. [D.E. 1, ¶¶ 12, 55, 61, 76 n. 25].  Group therapy topics can include obedience, dealing with authority, self-discipline, and selflessness. [D.E. 1, p. 74]. Physical activity disclosed in the

Parent Handbook includes walking 4-6 miles a day in the course of caring for animals, chopping wood, building fences, riding horses, and "other various forms of good old-fashioned ranch work." [D.E. 1, pp. 80, 83]. Rigorous physical exercise includes jumping rope, running, sit-ups, push-ups, and wall-sits. [D.E. 1, p. 80]. Plaintiffs allege that the running in particular was a punishment and also that some of the other physical exercise constituted punishment. [D.E. 1, ¶¶ 15, 64 n.20, 73(e), 77, 78(e), 80(b) n. 27, 83, 86(e)]. They also include a frequent refrain that the running occurred in the presence of "sharp rocks and rattlesnakes." [D.E. 1, ¶¶ 15, 64 n.20, 73(e), 77, 78(e), 86(e)]. This is colorful, but does not support Plaintiffs' theory of coercion given that both rocks and rattlesnakes are commonly found in the outdoors in Wyoming and TTS operates its program largely outdoors as disclosed throughout the Parent Handbook [D.E. 1, p. 64]. Nor do sharp rocks or rattlesnakes appear to have resulted in injury to them.

In terms of nutrition, Plaintiffs may not have liked eating beans at some points, but they do not claim that they were malnourished or, relatedly, address the lengthy Parent Handbook disclosure regarding the use of nutritional supplements as part of the TTS program in order to ensure adequate nutrition. [D.E. 1, pp. 68-69, 79]. Plaintiffs claim that one of the forced labor activities they endured was being responsible for cooking meals for groups of people, which is consistent with what the Parent Handbook states that this activity is part of the program. ("The girls take turns cooking for the camp.") [D.E. 1, pp. 78-79

Plaintiffs' allegations as to school are difficult to follow. In one place they claim that they "received no educational training related to school" as well as "no instructions [*sic*] from a certified educational teacher" but simultaneously allege that they received "between zero and two hours of [online] education daily." [D.E. 1, ¶ 60]. In another paragraph they reference the existence of a "school room." [D.E. 1, ¶ 13]. Plaintiff Nash alleges that she walked to and from school classes.

15

[D.E. 1, ¶ 82]. None of these varying and internally inconsistent allegations acknowledge the full page disclosure in the Parent Handbook that discusses the TTS academic program, noting that it is an accredited independent study course. [D.E. 1, p. 75]. Nor do they allege that the TTS program was in violation of DFS educational requirements of RTCs discussed above, which must be in place in order for TTS to obtain and keep its certification.

In addition to the admission criteria, individualized treatment, educational curriculum, and parental or guardian consent and participation requirements discussed above, there are still more regulatory requirements applicable to TTS that undercut the plausibility that their operations are a "guise." Minimum staffing requirements for residential treatment centers include licensed mental health professionals, direct care staff, and medical personnel or licensed practical nurse. WY ADC 049.0029.10 § 4. Staff must complete a 30-hour orientation program and 20 hours of annual training. WY ADC 049.0029.10 § 5. RTCs must meet staffing ratios including a "full time equivalent licensed mental health professional/child ratio of 1:10 or a ratio of 1:12 when the licensed mental health professional works with an aide for the delivery of therapeutic services," a minimum direct care staff to child ratio of 1:6 or 1:10 depending whether it is night time or daytime. WY ADC 049.0029.10 § 7. They must also conduct bed checks three times per hour during sleeping hours. *Id*.

Plaintiffs include a handful of allegations that have little to no bearing on their causes of action. For example, Plaintiffs allege that TTS brought a "frivolous" defamation lawsuit against former residents who posted negative comments on the Internet. [D.E. 1, ¶ 18]. They note that this lawsuit that it was "dismissed by consent." [D.E. 1, ¶ 18]. They do not allege, and cannot, that a court ever concluded that this lawsuit was frivolous. And they do not offer allegations that connect a defamation lawsuit occurring after admission to TTS to a forced labor recruitment scheme that

occurs prior to admission at TTS given the theory of fraudulent inducement. The lawsuit simply

has no bearing on the legal theories of the case.

Similarly, Plaintiffs allege that the methods of transportation company Touchdown, Inc.

included "legal abduct[ion] and use of a "medical or cement boot" to prevent escape. [D.E. 1, ¶

57]. They allege that owners of TTS and TCR used this transportation company but do not

otherwise offer a clue as to why they have included the allegation. [D.E. 1, ¶ 57]. They do not

allege that TTS or TCR controlled or had input into the transport company's operations or methods.

They do not allege that TTS or TCR paid for transportation of any Plaintiff or that Touchdown,

Inc.  They do not name any specific defendant as being involved at all in the transportation of any

named Plaintiff. They do not allege that the parents of anyone transported by Touchdown, Inc. did

not consent to the transportation or its conditions. They do not name Touchdown, Inc. as a co-

defendant. Here, as with the allegations concerning the lawsuit brought by TTS, this allegation is

irrelevant.

## III.     LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency

of the allegations within the four corners of the complaint after taking those allegations as true."

*Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion,

"[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that

discovery will reveal evidence to support the plaintiff's allegations." *Shero v. City of Grove,

Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007)); *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 555

(U.S. 2007). A court considering a motion to dismiss may identify allegations that are no more

than conclusions, and therefore not entitled to the assumption of truth. *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). "In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not

only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference. [T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (internal citations and quotations omitted).

## IV.    ARGUMENT

### A.    All Three TVPA Causes of Action Fail to Adequately Allege Knowledge, Cognizable Labor or Services, Compulsion, and Venture Liability Elements.

Plaintiffs bring three TVPA causes of action: Counts 1, 2, and 3. Count 1 alleges perpetrator liability for a forced labor violation pursuant to 18 U.S.C. § 1589(a) against TTS, TCR, Gerald Schneider, Michaeleen Schneider, Angie Woodward, Jerry Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, and Kyle Woodward. Count 2 alleges venture liability for a forced labor violation in violation of 18 U.S.C. § 1589(b) against all defendants. And Count 3 alleges perpetrator and/or joint venture liability for trafficking that can be committed via recruitment, harboring, transportation, providing, and/or obtaining forced labor in violation of 18 U.S.C. § 1590(a) against all defendants. All three counts are predicated on the existence of a violation pursuant to 18 U.S.C. § 1589(a), which requires a knowing violation. Plaintiffs' allegations are insufficient to establish knowledge as to each defendant and Counts 1, 2, and 3 fail for three additional reasons. First, Plaintiffs have not stated a cognizable labor or services theory. Second, Plaintiffs have not stated a claim of compulsion that would state a claim as to 18 U.S.C. § 1589(a)(1) or (b)(2). Third, Plaintiffs have not stated a plausible venture liability theory.

