Rick L. Koehmstedt, WSB 6-3101
Schwartz, Bon, Walker & Studer, LLC
141 S. Center St., Suite 500
Casper, WY  82601
(307) 235-6681
rick@schwartzbon.com

Patricia K. Buchanan (WSBA 19892)
*Admitted Pro Hac Vice*
Patterson Buchanan Fobes & Leitch, Inc., P.S.
1000 Second Ave., 30th Floor
Seattle, WA  98104
(206) 462-6700
pkb@pattersonbuchanan.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CARLIE SHERMAN, ANNA GOZUN, AMANDA NASH, and JOHN DOE, on behalf Of themselves and all similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>TRINITY TEEN SOLUTIONS, INC., a Wyoming corporation; TRIANGLE CROSS RANCH, LLC, a Wyoming limited liability corporation; MONKS OF THE MOST BLESSED VIRGIN MARY OF MOUNT CARMEL, d/b/a MYSTIC MONK COFFEE, a Wyoming Corporation; GERALD E. SCHNEIDER; MICHAELEEN P. SCHNEIDER; ANGELA C. WOODWARD; JERRY D. WOODWARD; DANIEL SCHNEIDER; MATHEW SCHNEIDER; MARK SCHNEIDER; KARA WOODWARD; KYLE WOODWARD; THOMAS GEORGE; JUDITH D. JEFFERIS; DALLY-UP, LLC, a Wyoming limited liability corporation; ROCK CREEK RANCH, INC., a Delaware corporation; DIOCESE OF CHEYENNE, a Wyoming corporation; the SOCIETY OF OUR LADY OF THE MOST HOLY TRINITY, a Texas corporation; and NEW MOUNT CARMEL FOUNDATION, INC., a Wyoming corporation,<br><br>Defendants. | Civil Action No.: 20-cv-00215 |

**BRIEF IN SUPPORT OF DEFENDANT NEW MOUNT CARMEL FOUNDATION, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## I.   INTRODUCTION AND RELIEF REQUESTED

In Plaintiffs' Amended Complaint against numerous defendants, Plaintiffs allege that Defendant New Mount Carmel Foundation, Inc. (the "Foundation"), knew about and benefitted from coerced labor.  *See* Am. Compl., dkt. 106, at 48 n.11.  Plaintiffs further allege that the Foundation financially supported Defendant Monks of the Most Blessed Virgin Mary of Mount Carmel ("the Monks").  *See id.*  ("Plaintiff avers that the sole purpose of the Foundation is the support of [the Monks] and that it is the sole source of significant support, therefore each hour of coerced child labor directly benefitted the Foundation with the knowledge and consent of its president, director, secretary, and other officers."); *id.* at ¶ 32.

These statements amount to conclusory allegations, which are legally insufficient to survive a motion to dismiss.  *See, e.g., Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).  Accordingly, under Federal Rule of Civil Procedure 12(b)(6), the Foundation moves to dismiss, with prejudice, Plaintiffs' claims against it for alleged violations of 18 U.S.C. § 1589(b)—forced labor—§ 1590(a)—human trafficking—and § 1961 *et seq.*—RICO.  With respect to the Foundation, Plaintiffs have failed to state a plausible claim for relief.

The Foundation must be dismissed because:

1.  Plaintiffs allege zero facts supporting that the Foundation knew about coerced labor;

2.  To support the financial-benefit element under 18 U.S.C. § 1589(b), Plaintiffs conflate the Monks' purported construction activities, which Plaintiffs allegedly worked on, with the Foundation's construction project—a gothic stone monastery—which Plaintiffs never worked on;

3.  Plaintiffs distort documents cited in their Amended Complaint by omitting context to suggest the documents refer to the Monks' construction activities when those documents, in fact, only refer to the Foundation's construction project;

4. The plausibility of Plaintiffs' theory against the Foundation depends on withholding the existence of the Foundation's construction project from the Court, but it does exist, as demonstrated by the documents referenced by Plaintiffs—Exhibits A and B[1];

5. Plaintiffs' other claims—participating in a human-trafficking venture and RICO—depend on Plaintiffs' other implausible allegations, which are not entitled to be accepted as true.

## II.   STATEMENT OF FACTS

Plaintiffs brought a putative class action complaint against numerous defendants, including the Foundation. *See generally* Am. Compl., dkt. 106.

Plaintiffs allege that they, and others in the putative class, were coerced through threats and other means to provide free labor on working ranches in Wyoming by Defendants Triangle Cross Ranch and Trinity Teen Solutions. *Id.* at ¶¶ 3–4, 9–12, 50–64. It is also alleged that Daniel Schneider, a relative of other defendants allegedly connected to the forced-labor ranches, would transport Triangle Cross Ranch residents from the ranch to "The Monastery" for labor. *Id.* at ¶ 76. "The Monastery" is Plaintiffs' abbreviation for Defendant Monks of the Most Blessed Virgin Mary ("the Monks"). *Id.* at ¶ 32 (stating also that the Monks had a coffee business called Mystic Monk Coffee). At times in their Amended Complaint, Plaintiffs also refer to "The Monastery" as a physical location—the Monks' property—where Plaintiffs purportedly provided labor for the Monks' construction activities. *See id.* at ¶¶ 76–77. It is further alleged that Daniel Schneider would deliver pressure washers and other machines requiring repair to the Triangle Cross Ranch. *Id.*

Plaintiff Sherman alleges that she was a resident at TTS[2] on two occasions—from May 2012 to July 2013 and from July 2014 to October 2015. *Id.* at ¶ 113. Plaintiff Sherman alleges that her forced labor included cleaning at Mystic Monk Coffee[3] and that it occurred at "The

---

[1] Exhibits A and B cited throughout this motion are attached to the Declaration of Patricia K. Buchanan.
[2] Defendant Trinity Teen Solutions.
[3] The Monks operate Mystic Monk Coffee, which packages and sells coffee and accessories. Am. Compl. ¶ 32.

