

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

---

CARLIE SHERMAN, ANNA GOZUN, AMANDA
NASH, ANDREW SCAVUZZO, and EHAN
JELINEK, on behalf of themselves and similarly
situated persons,

                  Plaintiffs,

    v.

TRINITY TEEN SOLUTIONS, INC., a Wyoming
corporation; **TRIANGLE CROSS RANCH, LLC**, a
Wyoming limited liability company; **MONKS OF THE
MOST BLESSED VIRGIN MARY OF MOUNT
CARMEL, d/b/a MYSTIC MONK COFFEE**, a
Wyoming corporation; **GERALD E. SCHNEIDER;
MICHAELEEN P. SCHNEIDER; ANGELA C.
WOODWARD; JERRY D. WOODWARD; DANIEL
SCHNEIDER; MATHEW SCHNEIDER; MARK
SCHNEIDER; KARA WOODWARD; KYLE
WOODWARD; THOMAS GEORGE; JUDITH D.
JEFFERIS; DALLY-UP, LLC**, a Wyoming limited
liability company; **ROCK CREEK RANCH, INC.**, a
Delaware corporation; **DIOCESE OF CHEYENNE**, a
Wyoming corporation; **SOCIETY OF OUR LADY
OF THE MOST HOLY TRINITY**, a Texas
corporation; and **NEW MOUNT CARMEL
FOUNDATION, INC.**, a Wyoming corporation,

                  Defendants.

Case No. 20-CV-215-SWS

---

**ORDER GRANTING SECOND MOTIONS TO DISMISS OF MONK
DEFENDANTS AND NEW MOUNT CARMEL FOUNDATION**

---

This case comes before the Court on:

(1)    the second motion to dismiss of Defendants Monks of the Most Blessed

Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee and Daniel Schneider (collectively, "Monk Defendants") (Docs. 121, 122), and

(2)     the second motion to dismiss of Defendant New Mount Carmel Foundation. (Docs. 130, 131.)

Plaintiffs filed oppositions thereto (Docs. 142, 138, respectively), and the movants replied (Docs. 149, 148, respectively).  Having considered the parties' arguments and reviewed the record herein, the Court finds the motions to dismiss should be granted.

## INTRODUCTION

Plaintiffs' putative class action alleges the parents of "troubled teen" minors paid to send their children to one of two working ranches in Wyoming where the teens were supposed to receive various forms of traditional and cutting-edge therapy and schooling. Plaintiffs contend it was all a racket, though, as the ranches were light on the education, even lighter on the therapy, and largely forced the teenagers to labor for many hours per day under horrible conditions.  They allege each Defendant was either directly involved with the scam or knowingly benefitted from the forced labor.  Plaintiffs assert federal causes of action for unlawful forced labor, human trafficking, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), and state-law causes of action for negligence and/or negligent infliction of emotional distress.  (Am. Compl. Doc. 106.)

## STANDARD FOR RULE 12(b)(6) MOTIONS TO DISMISS

The Foundation and the Monk Defendants moved to dismiss the claims under Fed. R. Civ. P. 12(b)(6) by alleging Plaintiffs have failed to state a plausible claim for relief.

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint's factual allegations, assumed to be true, must "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the context of a 12(b)(6) motion to dismiss, this plausibility standard requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard does not require a plaintiff to show a defendant probably acted wrongfully, but it requires more than "a sheer possibility." *Id.* That is, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphases in original).

"Thus, mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The Court accepts the nonmoving party's well-pled

factual allegations as true and construes them in the light most favorable to the nonmoving party, but it is not bound to accept an asserted legal conclusion as true. *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## PLAINTIFFS' GENERAL ALLEGATIONS

In very general terms, Plaintiffs' amended complaint asserts the following primary points:

- Some Defendants own and operate the Triangle Cross Ranch (TCR) in northern Wyoming which took in "troubled teen" males, having approximately 23 such males at any given time. (Am. Compl. ¶¶ 3, 144.) At a significant monthly cost to the teen's parents/guardians, TCR promised to provide focused education and therapy/counseling to correct the teen's misguided ways. (Am. Compl. ¶¶ 2, 4; p. 5 n.1.)  The owners of TCR also founded Mount Carmel Youth Ranch (MCYR), which operated as a nonprofit group home to provide services to troubled teens. (Am. Compl. ¶ 3.)  MCYR operated at TCR and closed in November 2012. (*Id.*)

- Other Defendants own and operate another northern Wyoming ranch, Trinity Teen Solutions (TTS), which took in "troubled teen" females, having approximately 12 such females at any given time. (Am. Compl. ¶¶ 4, 144.) Again, at a significant monthly cost to the teen's parents/guardians, TTS promised to provide focused education and therapy/counseling to correct the teen's misguided ways.  (Am. Compl. ¶¶ 2, 4, 5; p. 5 n.1.)

- The owners of TCR and the owners of TTS are close family relatives.  (Am. Compl. ¶¶ 3, 4.)

- Immediately upon a troubled teen's arrival at either TCR/MCYR or TTS as a resident, Defendants entirely disregarded the promises of education and treatment, and instead began mistreating the resident, exploiting the resident for cheap labor, and forcing the resident to live in subhuman conditions. (Am. Compl. ¶¶ 10-16.)

Plaintiffs contend all Defendants either directly participated in the mistreatment or

financially benefited from such mistreatment, e.g., by receiving free forced labor[1] at its facilities.

