Craig A. Edgington (TN Bar #36205)
Brice M. Timmons (TN Bar #29582)
Bryce W. Ashby (TN Bar #26179)
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
craig@donatilaw.com
brice@donatilaw.com
bryce@donatilaw.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com

Frank L. Watson, III, *(Pro Hac Vice)*
William E. Routt, III, *(Pro Hac Vice)*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN**, **ANNA GOZUN**; and **AMANDA NASH** on behalf of themselves and all similarly situated persons, <br><br> Plaintiffs, <br><br> vs. <br><br> **TRINITY TEEN SOLUTIONS, INC.**, a Wyoming corporation; **ANGELA C. WOODWARD**; **JERRY D. WOODWARD**; **KARA WOODWARD**; **KYLE WOODWARD**; and **DALLY-UP, LLC,** a Wyoming limited liability corporation, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Doc. No. 2:20-cv-215-SWS |

1

**MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3) AND
APPOINTMENT OF CLASS COUNSEL UNDER RULE 23(g)**

## I.   INTRODUCTION

In this putative class action, Plaintiffs, all human trafficking victims of the "troubled teen industry," have brought suit on behalf of themselves and all similarly situated persons against Defendants Trinity Teen Solutions, Inc., Angela C. Woodward, Jerry D. Woodward, and Dally-Up, LLC ("Defendants").

Defendants engaged in a recruitment scheme whereby they induced parents of troubled minors to pay substantial sums of money under the guise that their children would receive cutting-edge residential treatment, therapy, and continuing education. In fact, Defendants used these children as forced labor for their own benefit and, to do so, employed threats of physical punishment, humiliation, degradation, starvation, and isolation to ensure compliance with lengthy days of back-breaking labor.

Plaintiffs are entitled to certification of the putative class. By Defendants' own admissions, they "treated" hundreds, if not thousands, of minors at their ranch. All of these minors were subjected to the same treatment, including forced labor and physical abuse. The common questions that arise from Defendants' treatment of these minors, many of whom do not have the resources to vindicate their legal interests on an individual basis, plainly predominate over any individualized questions that may arise. Classwide resolution of the issues raised by the named Plaintiffs and putative class representatives, whose claims are typical of those of the putative class members, is superior to individual litigation. Classwide litigation promotes judicial efficiency, avoids inconsistent rulings from different courts, and preserves the resources of the parties. It also provides putative class members without sufficient funds to individually hire an attorney an avenue

to obtain a remedy for the abhorrent conditions they suffered at Defendants' hands.  As is set forth below, Plaintiffs satisfy each requirement under Rule 23 of the Federal Rules of Civil Procedure for the certification of a putative class and accordingly request that the Court grant this Motion in its entirety.

## II. STATEMENT OF FACTS

Defendant Angela ("Angie") Woodward and her husband established Trinity Teen Solutions, Inc. (hereinafter "Trinity Ranch" or "TTS") in 2002 as the owners and operators. The Trinity Ranch is a Wyoming corporation which operates as a working ranch in Park County, Wyoming under the guise of providing therapy to teenagers as a Residential Treatment Center in Park County, Wyoming.  In fact, no such therapy was provided.  Rather, Defendants subjected the children in their care to forced labor for their own profits.

To obtain cheap and easily exploited labor, Defendants engaged in a recruitment scheme whereby they induced and continue to induce parents of troubled minors to pay substantial sums of money under the guise that their children would receive cutting-edge residential treatment, therapy, and continuing education.

TTS's Parent's Handbook (D.E. 106-1) lists just some of the following "treatment" modalities and activities that Plaintiffs or the putative class members would purportedly receive: wilderness therapy/outdoor behavior healthcare, reality therapy, experiential therapy, strategic therapy, animal assisted therapy, group therapy, individual therapy, Christ-centered counseling, rational emotive behavioral therapy, Eye Movement Desensitization Reprocessing, personality assessment, nutritional therapy, crisis intervention, art therapy, relationship therapy, Bibliotherapy, cognitive restructuring, confrontive therapy, insight therapy, behavior modification, solution oriented therapy, symptom focused education, ordeal therapy, career counseling, and personality inventories/assessments.

Very few if any mental health facilities in the United States actually offer this vast array of therapeutic interventions, which range from cutting-edge proprietary, manualized therapies requiring certifications and training that the underqualified staff of TTS have never received, to "therapies" that are simply made up for the purposes of marketing TTS.