### 1.    Plaintiffs' Allegations Do Not Support a Knowing Section 1589 Violation.

The civil provision of the TVPA that authorizes the causes of action pursuant to Counts 1,

2, and 3, 18 U.S.C. § 1595(a), states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

Count 1 alleges the following three possible means of violating 18 U.S.C. § 1589(a):

> (a)Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) [omitted]; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

Plaintiffs appear to proceed mostly on a theory of perpetrator liability as to Count 1, having alleged violations of Section 1589(a), but may include venture liability in the alternative. [D.E. 1, ¶¶ 111-14].

Count 2 alleges venture liability pursuant to Section 1595(a) and Section 1589(b). Section 1589(b) is substantially similar to Section 1595(a). It states:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

Count 3 alleges a violation of 18 U.S.C. § 1590(a) which states in relevant part:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined

under this title or imprisoned not more than 20 years, or both.

Count 3 alleges both perpetrator liability and venture liability. The basis of a trafficking violation pursuant to Section 1590 can be a variety of misconduct. Plaintiffs appear to proceed on a theory of recruiting, providing, or obtaining. They allege conduct having to do with a transportation company as discussed above but do not offer allegations pertaining to any specific defendant in support of a transportation theory. Accordingly, transportation does not appear to form the basis of the cause of action in Count 3. Certainly, harboring is not implicated in Plaintiffs' allegations. Regardless of the theory of a trafficking violation, a Section 1590 claim in this case requires the allegation of facts establishing a forced labor violation. *See Pasamba v. HCCA Intern, Inc*., 2008 WL 2562928 at *6 (D. Ariz 2008) (noting that "[t]o plead trafficking with respect to peonage, slavery, involuntary servitude, or forced labor, Plaintiff must allege facts that would prove peonage, slavery, involuntary servitude, or forced labor.")

Liability pursuant to the statutes alleged in all three TVPA counts require allegations sufficient to support a forced labor violation under Section 1589. Plaintiffs do not allege that the existence of a Section 1589 criminal conviction. Accordingly, they must properly plead  the existence of a knowing forced labor violation in order to meet their burden. "[E]ach criminal provision of the TVPA has a *mens rea* requirement of knowing or reckless conduct by the accused. *See* 18 U.S.C. §§ 1589(a); 1590(a); 1591(a); 1594(a-b); 1593A. In contrast, the civil provision of the TVP[]A [Section 1595(a)] requires only that one 'knowingly benefit[ ], ... from participation in a venture which that person *knew or should have known* has engaged in an act in violation of [the TVPA]' to be held liable." *Ricchio v. Bijal, Inc*., 424 F.Supp 3d. 182, 193 (D. Mass. 2019) (emphasis in original).

Counts 1 and 3 require articulation of a "knowing" violation on behalf of each defendant named for those respective counts, in other words, awareness of one's own actions. Plaintiffs' claims in Count 1 pursuant to Section 1589(a)(1) and (a)(2) require the knowing commission of force, threats of force, physical restraint, threats of physical restraint, serious harm, or threats of serious harm. Their claims in Count 1 pursuant to Section 1589 (a)(4) require a showing of a scheme, plan, or pattern. Count 3 requires a showing of having knowingly recruited, harbored, transported, provided, or obtained by any means, a person for forced labor or services.

TTS is an entity and cannot form the requisite state of mind to commit  knowing violations. Accordingly, to the extent Plaintiffs rely on a theory that TTS is a perpetrator for any of the TVPA counts, there must be sufficient allegations of conduct by individuals that can be imputed an entity in order to hold it liable for knowing conduct,. *See U.S. v. A&P Trucking Co*, 358 U.S. 121, 125 (1958) (stating that "impersonal entities can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of respondent superior."). The allegations here with respect to the conduct of individuals are insufficient. The only allegations against Angela and Jerry Woodward are that they are owners of TTS who "followed in the footsteps" of Gerald Schneider who is Angela Woodward's father. The extent of the allegations against Kyle and Kara Woodward are that they are the children of Angie and Jerry Woodward and employees of TTS. Plaintiffs do not otherwise allege anything that any Woodward defendant or any other defendant did, said, knew, planned, controlled, caused, or anything else that demonstrates their individual awareness, that is to say, knowledge, that Plaintiffs' labor or services was being obtained or provided in violation of the TVPA. Nor do they allege conduct by any particular TTS employee or type of employee. Nor have they alleged the role any particular individual played in particular in furtherance of a "scheme, plan, or pattern intended to cause [Plaintiffs] to believe that, if that

21

person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." This falls well short allegations sufficient to show a knowing violation pursuant to 18 U.S.C. § 1589(a). *See also Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe Cty. Justice Ctr.*, 492 F.3d 1158, 1163 (10th Cir. 2007) (explaining that "to state a claim in federal court, a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated.") The Court should dismiss the three TVPA counts due to insufficient allegations demonstrating a knowing forced labor violation.

### 2.   Plaintiffs Fail to State a Cognizable Labor or Services Theory.

The labor or services theory fails for two reasons. First, the conditions with which Plaintiffs take issue (*e.g.*, the chores, rustic living conditions, physical exercise, and care of animals) were services provided *to* Plaintiffs by TTS for Plaintiffs' benefit, not the other way around. Second, "labor or services" under the TVPA contemplates work benefitting someone or something else and Plaintiffs have failed to state a claim to that end.

The Wyoming Supreme Court has recognized the DFS definition of "services" requiring licensure or certification as a substitute childcare provider, which states the following: "'Service' means one or more organization-operated programs or activities having a common general objective and involving deployment of the organization's material and human resources in a planned and systematic manner." WY ADC 049.0029.1 § 6(s); *Triangle Cross Ranch Inc. v State*, 345 P.3d 890, 893 (Wyo. 2015). As noted above, TTS's certification as an RTC denotes that it has to "provide services for children who require a combination of therapeutic, educational, and treatment services in a group care setting." *Id*. WY ADC 049.0029.10 § 2. The *Triangle Cross Ranch* court concluded that the engagement of children in ranch work at TCR required certification

because it was a "service" as defined" by DFS. 345 P.3d at 894 (Concluding that TCR was providing a "service" because it "receives payment for allowing children to do their ranch work because they pledge that the end result will be a boy who has overcome his negative behavior.") Nowhere in the *Triangle Cross Ranch* decision does the Wyoming Supreme Court take issue with the notion of a substitute childcare provider including ranch work performed by children in the services that it offers.