Monastery at which Defendant [Mystic Monk Coffee] was located." *Id.* at ¶¶ 114(q), 115.[4]

Plaintiff Gozun alleges that she was a resident at TTS from February 2, 2012, to August 1, 2012. *Id.* at ¶ 118. Plaintiff Gozun alleges that her forced labor occurred at, among other locations, "The Monastery." *Id.* at ¶ 120. It can be inferred that Plaintiff Gozun's alleged labor is the same as Plaintiff Sherman's—i.e., cleaning at Mystic Monk Coffee, the Monks' coffee business. *See id.* at ¶¶ 32, 119 ("Plaintiff Gozun's labor list substantially mirrors Plaintiff Sherman's list.").

Plaintiff Nash alleges that she was a resident at TTS from May 7, 2015, to November 2015. *Id.* at ¶ 123. Plaintiff Nash alleges that her labor primarily occurred at TTS. *Id.* at ¶ 125.

Plaintiff Scavuzzo alleges he was a resident at TCR[5] from April 8, 2012, to July 4, 2012. *Id.* at ¶ 131. He alleges he did "regular roofing work" and the installation of joists "for the ongoing construction projects at The Monastery that inured to the financial benefit of The Foundation." *Id.* at ¶¶ 132(b), 133.

Plaintiff Jelinek alleges he was a resident at TCR from mid-May 2011 to December 20, 2011. *Id.* at ¶ 136. Plaintiff Jelinek alleges that his labor included repairing equipment used in the construction projects at "The Monastery" that inured to the financial benefit of The Foundation. *Id.* at ¶ 137(b), 138.

With respect to the Foundation, Plaintiffs allege that the Foundation knew about the labor, financially supported the Monks, and therefore received a financial benefit when Plaintiffs provided labor for the Monks' construction activities. *E.g.*, *id.* at ¶ 48 n.11.

Plaintiffs cite to the Foundation's website—a current and prior version—to support their allegation that the Foundation financially supported the Monks' construction activities. *See id.* at ¶¶ 80–84. Plaintiffs conflate two very different construction projects, and this error is fatal to their claims against the Foundation. More specifically, Plaintiffs distort the websites and suggest that they refer to the Monks' construction activities when, in fact, they only refer to the

---

[4] Plaintiff Sherman alleges that she was coerced at TTS. *See* Am. Compl. ¶ 117.
[5] Defendant Triangle Cross Ranch.

Foundation's construction project—a custom-gothic-stone monastery—a project that Plaintiffs never worked on.  *Compare* Am. Compl. ¶ 82(a)–(c), *with* Ex. B[6] at 1–2.

Plaintiffs also cite to the Foundation's IRS Form 990s and assert that the accounting suggests an unusual construction project.  Am. Compl. at ¶¶ 85–106.  They specifically assert that the "architecture expenses" are much greater than a typical construction project.  *Id.* at ¶¶ 103–06.  Plaintiffs conclude that the only plausible explanation for this accounting is unlawful financial activity.  *Id.* at ¶ 106.  Plaintiffs, however, withheld from the Court that the Foundation was, in fact, engaged in an atypical construction project—building a custom-gothic-stone monastery.  *See* Ex. B at 1–2 (referencing "gothic" monastery); *id.* 6–16 (detailed building plans).

Plaintiffs are bringing three claims against the Foundation: a claim under 18 U.S.C. § 1589(b) for knowingly receiving a financial benefit from forced labor, a claim under 18 U.S.C. §1590(a) for alleged trafficking, and a RICO violation under 18 U.S.C. § 1961 *et seq.*  *Id.* at 60 (Count 2), 61 (Count 3), and 62 (Count 4).

## III.   ISSUES

1. Should this Court dismiss Plaintiffs' forced-labor claim against the Foundation when Plaintiffs have provided only conclusory allegations that the Foundation knew about coerced labor?

2. To state a forced-labor claim, Plaintiffs must plausibly allege that the Foundation received a financial benefit from participating in a forced-labor venture.  Although Plaintiffs allege the Foundation financially supported the Monks, they never allege how the Foundation benefitted.  They frame their entire claim against the Foundation by omitting the existence of the Foundation's construction project—building a custom-gothic-stone monastery, a project that Plaintiffs never worked on.  Should the Court dismiss Plaintiffs' claim?

---

[6] Exhibit B is the Foundation's prior website.  Exhibit A is the Foundation's current website.