## PLAINTIFFS' FIVE CAUSES OF ACTION[2]

Counts 1, 2, and 3 in Plaintiffs' amended complaint assert claims under the Trafficking Victims Protections Reauthorization Act of 2008 (TVPRA), which is enforceable between private parties through 18 U.S.C. § 1595(a).  Count 1 asserts a violation of 18 U.S.C. § 1589(a), which holds liable those who directly and unlawfully force others to perform labor.  Count 2, under § 1589(b), concerns those who, while not directly forcing illegal labor, know or should know of the unlawful nature of the labor and benefit from the forced labor.  Count 3 alleges a violation of 18 U.S.C. § 1590(a), which imposes liability for trafficking humans for forced labor.

Count 4 asserts certain Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), specifically 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in [or affecting] interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  RICO is enforceable civilly by a person "injured in his business or property."  18 U.S.C. § 1964(c).

Finally, Plaintiffs' Count 5 is a state-law tort claim, described as "Negligence and Negligent Infliction of Emotional Distress."  (Am. Compl. p. 67.)

---

[1] The amended complaint repeatedly refers to "child labor," and indeed the amended complaint describes most of the alleged forced labor coming from minors.  The Court refers to it simply as "forced labor," though, because at least one named Plaintiff was 18 years old at the time of his stay at TCR (Am. Compl. ¶ 134), and therefore was a legal adult at the time.  *See* Wyo. Stat. Ann. § 14-1-101(a).

[2] Not all causes of action are alleged against every defendant.

## SPECIFIC ALLEGATIONS AGAINST MONK DEFENDANTS
## AND THE FOUNDATION

Relative to these motions to dismiss, Count 1 is asserted against only Defendant Daniel Schneider. Counts 2, 3, and 4 are asserted against all Monk Defendants as well as the Foundation. Count 5 is not asserted against any of these Defendants and is not at issue in this Order. The following allegations from the amended complaint are relevant to the two motions to dismiss.

Defendant The Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee, is a Wyoming Religious Corporation operating in northern Wyoming, which, among other activities, packages and sells coffee and accessories. (Am. Compl. ¶ 32.) Mystic Monk Coffee's business premises are located at "The Monastery." (*Id.* ¶¶ 32, 115.) Rather confusingly, the amended complaint uses the phrase "The Monastery" to refer to both the Monks (*id.*) as well as physical premises where the Monks worked and lived (*see, e.g., id.* ¶ 76).

Defendant Father Daniel Schneider ("Fr. Daniel Schneider") is a monk and the President of the Monks. (*Id.* ¶ 37.) He is also the son of TCR's owners and the brother of TTS' owners. (*Id.* ¶¶ 31, 35, 37.) Prior to being president, Fr. Daniel Schneider was the treasurer for the Monks. (*Id.* ¶ 109.)

The Foundation is a Wyoming nonprofit corporation. (*Id.* ¶ 48.) Plaintiffs assert "the sole purpose of the Foundation is the support of The Monastery and that it is the primary source of support for The Monastery, therefore each hour of coerced child labor benefitted the Foundation with the knowledge and consent of its president, director,

secretary, and other officers." (*Id.* p. 19 n. 11.)

Three of the four named Plaintiffs allegedly performed forced labor at "The Monastery" or on equipment used for construction projects at "The Monastery." (*Id.* ¶¶ 114-15, 120, 131-33, 137-38.) "Fr. Daniel Schneider would arrive at TCR and request from his father, Defendant Gerald Schneider, labor that was needed at The Monastery and he would transport TCR residents for forced labor at The Monastery. Quite often Fr. Daniel Schneider would deliver pressure washers and other machines requiring small engine repair for boys assigned to mechanical work at TCR to complete at the Triangle Cross Ranch." (*Id.* ¶ 76.)

77.     Specifically, but without limitation, Plaintiff Jelinek and other putative class members performed substantial mechanical and construction labor at The Monastery, actually building the physical infrastructure and buildings on its grounds. This work was performed without remotely adequate safety precautions. For example, putative class members would perform work on buildings as high as forty (40) feet without safety harnesses or hard hats. Putative class members performed labor that should have been performed by skilled tradesmen in compliance with OSHA safety standards. Instead, The Monastery and its funding arm, The Foundation, utilized the coerced child labor of the putative class members in constructing The Monastery's physical infrastructure.

78.     Defendant Daniel Schneider is an agent and officer of the Monks of the Most Blessed Virgin Mary of Mount Carmel and had direct knowledge that the putative class members were providing uncompensated labor to The Monastery and specifically knew that they faced punishment if they did not perform such services.

79.     Fr. Maroney is the Secretary and Director of the Monks of the Most Blessed Virgin Mary of Mount Carmel and is also a board member of the Foundation and is its registered agent. "Br. Simon Mary of the Cross" is also a board member of the Foundation and a lay brother at The Monastery. At all times relevant to this Complaint, Fr. Maroney, Br. Simon Mary, and/or another similarly situated agent of The Monastery or The Foundation knew or in the exercise of reasonable diligence should have known that the putative class members were providing labor to The Monastery and Foundation, that the labor was not compensated, and that the putative class members faced punishment if they did not

provide such labor.

80.     The New Mount Carmel Foundation specifically states on its website that, "The New Mount Carmel Foundation, Inc. was organized to serve the temporal needs of the Monks of the Most Blessed Virgin Mary of Mount Carmel by bringing together donations from disparate sources and facilitating the purchase and development of a new monastery for this rapidly growing community of young Monks." On information and belief, this is a true statement, and the Foundation is the primary source of support for The Monastery, especially The Monastery's construction projects, thereby benefitting financially from each and every hour of labor provided by the putative class members.