In fact, Plaintiffs allege that they barely received any actual mental health treatment. Indeed, these allegations are well established by the testimony contained in the Declarations of thirty-seven (37) named plaintiffs and putative class members, all of which are attached to hereto as **EXHIBITS 1-37**. For instance, named plaintiff Carlie Sherman testifies in her Declaration that "I do not believe I received appropriate therapy or counseling during my time at Trinity Teen Solutions" but rather "I believe I was forced to work for 15 hours a day on average, approximately 7 days a week" for Defendants' financial benefit. (Declaration of Carlie Sherman ("Sherman Decl.") at ¶¶ 7, 13, 14, a copy of which is attached hereto as **EXHIBIT 1**). The other named plaintiffs and putative class members / declarant witnesses, all of whom received the same "treatment" by Defendants, provide substantially similar testimony in their own Declarations. (*See* **EXHIBITS 1-37**).

To obtain labor, Plaintiffs and putative class members or their parents were promised an environment in which troubled teenage minors could grow physically, academically, mentally, emotionally, socially, and spiritually through therapy and treatment. Instead, Plaintiffs and others similarly situated were transported to Wyoming, often through legal kidnapping at the suggestion of Defendants, and were forced to work in unfathomable conditions while receiving little to no formal education, behavioral treatment, or therapy. They were made to labor from early morning until late at night, without pay, under the constant threat of physical and emotional punishment and further confinement.

For instance, Plaintiff Carlie Sherman testifies in her Declaration that "[e]xamples of force, threat of force, physical restraint, or threats of physical violence" that she suffered include:

    a.   Being forced to run up and down a dangerous, rocky, steep hill inhabited by rattlesnakes;

    b.   Being forced to conduct push-ups or sprints;

    c.   Being forced to perform additional labor;

    d.   Being demoted a level and thus preventing me from returning home;

    e.   Being tied with rope to a staff member;

    f.   Being tied with rope to another girl;

    g.   Being tied with rope to an animal;

    h.   Additionally, during my second stay I was forced to pretend I was tied with an invisible rope to a staff member. Defendants have been investigated and no longer utilized the actual ropes to tie girls to staff members or other residents. Furthermore, I did witness other girls still being "attached" to animals by being required to hold their ropes at all times; and

    i.   Being forced to wear signs around my neck containing humiliating statements or being forced to wear an orange vest indicating that I or other putative class members were being punished.

(Sherman Decl. ¶ 4). The other named plaintiffs and putative class members had virtually identical experiences at TTS. (*See* Declarations attached hereto as **EXHIBITS 1-37**; *see also* Preliminary Report of forensic psychologist Dr. Sara Boyd ("Boyd Report"), attached hereto as **EXHIBIT 38**).

Defendants defrauded Plaintiffs, other putative class members, and their parents throughout the recruitment process, inducing them into paying substantial fees for residential treatment, under promises of receiving full-time cutting-edge therapies and while maintaining proper education towards high school graduation.

Rather, Defendants actually forced Plaintiffs and putative class members to work without pay for periods of time lasting between months and years.[1] As Plaintiff Carlie Sherman testifies, "Defendants knowingly provided or obtained my labor services and the labor services of other putative class members by means of serious harm or threats of serious harm."  (Sherman Decl. at ¶ 5).  "Examples of labor and services I was forced to perform are as follows:

    a.  Laundry for all girls;

    b.  Cleaning all the buildings, staff house, farm equipment, and farm vehicles;

    c.  Property upkeep;

    d.  Fencing repair;

    e.  Cooking three meals each day for twenty people;

    f.  Shoveling sheep and other animal feces;

    g.  Hay runs, which included loading and unloading hay trucks;

    h.  Manual irrigation of large fields by running irrigation pipes for multiple hours each day during the summer;

    i.  Picking rocks out of fields for multiple hours each day that we were required to do this labor;

    j.  Feeding animals (cows, sheep, pigs, horses, dogs, goats, chickens, cats) daily;

    k.  Grooming animals (cows, sheep, pigs, horses, goats, cats) daily;

    l.  Providing medical care to animals daily;

    m.  Fire shifts in the middle of the night that would disturb my sleep and cause sleep deprivation; and

    n.  Waking in the middle of the night to oversee the birthing and medical care of new lambs.

(Sherman Decl. ¶ 5).

---

[1] TTS's Parents Handbook states the minimum length of stay is 45 days, and the average girl is at TTS for between 12 -18 months.

The other named plaintiffs and putative class members have provided virtually identical testimony to the Court and will testify accordingly.  (*See* Declarations attached hereto as **EXHIBITS 2-37**).

On June 14, 2022, Defendant Kyle Woodward, who has served as the assistant director of Trinity Teen Solutions since 2015, testified at his deposition that he witnessed female mental health residents of trinity teen solutions conducting the following typical duties of a ranch hand at Trinity Teen Solutions since 2015: loading and unloading hay, clearing fields for planting, conducting irrigation, mending broken fences, cleaning buildings on the ranch, cooking, disposing of dead animals, the administration of vaccines, the castration of animals, cleaning of ranch vehicles, the feeding of animals, the grooming of animals (*See* Dep. Tr. of Kyle Woodward ("K. Woodward Dep."), pp. 23:20 – 25:24, 28:12 – 31:20.  A copy of Defendant Kyle Woodward's deposition is hereto attached as **EXHIBIT 39**).