The TTS program, as set out in the detailed disclosures of the Parent Handbook discussed above and appended to the Complaint, clearly describes that chores, rustic living conditions, physical exercise, and care of animals are part of the TTS therapeutic services that it provides to children who meet specified criteria for admission and as consented to by their parents or guardians. Plaintiffs do not provide allegations supporting a conclusion that TTS is doing anything other than administering its program that is authorized by DFS. The conclusory allegation of a "guise" coupled with an implausible and insufficient "working ranch" theory do not suffice. More must be required in this case in order to state a plausible theory that TTS manages to run a forced labor scheme when  it is required to provide the kinds of services discussed above such as written ITPC's that include various kinds of clinical assessments, determination of individualized treatment goals and strategies, accredited education, 24 hours of therapeutic services per month, and discharge and continuing care planning. Plaintiffs do not suggest that TTS is failing to meet other various regulatory requirements imposed by DFS such as providing information about communication restrictions to parents and guardians in advance, meeting minimum clinical staffing requirements, meeting staff orientation and annual training requirements, meeting staffing ratio requirements, and conducting bed checks all night long. In short, TTS is a lawful business providing services authorized by the state of Wyoming that include chores, rustic living conditions,

physical exercise, and care of animals. While Plaintiffs may not have wanted to do those things their parents or guardians made this choice for them. Accordingly, the services they received are not forced labor within the meaning of 18 U.S.C. § 1589.

Plaintiffs also do not articulate a labor or services theory that is covered by the TVPA. Labor or services is not specifically defined in the TVPA. The Tenth Circuit upheld the following jury instruction in a forced labor and involuntary servitude criminal prosecution that contemplates labor or services resulting in a benefit to someone or something:

> [Y]ou must decide whether the defendant obtained the labor or services of another person, namely, the alleged victim named in that particular count of the indictment. "Obtain" means to gain, acquire, or attain. "Labor" means the expenditure of physical or mental effort. "Services" means conduct or performance that assists or benefits someone or something.

*U.S. v. Kaufman*, 546 F.3d 1242, 1260-62 (10th Cir. 2008). The *Kaufman* court set forth the following analysis regarding the jury instruction at issue:

> [T]he instructions' definitions of "labor" and "services" set forth the ordinary meaning of those terms. *See* 8 OXFORD ENGLISH DICTIONARY 559 (2d ed.1989) (defining "labour" as "[e]xertion of the faculties of the body or mind, esp. when painful or compulsory; bodily or mental toil"); 15 OXFORD ENGLISH DICTIONARY 34, 36 (2d ed.1989) (defining "service" as "[t]he condition of being a servant; the fact of serving a master" and as "[t]he action of serving, helping, or benefitting; conduct tending to the welfare or advantage of another"); *see also Hackwell v. United States,* 491 F.3d 1229, 1233–34 (10th Cir.2007) (relying on the RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE'S definition of services as "the performance of any duties or work for another").

546 F.3d at 1261. The concept of a benefit or service to someone else is woven into the concept of labor or services under the TVPA as reflected in the analyses of various circuits. The Congressional history of the TVPA discussed by the *Kaufman* court reflects that Section 1589's purpose was to "combat trafficking in persons, a contemporary manifestation of slavery." *Id.* at 1261 (citation omitted). The Sixth Circuit has noted that Section 1589 was "passed to implement the Thirteenth

Amendment [prohibition] against slavery or involuntary *servitude*." *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) (emphasis supplied). The Ninth Circuit observed that "Congress intended to reach cases in which persons are held in a condition of *servitude*..." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (internal quotation marks omitted) (emphasis supplied). The Seventh Circuit observed that "we know that when Congress amended [Section 1589] it expanded the definition of involuntary *servitude* to include nonphysical forms of coercion.") *United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008) (emphasis supplied). While involuntary servitude is penalized by a different statute, 18 U.S.C. § 1584, as is apparent from the foregoing, courts generally reference the concept of involuntary servitude in interpreting Section 1589. "[T]he term 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work *for* the defendant." *U.S. v. Kozminski*, 487 U.S. 931, 952 (1988) (emphasis supplied).

In other words, even the most violent and obvious abuse is not actionable as forced labor or services if it is unaccompanied by a showing of servitude. In this case, Plaintiffs' only allegations in furtherance of a benefit to TTS or any Woodward defendant is a "working ranch" and its size: 160 acres. As discussed above, this is insufficient to be plausible. This is particularly so in light of Plaintiffs' acknowledgement that TTS is a certified residential treatment center. Therefore, its operations are subject DFS regulation and oversight as discussed above. More is required in order to properly allege that Plaintiffs' alleged forced labor benefitted the defendants. Plaintiffs would have the Court apply the federal forced labor statute to create liability by converting services provided to children that fit within the certified program of a residential treatment center authorized to operate by the state of Wyoming into forced labor or services provided by the children. This is an extreme and absurd result, therefore the Section 1589 causes

of action against TTS and the Woodwards should be dismissed. *See U.S. v. Katz*, 271 U.S. 354, 362 (1926) (observing that "[g]eneral terms descriptive of a class of persons made subject to a criminal statute may and should be limited, where the literal application of the statute would lead to extreme or absurd results, and where the legislative purpose gathered from the whole act would be satisfied by a more limited interpretation").

### 3. Plaintiffs Fail to Adequately Allege Compulsion Under the TVPA.

Section 1589 "prohibits knowingly providing or obtaining labor or services by a variety of means, including 'serious harm or threats of serious harm.'" *U.S. v. Kalu*, 791 F.3d 1194, 1211 (10th Cir. 2015); 18 U.S.C. § 1589(a). "Serious harm" includes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to *compel* a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 791 F.3d at 1211; 18 U.S.C. § 1589(c)(2). The *Kalu* court's analysis of the forced labor statute makes it clear that it is involuntary provision of labor or services that Section 1589 prohibits. 791 F.3d at 1212-13.