## IV.    ARGUMENT

### A.  Legal standard under Fed. R. Civ. P. 12(b)(6)

For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, only well-pleaded (non-conclusory) factual allegations are taken as true; the rest must be disregarded.  *Id.* at 679–80; *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012); *Soto for estate of Jimenez v. Bd. of Cnty. Comm'rs of Caddo Cnty., Okla.*, 748 Fed. Appx. 790, 793 (10th Cir. 2018) ("We accept as true the remaining, well-pleaded (that is, plausible, non-conclusory, and non-speculative) factual allegations and construe them in the light most favorable to the plaintiff."). Considering the well-pleaded facts and the reasonable inferences from those facts, the court must determine if the plaintiff has alleged a plausible claim for relief.  *See id.*

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679.  A *possible* claim for relief will not survive.  *Id.* at 678.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* at 678 (citing and quoting *Bell Atlantic Corp. v. Twombly*, 560 U.S. 544, 557 (2007)).

### B.  18 U.S.C. § 1589(b) (Count 2)—Plaintiffs failed to allege facts supporting a plausible claim for relief under 18 U.S.C. 1589(b)—knowledge and financial benefit.

Plaintiffs allege that the Foundation violated 18 U.S.C. 1589(b), which permits them to seek damages under 18 U.S.C. 1595(a).  18 U.S.C. 1589(b) states:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means . . . .

To avoid dismissal, Plaintiffs must plausibly allege that they provided labor that was procured by a prohibited method under § 1589(a) and that the Foundation knowingly benefited financially from participating in a venture that the Foundation knew engaged in the providing or obtaining of such prohibited labor.  *See Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019).

For the purposes of this motion, the Foundation assumes Plaintiffs have alleged sufficient primary violations of § 1589(a) under Count 1 of the Complaint—the coercive conduct that allegedly occurred at the ranches and motivated their labor.  To prove venture liability under 1589(b), however, Plaintiffs must plausibly allege that the Foundation (1) knowingly benefitted from participating in a venture engaged in these violations and (2) knew about this illegal conduct.  *See Bistline*, 918 F.3d at 873–76; 18 U.S.C. 1589(b).  Plaintiffs have failed to do so.

**1. Plaintiffs failed to allege any facts supporting that the Foundation knew about coerced labor.**

Although Plaintiffs allege several times that the Foundation "knew" about the coerced labor, these are conclusory allegations that merely parrot the legal requirements of a § 1589(b) violation.  These conclusory allegations are legally insufficient to survive a motion to dismiss.  *See, e.g., Khalik*, 671 F.3d at 1191; *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Examples of Plaintiffs' conclusory allegations regarding knowledge include:

- "The Foundation knew or in the exercise of reasonable diligence should have known that the putative class members were providing labor to the Foundation . . . and that the putative class members faced punishment if they did not provide such labor."  Am. Compl. ¶ 79.

- Br. Simon Mary was aware of the class member's labor.  *Id.* at ¶ 84.

- "[E]ach hour of coerced child labor directly benefitted the Foundation with the knowledge and consent of its president, director, secretary, and other officers."  *Id.* at ¶ 48 n.11.

Plaintiffs failed to support their conclusory allegations of knowledge with any facts.  Indeed, Plaintiffs do not even allege that an agent of the Foundation witnessed their labor.  For example, Plaintiff Scavuzzo claims he did "regular roofing work" at "The Monastery."[7]  *Id.* at ¶

---

[7] "The Monastery" is Plaintiffs' abbreviation for the Defendant Monks.  Am. Compl. at ¶ 32.  They also refer to "The Monastery" as a physical location—the Monks' property—where Plaintiffs purportedly provided labor for the Monks' construction activities.  *See id.* at ¶¶ 76–77.

132(b).  He does not, however, allege that he saw an agent of the Foundation, spoke to an agent of the Foundation, or otherwise knew about any agent of the Foundation.

Furthermore, even if Plaintiffs were to allege that they saw or interacted with an agent of the Foundation, this alone would not be enough to plausibly support knowledge.  The knowledge requirement under 18 U.S.C. § 1589(b) requires that the Foundation knew or should have known that the labor was coerced in violation of § 1589(a).  *See Bistline*, 918 F.3d at 873–76.  Without knowledge of the coercive acts, witnessing only Plaintiffs' labor, without more, would not inform an observer that the labor was coerced.  How would someone know what motivated Plaintiffs?  People freely volunteer their labor without coercion, such as people who volunteer to build homes for others through Habitats for Humanity.

All of the alleged coercive acts occurred at TCR or TTS.  How would the Foundation know about this?  Plaintiffs do not allege that any agent of the Foundation ever visited these ranches, let alone witnessed the coercive behavior occurring there.  Moreover, Plaintiffs have alleged that TCR and TTS engaged in fraud on the public, duping Plaintiffs' parents into sending them to "residential treatment centers" that were really forced-labor ranches.  In light of the purported persuasiveness of the TCR and TTS enterprise, even if Foundation members had visited the ranches and seen the alleged "coercive" acts, it would be plausible to assume this was part of Plaintiffs' sanctioned residential treatment.  Plaintiffs' parents purportedly consented and, to some extent, Wyoming also approved of the residential treatment centers.

Regardless, because Plaintiffs failed to plausibly allege facts supporting the Foundation's knowledge of their coerced labor, they have failed to state a claim under § 1589(b) with respect to the Foundation.  This claim must therefore be dismissed.