81.     Prior to the filing of this lawsuit, The Foundation maintained a far more detailed website. After the filing of the original Complaint in this lawsuit, the Foundation removed the majority of its website from the internet, replacing it with a one paragraph description of its purpose that attempts to paint the Foundation as a land holding company. The new website contains this explicit disclaimer, "New Mount Carmel Foundation, Inc. has no financial relationship or legal obligation to any other entity." This, however, is a fraudulent statement and was an intentional attempt at concealing statements on the Foundation's website that directly link it financially to The Monastery itself.

82.     Plaintiffs preserved a copy of the original website, which contains, inter alia, the following relevant statements:

    (a)     "(T)he Board of Directors is presently completing the installation of infrastructure and design preparations on the monastery complex as plans are being made to break ground in the near future."

    (b)     "[T]he Foundation presently works to construct a monastery for the protection and preservation of the Carmelite monastic life."

    (c)     "By ensuring the building of the monastic structures necessary for the temporal needs of the monks, these Carmelites will be able to live their life of worship and sacrifice."

83.     A specific reference on the website as it stood prior to the filing of this lawsuit should be of particular interest to the Court. Br. Simon Mary, the chair of The Foundation, had a biography on The Foundation's website (now removed) where he specifies: "Br. Simon Mary had extensive experience in the legal profession at the New England law firm of Donovan & O'Connor, LLP where he was preparing to challenge the Vermont Bar Exam. Br. Simon Mary brings selfless determination and zeal to the Foundation, whether raising funds or managing the

Foundation's current assets.  He is particularly concerned with protecting each and every donation received and making decisions only after seeking heavenly guidance; his greatest aspiration is to serve the Lord with loving fidelity in all things."

84.     Put simply, Br. Simon Mary, who was aware of the labor provided by the putative class members and the circumstances under which they provided it was not merely directly in control of The Foundation's finances, he was also possessed of sufficient legal education and experience that he knew or should have known that attempts at spoliation of evidence, such as the removal and/or alteration of relevant information from the website of a defendant in a lawsuit, is both unethical and unlawful.

85.     The Foundation is organized as a tax exempt 501(c)(3) organization. As such, The Foundation must file IRS Form 990 annually.

86.     During the period for which such forms are on file, 2014-2018, The Foundation informed the IRS that its purpose was "To serve the temporal needs of the Monks of the Most Blessed Virgin Mary of Mount Carmel by Bringing Together Donations from Disparate Sources and Facilitating the Purchase and Development of a New Monastery for this Rapidly Growing Community of Young Monks."

87.     Further, The Foundation, contrary to its assertion, does have a direct financial relationship to the Monks of the Most Blessed Virgin Mary of Mount Carmel, as its financial support of that organization, a Wyoming religious corporation, is its sole legal justification for tax exempt status.

88.     Based on this document, filed with the IRS under penalty of perjury, The Foundation specifically exists to provide for the material needs of The Monastery and to conduct the ongoing construction projects at The Monastery for which Fr. Daniel Schneider specifically procured the services of the putative class members.

89.     The Foundation, therefore, derived specific fiscal benefit from the coerced labor of the minor children comprising the putative class, and agents of both The Monastery and The Foundation were directly aware of the fact that this child labor was both coerced and uncompensated.

90.     These IRS Forms 990 are executed by Fr. Nicholas Maroney as "President."  The most recent filing in Plaintiffs' possession was executed by Fr. Maroney just over one year prior to the filing of this suit, on November 5, 2019. This is of specific interest because as of the time of the filing of these Forms 990, Fr. Maroney was the President of the Monks of the Most Blessed Virgin Mary of

Mount Carmel and was only a board member of The Foundation.

91.     Accordingly, the operation of The Monastery and The Foundation are directly intertwined by Fr. Maroney who was acting in a leadership capacity for both The Foundation and The Monastery and had direct and personal knowledge of the use of the putative class members as coerced labor in the construction of The Monastery's physical buildings.

92.     As of the end of FY 2018, The Foundation possessed $29,408,417 in net assets.

93.     These assets were primarily garnered from cash donations made during the preceding five years.  These donations totaled $2,220,749 in 2018, $1,623,348 in 2017, $4,268,896 in 2016, $6,802,372 in 2015, $3,079,562 in 2014, and $2,196,333 in 2013.

94.     On information and belief, substantial portions of these assets are the direct contributions of the Schneider and Woodward Defendants and were received by The Foundation with the knowledge of certain of its board members that the source of the donations were the profits from TCR and TCS through the unlawful coerced labor of children.

95.     Despite attempting to claim that it is merely a land holding company with no financial or legal connection to any other entity, as of 2013, the first year for which Plaintiffs have tax documents, The Foundation already possessed net assets of $11,633,133.  The majority of these assets were not land or buildings, but were capitalized portions of an ongoing, long-term construction project.

96.     This ongoing, long-term construction project was among the projects on which class members were employed at The Monastery for the financial benefit of both The Monastery and The Foundation.

97.     Far from being the land holding company that The Foundation attempts to paint itself as in its [first] Fed. R. Civ. P. 12(b)(6) motion [Doc. 80], to which this Amended Complaint is filed in response, as of 2013 The Foundation reported land and building assets worth $4,467,079.  As of the end of FY 2018, The Foundation reported that those assets had depreciated in value to $4,446,565.

98.     The majority of The Foundation's other assets are reported on each of its Forms 990 as "Construction in Progress," and despite years of construction, The Foundation has not yet realized one dollar of appreciation in the value of its buildings, instead continuing to capitalize the assets as though it were a land developer operating on a long-term construction contract.

99.     In 2014 The Foundation reported reasonable costs for the construction of land improvements ($168,422), a gas line ($53,668), and a water well ($30,855).