On June 15, 2022, Defendant Jerry Woodward, who has served as the administrative director and owner of Trinity Teen Solutions since its inception in 2002, testified at his deposition that those typical duties listed above were the typical duties of a ranch hand, with the exception of cooking and the addition of installing new fences. (*See* Dep. Tr. of Jerry Woodward ("J. Woodward Dep."), pp. 38:1 – 39:24. A copy of Defendant Jerry Woodward's deposition is hereto attached as **EXHIBIT 40**). Defendant Jerry Woodward further testified that between 2010 and 2018, female mental health residents of trinity teen solutions probably conducting between five (5) and twelve (12) of the listed typical duties of a ranch hand in a given year, with variance related to which animals the ranch had at a given time. (*See* J. Woodward Dep., pp. 44:1 - 45:19).

In fact, it is plain from the evidence obtained by Plaintiffs to date that Defendants treated all of the minors in their care in a uniform manner.  For example, every minor's daily activities

were tracked via an "Advisor Assessment" form, demonstrating that each minor was compelled to participate in the same or substantially similar daily activities, such as fence building, animal care, cooking, irrigation, ranching activities, lawn and garden, and "challenges." (*See* Dep. Tr. of Justin McColl ("McColl Dep."), pp. 66:19 – 72:1) (a copy of Defendant Justin McColl's deposition is hereto attached as **EXHIBIT 41**). (*See also* Exhibit 137 to McColl Dep. at p.4 (providing an example of an "Advisor Assessment" form). A number of additional exhibits to Mr. McColl's deposition demonstrate both the manner in which the minors at TTS were subjected to forced labor and the uniform nature of their treatment. (*See* Exhibits 138 and 139) (Daily Supervision Checklists demonstrating the labor performed by the minors and showing that twelve putative class members were present with named Plaintiffs Sherman at this particular time); Exhibit 140 (example of Client Work Performance Report demonstrating physical challenges and labor performed); Exhibit 141 (Weekly Progress Note including detailed information regarding irrigation duties); Exhibit 142 (example of Weekly Holy Cowgirl Note demonstrating labor and physical challenges performed); Exhibit 143 (collection of Challenge logs demonstrating the physical consequences of push-ups, sit-ups, sprints, and hill runs); Exhibit 144 (Plaintiff Sherman's Discharge Session Paperwork highlighting labor and chores performed); Exhibit 145 (discharge paperwork indicating at pages TTS_017777-78 that discharged minors will "lose their freedom" if they speak negatively about TTS); Exhibit 146 (Plaintiff medical records further demonstrating labor performed) (the referenced Exhibits to Mr. McColl's deposition are attached collectively hereto as **EXHIBIT 42**). An email from Defendant Angela Woodward describing the duties of a Behavioral Health Advisor to a former employee, attached hereto as **EXHIBIT 43**, likewise demonstrates the labor performed by minors at TTS and their uniform treatment of the minors under their care. In this letter, Defendant Angela Woodward stated the daily activities of

an advisor were to supervise the clients performing daily chores like cleaning cabins, ranch chores, feeding animals, building fences, and irrigating fields, among other duties.

Defendants and/or their agents caused Plaintiffs and the putative class members to believe that if they did not work for Defendants, they would suffer physical or emotional abuse and prolonged confinement and, in fact, subjected Plaintiffs and the putative class members to such abuse. Specifically, Plaintiffs and the putative class members at TTS were subjected to or threatened with food and sleep deprivation, physical punishment, emotional abuse, and humiliation, to include, but not limited to, being leashed to other exploited girls, staff members, and/or farm animals, solitary isolation in the form of the chair[2] as punishment for twenty-four (24) hours a day for months on end, forced silence for weeks at a time, being forced to run up and down a massive hill, perform sprints and push-ups, being forced to eat only small quantities of cold kidney beans for weeks at a time, additional forced labor, and humiliation to force compliance with mandated labor assignments. (*See, e.g.*, Sherman Decl. at ¶ 6; *see generally*, Plaintiff and putative class member Declarations at **EXHIBITS 2-37**).

Plaintiffs and the putative class members had all mail read by staff members and Plaintiffs and the putative class members were forced to re-write communication to their parents if they stated anything negative about TTS. Furthermore, once telephone communication was authorized, a TTS staff member observed all telephone communications and at all times had the ability to terminate the communication and often did terminate communications if Plaintiffs or the putative class members said anything negative about TTS. (*See, e.g.*, Sherman Decl. at ¶¶ 16-17; *see generally*, Plaintiff and putative class member Declarations at **EXHIBITS 2-37**).