In this case, the claim of compulsion fails for several reasons but principally because Plaintiffs' parents and/or guardians consented to their admission to and ongoing treatment at TTS. To that end, as discussed above, the Parent Handbook provides a variety of disclosures that are consistent with DFS legal requirements of RTCs. Rigorous physical exercise, chores including ranch work and cooking, taking care of animals, limitations on communication, discipline, discomfort, ordeals, hard lessons, being confronted with the consequences of one's own actions, and rustic living conditions are all described in advance to the parents or guardians who are required to give consent in order for the child to be admitted. That Plaintiffs take issue with

discipline, restrictions, or other aspects of the TTS program does not give rise to compulsion under the TVPA. Section 1589 does not forbid "permissible warnings of adverse but legitimate consequences." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). Here, TTS discloses that its program can intentionally cause an addicted or otherwise unable to function child to "hit[] rock bottom" so that they may recover. Parents or guardians consent to these terms.

The consent of Plaintiffs' parents and guardians does not begin and end with admission. It is ongoing. Individualized treatment plans and ongoing parental involvement are disclosed by the Parent Handbook and DFS regulations. Plaintiffs do not allege that their parents or guardians did not participate in their treatment or were not informed of their ongoing treatment and services they received. The possible treatments listed in the Parent Handbook are just that, possibilities, and not promises as communicated at the beginning of the Parent Handbook. To that end, Plaintiffs do not include parents or guardians in their putative class nor do they offer any specific allegations about parents or guardians that support a belief that TTS promised to provide the treatments listed in the Complaint to their children.

As is clear from the admissions criteria for an RTC and contents of the Parent Handbook discussed above, children are bound to be admitted to such places against their will. While Plaintiffs may take issue with TTS's practices, not every bad relationship between someone in a position of authority and someone subject to that authority will constitute forced labor. *See e.g. Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017) (Noting that "not all bad employer-employee relationships or even bad employer-immigrant ... relationships will constitute forced labor" and concluding that the plaintiff "cannot establish a forced labor claim by presenting evidence that her employment environment caused her to experience psychological harm. Rather, [the plaintiff] must present sufficient evidence upon which a jury could reasonably conclude that

the Saudi family *knowingly* or *intentionally* engaged in actions or made threats that were sufficiently serious to compel a reasonable person in Muchira's position to *remain* in the Saudi family's employ, against her will and in order to avoid such threats of harm, when she otherwise would have left.") (citations omitted) (emphasis in original). As is evident from the foregoing, not being freely able to leave can be a factor in determining whether the labor or services were involuntary, but Plaintiffs' suggestion that as minor children in the custody of a substitute childcare provider they were not free to leave TTS does not support their forced labor claims. [D.E. 1, ¶¶ 73(a), 78(a)]. On the contrary, had TTS permitted the minor children admitted to its facility to leave freely it would have faced another kind of liability. "Read in the proper context, only *unlawful* physical restraint triggers § 1589(a)(1)." *McCullough v. City of Montgomery*, 2020 WL 3803045 at *9 (M.D.Ala. July 07, 2020) (emphasis in original).

Another factor that undercuts Plaintiffs' ability to show compulsion is their status as children being subject to the will and authority of their parents or guardians. Alleged abusiveness towards a child either by a parent, someone standing in the shoes of a parent, or pursuant to the consent of a parent including where tasks are compelled does not mean that forced labor occurred. *See e.g. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014) (reversing the conviction of a defendant who brought four children who were relatives to the United States to live with him, made them do a variety of tasks, and behaved abusively towards them noting that "[a]n American parent has always had the right to make his child perform household chores" and that "the extremity of force is also not a determinant of forced labor, one way or the other. A parent who brutally beats a child to get the child to sit up straight or stop crying, or to punish a child for some slight misdeed is not guilty of forced labor.")

28

In this case, assuming that every allegation regarding abusive conduct is true as the Court must, Plaintiffs' allegations at best invoke an area of regulation belonging to the state of Wyoming, including DFS in particular, but they are not forced labor. *See id*. at 627 (citing to *Bond v. U.S.*, 572 U.S. 844 (2014) for the proposition that "the Supreme Court has recently reemphasized that we should be cautious in inferring Congressional intent to criminalize activity traditionally regulated by the states.") It does not suffice to simply call TTS's operation a "guise" absent any other facts that would support the theory of a guise, including allegations that would support a theory that Plaintiffs' parents did not consent to their treatment. For these reasons and because forced labor does not contemplate the compulsion of minor children under these facts, the Court should dismiss the TVPA counts.

### 4.     Plaintiffs Fail to State a Claim for Venture Liability.

As discussed above, Section 1595(a) permits a civil action against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." Plaintiffs appear to plead venture liability either principally or in the alternative for all three TVPA counts. And Section 1595(a) contains the language "knew or should have known" it also requires a showing of knowing participation in a venture and a knowing benefit. Plaintiffs do not allege sufficient facts to this end.

In *Bistline v. Parker*, 918 F.3d 849 (10 Cir. 2019) the Tenth Circuit adopted the First Circuit's application of the definition of "venture" under TVPA provision 18 U.S.C. § 1591(e)(6) as "any group of two or more individuals associated in fact, whether or not a legal entity" to Section 1589. *Bistline*, 918 F.3d at 873 (citing *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017)).

While this venture definition above is broad, it is not without limitation. To this end, a closer analysis of *Bistline* court's discussion of continuous conduct is in order.

In addition to the notorious Fundamentalist Latter Day Saints (FLDS) prophet Warren Jeffs, the *Bistline* defendants included a law firm and one of its partners, Rodney Parker. 918 F.3d at 854. Parker allegedly helped Jeffs reinstate a trust that Jeffs' ailing father controlled as part of his advice to Jeffs on how to accomplish Jeffs' objective of total control over the homes, possessions, and bodies of the FLDS community, including Jeffs' plan to facilitate the rape of minor girls by himself and others. *Id*. at 856-57. Jeffs obtained the control and opportunity to prey on children he desired through a campaign of coercion and control over the FLDS community while Parker and his law firm received payment for their legal work from the trust. *Id*. at 857, 875.

Key to the *Bistline* Court's holding regarding the sufficiency of the joint venture allegations was the notion that the defendants allegedly set up a scheme "designed *expressly* for the purpose of facilitating these crimes and also ensuring that defendants would personally reap ample benefits therefrom." *Id*. at 875-76 (emphasis in original). Moreover, the *Bistline* Court remarked "that despite extensive knowledge of the ways Mr. Jeffs was using his power to harm plaintiffs and other similarly-situated individuals, defendants continued to use their legal expertise to uphold this scheme." *Id*. at 875. Moreover, the facts demonstrated awareness of illegal conduct over a period of years and "construct[ion] of a scheme for the purpose of enabling it." *Id*. at 876. Here, Plaintiffs must allege continuous conduct or a pattern of behavior in order to state a joint venture claim under Section 1595(a). *See e.g. M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (Observing where there no "actual knowledge of participation in the sex trafficking itself…Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established

30

a pattern of conduct or could be said to have a tacit agreement"). They have not. They have offered

no allegations of scheme describing the benefits received by the defendants and their awareness of

the illegality of their actions as contemplated by *Bistline*. They only allege family relationships,

who owns which entity or property, and advance conclusory allegations of "guise" substitute

childcare provider operations that ignore the laws applicable to these organizations and run

contrary to the TTS representation in a document that they themselves attach to the Complaint.