**2.  Plaintiffs failed to plausibly allege that the Foundation knowingly benefitted from coerced labor.**

In addition to plausibly alleging knowledge of illegal conduct, Plaintiffs must plausibly allege that the Foundation knowingly benefitted from participating in a venture that was engaged in violations of 18 U.S.C. § 1589(a).  *See Bistline*, 918 F.3d at 873–76; 18 U.S.C. 1589(b).  The

benefit must be financial or receiving something of value.  *Id.*

Plaintiffs fail to plausibly allege that the Foundation benefitted from participating in a forced-labor venture.  Although they sprinkle allegations throughout their amended complaint that the Foundation financially benefitted from their forced labor, these are conclusory allegations that must be disregarded.  *Khalik*, 671 F.3d at 1191; *Iqbal*, 556 U.S. at 678.  These allegations merely parrot the relevant § 1589(b) legal requirements.  Examples of Plaintiffs' conclusory financial-benefit allegations include:

- "Plaintiff avers that the sole purpose of the Foundation is the support of [the Monks] and that it is the primary source of support for [the Monks], therefore each hour of coerced child labor directly benefitted the Foundation . . . . ."  Am. Compl. ¶ 48 n.11.

- "[T]he Foundation is the primary source of support for [the Monks], especially [the Monks'] construction projects, thereby benefitting financially from each and every hour of labor provided by the putative class members."  *Id.* at ¶ 80.

- "The Foundation specifically exists to provide for the material needs of [the Monks] . . . .  The Foundation, therefore, derived specific fiscal benefit from the coerced labor of the minor children comprising the putative class."  *Id.* at ¶¶ 88–89.

- "This ongoing, long-term construction project was among the projects on which class members were employed at [the Monks] for the financial benefit of both [the Monks] and The Foundation."  *Id.* at ¶ 96.

There are three problems with Plaintiffs' financial-benefit theory with respect to the Foundation.  First, Plaintiffs only provide conclusory allegations that the Foundation financially benefitted from Plaintiffs' coerced labor.  These allegations must therefore be disregarded.  *Iqbal*, 556 U.S. at 678.

Second, the financial-benefit theory makes no sense because the Foundation received nothing.  Even accepting the conclusory allegations as true, only the Monks received a purported financial benefit.  The Monks allegedly received financial support from the Foundation and labor from Plaintiffs.  The labor occurred on the Monks' property.  For example, Plaintiff Scavuzzo

alleges he performed roofing work and installed joists on the Monks' property.  Am. Compl. ¶¶ 132(b), 133.[8]  The Foundation's benefit?  The Foundation received nothing.

Third, the plausibility of Plaintiffs' entire theory against the Foundation depends on Plaintiffs withholding from the Court that the Foundation actually had its own construction project; that Plaintiffs never worked on this construction project; that the references on the Foundation's website (both the current version and the prior version) to a "construction project" referred to the Foundation's construction project, not to the Monks' purported construction activities; that the Foundation never stated it was financially supporting the Monks; and that the Foundation's construction project—building a custom-gothic-stone monastery—was atypical, expensive, and explains the multimillion-dollar accounting that Plaintiffs allege could only be consistent with illegal activity.

Plaintiffs' tactic of intentionally withholding this information from the Court, pretending like it doesn't exist, and then distorting the documents they are relying on in order to attempt to survive a motion to dismiss is troubling.

Plaintiffs distort two types of source documents and then rely on their self-created distortion as the basis for all of their other allegations against the Foundation: The Foundation's website (both current and prior versions) and the Foundation's IRS Form 990s.

The Foundation has included its websites, which Plaintiffs refer and cite to throughout their Amended Complaint, as exhibits to Patricia K. Buchanan's declaration.  This Court should consider and may properly consider these exhibits in ruling on the Foundation's motion to dismiss.  *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997).  The Foundation's current website is attached as **Exhibit A**.  Relevant pages of the Foundation's prior website, with a copyright date of 2013, have been included as **Exhibit B**.

---

[8] While this labor may have increased the property's value, the Foundation did not own this property.  The Monks allegedly did.  Thus, Plaintiffs' conclusory allegation that this labor inured to the financial benefit of the Foundation doesn't logically follow.  *See* Am. Compl. ¶¶ 132(b), 133.

i.  **The Foundation's current website does not establish a financial link with the Monks.**

Plaintiffs rely heavily on a single quote on the Foundation's website: "The New Mount Carmel Foundation, Inc. was organized to serve the temporal needs of the Monks of the Most Blessed Virgin Mary of Mount Carmel by bringing together donations from disparate sources and facilitating the purchase and development of a new monastery for this rapidly growing community of young Monks."  Am. Compl. ¶ 80; *see also id.* at ¶ 86 (quoting the Foundation's IRS Form 990).

Plaintiffs concede this is a "true statement."  Am. Compl. ¶ 80.  Yet, their financial-benefit theory against the Foundation is based on a mischaracterization of this statement.  They allege this statement means the Foundation "is the primary source of support for **The Monastery**, especially The Monastery's construction project, thereby benefitting financially from each and every hour of labor provided by the putative class members."  *Id.* (emphasis added).  "The Monastery" is Plaintiffs' abbreviation for the Monks.  *Id.* at ¶ 32.

Although Plaintiffs never say what they mean by "support"—emotional, financial, spiritual?—the Foundation infers that Plaintiffs allege that the Foundation provided financial support to the Monks for their purported construction projects.  The quoted sentence from the Foundation's website, however, says nothing about giving the Monks financial support, let alone supporting the Monks' purported "construction projects."

Rather, the quoted statement says the Foundation is "bringing together donations from disparate sources and **facilitating the purchase and development of a <u>new</u> monastery** . . . ."  *Id.* (emphasis added).  As stated, the Foundation itself is facilitating the development of the *new* monastery, not the Monks.  Plaintiffs have intentionally obscured this reality and then relied on their self-created distortion to support their entire claim against the Foundation.  A copy of the Foundation's current webpage, referred to and quoted by Plaintiffs, is included as Exhibit A.