100.     In 2014 The Foundation reported capitalized architecture fees of $7,165,231.

101.     In 2015 The Foundation's reported figure for capitalized architecture fees increased to $12,993,608.

102.     In 2015 the only increase in value to the other "construction in progress" items was the increase in the capitalization of the gas line to $217,830. For the remaining years, The Foundation capitalized all of its "construction in progress" as a single lump sum and claimed absolutely no increase to the value of its buildings or land.

103.     Architecture expenses typically encompass no more than 12% of the cost of a building project.  That percentage decreases as the cost of the building project escalates, and a floor of 6.5% is the industry standard.  This suggests that The Foundation claims to be constructing a complex that will ultimately cost approximately $200 Million Dollars, at a minimum.

104.     Payment of millions of dollars in architect's fees in advance of construction is also practically unheard of within the construction industry. Architectural fees are nearly always paid on a schedule periodically at different phases of construction.

105.     However, despite architect's fees in excess of $12 Million, The Foundation has, as of the end of FY 2018, reported $23,640,759 of total construction costs, indicating that over 50% of all of the capitalized value of its construction was in architect's fees.

106.     While The Foundation's reporting of its assets and the expenditure of its income are technically *possible*, they are not plausible and give rise to a reasonable inference that The Foundation is engaged in unlawful financial activities.

107.     Further, given the fact that The Foundation has attempted to conceal information about its board, its activities, and its purpose through the radical alteration of its website immediately following the filing of this lawsuit, this Court may reasonably infer that The Foundation is engaged in activities that link it to the criminal enterprise described herein.

108.     On information and belief, The Foundation is not actually in

possession of tens of millions in "construction in progress," certainly not incurred as legitimate "architect" fees but is actually either in possession of assets belonging to the Schneider and Woodward Defendants who are utilizing The Foundation, with the aid and assistance of Fr. Daniel Schneider and The Monastery, to conceal their assets by inaccurately reporting those assets as capitalized "construction in progress."

109.    In the alternative, on information and belief, the obviously inflated "architect" fees represent money received from the Schneider and Woodward Defendants and managed by Fr. Daniel Woodward in his capacity as treasurer and subsequently president of The Monastery that were passed through The Foundation and/or The Monastery in order to engage in tax avoidance or in an effort to conceal the profits of TCR and TTS.

110.    Accordingly, Defendants Fr. Daniel Schneider, The Foundation, and The Monastery are active participants in a scheme to profit directly from the illegal activities of Defendants TCR and TTS both by utilizing the coerced labor of the children kept at these facilities and by working with them to conceal the profits unlawfully made through this criminal enterprise. In exchange The Monastery and The Foundation receive free labor and, on information and belief, substantial financial assets for the construction and operation of The Monastery's physical buildings and the "temporal needs" of the monks themselves.

(Am. Compl. ¶¶ 77-110.)  In their motion to dismiss, Monk Defendants assert Father Nicholas Maroney and Brother Simon Mary are the same person, which Plaintiffs accept as true. (Doc. 122 p. 6 n.2; Doc. 142 p. 5 n.4.)

## DISCUSSION

The Court has grouped Monk Defendants' motion with the Foundation's motion because Plaintiffs contend the knowledge held by the Foundation is the same knowledge held by Monk Defendants as they are intertwined due to the overlapping positions of Father Nicholas Maroney and Fr. Daniel Schneider. (*See* Doc. 138 p. 13 ("The Monks themselves offer the most concrete example of knowledge and coordination between the Monks and the Foundation possible, *that they share a single managing agent*.").)  In brief, the Court

finds Plaintiffs' allegations of knowledge are conclusory and fail to state a plausible claim for relief.

1.    **Consideration of Materials from Outside the Pleadings Submitted by the Foundation**

The Foundation attached an affidavit from counsel, a paper copy of its current website, and paper copies of certain pages from its former website to its 12(b)(6) motion to dismiss. (Docs. 132, 132-1.) In their response to the motion to dismiss, Plaintiffs argue the Court should not consider these extraneous materials in relation to the motion to dismiss. (Doc. 138 pp. 10-11.)

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). If the motion is converted, the Court must give the parties "a reasonable opportunity to present all the material that is pertinent to the [summary-judgment] motion" before ruling on the converted motion. *Id.* There are certain exceptions to the rule against considering extraneous materials, though. The Foundation contends the extraneous materials should be considered in this case because "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" without converting the motion to one for summary judgment. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

The Court will not consider the additional materials submitted by the Foundation because it finds them to be unnecessary to the analysis. The Court finds the motions to

dismiss turn on whether Plaintiffs have plausibly alleged Monk Defendants and the Foundation knew or had reason to know of the unlawful forced labor allegedly provided to their benefit. The Foundation's request for the Court to consider the additional materials is therefore denied.

2. **Count 1 - Liability as a Primary Offender Under 18 U.S.C. § 1589(a) for Knowingly Providing or Obtaining Illegal Forced Labor**

Fr. Daniel Schneider is the only Monk Defendant allegedly liable under § 1589(a) in Count 1 as a primary offender.

> To prevail on a claim under § 1589(a), a plaintiff must establish that the defendant knowingly acquired plaintiff's labor by means and/or threats of: (1) force and physical restraint; (2) serious harm, including psychological and financial harm; (3) abuse of the legal process; or (4) a scheme intended to cause the plaintiff to believe that if she did not perform the labor or services, she would suffer serious harm.

*Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018). Section 1589(a) is intended to hold liable the person who actually employs the force or threats against the victim to extract unlawful labor or services from the victim.