---

[2] This was known as "solitary confinement," "isolation," "on chair," and "life review." It would often involve sitting in a chair facing a cabin wall for up to 16 hours a day without the ability to speak to other class members. Girls were only allowed to carry the chair when moving to their next labor task.

Defendant Owners' scheme was designed to make Plaintiffs and other putative class members afraid, intimidated, and powerless to leave Defendant Owners' employment while all Defendants profited or knowingly benefitted, financially or through receipt of free labor, from participation in a venture which all Defendants knew or should have known was unlawful.

### III.   ARGUMENT

#### A.   The putative class should be certified by this Court under Rule 23 of the Federal Rules of Civil Procedure and case law.

The claims of the Plaintiffs and putative class members here should be certified under Rule 23. The circumstances underlying this action are "uniquely suited for a class action." *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 261 (D. Colo. Feb. 27, 2017) (granting motion for class certification of claims including violations of the forced labor provision of the Trafficking Victims Protection Act (TVPA)). "'The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Id*. At 262 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)). "The exception is appropriate when the party seeking certification can establish the four threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and fulfillment of at least one of the provisions in Rule 23(b). *Id*.

"Under Rule 23(a), the party requesting certification must first show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Id*. at 263. "If successful, the party must then demonstrate, pursuant to Rule 23(b), one of the following: (1) individual adjudication would create a risk of incompatible standards of conduct for the party opposing the class or would impair other members' ability to protect their interests; (2) injunctive or declaratory relief is appropriate for the class as a whole due

10

to the action or inaction of the party opposing the class; or (3) common questions of law or fact predominate over any individual questions and a class action is the superior method for "fairly and efficiently adjudicating the controversy." *Id.*

As in *Menocal*, the named plaintiffs and putative class here "rely on Rule 23(b)(3), which requires *predominance* of questions of law or fact to the class and *superiority* of the class action method." *Id.* (emphasis in original). "The conditions of predominance and superiority were added 'to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

In *Menocal*, the court certified a putative class to assert claims under the TVPA where the class representatives and class members were subjected to forced labor and where the complex and novel questions posed by the case were subject to resolution on a classwide basis. *Menocal*, 320 F.R.D. 25 at 261 (recognizing that "the class action is 'a valuable tool to circumvent the barriers to the pursuit of justice.'") (citing Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 25:24 (4th ed.)); *see also Lawrence v. First Fin. Inv. Fund V, LLC*, 336 F.R.D. 366, 386 (D. Utah 2020) (plaintiff entitled to certification of proposed classes under FRCP 23); *Ramos v. Banner Health*, 325 F.R.D. 382 (D. Colo. 2018) (same). In fact, courts regularly grant class certification in TVPA cases. *See Owino v. Corecivic, Inc.*, 36 F.4th 839 (9th Cir. 2022); *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269 (11th Cir. 2020); *Magtoles v. United Staffing Registry, Inc.*, 21-cv-1850, 2022 U.S. Dist. LEXIS 93924 (E.D.N.Y. May 25, 2022); *Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671 (W.D. Wash. 2018). Likewise, the Central District of California, in *Raul Novoa, et al. v. The GEO Group, Inc.*, certified a TVPA claim and demonstrated, through its order,

that TVPA claims are eminently certifiable.  *Novoa v. GEO*, Case No. EDCV 17-2514 JGB

(SHKx), a copy of which is attached hereto as **EXHIBIT 44**.  The Court should grant class

certification in this instance.

### B.     The Proposed Class

From November 27, 2010, to the present, Plaintiffs, and all similarly situated
persons who received treatment from Defendant Trinity Teen Solutions, Inc. and
were subjected to the provision of "agricultural labor" (as defined 26 CFR §
31.3121(g)(1)) or any other manual labor to one or more of the Defendants
without payment for said labor.

### C.     Plaintiffs Satisfy the Requirements of Rule 23(a)

1.     **Numerosity**

The proposed classes are so "numerous that joinder of all members is impracticable." Fed.

R. Civ. P. 23(a)(1).   Where there are likely more than 40 class members, numerosity is

presumptively satisfied.  NEWBERG § 3:12.  When analyzing numerosity, a district court uses its

common sense.  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012). Only a

"reasonable estimate" is required to establish numerosity.  *Bentley v. Honeywell Intern., Inc.*, 223

F.R.D. 471, 480 (S.D. Ohio 2004).  Indeed, class representatives need only demonstrate "'some

evidence of established, ascertainable numbers constituting the class.'"  *Menocal*, 320 F.R.D. 25

at 263 n.1 (citing *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-

15 (10th Cir. 2014)).