This falls well short of allegations that would support that the Defendants knew they were in a

forced labor venture together. For this reason, Plaintiffs fail to state a venture liability claim. To

the extent their TVPA claims rely on venture liability pursuant to Section 1595(a), the Court should

dismiss these claims.

      As noted above, part of venture liability is receipt of a knowing benefit. TVPRA cases

discussing venture liability pursuant to 18 U.S.C. § 1595(a) reference the receipt of money, labor,

or other valuable, monetarily quantifiable benefits. *See e.g. Ricchio v. McLean*, 853 F.3d 553, 557

(1st Cir. 2017) (Defendant hotel operator received payment for motel room)*; Paguirigan v. Prompt

Nursing Empl. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (Defendant received

plaintiff's labor as a nurse in a nursing home)*; Lesnik v. Se*, 374 F. Supp. 3d 923, 952-53 (N.D.

Cal 2019) (Defendants received under-compensated labor at a paint shop construction project );

*Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018)  (Defendants received plaintiff's free

labor in their homes and businesses); *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d

320, 329 (E.D.N.Y. 2014) (Defendants received plaintiff's uncompensated labor in their illegal

fencing operation and in their restaurant); *Bistline*, 918 F.3d 849, 875 (Defendants received

attorneys' fees and free manual labor). *See also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F.

Supp. 3d 959, 964 (S.D. Ohio 2019) (Defendant hotel operator received revenue from hotel room

rental and/or royalties therefrom). In this case, as discussed above in various places, the "working ranch" theory is not stated in sufficient detail to articulate a benefit to TTS or any Woodward defendant at all, let alone a knowing benefit. On the contrary, given the small size of the TTS property and the various requirements it must meet in order to maintain DFS certification it is more plausible to conclude that what Plaintiffs describe as their labor or services were a cost to TTS, not a benefit. For this additional reason, Plaintiffs' venture liability theory fails and the Court should dismiss all three counts that rely on venture liability.

**B.      The RICO Claim is Untimely, Lacks Substantive Elements, and Fails Due to Lack of Standing.**

Plaintiffs bring their RICO claims against Defendants TTS, TCR, Gerald Schneider, Michaeleen Schneider, Angela Woodward, Jerry Woodward, Daniel Schneider, Mathew Schneider, Mark Schneider, Kara Woodward, Kyle Woodward, Thomas George, and Judith Jefferis. "To successfully state a RICO claim, a plaintiff must allege four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002). Where the third and fourth elements are concerned, Plaintiffs allege the TVPA violations discussed above as predicate acts. [D.E. 1, ¶¶ 138-130]. Because Plaintiffs fail to state TVPA claims, the RICO cause of action must be dismissed.

The Complaint additionally fails to state a RICO claim because (1) Plaintiffs' alleged injuries are insufficient to meet the statute's requirements for standing; (2) The Complaint alleges insufficient facts to make the claims timely; and (3) the Complaint fails to plausibly allege the substantive elements of a RICO claim.

1.      **Plaintiffs Lack Standing Because They Do Not Allege an Injury to Business or Property.**

RICO standing is a more rigorous matter than standing under Article III, because it requires plaintiffs show they were injured in "business or property by reason of prohibited racketeering activities." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010). It is well established that the "business or property" requirement "has a restrictive significance which helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08 Civ. 6150, 2010 WL 3026510, at *12 (S.D.N.Y. Aug. 2, 2010). Physical or emotional harm thus cannot be a cognizable RICO injury. *Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 458 (S.D.N.Y. 2004). Nor will "pecuniary losses flowing from [a] personal injur[y]," support a claim. *Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 918 (3d Cir. 1991); *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565–66 (6th Cir. 2013).

Here, the Complaint alleges three types of injuries from the alleged RICO violation: (1) labor services without compensation; (2) emotional and physical pain; (3) unspecified "economic damages". [D.E. 1, ¶¶ 142, 144-45].  Emotional distress is personal harm. The Tenth Circuit has expressly held that "emotional damages are not the type of injuries redressable by…RICO." *Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006). Accordingly, to the extent Plaintiffs' claims depend on personal harms, they must be dismissed.

Nor do Plaintiffs' claims for forced labor without compensation confer RICO standing. First, Plaintiffs have not sufficiently alleged that they provided labor, rather, they received a service, as discussed above. Second while courts have concluded that other TVPA forced labor plaintiffs have articulated sufficient facts to establish an injury to business or property, a survey of those cases reveals that they are distinguishable from the instant case. In other TVPA/RICO cases

33

plaintiffs pleaded an expectation of payment for their services in advance of the commission of the alleged predicate TVPA act, a cognizable Federal Labor Standards Act (FLSA) claim, a state law business tort, or some combination of the three. None of the foregoing is present in this case.

Particularly relevant is *Copeland v. C.A.A.I.R., Inc.*, 2019 WL 4307125 (D. Okla. 2019). *Copeland* involved an entity that held "itself out as a long-term residential drug and alcohol recovery program" but, unlike TTS, "was not certified as a treatment provider and provide[d] no meaningful treatment for its residents, including rehabilitative and psychiatric treatment." *Id*. at *2. Plaintiffs, who agreed to participate in the program as a condition of drug court, alleged that once they were at the facility there were "required to work in excess of 40 hours a week" for a co-defendant "under constant threat of incarceration." *Id*. at *1. Plaintiffs worked without pay at a chicken processing plant. *Id*. at *2. They alleged that the owner defendants, who had no background in drug and alcohol treatment, founded the residential treatment center in order to provide income to the organization and themselves and to provide "cheap labor to third-party agricultural interests affiliated with [the residential treatment facility]." *Id*. Plaintiffs brought TVPA, RICO, and FLSA claims. The *Copeland* court set forth a four-factor test applicable to "cases where a plaintiff is in the rehabilitative custody of an institution and in cases where a plaintiff has alleged joint employment" in determining whether the plaintiffs offered sufficient allegations to conclude that they were employees under the FLSA. *Id*. at *3. It concluded that they had. *Id*.  It also concluded that plaintiffs had sufficiently alleged RICO standing based on its analysis "that Plaintiffs are properly considered employees under FLSA." *Id*. at *11.