The webpage goes on to inform the reader—including Plaintiffs' counsel, who had this information before filing but ignored it—about the monastery construction project the

Foundation has undertaken: an entirely different construction project, at an entirely different location than where Plaintiffs purportedly provided labor to the Monks.  The webpage, relied on by Plaintiffs, states that the Foundation "has undertaken a serious endeavor in service of an identified need: to receive donations from well-intentioned faithful toward the purchase and subsequent development of a remote mountainous parcel of real property near Cody, Wyoming so that the property and improvements thereon may be donated to the Monks."  Ex. A.  The webpage further states, "Mountainous land was purchased near Meeteetse, Wyoming in 2010 and construction on the monastery buildings began in 2014 and is in progress today."  *Id.*  According to the webpage, the Foundation has been constructing a new monastery, beginning in 2014, with the intent of donating this property to the Monks.  *Id.*

Importantly, Plaintiffs' counsel knows that the property the Foundation purchased and has been developing—the construction project referred to on the Foundation's website—is not the property that Plaintiffs allegedly worked on.  This will be undisputed.

Plaintiffs' conclusory allegation that the Foundation is supporting the Monks' construction projects is therefore wholly unsupported.  *See* Am. Compl. ¶ 80.  Indeed, the Monks, as alleged by Plaintiffs, had their own income source to fund their own construction project— Mystic Monk Coffee.  *Id.* at ¶ 32.  Because the website doesn't aid Plaintiffs' invented assertion of a financial link, Plaintiffs' allegation is based entirely on their own speculation and imagination.  This allegation must therefore be disregarded.  *See Khalik*, 671 F.3d at 1191; *Soto*, 748 Fed. Appx. at 793.

Despite having no basis supporting their conclusory allegation that the Foundation financially supported the Monks, Plaintiffs highlight the following quote from the Foundation's updated website: "New Mount Carmel Foundation, Inc. has no financial relationship or legal obligation to any other entity."  Am. Compl. ¶ 81; Ex. A.  Plaintiffs allege this is a fraudulent statement.  Am. Compl. ¶ 81.  Again, this is a conclusory statement not entitled to be accepted as true.  *Iqbal*, 556 U.S. at 679–80.  Plaintiffs fail to support their bald assertion with any facts.

Plaintiffs' conclusory statement also lacks plausibility.  The Foundation states on its

website that it is building a new monastery, which it intends to donate to the Monks. Ex. A. This statement is entirely consistent with the Foundation's other statement that it has no financial relationship or legal obligation to any other entity. A person can intend to do something, but that intent does not make them legally obligated to follow through. While the Foundation intends to donate the new gothic monastery to the Monks, the Foundation has no legal obligation to do so. Thus, Plaintiffs' conclusory allegation that the Foundation created this statement on its website to "conceal" its "direct" financial link to the Monks lacks a basis, let alone a reasonable basis. *See* Am. Compl. ¶ 81.[9]

### ii.   Merely updating a website does not establish spoliation—no prejudice.

When discussing the Foundation's current and prior websites, Plaintiffs make the factually and legally invalid assertion that the Foundation committed spoliation by updating its website after this lawsuit began. Am. Compl. ¶¶ 81–84. Based on this fact alone, they request an adverse inference. *Id.* at ¶ 107. Specifically, they want this Court to infer, at the pleading stage, that the Foundation was engaged in a forced-labor criminal enterprise for over a decade merely from the fact that the Foundation updated its website in 2021. *Id.* The Foundation's prior website had not been updated since 2013. *See* Ex. B at 1 (copyright 2013).

In other words, not only do they accuse the Foundation of spoliation—though they can't meet the spoliation requirements as applied in the Tenth Circuit—they also request an adverse inference, at the pleading stage, to avoid a motion to dismiss.

The Court should take a moment to consider: why are Plaintiffs' counsel, who have an obligation to conduct a reasonable pre-filing investigation, focusing on the mere fact that the Foundation updated its website—rather than focusing on the website's content—and begging this Court for an adverse inference? The answer: absent an adverse inference, Plaintiffs have **no**

---

[9] Plaintiffs would know that the Foundation's statement is accurate if they had conducted a reasonable pre-filing investigation of public records. The Foundation has no legal obligation to donate its gothic monastery to the Monks. Thus, public records would demonstrate that Plaintiffs' allegation that the Foundation created this statement on its website to "conceal" its "direct" financial link to the Monks is untrue—and therefore was made without a reasonable basis, in addition to being inaccurate. *See* Am. Compl. ¶ 81.

**reasonable basis** for their lawsuit against the Foundation.

Unfortunately for Plaintiffs, they are not entitled to an adverse inference for two reasons. First, Plaintiffs' allegation of spoliation is a legal conclusion that must be disregarded. *Iqbal*, 556 U.S. at 679–80.

Second, spoliation has not occurred as a matter of law. Among other requirements, to establish spoliation, Plaintiffs must show  (1) evidence was destroyed, and (2) the destruction prejudiced them. *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015). Plaintiffs cannot meet either requirement. Regarding destruction, no evidence was destroyed. Plaintiffs do not even allege that the Foundation destroyed the information on the prior website. Indeed, it was not destroyed. Attached as Exhibit B is a true and correct copy of relevant pages from the Foundation's prior website. Regarding prejudice, Plaintiffs suffered no harm. They preserved a copy of the website. Am. Compl. ¶ 82. Thus, even if updating the website had destroyed information, Plaintiffs suffered no prejudice because they have the alleged evidence.