The amended complaint here does not allege Fr. Daniel Schneider ever used or threatened the use of force and physical restraint, serious harm, or the legal process in an attempt to get Plaintiffs to perform forced labor. Instead, Plaintiffs allege the fourth option—that Fr. Daniel Schneider acquired Plaintiffs' forced labor through a scheme intended to cause Plaintiffs to believe they would suffer serious harm if they did not comply. In their response to the motion to dismiss, Plaintiffs assert:

> Indeed, [Fr. Daniel] Schneider worked closely with his father to obtain coerced labor from Plaintiffs and the putative class and would transport Plaintiffs and the putative class to perform such labor himself. Plaintiffs and

> the putative class were subject to punishment for failing to perform the labor, and Defendant [Fr. Daniel] Schneider could easily ensure that such punishment was meted out given his close familial relationship with his father and the others running TCR.

(Doc. 142 p. 12.)  As the lack of citation to the amended complaint might foretell, this allegation does not appear in the amended complaint.  (*See generally* Am. Compl.)  "It is well-established, however, that in determining whether to grant a motion to dismiss, the district court … [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint."  *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995).  Factual allegations contained in the response to a 12(b)(6) motion to dismiss cannot carry a plaintiff's burden of setting forth a plausible claim for relief.  The closest factual allegations found within the amended complaint are:

> Fr. Daniel Schneider would arrive at TCR and request from his father, Defendant Gerald Schneider, labor that was needed at The Monastery and he would transport TCR residents for forced labor at The Monastery.  Quite often Fr. Daniel Schneider would deliver pressure washers and other machines requiring small engine repair for boys assigned to mechanical work at TCR to complete at the Triangle Cross Ranch.
> …
>
> The Foundation specifically exists to provide for the material needs of The Monastery [i.e., the Monks] and to conduct the ongoing construction projects at The Monastery for which Fr. Daniel Schneider specifically procured the services of the putative class members.

(Am. Compl. ¶¶ 76, 88.)  Giving these allegations all reasonable inferences, they do not demonstrate or suggest Fr. Daniel Schneider's knowing and active participation in a scheme intended to cause Plaintiffs to believe they would suffer serious harm as punishment if they failed to perform labor or services for Monk Defendants.  These allegations assert Fr. Daniel Schneider arranged for and facilitated Plaintiffs' labor at "The

Monastery," but they do not allege in any fashion that Fr. Daniel Schneider knew or should have known the Plaintiffs' labor was unlawfully forced or that Fr. Daniel Schneider ever knew or suggested in any manner Plaintiffs would suffer serious harm if they did not perform the labor. And it would be an unreasonable inference to charge Fr. Daniel Schneider with the knowledge required by § 1589(a) solely due to his familial relationships with others accused of wrongdoing.

Plaintiffs' amended complaint does not allege a plausible basis to hold Fr. Daniel Schneider liable as a primary offender under 18 U.S.C. § 1589(a).

### 3.   <u>Count 2 - Venture Liability Under 18 U.S.C. § 1589(b) for Knowingly Benefiting from Illegal Forced Labor</u>

Plaintiffs allege Count 2 against all Monk Defendants and the Foundation. Section 1589(b) holds liable "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." To avoid dismissal of this claim, "plaintiffs must plausibly allege that [plaintiffs] provided labor or services that were procured by a method that is prohibited under the TVPRA, and that [Monk Defendants and the Foundation] knowingly benefited from participating in this venture." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019). "Venture" means "any group of two or more individuals associated in fact, whether or not a legal entity." *Id.* at 873 (quoting 18 U.S.C. § 1591(e)(6)). Plaintiffs assert Count 2 against all Monk Defendants.

Monk Defendants and the Foundation largely attack this claim on the scienter element, arguing the amended complaint fails to set forth any factual basis to support the assertion they knew or should have known they were benefitting from conduct violative of the TVPRA. (Doc. 122 pp. 11-13; Doc. 131 pp. 7-8.) Plaintiffs respond that "actual, subjective knowledge" is not required because 18 U.S.C. § 1595(a) allows a victim to bring suit for venture liability against a person who knowingly benefitted and who "knew or should have known" of the unlawful nature of the venture. (Doc. 142 pp. 12-14; *see also* Doc. 138 pp. 11-15.)

The Court has set forth verbatim above the relevant paragraphs from Plaintiffs' amended complaint and will not endeavor to repeat them here. In short, the operative allegations provide as follows:

- "[E]ach hour of coerced child labor directly benefitted the Foundation with the knowledge and consent of its president, director, secretary, and other officers." (Am. Compl. p. 19 n.11.)

- Fr. Daniel Schneider "had direct knowledge that the putative class members were providing uncompensated labor to The Monastery and specifically knew that they faced punishment if they did not perform such services." (Am. Compl. ¶ 78.)

- Father Nicholas Maroney, Brother Simon Mary, and/or other agents of Monk Defendants or the Foundation "knew or in the exercise of reasonable diligence should have known that the putative class members were providing labor to The Monastery and Foundation, that the labor was not compensated, and that the putative class members faced punishment if they did not provide such labor." (*Id.* ¶ 79.)

- Brother Simon Mary (a/k/a Father Nicholas Maroney) "was aware of the labor provided by the putative class members and the circumstances under which they provided it." (*Id.* ¶ 84.)

- Agents of both Monk Defendants and the Foundation "were directly aware

of the fact that this child labor was both coerced and uncompensated." (*Id.* ¶ 89.)

- Father Nicholas Maroney acted in a leadership capacity for both the Foundation and Monk Defendants and "had direct and personal knowledge of the use of the putative class members as coerced labor in the construction of The Monastery's physical buildings." (*Id.* ¶ 91.)

- "On information and belief, substantial portions of [the Foundation's] assets are the direct contributions of the Schneider and Woodward Defendants and were received by The Foundation with the knowledge of certain of its board members that the source of the donations were the profits from TCR and TCS through the unlawful coerced labor of children." (*Id.* ¶ 94.)