Plaintiffs believe that the class contains between 250 and 1,000 members and therefore

presumptively meets the numerosity requirements of Rule 23. Alba Conte, Herbert B. Newberg,

& William B. Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. 2011) (a class of 40 or more

members should presumptively satisfy numerosity).  In fact, the undersigned attorneys have been

contacted by approximately one hundred and thirty (130) potential class members in connection

with this case.  (Declaration of Brice M. Timmons ("Timmons Decl.") at ¶ 6, a copy of which is

attached hereto as **EXHIBIT 45**).  Slightly over one hundred (100) of these contacts have claims that are within the statute of limitations and are viable, putative class members.  (Timmons Decl. at ¶ 6).  Approximately eighty (80) of these contacts have expressed a desire to actively participate in this litigation.  (Timmons Decl. at ¶ 6).  These facts alone demonstrate that there are more than forty putative class members and that numerosity is established.  In fact, during a discovery dispute resolution conference before Magistrate Judge Rankin on August 9, 2022, Counsel for Defendants represented to Counsel for Plaintiffs and the Court that the putative class, as defined by Plaintiffs, consists of 255 individuals by their own calculations.  (Timmons Decl. at ¶ 7).

The Declarations of the named Plaintiffs and proposed class members further demonstrate that numerosity is satisfied here.  For example, Plaintiff Carlie Sherman testifies in her Declaration that she "witnessed the presence of between twenty-two (22) and twenty-five (25) putative class members" during the course of her first stay and TTS and "thirty-three (33) and thirty-seven (37) putative class members" during the course of her second stay at TTS.  (Sherman Decl. at ¶¶ 20-21); *see also* Plaintiff and putative class member declarations at **EXHIBITS 1-37**).  Based on her personal observations alone, Defendant Sherman, through her Declaration presumptively, satisfies the numerosity requirement.

The Defendants' testimony further supports a finding of numerosity here.  Defendant Jerry Woodward, the Administrative Director and Owner of Trinity Teen Solutions, testified that TTS has treated "hundreds" of girls since its inception.  (Woodward Dep. 22:17-23; 27:13-21).  He went on to testify that he believed his wife was a truthful woman, she spoke on behalf of the company, she was a co-owner, and he had no reason to believe his wife was lying when she provided The Powell Tribune with a quote that Trinity Teen Solutions had housed "a couple thousand girls." (Woodward Dep. 23:14-27:21) (A copy of the news article is hereto attached as

**EXHIBIT 46**).   Based on these facts and Defendants' own admissions, Defendants cannot reasonably dispute that numerosity is satisfied in this case.

     2.    **Commonality**

The proposed classes also meet the commonality requirement of Rule 23(a)(3). Commonality only requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To demonstrate commonality, plaintiffs' "claims must depend upon a common contention . . . that is capable of class wide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  "[E]ven a single common question will do." *Id*. at 359. It is "not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *Menocal*, 320 F.R.D. at 264.

Federal law provides a private cause of action against anyone who "knowingly . . . obtains the labor or services of a person:  "(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint," 18 U.S.C. § 1589(a), or against anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services,"18 U.S.C. § 1590(a).

The resolution of Plaintiffs' claims alleging that Defendants violated the above provisions will turn on questions that are common to the putative class, including (1) whether Defendants

obtained the labor of class members; (2) whether Defendants threatened class members with physical restraint, serious harm, or abuse of the legal process; (3) whether Defendants "knowingly" obtained class members' labor "by . . . means of" these threats; and (4) whether Defendants knowingly recruited, harbored, transported, provided, or obtained by any means, any person for labor or services.

Evidence in the record establishes that these common questions have "common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Each of the thirty-seven Declarants, all of whom are named Plaintiffs or putative class members, have testified to substantially similar mistreatment at the hands of Defendants. This testimony, along with Plaintiffs' allegations, demonstrate that a number of common questions of law and fact exist in connection with the putative class. Plaintiffs have met their burden to demonstrate commonality in this instance.

3.     **Typicality**

Plaintiffs' claims are also "typical of the claims . . . of the class." Fed. R. Civ. Proc. 23(a)(3). A representative's claim is typical if it arises from the same conduct that gives rise to the claims of other class members and if his or her claims are based on the same legal theory. *Beattie v. Century Tel., Inc.*, 511 F.3d 554, 561 (6th Cir. 2007); *Kerns*, 2007 WL 2044092, at *5. "[F]or the district court to conclude that the typicality requirement is satisfied, "a representative's claims need not always involve the same facts or law, provided there is a common element of fact or law." *Gaynor v. Miller*, 2018 WL 375606, at *9 (E.D. Tenn. Aug. 6, 2018); *Kerns*, 2007 WL 2044092, at *5-6. Indeed, the typicality requirement, like the commonality requirement, does not require that "every member of the class share a fact situation *identical* to that of the named plaintiff." *Menocal*, 320 F.R.D. 258 at 265 (emphasis in original). Rather, "'differing fact

situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.'" *Id.* (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)) (finding that proposed TVPA class representatives satisfied typicality requirement where putative class members were subject to forced labor at the direction of defendant's staff).