Other courts have reached similar conclusions.  *See e.g. Tanedo v. East Baton Rouge Parish School Bd*, 2012 WL 5378742 at *1-2, 9 (C.D. Cal. 2012) (permitting RICO claims to move forward where plaintiffs alleged that they were recruited to work as teachers in the United States

and made to pay several fees or face job and visa loss); *Javier v. Beck*, 2014 WL 3058456 at *1-2, 7 (S.D.N.Y.) (recognizing RICO standing where Plaintiff alleged that he signed an employment contract with defendants to work as a physical therapy rehab manager but that defendants made him do unskilled work and paid him less than half of what he claimed); *Adhikari v. Daoud & Partners*, 697 F.Supp.2d 674, 680-81, 691 (S.D. Tex. 2009) (Plaintiffs adequately pleaded RICO standing where they alleged that their deceased relatives were recruited to work at what was represented to be luxury hotels or an "American camp" in the United States but who were made to work for less pay in Iraq under dangerous conditions where they were killed); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1167-69 (D. Kan 2018) (involving a default judgment where Plaintiff set forth the hours she worked in bakeries, restaurants, and homes over a period of ten years as part of her FLSA claim).

In this case, Plaintiffs do not allege that they were recruited to do work, factors that suggest the existence of an employee-employer relationship, or a state law business tort. Even under the most expansive approach to defining a specific business or property interest they have not advanced sufficient allegations to establish RICO standing. "Without a harm to a specific business or property interest-a categorical inquiry typically determined by reference to state law-there is no injury to business or property within the meaning of RICO." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (affirming RICO standing where the harms the plaintiff alleged "amount to intentional interference with contract and interference with prospective business relations, both of which are established torts under California law"). While Plaintiffs attempt to meet the RICO standing "concrete financial loss" requirement by stating hours worked accompanied by FLSA-type prevailing wage allegations, this is unavailing unaccompanied by an FLSA claim or even allegations that might support an FLSA claim. [D.E. 1, ¶¶ 93, 96]; *Ivar v. Elk River Partners, Inc.*,

705 F.Supp.2d 1220, 1232 (D. Colo. 2010) (observing that "[a] plaintiff asserting a claim under 18 U.S.C. § 1964(c) must allege *actual,* quantifiable injury" and that "a showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest.") (citations omitted, emphasis in original). Quantifying what is otherwise an intangible loss does not meet the concrete financial loss requirement. For this reason, Plaintiffs' RICO claim must be dismissed for lack of standing.

### 2.      Plaintiffs' RICO Claims are Untimely.

RICO claims are subject to a four year statute of limitations. *Robert L Kroenlein Tr. ex rel. Alden* v. *Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014) (citing *Rotella v. Wood*, 528 U.S. 549, 552 (2000)).   Civil RICO accrual of time is analyzed via either injury-discovery or injury-occurrence. *Kirchhefer*, 764 F.3d at 1276. The Tenth Circuit has yet to adopt either approach. *Id*.

Under the injury-occurrence rule, "a claim would 'accrue' when the injury occurs, even if undiscovered." *Id*. at 1275. Under the injury-discovery rule, the inquiry focuses on "when a plaintiff actually discovers his injury, but also when a reasonably diligent plaintiff would have discovered the injury." *Id*. 1279 (citations omitted). "The plaintiff need not discover *all* elements of the fraudulent scheme to be on notice of the potential of fraud." *Id*. (Citing to *Ebrahimi v. E.F. Hutton & Co.,* 852 F.2d 516, 523 (10th Cir.1988) and its language that "[i]nquiry notice is triggered by evidence of the *possibility* of fraud; it does not require full exposition of the fraud itself.")(emphasis in originals).

In this case, Plaintiffs filed their RICO claim on November 25, 2020. [D.E. 1]. Four years prior to the filing date is November 25, 2016. Plaintiff Sherman claims that she was at TTS from May 2012 to July 2013 and from July 2014 to October 2015. [D.E. 1 ¶ 69]. Plaintiff Gozan claims that she was at TTS from February 2, 2012 to August 1, 2012. [D.E. 1 ¶ 74]. Plaintiff Nash claims

that she was at TTS from May 7, 2015 to November 2015 and that she was a minor until November 28, 2017. [D.E. 1 ¶¶ 79, 84]. Plaintiff Doe does not make a claim that he was ever at TTS for any reason nor does he allege any specific facts against any Trinity or Woodward outside of what has already been set forth above in terms of an unsupported working ranch theory. However, he claims to have been at TCR from May 2011 to December 20, 2011.

Plaintiffs claim a series of physical, emotional, and psychological injuries they received while at TTS, lost wages and daily damages for alleged forced labor occurring during their time at TTS and TCR, and psychological and emotional distress diagnosed at an undisclosed time in connection with their time at TTS and TCR. [D.E. 1, ¶¶ 72-73, 77-78, 85-86, 90, 93-98]. The allegations document their awareness of their claimed injuries at the time of the occurrence. While they have alleged a fraudulent recruitment scheme they have not alleged the kind of fraud that conceals an injury. *See e.g. Kirchhefer*, 764 F.3d at 1275 (explaining that "a perpetrator's deceptive conduct could prevent a plaintiff from even *knowing* that he or she has been defrauded and produce the perverse result that the law which was designed to prevent fraud could become the means by which it is made successful and secure.) (citation and internal punctuation omitted, emphasis in original). Rather, they make allegations demonstrating awareness of claimed injuries as they were occurring. Under an injury-occurrence rule, each Plaintiff's claim is plainly beyond four years.

Under an injury-discovery rule, they are also beyond four years. In another TVPA case, a court concluded that the RICO limitations period began when the plaintiffs' alleged confinement ended. *Oak-Jin Oh v. Soo Bok Choi*, 2016 WL 11430442 at *9 (E.D.N.Y. 2016). In this case, the latest period of confinement of any Plaintiff, that of Plaintiff Nash, ended in November 2015. By this measure, Plaintiff Nash had until November 2019 to file her claim. Since all the Plaintiffs were minors during their time at TTS and TCR, they presumably intend to make an argument that

they were not able to file due to their minority. However, except for Plaintiff Nash, they have not

set forth when each of them turned 18 that would support this argument for RICO claims that are

otherwise plainly untimely. They do not claim to be minors now. Accordingly, that have not "pled

facts to show *by the exercise of due diligence* [they] could not have known that [they] might have

a cause of action." *Sullivan v. Harris*, 2019 WL 5258045 at *3 (D. Wyo. 2019) (emphasis in

original). For this reason, Plaintiffs' RICO claims as currently pled are untimely and subject to

dismissal. Any request to amend requires an assessment of futility based on all Plaintiffs providing

the dates when they reached the age of majority.