### iii. **Plaintiffs misrepresent the content of the prior website—no financial link. The website only refers to the Foundation's construction project; it never references the Monks' purported construction activities where Plaintiffs allegedly provided labor.**

Like Plaintiffs' distortion of the Foundation's current website, they misrepresent the contents of the prior website. Plaintiffs boldly state "the Foundation's website [] directly link[s] it financially to [the Monks]." Am. Compl. ¶ 81. This assertion is a conclusion not entitled to be accepted as true. *See Iqbal*, 556 U.S. at 679–80. Plaintiffs provide no factual support.

This conclusion also lacks plausibility. Plaintiffs state that the website they possess establishes a direct financial link. But they fail to allege anything on the website establishing this purported link. If the link exists, then they should back up this bald statement with facts. The Foundation has provided the websites referred to by Plaintiffs, both current and past, as Exhibits A and B. Spoiler alert: there is no financial link.

Plaintiffs allege that the following three statements from the prior website have relevance, though context reveals that Plaintiffs have distorted their meaning.

First, "[T]he Board of Directors is presently completing the installation of the infrastructure and design preparations on the monastery complex as plans are being made to break ground in the near feature." Am. Compl. ¶ 82(a). From this quote, they want the Court to infer that the Foundation is referring to the Monks' purported construction activities. *See id.*

What the website, in context, actually says:

> As the Carmelite Monks of Wyoming receive numerous vocational inquiries each week (in excess of three hundred inquiries in the last year alone), the New Mount Carmel Foundation has undertaken the holy work of acquiring mountain land and constructing a **classic gothic monastery** in keeping with the Carmelite Rule. Thanks to the generosity of many benefactors, the New Mount Carmel Foundation was able to purchase a solitary, beautiful ranch at the end of a private road near Meeteetse, Wyoming, in 2010. **Having acquired mountain property, the Board of Directors is presently completing the installation of infrastructure and design preparations on the monastery complex as plans are being made to break ground in the near future**.

Ex. B at 1 (copyright 2013) (emphasis added); *compare* Am. Compl. ¶ 82(a), *with id.*

It is undisputed that the property where Plaintiffs purportedly provided labor for the Monks was not the property referenced on the Foundation's website. Indeed, Plaintiffs allege that they provided labor at the Monks' property, not the Foundation's. Am. Compl. ¶ 96 (stating class members were employed at "The Monastery"); *id.* at ¶ 132(b) (alleging roofing work at "The Monastery"); *id.* at ¶ 137(b) (alleging mechanical repair on equipment used at "The Monastery").[10] The Foundation's website, however, refers to the property that the Foundation purchased, while Plaintiffs allege that they provided labor at the Monks' property.

Second, Plaintiffs quote: "[T]he Foundation presently works to construct a monastery for the protection and preservation of the Carmelite monastic life." *Id.* at ¶ 82(b). Again, Plaintiffs want the Court to infer that the Foundation is referring to the Monks' construction activities.

In context, this interpretation is untenable. The sentence on the website reads: "Having purchased a solitary, mountainous property in keeping with the monastic tradition, **the Foundation presently works to construct a monastery for the protection and preservation**

---

[10] "The Monastery" is Plaintiffs' abbreviation for the Monks. Am. Compl. ¶ 32.

**of the Carmelite monastic life**." Ex. B at 2 (emphasis added) (history of New Mount Carmel); *compare id.*, *with* Am. Compl. ¶ 82(b). The Foundation is referring to its property, not the Monks' property where the Plaintiffs allegedly worked.

Third, Plaintiffs quote: "By ensuring the building of the monastic structures necessary for the temporal needs of the monks, these Carmelites will be able to live their life of worship and sacrifice." Am. Compl. ¶ 82(c). In context, from the website, this sentence refers to the "monastery structure" that the Foundation was preparing to build on the Foundation's property. *See* Ex. B at 2 ("Presently the foundation is . . . preparing to break ground on the monastery structure in the near future."). The Foundation's prior website had a copyright date of 2013. *See id.* Thus, as of 2013, where the website is referring to preparations being undertaken to break ground on a new monastery, the construction had not yet begun.

But Plaintiffs claim to have worked on the Monks' construction project—not the Foundation's—in 2011 and 2012. Plaintiff Scavuzzo alleges that he performed "regular roofing work" and the installation of joists "for the ongoing construction projects at [the Monks]" in 2012. Am. Compl. ¶¶ 132(b), 133. Plaintiff Jelinek alleges that, in 2011, he repaired equipment used in construction projects at [the Monks' property]." *Id.* at ¶ 136, 137(b), 138. While it remains unclear what "construction project" Plaintiffs were working on—they never describe what was being built—*it is factually impossible that Plaintiffs were working on the Foundation's project. When Plaintiffs allegedly provided labor, the Foundation's construction project had not begun.*

Plaintiffs allege that their quotes in paragraph 82(a)–(c) are "relevant." They are. They demonstrate that Plaintiffs filed a baseless claim against the Foundation. Although Plaintiffs imply that these quotes refer to the Monks' construction activities, as demonstrated above, the Foundation was referring to its own construction project, which Plaintiffs never worked on.