Glaringly omitted from these paragraphs are factual averments to support the conclusory assertions of knowledge. There are no alleged facts suggesting how it is plausible that Monk Defendants and the Foundation knew or should have known they were participating in an illegal venture of forced labor. Allegations that Defendants acted "with the knowledge and consent," "had direct knowledge," "knew or should have known," "were aware," "were directly aware," "had direct and personal knowledge," and acted "with the knowledge" are conclusory. To overcome a 12(b)(6) motion, these conclusory allegations require supporting factual allegations demonstrating *how* a defendant possesses the alleged knowledge or awareness or at least allow the Court to reasonably infer Defendants possessed this knowledge or awareness. "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). By themselves, these assertions are only threadbare recitals of the scienter element. For example, Plaintiffs do not allege Monk Defendants or the Foundation's agents ever threatened them or punished them in any manner, nor do they

allege Monk Defendants or the Foundation's agents ever witnessed anyone threatening them or punishing them. *See Jensen v. United States Tennis Ass'n*, No. 20-2422-JWL, 2020 WL 6445117, at *6 (D. Kan. Oct. 30, 2020) (granting 12(b)(6) dismissal of § 1589(b) claim as to USTA after finding plaintiff had not plausibly asserted the knowledge element because "plaintiff does not allege that she ever notified USTA about Coach Haultain's conduct and she does not allege that anyone employed by USTA witnessed Coach Haultain's conduct or otherwise had any reason to know about Coach Haultain's conduct"); *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (knowledge that a hotel was benefitting from an illegal TVPRA venture was sufficiently alleged where, along with allegations of "high-fives" between the alleged trafficker and hotel owner while discussing getting their past business relationship "going again," the plaintiff also alleged that "in plain daylight view of the front office of the motel," the alleged trafficker "kick[ed] her and force[d] her back toward the rented quarters when she had tried to escape").

Absent some factual support for these allegations of knowledge or constructive knowledge, they are only a formulaic recitation of the scienter element, which is not sufficient to state a plausible claim. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) ("Thus, mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice."). The Court must disregard these unsupported conclusory statements when examining a complaint under Rule 12(b)(6). *See id.* And the remaining factual allegations in the amended complaint fail to plausibly allege Monk Defendants and the Foundation knew or should have known the venture they allegedly participated in obtained or provided labor services by any of the unlawful means set out in

§ 1589(a). *See J.L. V. Best W. Int'l.,* 521 F. Supp. 3d 1048, 1071 (D.Colo. 2021) (hotel knew or should have known of human trafficking on its premises where plaintiff "repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment, and often displaying prominent bruising all over her person").

Plaintiffs' responses to the motions to dismiss do not further demonstrate the knew-or-should-have-known element. For example, in response to the Monk Defendants' motion to dismiss, Plaintiffs asserted "the Monk Defendants, and specifically Daniel Schneider, Fr. Maroney, and Br. Simon Mary, directly and specifically knew of all of the conditions under which they were obtaining and benefitting from the forced labor of Plaintiffs and the putative class." (Doc. 142 p. 16.) This, too, is a conclusory statement devoid of any factual support.

Plaintiffs' amended complaint does not allege a plausible basis to hold Monk Defendants or the Foundation liable under 18 U.S.C. § 1589(b) for venture liability.

4. **Count 3 - Liability under 18 U.S.C. § 1590(a) for Knowingly Trafficking a Person for Forced Labor or Services**

Section 1590(a) holds liable "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter." It "imposes liability for [human] trafficking, which is separate and distinct from liability for forced labor or services." *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1133 (D. Colo. 2019). Much of the foregoing analysis concerning § 1589(b) applies here because the same scienter requirement applies. (*See* Doc. 138 p. 20

(Plaintiffs assert, "This claim substantially mirrors Plaintiffs' Count 2 forced-labor claim."); Doc. 142 p. 16 (same).)

In response to Monk Defendants' motion to dismiss, Plaintiffs assert, "Again, the Monk Defendants knowingly benefitted from the coerced labor and the trafficking conduct found within § 1590(a) to obtain Plaintiffs' coerced labor. Defendant Schneider personally transported Plaintiffs and members of the class to obtain labor and services in violation of the TVPRA." (Doc. 142 p. 17.) And in response to the Foundation's motion, Plaintiffs state, "Again the Foundation knowingly benefitted from the coerced labor and the trafficking conduct found within § 1590(a) to obtain Plaintiffs' coerced labor." (Doc. 138 p. 21.)

The amended complaint indeed alleges Fr. Daniel Schneider personally transported residents from TCR to "The Monastery" to provide labor at "The Monastery." (Am. Compl. ¶ 76.) But the same problems plaguing Count 2 as to the scienter element also exist here. Aside from conclusory allegations that merely assert Monk Defendants and the Foundation knew or should have known of the unlawful forced labor, Plaintiffs have not offered any facts underpinning the scienter element. That is, the amended complaint offers no factual basis for actually establishing Monk Defendants' or the Foundation's alleged knowledge or constructive knowledge. An allegation to the effect that "defendant had the requisite knowledge" is conclusory and insufficient to survive a 12(b)(6) motion on its own without supporting factual averments. And no factual allegations are found in the amended complaint sufficient to allow the Court to reasonably infer that Monk Defendants or the Foundation knew or should have known of the forced nature of the labor. *See J.L. v. Best*

*W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1068 (D. Colo. 2021) ("The deficiencies in the complaint are readily discernable when compared to cases where courts have concluded that plaintiffs sufficiently alleged hotels knew or should have known of a plaintiff's trafficking. For instance, plaintiff does not contend that hotel staff observed her trafficker forcefully bring her to a hotel, restrain her, or argue with her. *See A.B.*, 455 F. Supp. 3d at 189–90 (alleging staff were aware of 'loud altercations' as well as 'constant' attacks on the plaintiff); *H.H.*, 2019 WL 6682152, at *1 (claiming hotel staff discovered her chained up in the bathroom and ignored her plea for help).").