Plaintiffs and putative class members all performed work for Defendants.  (*See* **EXHIBITS 1-37**). Plaintiffs and putative class members each faced similar threats of physical punishment such as running the hill, push-ups, and sprints, along with solitary confinement in the form of "the Chair," being forced to perform additional labor, being demoted levels and thus preventing return to their parents, being tied to staff, animals, or other residents with rope, and being humiliated by wearing signs with humiliating statements form the basis of Plaintiffs' forced labor claims (*See Id.*); (*See also* Letter from Defendant Angela Woodward to John M. Kiedrowski, attached hereto as **EXHIBIT 47**) (providing a detailed explanation of the work that was imposed on all of the minors residing at TTS). *See Bass v. PJCOMN Acquisition Corp.*, No. 09-CV-01614-REB-MEH, 2011 WL 2149602, at *3 (D. Colo. June 1, 2011) ("A plaintiff's claim is typical of class claims if it challenges the same conduct that would be challenged by the class.").

The report of Plaintiffs' expert Sara Boyd, Ph.D., ABPP, and Licensed Clinical Psychologist, supports finding that typicality has been demonstrated by Plaintiffs here.  Dr. Boyd interviewed named Plaintiffs and several putative class members.  Dr. Boyd diagnosed each of these individuals with a number of psychological injuries[3] caused by TTS and, in doing so,

---

[3] The psychological injuries diagnosed by Dr. Boyd include Intrusion Symptoms, Avoidance Symptoms, Disordered Eating, Mood Disorder Symptoms, including Depression, Irritability, Hopelessness, and Disregulated Anger, Self-Destructive Tension Reduction Behaviors, Somatic Complaints, Sleep Disruption, Damage to Family Relationships, and Educational Disruption.  (Boyd Report at pp. 2-4).

determined that these injuries were "highly similar" with a "substantial and close overlap between the symptoms reported and signs demonstrated by the individuals I interviewed." (Boyd Report at pp. 2, 4). Dr. Boyd found, among other things, that "[a]ll individuals reported that they were forced to complete highly stressful and painful physical labor activities, including manual farm labor and punitive punishments such as running hill sprints repeatedly," "[l]iving arrangements were described as lacking privacy, physically and emotionally painful, and oriented around deprivation," "[a]ll individuals reported that they experienced blaming and critical comments from staff, including individuals who were supposed to be engaged in therapeutic contact with the youth," "[a]ll individuals reported wanting desperately to leave Trinity, but not being permitted to leave or to report the nature of the setting and the physical/psychological demands being placed on them by Trinity staff," and "[a]ll individuals reported being forced to witness or even participate in humiliation-based punishments of peers, as well as witnessing peers being injured." (Boyd Report at pp. 4-5). Dr. Boyd concluded that "there was a high degree of congruity between the Trinity-related experiences of the individuals I interviewed, the conditions and treatment they described (i.e., conduct), the symptoms they reported and demonstrated during interviews, and the psychological injuries that manifested during and after their placements at Trinity." (Boyd Report at p. 6). Given such congruity between the treatment of minors at TTS, the Plaintiffs' claims are "typical" of those of the putative class members and all arose from the same conduct by Defendants. Plaintiffs have clearly demonstrated that their claims and those of the putative class members share common elements and facts of law and are based upon the same legal or remedial theory. Typicality is satisfied under these circumstances.

4.    **Adequacy**

Plaintiffs and Plaintiffs' counsel can "fairly and adequately protect the interest of the class." Fed. R. Civ. Proc. 23(a)(4).  Adequacy under Rule 23(a)(4) is satisfied where a proposed class representative: (1) does not have conflicts with other members of the class, and (2) has retained qualified counsel.  *Young*, 693 F.3d at 543.  Here, Plaintiffs' interests are aligned with the Class Members.

There is no apparent conflict of interest between the potential class members and either the named Plaintiffs or named Plaintiffs' counsel. The named Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. The named Plaintiffs' attorneys' incentives are aligned with the class; their contingency fee agreement only allows the attorneys to be compensated if they successfully prosecute the suit. (Declaration of Frank L. Watson, III ("Watson Decl.") at ¶ 9, a copy of which is attached hereto as **EXHIBIT 48**); *see Rutter & Wilbanks Corp. v. Shell Oil Co.*¸ 314 F.3d 1180, 1187-88 (10th Cir. 2002).