> **3.      Plaintiffs Fail to Articulate the Necessary and Substantive Elements of a RICO Claim.**

The Complaint fails to allege that the members of the alleged enterprise "joined together

to create a distinct entity" for a common purpose as required to establish an association-in-fact

enterprise. *United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 855 (7th

Cir. 2013) (RICO claim dismissed where the alleged activities "[were] entirely consistent with [the

defendant companies] each going about [their] own business"); *see also Boyle v. United States*,

556 U.S. 938, 946 (2009). A RICO pattern is established by pleading that the predicate acts had

the "same or similar purposes, results, participants, victims, or methods of commission," *H.J. Inc.*

*v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). In this case, Plaintiffs do not establish same or

similar purposes, results, or methods of commission with the conclusory allegations that Angie

Woodward "followed in the footsteps" of her father or by attaching the TTS Parent Handbook

without a single allegation that any aspect of its contents applied to TCR's operations. There are

no allegations connecting TTS's operations and alleged to those of TCR outside of those discussed

above which do not suffice. That TTS and TCR are both substitute childcare providers does not

establish anything other than they are two different operations each going about their own business.

38

They have different staff, residents, admissions criteria, and are located several miles apart from one another.

The insufficiency of Plaintiffs' enterprise theory is nowhere more evident than in the dearth of allegations regarding each defendant. To be liable under 18 U.S.C. § 1962(c), one must have some part in directing the enterprise's affairs and participate in the operation or management of the enterprise. *Reves v. Ernst & Young,* 507 U.S. 170, 179, 183, 185 (1993). "A defendant will not be liable simply because he provides services that benefit the enterprise; instead, there 'must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus.'"; *Taylor v. Chesapeake Operating, Inc*., 2019 WL 6174944 at *4 (W.D. Okla. 2019); *Reves*, 507 U.S. at 178-79. In this case, as discussed above, the Complaint describes who defendants are without describing either their role in directing the enterprise's affairs or their participation in the operation or management of the enterprise. At best, they have identified the owners of TCR and TTS, respectively, but have made no allegations that support the notion that anyone associated with TTS could operate anything having to do with TCR nor vice versa. This theory particularly fails as to Kyle and Kara Woodward, whose only apparent contribution to the RICO enterprise was to be employed by TTS. [D.E. 1, ¶ 67].  Into this unavailing attempt to construct a RICO cause of action by claiming without support that TCR and TTS are in business together, Plaintiffs have thrust a number of other defendants like Judith Jefferis unaccompanied by a description of how each contributed to the RICO enterprise. [D.E. 1 ¶¶ 55, 65-66]. The act of conducting an enterprise through a pattern of racketeering activity "must be established as to each individual defendant." *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027–28 (8th Cir. 2008); *see also U.S. v. Persico*, 832 F.2d 705, 714 (2d Cir.1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a

defendant, rather than the collective activities of the members of the enterprise."). In this case, Plaintiffs rely on group pleading. The group pleading in this case does not establish the requisite facts demonstrating that each defendant acted on behalf of the enterprise (rather than its or his own interest) or directed the enterprise's affairs. *See Reves* 507 U.S. at 179 (1993); *United Food & Commercial Workers Unions*, 719 F.3d at 854.

Finally, Plaintiffs' RICO enterprise theory fails because they do not distinguish the RICO "person" from the RICO "enterprise." The Supreme Court has held that the language of § 1962(c) creates a pleading requirement of distinctness: "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001). Plaintiffs attempt to hedge their bets where distinction is concerned by pleading in the alternative. However, the RICO person and RICO enterprise in this case are still impermissibly one and the same.

Plaintiffs allege that TTS and TCR are each a RICO "enterprise." [D.E. 1, ¶¶ 133-134]. They also allege that each Individual RICO Defendant is a RICO "person." [D.E. 1, ¶ 132]. However, this does not comport with the rest of the Complaint. Plaintiffs also allege that all the RICO Defendants, which includes the Individual RICO Defendants and entities TTS and TCR, "repeatedly committed the RICO predicate acts of human trafficking and forced labor as alleged above and profited from the same." [D.E. 1, ¶ 139]. They allege that Defendants TTS and TCR and other defendants committed the predicate acts throughout the Complaint and indeed bring all three TVPA counts against TTS and TCR as defendants. This impermissibly combines the RICO "person" and the RICO "enterprise." In *Zavala v. Wal-Mart Stores, Inc.*, 447 F.Supp.2d 379 (D.N.J. 2006) plaintiffs brought a RICO and TVPA action that suffered from the same deficiency:

> Here, and elsewhere in the Second Amended Complaint, Plaintiffs allege that both Wal–Mart and the contractors committed the predicate acts. The language of the statute specifies that the "person" commits the predicate acts: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). The "person" conducts the enterprise through a pattern of racketeering activity. When Plaintiffs allege that the contractors engaged in the predicate acts that constitute racketeering activity, as they do at numerous points in the Second Amended Complaint, this confirms that the contractors are within the meaning of "person." See *Whelan v. Winchester Prod. Co.,* 319 F.3d 225, 229 (5th Cir.2003) ("For purposes of § 1962(c) ... the plaintiff must demonstrate ... that the RICO 'person' who commits the predicate acts is distinct from the enterprise.") Because both Wal–Mart and the contractors engaged in the racketeering activity, and also constitute the enterprise, the RICO person and the RICO enterprise are identical.

*Zavala*, 447 F. Supp.2d at 383. The *Zavala* court concluded this was clearly impermissible pursuant to the Supreme Court's holding in *King*, 533 U.S. at 161 which held that the RICO "person" must be distinct from the "enterprise" who improperly conducted the enterprise's affairs. *Zavala*, 447 F. Supp.2d at 383.

In the alternative Plaintiffs allege that TTS and TCR in combination with the Individual RICO Defendants formed an associated fact enterprise in which both TCR and TTS constitute a RICO person. [D.E. 1, ¶ 145]. The alternative pleading does not meet the distinctness requirement. "If the members of the enterprise are the same as the persons, the distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical." *Zavala*, 447 F.Supp.2d at 383. Because Plaintiffs fail to meet the RICO conduct, pattern and enterprise pleading requirements, this cause of action must be dismissed.