### iv.    The IRS Forms do not plausibly support illegal activity.

Plaintiffs make several baseless allegations connected to the Foundation's annual IRS Form 990 from 2014–18. First, they repeat their mischaracterization of the Foundation's stated

purpose.  *See* Am. Compl. ¶¶ 86–89 (stating Foundation exists to fund the Monks' construction projects, though Plaintiffs' counsel knows the Foundation's website only refers to the Foundation's construction project, not the Monks').  As explained above when discussing the Foundation's website, nowhere does the Foundation say it provides the Monks with financial support, let alone that it funds the Monks' construction projects.  To the contrary, only by ignoring all of the context on the Foundation's website, and pretending that the Foundation has no construction project, could Plaintiffs have arrived at this conclusory allegation.

Indeed, Plaintiffs generally allege that the Foundation's IRS forms suggest that the Foundation is engaged in an unusual, long-term, multimillion-dollar construction project.  *See* Am. Compl. ¶¶ 92–110.  Plaintiffs never allege that the Foundation is not, in fact, engaged in such a project.  *See id.*  They even concede that the Foundation's reporting of its assets and expenditures is "technically possible."  *See id.* at ¶ 106.  Nevertheless, they ask the Court to draw the inference that the Foundation is engaged in "unlawful financial activities."  *Id.*

Assuming for a moment that the Foundation's accounting in its IRS Form 990s supports Plaintiffs' conclusion of "unlawful financial activity."  It remains unclear why, of all the "unlawful" activity it could suggest, it means that the Foundation must be engaging in a forced-labor enterprise as alleged by Plaintiffs.  While possible, without other factual allegations for support, Plaintiffs' conclusion is speculative.

Plaintiffs' illegal-activity allegation, in addition to being baseless, is implausible because the Foundation was, in fact, engaged in a highly unusual construction project.  Plaintiffs, as explained above, have a copy of the Foundation's 2013 website, attached as **Exhibit B.**  That website shows the following planned construction project:

## Refectory

The refectory is the building where the monks live their common life.  The monks eat in a common refectory listening to a reading from Sacred Scripture.  The refectory building will have a kitchen area, recreation room, library, computer scriptorium, and various work rooms.



Ex. B. at 6–7.

## Chapter House

The chapter house is the building where the monks make their vows and are clothed in the holy habit.  The monks will use it as a temporary chapel.





Ex. B at 8–9.

## Hermitages

There will be thirty hermitages for monks in the Grand Cloister.



Ex. B at 10.

## Infirmary

The infirmary building includes an infirmary for the sick, a novitiate area, and the offices of the monastery.



Ex. B at 12–13.

## Chapel

The chapel will be built with a choir for 30 monks and their guests.





Ex. B at 14–15.

Plaintiffs fail to acknowledge this construction project—the only construction project referred to on the Foundation's website.  Indeed, Plaintiffs' conclusion that illegal activity is the only "plausible" explanation for the Foundation's accounting depends on pretending that the Foundation's actual construction project doesn't exist.  For example, Plaintiffs allege how "unusual" it is for a construction project to have millions of dollars in "architecture fees" and how a standard project only has a small percentage of the total construction costs in architecture expenses.  Am. Compl. ¶¶ 101, 103–06.  Maybe so, but as evident from the Foundation's architectural renderings and building plans, this was not a standard construction project.  Although Plaintiffs allege the "industry standard" and the "typical" expenses for architecture expenses on building projects, these figures are meaningless with respect to the Foundation's project.  *See id.* at ¶ 103.

The real question is: What's the typical expense for a custom-gothic-stone monastery?  Plaintiffs don't say.  Nor could they.  A one-of-a-kind project, by definition, is atypical.

Plaintiffs also fail to acknowledge that the Foundation did, in fact, build the gothic-stone monastery referred to and depicted on its website. This will be undisputed.

With this in mind, Plaintiffs' allegations concerning the Foundation's purportedly unusual accounting are unfounded, based on Plaintiffs' speculation, and ignore the Foundation's actual construction project as a plausible explanation.

- Plaintiffs allege that the Foundation's accounting indicates that it was funding the Monks' construction projects. Am. Compl. ¶¶ 95–96. This is a conclusory allegation and implausible. Plaintiffs' allegation could make sense if the Foundation had no construction project of its own. But since it did, and because that project was clearly unusual and expensive, Plaintiffs have no reasonable basis to say that the accounting means the Foundation was supporting the Monks' construction projects. If anything, the accounting further supports that the Foundation was actually developing the immense building project referenced on its website.

- Plaintiffs allege "on information and belief"—i.e., based on sheer speculation and withholding the Foundation's actual construction project from the Court—that the Foundation doesn't possess millions in "construction in progress." *Id.* at ¶ 89. Instead, Plaintiffs allege that the accounting indicates the Foundation possesses assets of the Schneider and Woodward Defendants and is concealing their assets as "construction in progress." *Id.* This conclusory allegation, based on sheer speculation and not entitled to be accepted as true, flows from Plaintiffs' self-created theme that the Foundation's accounting only plausibly supports illegal activity. Again, the plausibility of Plaintiffs' illegal-activity theory depends on withholding the plausible alternative explanation from the Court—that the Foundation was engaged in an unusual construction project, which Plaintiffs had no connection with.