Plaintiffs' amended complaint does not allege a plausible basis to hold Monk Defendants or the Foundation liable for trafficking under 18 U.S.C. § 1590(a).

**5.     Count 4 - RICO Violation Under 18 U.S.C. § 1964(c) and 1962(c)**

RICO "created a new civil cause of action for '[a]ny person injured in his business or property by reason of a violation' of 18 U.S.C. § 1962." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2096 (2016) (quoting 18 U.S.C. § 1964(c)). "That is, RICO vests a private citizen with substantive rights to avoid 'injur[ies]' to 'his business or property' caused by a pattern of racketeering activity, and it explicitly creates a federal cause of action to vindicate those federal rights." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017). A civil claim under § 1964(c) requires a plaintiff to plead: "(1) that the defendant violated § 1962; (2) that the plaintiff's business or property was injured; and (3) that the defendant's violation is the cause of that injury." *Id.* In this case, Plaintiffs allege a violation of § 1962(c), under which "a RICO plaintiff must allege a 'person' '(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"

*Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1182 (10th Cir. 2019) (quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016)).

"Racketeering activity" includes any act indictable under the TVPRA, and "pattern of racketeering activity" means at least two incidents of racketeering activity.  18 U.S.C. § 1961(1), (5).  Plaintiffs correctly identify that forced labor and human trafficking constitute racketeering activity ("predicate acts").  (Doc. 142 p. 17); *see Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1168-69 (D. Kan. 2018).  However, as the Court determined above, Plaintiffs have not adequately pled claims of forced labor or human trafficking against Monk Defendants or the Foundation.  The lack of plausible predicate acts committed by Monk Defendants or the Foundation means Plaintiffs have not adequately pled a "pattern of racketeering activity."  *See Tal v. Hogan*, 453 F.3d 1244, 1263-68 (10th Cir. 2006) (examining the pleading sufficiency of a civil RICO claim by first examining the pleading sufficiency of the alleged predicate acts); *Apache Tribe of Okla. v. Brown*, 966 F. Supp. 2d 1188, 1194-96 (W.D. Okla. 2013) (same); *Nielsen v. The Patriot Grp., LLC*, No. 1:15-CV-00137, 2016 WL 407073, at *3 (D. Utah Feb. 2, 2016) ("Plaintiff purports to base RICO racketeering activity on mail and wire fraud under 18 U.S.C. § 1341 and § 1343.  He is therefore first required to plead factual allegations sufficient to support a claim under these statutes.").  Plaintiffs' RICO claim against Monk Defendants and the Foundation must fail due to the lack of plausibly-pled predicate acts of racketeering activity.

Additionally, and alternatively, Plaintiffs' RICO claim against Monk Defendants and the Foundation fails for lack of a plausibly-pled injury to Plaintiffs' business or property.  A civil RICO plaintiff "only has standing if, and can only recover to the extent

that, he has been injured in his business or property by [reason of] the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  "Injury in his business or property" connote "words of limitation." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 279 (1992) (O'Connor, J., concurring).  Injury to one's business or property excludes personal injuries. *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2108 (2016).  "Additionally, injury to ... reputation, dignity and emotional damages are not the type of injuries redressable by the antitrust laws or RICO which are expressly limited to injuries to 'business or property.'" *Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006).  The requirement of an injury to business or property "helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).

Plaintiffs contend that Monk Defendants' failure to pay them for their labor is a sufficient allegation of business or property loss, contending, "Plaintiffs have plausibly alleged a concrete financial loss in that Monk Defendants forced Plaintiffs to work long hours without pay." (Doc. 142 p. 20.)  Plaintiffs cite to *Jane Doe I v. Reddy*, No. C 02-05570 WHA, 2003 WL 23893010, at *1 (N.D. Cal. Aug. 4, 2003), to support this proposition, but *Reddy* is materially different from this case.  In *Reddy*, the plaintiffs alleged "defendants fraudulently induced them to come to the United States from India on false promises that they would be provided an education and employment opportunities, but then forced them to work long hours under arduous conditions for pay far below minimum wage and in violation of overtime laws, and sexually abused and physical beat them." *Id.*, 2003 WL 23893010, at *1.  Thus, the plaintiffs in *Reddy* were induced by the

defendants to come to the United States, at least in part, for business or employment purposes.

Unlike the plaintiffs in *Reddy*, there is no allegation here that Plaintiffs (or their parents) were fraudulently induced to attend TCR or TTS for business or employment purposes. Based on Plaintiffs' allegations that the residents were sent there by their parents, at great cost to their parents, for treatment and reform purposes, it is unreasonable to infer that Plaintiffs attended TCR or TTS for employment or were ever induced by promises of wage payment. Plaintiffs have not alleged Plaintiffs (or their parents) ever expected to be paid during their stays at TCR or TTS; indeed, the allegation is that their parents paid for them to be there. According to the amended complaint, Plaintiffs attended TCR or TTS because they were "troubled teens," not because they were looking for or were promised employment opportunities, and TCR and TTS "induce[d] parents of troubled minors to pay substantial sums of money under the guise that their children would receive cutting edge residential treatment, therapy, and continuing education." (Am. Compl. ¶ 4.) Thus, there is no reasonable inference that Plaintiffs attended TCR or TTS for business or employment purposes, and there is also no reasonable inference that Monk Defendants' (or the Foundation's) failure to pay wages to Plaintiffs for their labor amounted to injury to their business or property. *Cf. Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) ("The **employees** allege an injury to their property in the form of lost wages.") (emphasis added). Here, the amended complaint does not allege Plaintiffs were ever employees of TCR, TTS, Monk Defendants, or the Foundation, or that Plaintiffs ever intended to be employed by these Defendants. Plaintiffs have not pled a viable RICO claim

against Monk Defendants or the Foundation because they have not plausibly alleged Plaintiffs suffered an injury to their business or property.