Furthermore, Plaintiffs' counsel are uniquely qualified to prosecute this case. *United Food & Commer. Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 654 (W.D. Okla. 2012) (internal citations omitted) (adequacy of class counsel "implicates "the experience and competence of the attorney[s] representing the class."). They have substantial class action experience litigating complex cases.  (Timmons Decl. ¶¶ 2-4); (Watson Decl. at ¶¶ 2-8).

D.    **Common Questions of Law and Fact Predominate and a Class Action is the Superior Method of Resolving Plaintiffs' Human Trafficking & Forced Labor Claims**

These classes should be certified under Rule 23(b)(3) because "questions of law or fact common to the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

18

1.      **Predominance**

For common questions of law or fact to predominate under Rule 23(b)(3), "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that answers to those common questions" be dispositive of the plaintiff's claims. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). Rather, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common aggregation-defeating, individual issues." *Id.* Its "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Menocal*, 320 F.R.D. 258 at 265. "[T]he interest of justice requires that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

With respect to Plaintiffs' forced labor claims, the common questions at issue include, among others, (1) whether Defendants obtained labor from class members; (2) whether Defendants threatened class members with physical restraint, serious harm, or abuse of the legal process; and (3) whether Defendants "knowingly" obtained that labor "by . . . means of" these threats. These questions easily predominate over any individual question of law or fact.

Plaintiffs' forced labor claims turn on whether Defendants "knowingly" obtained Plaintiffs' labor "by . . . means of" the threats of solitary confinement in the form of "the Chair," being forced to perform additional labor, being demoted levels and thus preventing return to their parents, being tied to staff, animals, or other residents with rope, and being humiliated by wearing signs with humiliating statements form the basis of Plaintiffs' forced labor claims. However, for two reasons, these questions do not call for a predominance-defeating, individualized inquiry into the minds of each class member. First, the language and structure of the forced labor statute call

for an objective inquiry that turns on whether a reasonable person would provide labor to the Defendants if placed in the position of the person providing such labor. *See, e.g. Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK, 2011 WL 7095434, AT *7 (C.D. Cal. Dec. 12, 2011) (concluding that forced labor statute calls for an objective inquiry and it is susceptible to class-wide adjudication). Indeed, the statute focuses on Defendants' scienter, not the plaintiff's state of mind. Under Section 1589, "someone is guilty of forced labor if he intends to cause a person . . . to believe that if she does not continue to work, she will suffer the type of serious harm . . . that would compel someone in her circumstances to continue working to avoid that harm." *United States v. Dann*, 652 F.3d 1160, 1169-70 (9th Cir. 2011).[4]

A person violates the forced labor statute if he obtains labor through threats that he intends or knows would cause a certain state of mind in a reasonable person in the position of the laborer. Applied to the facts of this case, that standard would require asking a factfinder whether Defendants took actions to obtain labor from female mental health inpatient residents, knowingly or intending that a reasonable person in their position would feel compelled to provide that labor.

Second, even if the Court were to conclude that to establish liability, Plaintiffs must show that class members provided labor **because of** Defendants' threats, the common questions and proof upon which Plaintiffs' forced labor claims would overwhelm any individual issues. Even under a subjective standards, some forced labor cases are clearly susceptible to class wide adjudication: "[B]ased on the type of coercion used, there may be cases where consent becomes

---

[4] The definition of "serious harm" under the statute makes specific reference to a "reasonable person" standard. Serious harm

> means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances to compel *a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c) (emphasis added).

irrelevant. In other words, some 'choices' might be so illegitimate that any decision to work is 'involuntary.'" *David v. Signal Int'l, LLC*, No. CIV. A. 08-1220, 2012 WL 10759668 at *21 (E.D. La. Jan. 4, 2012).

This case falls into that category. The facts here precisely illustrate the limits of consent-based defenses to forced labor claims. In the modern era, "the typical techniques . . . used to hold persons in slavelike conditions are not limited to physical or legal means." *United States v. Kozminski*, 487 U.S. 931, 956 (1988) (Brennan, J. concurring). Therefore, in many modern cases, factfinders must engage in a fact-based inquiry to examine the extent and nature of the Defendants' coercive conduct. *Id.* However, the ***legal compulsion*** to work remains an obvious and clear-cut example of forced labor. As Justice Brennan observed, "the use of the master's whip and the power of the State to compel one human to labor for another were clearly core elements of slavery that the Thirteenth Amendment and its statutory progeny intended to eliminate." *Id.* at 954. Under these classic "slavelike conditions," "[c]onsent becomes irrelevant." *David*, 2012 WL 10759668, at *21. Likewise, here, it makes little sense to require class members to make individual showings of coercion when Defendants required class members to provide them with free labor.