### C.   Plaintiffs' Negligence Claims Must Be Dismissed.

Plaintiff Nash and the putative Subclass, not the other named Plaintiffs or Doe, bring their causes of action for negligence and negligent infliction of emotional distress against TTS, Dally-Up, LLC, the Diocese of Cheyenne, and Society of our Lady of the Most Holy Trinity.

Preliminarily, there is an issue as to the propriety of the negligence causes of action. As described above, TTS is required to have clinical staff and provide individualized therapeutic treatment. Plaintiffs claim deficient or withheld treatment throughout the Complaint. [D.E. 1, ¶¶ 9-11, 56, 60, 72, 97-98]. To the extent Plaintiffs' make an injury claim against a health care provider, they must bring a medical malpractice action subject to the Wyoming Medical Review Panel Act of 2005.

1.      **Plaintiff Nash Fails to Articulate Plausible Claims or Establish a Duty as to Dally-Up, LLC.**

The state law causes of action are the only claims against Dally-Up LLC. Plaintiffs allege that Dally-Up LLC leased the land where TTS sits prior to 2010 and purchased it in 2010. [D.E. 1, ¶ 54]. They describe it as a "shell company" that purchased the land in order for Defendant Owners to avoid liability for their "egregious conduct." *Id*. They do not provide allegations that describe what they think a "shell company" is. To that end, LLC's are meant to be flexible entities. "[I]n many cases [LLCs] legitimately do not require more than a single member with little capital. The limited liability company can be used for a variety of businesses with lawful purposes, from a member whose only assets are herded across the Wyoming prairie to one that is publicly traded and operates around the world." *GreenHunter Energy, Inc. v. Western Ecosystems Technology, Inc.*, 337 P.3d 454, 464 (Wyo. 2014).  In this case, "shell" is no more than a vague and insufficient insinuation.

Plaintiffs additionally allege that free labor and maintenance for the seller, Defendants Judith Jefferis and Rock Creek Ranch, were a term of the sale. [D.E. 1, ¶ 55]. They offer no additional theory in support of such an extraordinary allegation. For example, they do not articulate the party or parties who had the obligation to supply the free labor and maintenance given their assertion that the buyer was a "shell company." They do not suggest that the sale price of the

property was somehow so low that it would provide an inducement for the buyer to supply illegal forced labor to Judith Jefferis and Rock Creek Ranch over the last 11 years. They have no theory as to how often or the quantity of forced labor that had to be provided. In short, Plaintiffs do not offer sufficient support for their claim that unconscionable and/or unenforceable terms were included in the sale of land. "A plaintiff must 'nudge [ ] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

The lack of plausible allegations is linked to Plaintiffs' failure to articulate a duty as to Dally-Up, LLC. "In general, to establish a negligence claim, the plaintiff must show: 1) the defendant owed the plaintiff a duty to conform to a specific standard of care; 2) the defendant breached the duty by failing to act in accordance with the standard of care; 3) the defendant's breach of the duty of care proximately caused the plaintiff's injury; and 4) the plaintiff's injury is compensable by monetary damages." *Warwick v. Accessible Space, Inc.*, 448 P.3d 206, 211 (Wyo. 2019)

Plaintiffs do not bring premises liability claims against Dally-Up, LLC. Nor do they allege that Dally-Up, LLC had ongoing involvement with any other aspect of Plaintiffs' claims or with TTS operations beyond the lease and sale of the property where TTS sits, which occurred well before the earliest date of admission of any Plaintiff.  "The law recognizes a duty when, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the

plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Id*. (citation and internal punctuation omitted). There is simply no relation between Plaintiffs and Dally-Up, LLC. Plaintiffs cannot establish a duty on the part of Dally-Up, LLC based on the insufficient allegations discussed above. Accordingly, the negligence claims against Dally-Up, LLC should be dismissed.

### 2. Plaintiff Nash Fails to Adequately Allege Breach and Proximate Cause.

Plaintiff Nash claims that TTS subjected her to "extreme and outrageous conduct" that caused her "severe emotional distress and/or bodily harm" arising from her stay at TTS. [D.E. 1, ¶ 148]. Her claim is based on Post Traumatic Stress Disorder and physical and psychological pain. [D.E. 1, ¶ 85].

In this case, Nash fails to adequately allege breach and proximate cause given that, as described above, its program is authorized by the state of Wyoming and given that her parent(s) or guardian(s) consented to her admission to TTS after TTS disclosed its program in detail to them in advance. "Proximate cause is explained as the accident or injury must be the natural and probable consequence of the act of negligence." *Killian v. Caza Drilling, Inc.*, 131 P.3d 975, 985 (Wyo. 2006) citations omitted). "The ultimate test of proximate cause is foreseeable injury." *Id*. (citations omitted). In this case, Nash does not allege sufficient facts indicating that TTS should have foreseen her claimed emotional damages. She does not allege a physical injury that would have been visible. She does not allege information that might have put TTS on notice of an emotional injury such as a substantiated complaint to DFS, a failure by DFS to renew TTS's certification, or withdrawal of consent by her parent or guardian. She does not set forth allegations that support her position that TTS unjustifiably relied on the state of Wyoming's ongoing determination that it can operate its program or the consent given by her parent(s) or guardian(s).

44

Rather, her claims are alleged as if the regulatory requirements of TTS and parental consent have no bearing. They do. For these reasons, her claims fail to establish negligence or negligent inflection of emotional distress and should be dismissed.

## V.    CONCLUSION

The Court should dismiss all three TVPA claims because they fail to articulate a cognizable labor or services theory, they fail to properly allege compulsion under the circumstances of this case, and they fail to allege the elements of venture liability. The Court should dismiss the RICO claim because Plaintiffs lack standing, their RICO claim is untimely, and they fail to state the remaining RICO substantive elements of of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The Court should dismiss the negligence claim because Plaintiffs fail to articulate plausible allegations against or the presence of a duty as to Dally-Up, LLC, and fail to articulate breach and proximate cause. Finally, the Court should dismiss each individual Woodward defendant because the Complaint's group pleading fails to establish individual unlawful acts or failure to act on the part of any of them.

WHEREFORE, the Trinity and Woodward Defendants respectfully request that this Court dismiss the Class Action Complaint.

Respectfully submitted this 19th day of January, 2021.

GORDON REES SCULLY MANSUKHANI LLP

/s/ *Thomas B. Quinn*

555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
Email:  tquinn@grsm.com

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on this 19th day of January, 2021, a true and correct image of the foregoing was e-filed via CM/ECF and served to all attorneys of record according to CM/ECF.


*/s/ Fran Aragon Eaves*

For Gordon Rees Scully Mansukhani, LLP