- In the alternative to their concealing-assets-for-the-other-Defendants theory, Plaintiffs allege that the "obviously inflated" architect fees represent money received from the Schneider and Woodward Defendants and managed by Fr. Daniel

Woodward in his capacity as treasurer and president of the Monks, which passed through the Foundation. *Id.* at ¶ 109. Plaintiffs provide no support for this conclusory allegation. This alternative money-laundering theory again depends on pretending that no other plausible explanation exists for the Foundation's accounting, like, say, an unusual construction project. But as demonstrated from the Foundation's website, the Foundation has been engaged in an unusual construction project. Plaintiffs' conclusion therefore lacks plausibility and credibility.

This summarizes all of Plaintiffs' allegations against the Foundation. To have their allegations make any sense, Plaintiffs had to withhold from the Court that the Foundation has been engaged in a multimillion-dollar construction project that had nothing to do with their allegations. Why? Because they needed the Court to believe that the "construction project" referred to on the Foundation's website was the Monks' construction project and because they needed to withhold a plausible alternative explanation from the Court for the Foundation's accounting.

Because Plaintiffs failed to plausibly allege that the Foundation financially benefitted from Plaintiffs' labor, their forced-labor claims against the Foundation must be dismissed.

**C. 18 U.S.C. § 1590(a) (Count 3)—Plaintiffs failed to allege a plausible claim for relief under § 1590(a) because they have only provided conclusory allegations.**

Plaintiffs also allege a claim under 18 U.S.C. § 1595(a) against the Foundation for knowingly benefitting financially from participating in a venture that it knew or should have known engaged in a violation of 1590(a)—human trafficking. *See* Am. Compl. ¶¶ 171–75.

This claim is largely duplicative of Plaintiffs' Count 2 forced-labor claim, which alleges a violation of § 1589(b). The standard for proving liability under § 1595(a) is very similar to the standard for venture liability under § 1589(b) discussed above. Section 1595(a) states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew

or should have known has engaged in an act in violation of this chapter[11]) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

The standard for obtaining civil liability under § 1595(a)—other than against a direct perpetrator—closely mirrors the venture liability standard under § 1589(b).[12]  However, instead of the defendant knowing about coerced labor within the meaning of § 1589(a), Plaintiffs allege participation in a venture knowing that the venture engaged in conduct violating 18 U.S.C. § 1590(a), which states:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

It is not alleged—even in a conclusory fashion—that the Foundation knowingly did anything to directly violate § 1590(a).  Instead, Plaintiffs appear to allege that the Foundation knowingly benefitted from participating in a venture that it knew engaged in an act that violated § 1590(a), which would then constitute a violation of § 1595(a) and permit civil liability.  *See* Am. Compl. ¶¶ 171–75.

However, as explained above, Plaintiffs failed to plausibly allege that the Foundation benefitted financially or knew about coerced labor, let alone the trafficking conduct at issue in § 1590(a).  For these reasons, Plaintiffs' claim under Count 3 must be dismissed against the Foundation.

## D.  18 U.S.C. § 1961 (Count 4)—RICO—Plaintiffs failed to allege a plausible claim for relief under § 1961 because they failed to plausibly allege predicate acts.

Plaintiffs allege that the Foundation violated 18 U.S.C. § 1961 *et seq.* through its purported violations of the forced-labor and trafficking statutes, 18 U.S.C. §§ 1589(b) and

---

[11] In Count 3, the "act in violation of this chapter" under 18 U.S.C. § 1595(a) is alleged to be an act violating 18 U.S.C. § 1590(a).  *See* Am. Compl. ¶¶ 171–74.

[12] With respect to the interplay between 18 U.S.C. § 1589(b) and § 1595(a), though the standards for venture liability and knowingly benefitting under § 1595(a) are very similar, a person could be considered a "direct perpetrator" under § 1595(a) by violating § 1589(b).

1590(a).  *See* Am. Compl. ¶ 181 ("Nicholas Maroney conducted the affairs of the Foundation through a "pattern of racketeering" by repeatedly violating 18 U.S.C. §§ 1589 and 1590.").  As explained above, however, Plaintiffs failed to allege a plausible claim under either section 1589 or 1590 with respect to the Foundation.  Thus, their RICO claim also fails and must be dismissed.

## V.   CONCLUSION

Because Plaintiffs failed to state a plausible claim for relief against the Foundation, their claims against the Foundation must be dismissed, with prejudice.

DATED this 26th day of March, 2021.

SCHWARTZ, BON, WALKER & STUDER, LLC

By:  *s/Rick L. Koehmstedt*
　　　Rick L. Koehmstedt, WSB 6-3101
　　　Of Attorneys for Defendant New Mount
　　　Carmel Foundation, Inc.
　　　141 S. Center St., Suite 500
　　　Casper, WY  82601
　　　(307) 235-6681
　　　rick@schwartzbon.com

PATTERSON BUCHANAN
FOBES & LEITCH, INC., P.S.

By:  *s/Patricia K. Buchanan*
　　　Patricia K. Buchanan, WSBA 19892
　　　*Admitted Pro Hac Vice*
　　　Of Attorneys for Defendant New Mount
　　　Carmel Foundation, Inc.
　　　1000 Second Ave., 30th Floor
　　　Seattle, WA  98104
　　　pkb@pattersonbuchanan.com

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing document was served on all parties per the CM/ECF electronic service of the Court, this 26th day of March, 2021.


*/s/Jennifer Friesen*          
Jennifer Friesen, Legal Assistant