Plaintiffs' amended complaint does not allege a plausible basis to hold Monk Defendants or the Foundation liable under 18 U.S.C. §§ 1964(c) and 1962(c).

**6.      Plaintiffs' Request for Leave to Amend as to Monk Defendants**

In their response to Monk Defendants' second motion to dismiss, Plaintiffs contend they "should be provided leave to amend the First Amended Complaint in the event that the Court identifies any deficiency so that Plaintiffs['] claims can be heard on the merits." (Doc. 142 p. 22.)  Drive-by requests for conditional amendment tacked on to the end of briefing are improper.  "A district court may deny leave to amend when a plaintiff fails to file a written motion and instead merely suggest[s] she should be allowed to amend if the court conclude[s] her pleadings [a]re infirm." *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020) (alterations in original) (internal quotation marks omitted) (quoting *Warnick v. Cooley*, 895 F.3d 746, 755 (10th Cir. 2018)).  "[A] bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based." *Id.* (quoting *Albers v. Bd. of Cty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014)).

Granting Plaintiffs' threadbare request for leave to amend their amended complaint is particularly unwarranted in this case for two reasons.  First, Plaintiffs already filed an amended complaint in direct response to the Defendants' original motions to dismiss in an attempt to cure any pleading deficiencies. (*See* Doc. 106.)  Lawsuits "are not to be litigated piecemeal.   The court should not have to address repeated 'improvements' to the

complaint." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1236 (10th Cir. 2020). "Efficient adjudication of disputes requires that the party present its best effort to state a claim before the court addresses the motion to dismiss." *Id.*

Second, in violation of Local Civil Rule 15.1, Plaintiffs have not included "the proposed amended complaint as an attachment and include[d] a representation that the movant conferred with the opposing part and whether or not the opposing party objects to the motion."

Plaintiffs have not filed a motion for leave to amend, and they have already played the "buttress-the-complaint-through-amendment-game" once. They do not identify with any specificity what it is they seek to add to the amended complaint to save their claims against Monk Defendants. Significantly, Monk Defendants' arguments concerning the knowledge element of Plaintiffs' TVPRA claims were also presented in Monk Defendants' first motion to dismiss. (*Compare* Doc. 92 *with* Doc. 122.) Plaintiffs' inability to remedy its pleading deficiencies as to their claims against Monk Defendants via their amended complaint demonstrates that providing Plaintiffs a third bite at this apple would be futile. Consequently, their naked request for leave to amend "in the event that the Court identifies any deficiency" is denied and dismissal with prejudice of these claims is warranted. *See Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1191 (10th Cir. 2014) ("dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile").

## 7.    **Dismissal with Prejudice as to the Foundation**

The final issue concerns whether the claims against the Foundation should be

dismissed with prejudice. "[D]ismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1191 (10th Cir. 2014) (quoting *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)). The Court finds another amendment by Plaintiffs would be futile as to the failed claims alleged against the Foundation. After Plaintiffs' original complaint was filed in this case, the Foundation (and the other Defendants) filed a 12(b)(6) motion to dismiss. (Docs. 80, 81.) In direct response to the Defendants' motions to dismiss, Plaintiffs filed an amended complaint, which expressly attempted to cure any pleading deficiencies. (Doc. 106 ¶ 97 ("Far from being the land holding company that The Foundation attempts to paint itself as in its Fed. R. Civ. P. 12(b)(6) motion, to which this Amended Complaint is filed in response....").) The Foundation then filed this second motion to dismiss, which presented the same argument concerning Plaintiffs' failure to plausibly plead the knowledge element as its first motion to dismiss. (*Compare* Doc. 81 pp. 4-6 *with* Doc. 131 pp. 6-8, 23-24.) Plaintiffs' inability to remedy its pleading deficiencies against the Foundation as to the knowledge element via their amended complaint demonstrates that providing Plaintiffs a third attempt would be futile.

## CONCLUSION AND ORDER

The amended complaint does not state a plausible claim for relief against Defendant Monks, and Plaintiffs' indefinite request for leave to amend is denied. Likewise, the amended complaint does not state a plausible claim for relief against the Foundation. Under Rule 12(b)(6), all claims asserted against Monks of the Most Blessed Virgin Mary

of Mount Carmel, d/b/a Mystic Monk Coffee; Father Daniel Schneider; and the New

Mount Carmel Foundation must be dismissed for failure to state a claim on which relief

can be granted.  Plaintiffs have had two opportunities to state a viable claim against Monk

Defendants and the Foundation, and they should have done so by now if a viable claim

existed.

**IT IS THEREFORE ORDERED** that the second motion to dismiss of Defendants

Monks of the Most Blessed Virgin Mary of Mount Carmel, d/b/a Mystic Monk Coffee and

Daniel Schneider (Doc. 121) is **GRANTED**.  The causes of action alleged against Monk

Defendants are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the second motion to dismiss of Defendant New

Mount Carmel Foundation (Doc. 130) is **GRANTED**.  The causes of action alleged against

the Foundation are hereby **DISMISSED WITH PREJUDICE**.

**DATED:** November   30th , 2021.

Scott W. Skavdahl
United States District Judge