The Court need not decide that subjective consent is irrelevant in order to determine that Plaintiffs have established predominance. It is enough to conclude, at this stage, that the evidence supports an inference that class members did not voluntarily consent to the forced labor. *See CGC Holding*, 773 F.3d 1073 (10th Cir. 2014). *Id.* at 1091. When the facts giving rise to that inference apply across an entire putative class, class certification is proper. *Id.* at 1093; *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (affirming class certification of RICO claims, holding that "payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would

not have done so absent reliance upon the invoice's implicit representations that the invoiced amount was honestly owed"); *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (civil RICO on behalf of a putative class of all doctors who submitted at least one claim to any of the GEO HMOs during a twelve-year period).

Evidence that all class members were informed that they would be subject to the possibility of solitary confinement in the form of "the Chair," being forced to perform additional labor, being demoted levels and thus preventing return to their parents, being tied to staff, animals, or other residents with rope, and being humiliated by wearing signs with humiliating statements if they declined to labor for Defendants gives rise, at the very least, to an inference that class members provided labor to Defendants **because of** the possibility of the aforementioned punishments. The choice between solitary confinement or the other punishments and work is no choice at all. Just as an individual plaintiff asserting a "forced labor" claim could rely on this fact to demonstrate causation, "[f]or the purpose of class certification, [there is] no reason why a putative class containing plaintiffs' who were all subject to the same treatment "should not be entitled to posit the same inference to a factfinder on a classwide basis." *CGC Holding*, 773 F.3d at 1092.

Finally, predominance is not defeated by the need (if any) for individualized damages determinations. "'[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.'" *Menocal*, 320 F.R.D. 258 at 267 (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014)). Rather, "[s]ince causation under the forced labor statute 'can be found through generalized, classwide proof,' common questions predominate in this case and 'class treatment is valuable in order to take advantage of the efficiencies essential to class actions.'"

*Id*. at 267-68 (citing *CGC Holding Co., LLC*, 773 F.3d at 1089)).  Plaintiffs have met their burden to establish that common questions of law and fact predominate over individual issues.

    2.    **Superiority**

A class action is the superior method of resolving this controversy. "'[C]lass status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation.'" *Menocal*, 320 F.R.D. 258 at 267-68 (citing *CGC Holding Co., LLC*, 773 F.3d at 1087)).  In including Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Id*. (citing *Amchem Prods., Inc.*, 521 U.S. at 617 (quoting Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)).

Here, the class action vehicle is the superior method for adjudicating this controversy because it involves a substantial number of individuals who have limited financial resources, many of whom reside in different states. It is highly unlikely that they would assert these claims individually. *Cook v. Rockwell International Corp.*, 181 F.R.D. 473, 482 (D. Colo. 1998).

To the knowledge of Plaintiff's counsel, no other potential class member has filed any claim in any court or administrative proceeding based on these facts. Thus, no other potential class member has demonstrated an interest in controlling this litigation. *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Finally, the District of Wyoming is ideal for the concentration of this litigation because it is home to Defendants and the ranch facility.

## IV.    THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL.

Should the Court grant Plaintiffs' motion, it must appoint class counsel. Fed. R. C. P. 23(g).

Plaintiffs' counsel request appointment as class counsel.

Collectively they have invested significant time in identifying and investigating potential claims in this action. The team of attorneys representing Plaintiffs has significant class action experience and many have served as class counsel. Moreover, the varied litigation experience of the team will be beneficial to the classes' pursuit of claims here. Furthermore, Plaintiffs' counsel are committed to advancing the costs of this litigation.  (*See generally* Watson Decl.; Timmons Decl.).

WHEREFORE, Plaintiffs request that:

1.   The Court certify the class;

2.   The named Plaintiffs be named class representatives of the class;

3.   And that Plaintiffs' counsel be appointed as class counsel.

Respectfully submitted,

*/s/William E. Routt, III*
William E. Routt, III *(Pro Hac Vice)*
Frank L. Watson, III, *(Pro Hac Vice*)
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

Craig A. Edgington (TN Bar #36205)
Brice M. Timmons (TN Bar #29582)
Bryce W. Ashby (TN Bar #26179)
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
craig@donatilaw.com
brice@donatilaw.com

bryce@donatilaw.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of August 2022, a true and correct image of the foregoing was served via this Court's efiling system and/or email upon the following:

Thomas Quinn (WY: #5-2630)
Lillian L. Alves (Pro Hac Vice)
Lindsey M. Romano (Pro Hac Vice)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
tquinn@grsm.com
lalves@grsm.com
lromano@grsm.com

*/s/William E. Routt, III*

## CERTIFICATE OF CONSULTATION

The undersigned hereby certifies that, on August, 12, 2022, Defendants' Counsel, Lindsey Romano, and Plaintiffs' Counsel, William E. Routt, III, conferred in connection with the relief sought in this Motion. Defendants oppose the relief requested in this Motion.

*/s/William E. Routt, III*