Thomas Quinn (WY: #5-2630)
Lillian L. Alves (*Pro Hac Vice*)
Lindsey M. Romano (*Pro Hac Vice*)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
tquinn@grsm.com
lalves@grsm.com
lromano@grsm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN**, **ANNA GOZUN**, and **AMANDA NASH**; on behalf of themselves and all similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>**TRINITY TEEN SOLUTIONS, INC.,** a Wyoming corporation; **ANGELA C. WOODWARD; JERRY D. WOODWARD**; **KARA WOODWARD**; **KYLE WOODWARD; and DALLY-UP, LLC,**<br><br>Defendants. | Civil Doc. No. 20-CV-215-SWS<br><br>**TTS DEFENDANTS'** *AMENDED* **OPPOSITION TO MOTION FOR CLASS CERTIFICATION (PER [ECF 229])** |

Defendants Trinity Teen Solutions, Inc. (TTS), Angela Woodward, Jerry Woodward, Kara Woodward, Kyle Woodward, and Dally Up, LLC ("TTS Defendants") hereby oppose Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel Under Rule 23(g) ("Motion")  [D.E. 215]. Plaintiffs advance a vague, unascertainable, and impermissible fail-safe class definition. They also fail to satisfy the strict burden of proof requirements of FED. R. CIV. P. 23 to demonstrate numerosity, commonality, predominance, typicality, superiority and adequacy. They cannot meet their burden because of: (1) Diverse and individualized parent and

1

resident consent facts; and (2) Differing individual treatment plans, diagnoses, tasks, responses to tasks, physical abilities/limitations, consequences/reasons for consequences, ages at the time of residency, and residency duration. In order to establish that class certification is appropriate, Plaintiffs must establish the presence of elements central to their TVPA claims across the entire class. Such elements include:

(1) What did *each* resident do at TTS?

(2) What did *each* parent consent to in terms of their daughter's activities at TTS?

(3) What could the TTS parents consent to?

(4) Why was *each* resident given a particular task e.g. was it in furtherance of treatment goals or was it exploitation of labor of services under Section 1589(a)? *See U.S. v Callahan*, 801 F.3d 606, 617 (6th Cir. 2015).

(5) What were the *specific* "conditions" [D.E. 215, pp. 3-5] experienced by *each* resident and how does *each* meet the force, fraud, or coercion to obtain labor elements of Section 1589(a)? Which of those "conditions" correspond to forced labor elements versus which are simply abuse claims? *See United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014)("Although Toviave's treatment of the children was reprehensible, it was not forced labor.").

On their face, and as demonstrated below, all but the third issue are incapable of class-wide resolution.

## I. Background

### A. Plaintiffs' Insufficient Evidentiary Submission

TTS strives to save lives, not enslave children. [Ex. 1, Bischof Dep. 204:4-6 (Q: "Do you think in a way TTS helped save your daughter's life? A: Yes."]. Plaintiffs' remaining three causes of action are forced labor based on the TVPA, specifically 18 U.S.C. §§ 1589(a), 1589(b), and 1590. [D.E. 106, ¶¶ 159-175, D.E. 157]. Plaintiffs seek to certify a class based on the following definition:

> From November 27, 2010, to the present, Plaintiffs, and all similarly situated persons who received treatment from Defendant Trinity Teen Solutions, Inc. and were subjected to the provision of "agricultural labor" (as defined 26 CFR §

2

31.3121(g)(1)) or any other manual labor to one or more of the Defendants without payment for said labor.

[D.E. 215, p. 12].

Overall, Plaintiffs' own inconsistent and unreliable submissions and testimony belie their assertions that former TTS residents were subjected to "uniform treatment" or "substantially similar mistreatment," *i.e.,* abuse, sufficient to justify certification.  [*Id.* pp. 8, 14-15]. Plaintiffs reiterate the allegations from the First Amended Complaint ("FAC") and attach various documents. The submissions include 37 declarations from former residents that, like the Motion, mostly parrot the FAC and, where they do not, exhibit varying degrees of inaccuracy that make them unreliable. [D.E. 215-1 to 36, 216-1]. Additionally, Plaintiffs submit a number of documents that weigh against the aggregation of the claims, including the deposition transcripts of Kyle Woodward, Jerry Woodward, and Justin McColl, the McColl deposition exhibits, and the TTS records of Anna Alsup. [D.E. 216-3 to 216-9]. Plaintiffs remaining submissions are inapposite and irrelevant; including Counsel's declaration, newspaper articles quoting Angela Woodward, a 9/18/2007 Wyoming Department of Family Services (DFS) letter (*three years* prior to the cut-off date for the statute of limitations), and 2011 e-mails between Ms. Woodward and a prospective employee discussing field staff job duties. [D.E. 215-38 to 40, 216-1, 216-10]. Plaintiffs' submission fails to include documents regarding: (1) Parental consent or lack thereof; or (2) Alleged labor performed at locations outside of TTS.

Finally, Plaintiffs submit an objectionable 6-page letter from "forensic" psychologist Sara Boyd. Ms. Boyd offers an opinion based *solely* on interviews of six people, identified only by initials. She offers no corroborating records, accompanying evaluations, discussion of what information she elicited from interviewees, diagnoses, or any objective support for any aspect of her opinion. [D.E. 216-2, D.E. 215 p. 5]. Dr. Boyd accepts the interviewees' allegations at face

value and summarily concludes the existence of "highly similar" psychological injuries, "substantial and close overlap between the symptoms reported and signs demonstrated," and that the interviewees allege "similar conduct." *Id*. Plaintiffs rely heavily on her skewed opinions to establish "virtually identical" experiences. [D.E. 215 pp. 4-5, 16-17]. Defendants object to Dr. Boyd's letter because it does not meet *any* of the criteria of FRE 702. The opinion is unreliable. [Ex. 2, Fukutaki letter and C.V.] A similarly insufficient method of evaluation resulted in Dr. Boyd's exclusion as an expert in *Raynor v. G4S Solutions*. [Ex. 3, Order].

The "trend of authority" favors the practice of permitting *Daubert*-style challenges at the class certification stage. *In re EpiPen (Epinephrine Injection, USP) Mktg. Sales Practices and Antitrust Litig.* 2019 WL 1569294 at *2 (D. Kan. Apr. 11, 2019) (reviewing decisions of several Tenth Circuit district courts that so permitted and noting although the Tenth Circuit itself has yet to opine on permitting *Daubert*-style challenges during class certification, the Ninth, Eighth, and Seventh circuit approve the practice). Citing to the "rigorous analysis" required of the Court at the class certification stage and noting that "before granting or denying class certification based on expert evidence, a court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law," the *EpiPen* Court permitted modification of the scheduling order in order for the parties to engage in *Daubert* briefing. *Id*. at *3, *5 (citation and internal punctuation omitted).

The TTS Defendants request that the Court adopt the approach of the *EpiPen* Court and set a *Daubert* briefing schedule. There is ample basis to scrutinize Dr. Boyd's opinion and to require disclosure of the individuals she interviewed, as well as any information she used to support her opinion, and to permit the TTS Defendants an opportunity to submit its own, more fully responsive, expert report. This does not prejudice Plaintiffs as "any *Daubert* ruling specific to the

class certification stage is subject to amendment for purposes of the class certification determination and is not finally determinative of the admissibility of the expert's testimony at a trial on the merits." *EpiPen*, 2019 WL 1569294 at *4 (citation and internal punctuation omitted).

**B. The Varied, Individualized and Inconsistent Evidence Beneath The Surface**

Since 2002, Angela and Jerry Woodward have owned and operated Trinity Teen Solutions in Clark, Wyoming. [Ex. 4, Excerpts from D.E. 216-4 14:10-13]. The TTS property is around 160 acres, with around 50 acres of pasture. [*Id*. 78:2-8; Ex. 5, Jerry Woodward Declaration ¶ 7]. TTS began as a wilderness therapy concept, which incorporated cause and effect concepts and development of empathy. For example, if the irrigation pipes were not changed then the ground burned up and there was no pasture for the animals. [Ex. 6, Excerpts from D.E. 216-5 57:4-18). Over time, it has shifted to a more clinical operation, as evidenced by its continuous Joint Commission accreditation since 2016.[1]

Each and every putative plaintiff was admitted to TTS with her own particular history of acute mental health issues, including severe trauma and neglect. [Ex. 6 D.E. 216-5 174:3-9; 183:15-19]. The TTS treatment team creates an individual treatment plan tailored to each specific treatment need, diagnosis and goal, which the treatment team reassess on a regular basis. [*Id*. at 182:6-23; Ex. 10, Excerpt from Dep. Ex. 120 (pp 1-6)]. Individual treatment plans incorporate various "challenges" or interventions depending on the year the resident was present. [Ex. 6 D.E. 216-5 184:13-23]. TTS program components have variously included over the years:

(1) The same types of tasks a parent can require of a child in rural settings like watering animals, connecting pipes to irrigate a field, restocking wood, and keeping fires going at night;[2]

---

[1] Joint Commission Accreditation History *available at* https://www.qualitycheck.org/accreditation-history/?bsnId=582305 (last visited Aug. 25, 2022)
[2] Ex. 6 D.E. 216-5 38:24-41:5 (watering animals, types and numbers of animals, irrigation, stocking wood, fire challenge),

(2) Daily living tasks typical of communal living in a group of around 7-14, such as cooking for the other residents and cleaning up afterwards, ordering food for the residents with staff assistance, and laundry;[3]

(3) Online education, physical exercise or challenges, directing the other residents in physical exercise, mental or spiritual assignments like reading a book then writing about it, completing a mood chart and journaling, and;[4]

(4) Individual therapy, family sessions, daily check-ins with staff, weekly letter writing to family, weekly or bi-weekly assessments and intervention planning necessarily involving changes to activities, called "Holy Cowgirl," and group therapy either led by a therapist or life skills groups led by field staff.[5]

Everything each resident did at TTS was "tied back into their individual treatment plan." [Ex. 6 D.E. 216-5 29:2-15]. For example, on or about October 5, 2015, Ms. Nash, who describes herself as having been "physically capable" owing to her "background of sports," had the individual objectives of "hope and fortitude." [Ex. 11, Excerpt from Dep. Ex. 122 (pp. 166-174)][Ex. 8 Nash 190:6-10]. In connection with those objectives, her physical challenges included irrigation head leader, abdominal exercises, sprints, and running to and from areas on the ranch, the mental challenge "Don't Blame Mother," the spiritual challenge "Anne Frank," and any assignments from her counselor, Terry. [Ex. 11 Dep. Ex. 122] [Ex. 8 Nash 162:25-163:2].

TTS provides parents with extensive written disclosures as part of their consent to their child's admission to TTS. [Ex. 12, Consent Forms]. Each of the named Plaintiffs' parents acknowledged receiving and signing detailed consents, and each acknowledged receiving specific

---

[3] Ex. 6 D.E. 216-5 36:24-38:1 (7-14 residents, cooking, laundry, dishes); Ex. 8, Nash Dep. 181:25-182:19 (laundry challenge); Ex. 9, C. Sherman Dep. 172:6-13 (cooking and cleaning)

[4] Ex. 6 D.E. 216-5, 29:2-15 (physical challenges); Ex.8, Nash Dep. 167:16-20 (physical exercise challenges); Ex. 7 Gozun 128:4-6 ("three hours" a day in the schoolroom), 128:23-130:2 (mental and spiritual assignments), 142:7-16 (athletic director challenge), (173:1-5) (journaling); Ex. 9, C. Sherman Dep. 175:15-176:10 (journaling), 177:25-178:13 (read a book and write about it), 179:7-12 (mental and spiritual challenges and written assignments), 180:4-6 (mood chart);

[5] Ex. 6 D.E. 216-5 30:15-25 (individual sessions); 51:9-21 (Holy Cowgirl), 166:23-172:18 (life skills groups), 170:15-24 (family sessions);, Ex. 7 Gozun 198:18-24 (individual therapy); Ex. 9 C. Sherman 68:20-23 (weekly individual therapy sessions); 193:7-10 (weekly letters), Ex. 8 Nash 155:11-156:16) (daily check-ins, life skills groups, individual and family sessions, weekly letters)

language that describes the physical rigor of the TTS program in detail.[6] This Court ruled that at the pleadings stage, the Plaintiffs' allegations "lead to a reasonable inference that the parents of the Female Plaintiffs did not consent to labor beyond 'good old-fashioned ranch work' and did not consent to the alleged threats/punishments, such as food and sleep deprivation and forced isolation." [D.E. 157, p. 10.] As the individual depositions of Plaintiffs' parents revealed, the answers to the question of the scope of their consent were as varied as each individual resident.[7]

Further, the TTS program continuously changed from November 27, 2010 to present. A significant change occurred in 2014 with the passage of the Mental Health Parity and Addictions Equity Act. [Ex. 15, Excerpts from D.E. 216-3 - 88:2-13). This change shortened the length of stay of the residents and increased the overall acuity levels within the resident population. *Id*. The changes become readily apparent in reviewing the admission and discharge dates of the putative plaintiffs who submitted declarations in this matter. (Ex. 16, Plaintiff Declaration Table; Ex. 17, Declaration of Angela Woodward).[8] Residents admitted prior to 2014 often stayed for over a year;[9] whereas residents admitted after 2014 generally remained for shorter periods, closer to 90 days,[10] which is now common for an RTC.

---

[6] Ex. 13, Alsup. Dep. 94:1-99:17; Ex. 1 Bischof 102:16-104:19; Ex. 14, W. Sherman Dep. 77:25-79: 20; 162:9-164: 14.

[7] *Compare* Ex. 14 W. Sherman 87:1-17 (aware of and had concerns about "the amount of work [Carlie Sherman] was doing,"); 91:18-23 (did not have concerns with irrigation chore); 106:16-10 (not concerned about lambing but did not know that it could occur at night); *with* Ex.1 Bischof 64:17-65:22 (aware that Nash was performing chores at TTS and had no concerns); 198:9-199:16 (Nash complained about chores at TTS as much as "any kid is going to complain regardless of what it is," and that while she may not have realized certain specifics like night-time lamb shifts, "I – as a parent, I knew what I was consenting to . . .So, like I said, anything she brought up wasn't concerning."); 202:21-25 ("So, like I said, we couldn't have done it without TTS.  I get it.  Not everything for her there was pleasant, but, you know, like I said, part of it that I agreed to is that, yeah, I understand, you're going to have chores and things to do.").

[8] Review of this data raises the first of many aspects of the declarations that erode their reliability and invoke the need for individualized review of records. Putative plaintiffs Barth [D.E. 215-15], Guill-Conklin [D.E. 215-18], Bogner [D.E. 215-21], and Boutrous [D.E. 215-26] all report significantly different dates of TTS residency compared to the contents of TTS records.

[9] *See e.g.* Rohde [D.E. 215-16] (467 days, admitted in 2011); VanMeveren [D.E. 215-6] (435 days, admitted in to 2010); Lynch [D.E. 215-25] (748 days, admitted in 2010)

[10] *See e.g.* Arhelger [D.E. 215-5] (89 days, admitted in 2016), Willis [D.E. 215-28] (95 days, admitted in 2017), Sadberry [D.E. 215-35] (85 days, admitted in 2020); *See also e.g. Ariana M. v. Humana Health Plans of Tx. Inc.*, 2018 WL 4384162 at * 2 (S.D. Tex. Sep. 14, 2018) (discussing plan's authorization of a maximum of 90 days for

The residents varied widely in age at the time of residency, from as young as 12 to as old as 19. [Ex. 16 Plaintiff Declaration Table]. Using the submitted declarations as a sample, the youngest submitting putative plaintiff is *still* a minor and presumably under the care and control of her parents, whose declaration accompanies. [D.E. 216-1]. Further, the inclusion of Ms. DiTrolio, who was 19 at the time of discharge, creates another layer of individualized case facts. [Ex. 16 Plaintiff Declaration Table].  Based on her age, she was in Trinity's Young Adult Program called Journey to Life (JTL), which is not alleged in the FAC. [Ex. 18, CMS 7/9/12 Progress Note p. 3] (discussing a JTL backpack trip). TTS housed residents in JTL or over eighteen separately from minor residents. [Ex.7, Gozun 233:23-24]. JTL residents also signed different applications and consents with their parents. [Ex. 19, JTL Consent Forms]. Ms. DiTrolio's declaration makes no mention of these differentiating facts.

TTS modified its program and activities over the years to serve its changing population. For example, in 2014 TTS replaced wood-burning stoves with heatilators, which meant that the "fire shifts" ended. [Ex. 5, Woodward Dec. ¶ 6; FAC ¶¶ 12, 62, n.26]. Animals such as horses, pigs, chickens, sheep, cows, guinea pigs, dogs, and goats have been present in varying numbers or not at all from November 27, 2010 to present. [Ex. 5, Woodward Dec. ¶¶ 8-13]. Irrigation takes place during spring and summer but has run on an automatic system since 2019, which curtailed resident participation in that activity. [*Id*. at ¶ 7][Ex. 15D.E. 216-3 32:6-34:9].

Staffing and responsibilities at TTS also changed significantly during the course of a decade. TTS employed dozens of employees and independent contractors during the statutory period of the claims. [Ex. 20, TTS Defendants' Response to Plaintiffs' First Interrogatories and Requests for Production, pp 11-16]. Former clinical director JD McColl worked at TTS from April

---

"partial hospitalization care, treatment in a psychiatric day treatment facility, crisis stabilization unit, or residential treatment center for children or adolescents").

26, 2006 to February 28, 2013. *Id.* at 13. When he first arrived, Angela Woodward was "highly involved" with the treatment of residents but over the course of the years her role became more limited to medical issues as an RN. [Ex. 6, D.E. 216-5 25:11-26:4]. More recently, she has little direct contact with residents. [Ex. 21, Neve Dep. 73:3-20]. Jerry Woodward deals with daily ranch maintenance and paying bills but has little contact with employees or residents. [Ex. 4 D.E. 216-4 30:16-25]. Kyle and Kara Woodward are husband and wife and TTS employees, not owners, and live off site. [Ex. 15 D.E. 216-3 56:7-9; 90:1-22; 47:17-19]. They were married on August 4, 2018 and would have been minors at around the same time as a number of putative plaintiffs with older stays at TTS. [D.E. 178 ¶ 8]. Kyle Woodward has been a TTS employee since on or about January 12, 2015. [Ex. 20, Def. Discovery Responses, p. 11]. He does not participate in direct care of residents. [Ex. 15, D.E. 216-3 84:5-20]. Kara Woodward (Baus) worked at TTS as a behavioral health assistant from May 2015 to July 2015. [Ex. 20, Def. Discovery Responses, p. 11]. She returned to TTS as a behavioral health assistant from June 13, 2016 to June 27, 2016 and then became a Nursing Supervisor from June 28, 2016 to present. *Id.* Kara Woodward was not present at TTS as a supervisor or Woodward family member until *after* the period of residency of several declarants, including all three Plaintiffs. [Ex. 16, Plaintiff Declaration Table].

Importantly, Plaintiffs offer varying testimony about their interactions with the individually named Defendants and TTS staff. Ms. Gozun thinks she might have spoken to Angela Woodward and did speak to Jerry Woodward, but remembers no other details. [Ex. 7, Gozun 271:9-15, 272:1-8]. Ms. Gozun had no contact with Kyle or Kara Woodward. [*Id.* at 272:7-273:4]. Ms. Nash has never spoken to Angie, Jerry, or Kyle Woodward and recalled that Kara Woodard might have been "past staff." [Ex. 8, Nash 260:10-261:4]. Ms. Sherman claims that Angela Woodward once "cornered" her in a sleep cabin about leaving good reviews. [Ex. 9 C. Sherman

152:22-153:8]. She claims that Kara Woodward sat in on an interview with a child abuse investigator looking into abuse reports about Ms. Sherman's family. [*Id*. at 90:5-13; Ex. 22, Dep., Ex. 101].

All three Plaintiffs provided general testimony discussing "staff" or "consequences," but rarely named them, nor did they articulate *any specific* instances of "threats" *to obtain labor*.[11] Where Plaintiffs named staff, interactions varied. Ms. Sherman claims that a staff member "Taneisha" told her during her second stay that Ms. Sherman would be restrained if she tried to run away. [Ex. 9, C. Sherman 130:8-131:9]. Ms. Gozun claims staff "Amanda" gave her a consequence for saying "yes ma'am" instead of using her name. [Ex. 7, Gozun 186:22-187:3]. Ms. Nash stated: "I don't believe I had an ill relationship with any of the staff," that "Amanda or Janet" gave her a hill run for making a mistake on a Sysco order, and that "most likely Amanda" may have given her the consequence of 50 step-ups for not doing her dish chore correctly. [Ex. 8, Nash 163:13-20; 199:13-21; 209:3-15]. Void of any details, all declarations vaguely claim, at para. 4, that TTS, "its employees, agents, or staff, including but not limited to, Defendant Angela Woodward, Jerry Woodward, Kara Woodward, and Kyle Woodward" forced them to labor. Putative Plaintiffs DiTrolio, VanMeveren, Higgins, Kolenda, Rohde, Dohogne, Rodiguez, Lynch, Boutrous, Siegel, Heusinkveld and Mahdavi discharged *years* prior to the earliest possible date of employment for Kyle and Kara Woodward.

Information in the record often conflicts with residents' declarations or, read together, they are internally inconsistent. For example, Ms. Nash swears that she was forced to work "10 hours a day on average, approximately 7 days a week." [D.E. 215-3, p. 3]. Her testimony about an

---

[11] D.E. 215 p. 15. *See e.g.* Ex. 9 C. Sherman 115:13-18, 116:13-117:12, 122:2-124:11, 125:12-126:4; 126:25-130:7; 214:16-19 (consequences for "every infraction"), Ex. 7 Gozun 167:21-24 (step-ups for being late), 185:1-15 (step-ups for looking at a boy in church), 186:18-21, 187:10-13; Ex. 8 Nash 197:19-199:9, 200:7-202:17, 204:2-205:19 (step-ups for talking out of line).

average day at TTS indicates that she did, at best, an hour or two of outdoor chores interspaced with communal cooking and cleaning, schooling, and therapy. [Ex. 8 Nash 152:4-158:22]. Ms. Nash's testimony (not declaration) is consistent with the description of an average day at TTS years later provided by former staff Jenna Neve. [Ex. 21 Neve 16:12-18:14, 19:5-20:24]. Ms. Neve worked at TTS from April 2018 to November 2020 and testified that irrigation, before it was automated, took 1 1/2 to 2 hours. [Ex. 21 Neve 25:22-26:1; 75:10-21, 84:2-13]. However, the minor child who was at TTS the same time as Neve, swears inconsistently that she ran "irrigation pipes for multiple hours each day." [D.E. 216-1 ¶¶6(a), 10].

The inconsistencies continue. In her declaration, Ms. Sherman asserts that she was "demoted a level" to prevent her from returning home as an act of coercion to obtain her labor or services. [D.E. 215-1, ¶4(d).] Indeed, she was demoted a level at least once, but not to obtain her labor. [Ex. 23, Dep. Ex.  94]. Rather, she broke TTS patient safety rules by letting another resident rub her head. [Ex. 24, Dep. Ex. 163 excerpts, pp. 375-393], an important rule for Ms. Sherman,

███████████████████████████████████████████████████████████

█████████████████ [Ex. 9 C. Sherman 93:4-23, 196:1-197:10, 209:9-212:3].[12]

Ms. Gozun's declaration claims that she had to work 15 hours a day and sets forth the same list of tasks generally included in all the declarations. [D.E. 215-2, pp. 2-3]. However, her deposition testimony does *not* establish 15 hours a day of work. [Ex. 7, Gozun 164:9-13, 261:17-25, 268:9-17, 268:24-269:17, 270:8-25]. Additionally, Ms. Gozun's adopted father testified that her ankle issues resulted in her physical activities being restricted while she was at TTS. [Ex. 13 Alsup 111:4-9]. Moreover, Ms. Gozun went to ankle appointments in Cody which would have

---

[12] Further requiring individual review of claims, Ms. Sherman claims that not everything she wrote in her TTS journals was true. *Id.* at 210:12-13 ("it's not that things weren't true, it's that – some things were true, some things weren't true.")

removed additional time from her day. [Ex. 7 Gozun 187:23-190:10]. Ms. Gozun claims food deprivation or threats of the same in her declaration. [D.E. 215-3, ¶ 6(c)]. Yet, during the course of a two-day deposition, she did not testify that she was so threatened. Rather, Ms. Gozun testified she generally ate breakfast and dinner in the cook cabin and lunch in the school room. [Ex. 7 Gozun 132:10-14, 267:24-268:6]. Ms. Gozun testified that she was never demoted a level and made no mention of being threatened with a level drop, contrary to her declaration.  [*Id*. 205:13-20] [D.E. 215-2, ¶ 4(d)]. Ms. Gozun departed from Trinity before completing the program to have ankle surgery. [Ex. 13 Alsup 135:1-10]. Accordingly, nothing that happened at TTS "prevent[ed] [her] from returning home." [D.E. 215-2, ¶ 4(d)]. Also contrary to her declaration, Ms. Gozun testified that she never experienced the "punishment" involving "the chair" nor did she articulate a "chair" threat. [Ex. 7 Gozun 132:2-21]. [D.E. 215-2, ¶6(d)]

Ms. Nash also makes the "chair" assertion in her declaration [D.E. 215-3, ¶ 6(d)] but never mentioned such a threat during her lengthy testimony about consequences. [Ex. 8 Nash 188:4-215:16]. Ms. Nash also testified that she had to wait to use the bathroom but never disclosed having "repeated urinary tract infections" as stated in her declaration. [*Id*. 262:20-263:5] [D.E. 215-3, ¶6(e)]. She claims she was "deprived of food" in her declaration. *Id*. at ¶6(c). Yet she testified that she received three meals a day. [Ex. 8 Nash 263:13-16]. Finally, for all Ms. Sherman's complaints about TTS in her declaration, her father testified that she "wanted to graduate from Trinity" and had a good therapeutic relationship with her Trinity counselor, which supported the family's decision to send Ms. Sherman to TTS a *second* time. [Ex. 14 W.Sherman 150:2-151:2].

While Ms. Nash (residency 5/15-11/15) and Ms. Franch [D.E. 215-9 ¶14] (residency 2/16-7/16) claim 10 hours a day of labor, Ms. Bartholomew (residency 1/15-5/15 and 1/16-5/16), was at TTS at or near *the same time* as each of them and claims 16-20 hours a day of labor. [D.E. 215-

20 ¶14]. All but two claim seven days a week of labor, generally at ¶14. Ms. DiTrolio and Ms. VanMeveren claim six days and that Sunday was "typically a day that did not involve intensive labor." [D.E. 215-4 and 6; ¶ 14]. This is in spite of several residents with overlapping stays. [Ex. 16 Plaintiffs Declarations Table].

## II. ARGUMENTS AND AUTHORITIES

### A. Plaintiffs Fail to Carry Their Burden Under Rule 23

In reality, Plaintiffs have not carried their burden as to *any* of the Rule 23 elements. "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, [s]he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (emphasis in original). Both in the Tenth Circuit and elsewhere, courts agree that "[a] party seeking class action certification must demonstrate, *under a strict burden of proof*, that all of the requirements of 23(a) are clearly met." *Tabor v. Hilti, Inc.*, 2010 WL 11465270, at *1 (N.D. Okla. Sept. 21, 2010) (emphasis supplied) (quoting *Rex v. Owens ex rel. State of Okl.*, 585 F.2d 432, 435 (10th Cir. 1978)). Instead of meeting these requirements, Plaintiffs base their argument primarily on the FAC coupled with verbatim laundry lists of allegedly coercive practices and "labor" that, as noted above, yield considerable internal variation upon a minimal examination of records.

### B. Plaintiffs advance an impermissible and unascertainable fail-safe class

Plaintiffs proposed the following class definition:

From November 27, 2010, to the present, Plaintiffs, and all similarly situated persons who received treatment from Defendant Trinity Teen Solutions, Inc. and were **subjected to** the provision of "agricultural labor" (as defined 26 CFR §

31.3121(g)(1))[13] or any other manual labor to one or more of the Defendants without payment for said labor.

[D.E. 215p. 12. (Emphasis supplied). "Subjected to" makes this an impermissible fail-safe class. "A fail-safe class is one that is defined so that whether a person qualifies as a member depends on whether a person has a valid claim." *See Cox v. Sherman Capital LLC*, 2016 WL 274877 at *5 (S.D. Ind. Jan. 22, 2016) (citation and internal punctuation omitted). "Such a definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id*. In this case, the class membership depends on whether the individual was "subjected to…labor." *See also e.g. Francis v. Apex USA, Inc.*, 2021 WL 4487985, at *210 (W.D. Okla. Sept. 30, 2021) (examining whether plaintiffs were "subjected or compelled to work"); *Meganathan v. Signal Int'l, LLC*, 2014 WL 11512243 at * 1 (E.D. Tex. Aug. 4, 2014) ("Plaintiffs were allegedly subjected to forced labor and other serious abuses.").

Additionally, Plaintiffs' class definition is premised on concepts that are too vague, individualized, and subjective to allow for class-wide answers and, therefore, their class cannot be certified. *See Oshana v. The Coca-Cola Co.*, 225 F.R.D. 575 (N.D. Ill. 2005) (discussing the failure to create class membership "that is contingent on any objectively ascertainable factors.") This definition requires an examination of what each patient did, what activities she thinks were "manual labor" or "agricultural labor," and what of that "labor" was "forced" *in addition* to examining consent evidence. This requires the review of thousands of pages of records, if not additional testimony. Plaintiffs' declarations, as set forth above, are rife with too many vague assertions, inconsistencies and incomplete information to be a reliable method to answer these

---

[13] The inclusion of this regulation in the proposed definition only muddies the water. It defines agricultural labor performed on a "farm." The definition derives from Internal Revenue Service regulations that implement the Federal Insurance Contributions Act. TTS residents were not employees, and definitions related to the taxation of such employees are not relevant to their claims. Nor is there analysis of how TTS is a "farm" under this regulation.

questions. *See e.g. Rock v. Nat'l Collegiate Athletic Assoc.*, 2016 WL 1270087, at *7 (S.D. Ind. March 31, 2016) (noting that "[w]hile the Seventh Circuit has refused to deem such affidavits insufficient as a matter of law, at least in low value consumer cases,[14] the vagueness and subjectivity of the proposed class definitions would make it nearly impossible for the NCAA or a case administrator to sort out the self-serving affidavits from the meritorious ones.")

Plaintiffs' own testimony provides ample basis to conclude that their labor notions are individualized. Ms. Nash testified that she thinks "[a]ny single work that was on their property, other than self-care to myself" constitutes forced labor. [Ex. 8 Nash 272:15-19]. Ms. Gozun testified that doing one's own laundry is "forced labor" when it includes the laundry of others (who may have been simultaneously cooking for and cleaning up after Ms. Gozun). [Ex. 7 Gozun 222:12-16; 228:17-20].

The foregoing gives rise to a "need for detailed, individualized fact-finding, simply to determine class membership," "reveals that the proposed class definition is too vague," and makes the proposed class "unsuitable for certification." *Rock*, 2016 WL 1270087, at *7 (S.D. Ind. March 31, 2016). Class certification should be denied because Plaintiffs advance an impermissible fail-safe class that is also vague and unascertainable.

## C. Plaintiffs fail to establish numerosity

Plaintiffs dispense with a numerosity analysis and assert that they have "presumptively" met this requirement because they "believe that the class contains between 250 and 1,000 members." [D.E. 215, p. 12]. They cite to a series of documents and testimony alluding to total numbers of TTS records, but this, without more, is not tantamount to numerosity. [*Id*. at pp. 12-13].

---

[14] Each former resident stayed at TTS anywhere from a few months to a few years. *See e.g.* Ex.16 Plaintiff Declaration Table. This is hardly a low value consumer case where such declarations might arguably suffice.

"The Tenth Circuit has never adopted a specific number to support a presumption that joinder is impracticable." *Blanchard v. Wyo. Dept. or Corr. Dir.*, 2017 WL 10350607 at *4 (D. Wyo. Nov. 13, 2017). Moreover, "the numerosity component is not a question of numbers, but whether the nature of the action, size of the individual claims, and the location of the members of the class are such that it would make joinder impracticable." *Id*. A further factor that might impact the numerosity of the proposed class is whether it should include residents who were part of JTL or who are minors. Plaintiffs ignore this.

Additionally, Counsel's affidavit indicates that 80 specific and identifiable individuals have; (1) essentially "opted in" to this lawsuit; and (2) communicated extensively and directly with Plaintiffs' counsel. [D.E. 215-38]. That Plaintiffs know the identity of putative class members "weighs against a finding that joinder is impracticable." *Francis v. Apex USA, Inc.*, 2021 WL 4487985, at *210 (W.D. Okla. Sept. 30, 2021). Plaintiffs primarily rely on numbers alone to make a showing of numerosity and, where they do not, they fail to demonstrate that joinder is impracticable. As such, they do not meet their burden regarding numerosity.

### D. Plaintiffs cannot identify a single question common across the entire class that may be resolved "in one stroke."

The language of Rule 23(a)(2) "is easy to misread," because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349 (internal quotations omitted). But simply pleading the existence of such questions is never automatically sufficient to satisfy commonality because "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers *apt to drive the resolution of the litigation*." *Id.* at 350 (emphasis added) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)). This means that a question only satisfies commonality if a "determination of its truth or falsity will

resolve an issue that is *central to the validity of each of the claims* in one stroke." *Id.* (emphasis added). In this case, Plaintiffs do not identify common questions, instead, they restate the statutory language of Section 1589(a):

> (1) whether Defendants obtained the labor of class members; (2) whether Defendants threatened class members with physical restraint, serious harm, or abuse of the legal process; (3) whether Defendants "knowingly" obtained class members' labor 'by . . . means of" these threats; and (4) whether Defendants knowingly recruited, harbored, transported, provided, or obtained by any means, any person for labor or services.

*See* Mot. [D.E. 216] at 14-15. "[T]he members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350) (finding the district court's analysis of commonality deficient where it failed to explain how resolution of any "common" question would be central to resolving the causes of action asserted).

Rather, some unifying factor that is consistent across the entire class—such as a uniform corporate policy or a discriminatory test for promotions, *see Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159, n. 15 (1982) and *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018) ("*Menocal II*")—must be present to establish commonality. *See also Magtoles v. United Staffing Registry, Inc.,* 2022 WL 1667005 at *4 (E.D.N.Y. May 25, 2022) (an example of a TVPA class action that *did* have unifying factors consistent across the entire class that derived from the application of specific staffing contract terms).

No such factor is present here. As discussed above, what constituted "labor" for one plaintiff might not have for another. Plaintiffs have not specified "threats" by person, date, content, or impact on compulsion to "labor." Knowledge cannot be established "in one stroke" given varying levels of involvement, responsibility and even presence of the named Defendants, and

scarcely any identification of purportedly coercive employees. The Section 1590(a) theory invoked by the fourth factor remains as varied as Plaintiffs' interchangeable use of five different means of committing the supposed violation throughout this litigation, raising a myriad of individual questions. Accordingly, answers to all the foregoing questions will only establish facts relevant to each resident's particular claim. Plaintiffs' failure to identify even a single question that is truly common to the entire class demonstrates the wisdom of the Supreme Court's reasoning in *Falcon*, 457 U.S. 147, and *Dukes*, 564 U.S. 338. In both cases, the Court found commonality lacking because there was no class-wide policy or practice that would have operated in the same way on all class members. Such a unifying factor is completely absent in this case as well. The evidence cannot support a finding of commonality under Rule 23.

**E. No common issues predominate over individual issues.**

Much like commonality, predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016). Commonality is often seen as "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement" of predominance. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). In assessing predominance, the court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Menocal II*, 882 F.3d at 915.

Given that no question can be "characterized" as common, there is nothing for the Court to "weigh" for purposes of predominance. Without commonality, predominance fails as well. Nowhere is this more clearly demonstrated than in the witness testimony and exhibits summarized in I(B), above, particularly as contrasted with Plaintiffs' incomplete, if not untrue, declarations. Residents all had different diagnoses, tasks, responses to tasks, physical abilities or limitations, consequences and reasons for consequences, level progression, individual treatment plans, were

different ages during their stays, and stayed for different amounts of time. Moreover, their parents had their own understanding of what they consented to or not. This diversity of facts establishes that individual issues will certainly predominate.

Plaintiffs' view is that predominance is present because (1) consent is irrelevant, citing *David v. Signal Int'l*, 2012 WL 10759668 *21 (E.D. La. Jan. 4, 2012), and (2) the Court need not inquire whether Plaintiffs' labor was actually forced, but may determine if a "reasonable person" objectively would have felt their labor was forced, to determine that question on a class-wide basis, citing *Menocal v. GEO Group, Inc.*, 320 F.R.D. 258 (D. Colo. 2017) ("*Menocal I*") and *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *7 (C.D. Cal. Dec. 12, 2011). [D.E. 215 pp. 18-21]. The cases are inapposite.

The crux of this case is that Plaintiffs were minors whose parents consented to their TTS admission. *See e.g. John Roe I v. Bridgestone Corp*, 492 F. Supp.2d 988, 1020 (S.D. Ind. 2007) (distinguishing the forced labor *of adults* from child labor, noting that the FLSA permits children to do agricultural or work with limitations and/or "with the consent of their parents," and dismissing plaintiffs' forced labor claims for failure to state a claim). Whether these claims allege "forced labor" or "child labor" depends on the "particular circumstances" established by the evidence. *Id*. 1021-22. Here, those circumstances include what *each* resident did, the reason for *each* activity e.g. was it: (1) in furtherance of an individual treatment goal; (2) exploitation; or (3) something else; and what *each* parent agreed to and understood as compared against what is legally permissible. After all, a related TVPA statute, Section 1584, "does not restrict parents' (or guardians') rights to require their children (or wards) to help with household chores." *U.S. v. Djoumessi*, 538 F.3d 547, 553 (6th Cir. 2008) (citing *U.S. v. Kozminski*, 487 U.S. 931, 944 (1988)). Even *David*, upon which Plaintiffs rely, stated: "The TVPA did not render the issue of

consent irrelevant to a forced labor determination." 2012 WL 10759668 at *19. For these reasons, it would be reversible error to "infer[] that class members did not voluntarily consent to the forced labor." [D.E. 215, p. 20].

Where the "reasonable person" standard is concerned, Plaintiffs only thinly relate it to causation. *Id*. at 20, 22. "Reasonable person" derives from the Section 1589(a)(2) and (4) elements of "serious harm" that must be "sufficiently serious . . . to compel a reasonable person . . . to perform or to continue performing labor or services[.]" 18 U.S.C. § 1589(c)(2).The analysis in *Menocal II* and *Apex* is most applicable here. In *Menocal II*, all immigrant detainees were subject to the facility's *mandatory* Sanitation Policy and, if they failed to comply, they faced a range of possible sanctions. 882 F.3d at 920. The Court held that class-wide proof of causation was possible because "class allegations were based on a *single*, common scheme" based on *that policy*. *Id*. (emphasis supplied). Accordingly, the Sanitation Policy "provid[ed] the 'glue' that [held] together the class members' reasons for performing housing united cleaning duties." *Id*.

In so holding, "[t]he Tenth Circuit declined to decide whether a plaintiff", in the context of the Rule 23(b)(3) predominance requirement, "may use a 'reasonable person' standard to make the causation showing or whether a plaintiff must show that the unlawful means *in fact* caused the labor." *Apex*, 2021 WL 4487985 at *9 (emphasis in original). "But, even assuming the latter showing is required, i.e., the unlawful means in fact caused the labor, the Tenth Circuit held that TVPA causation may be proved by class-wide inference *in certain circumstances*, where the TVPA claim is 'susceptible to generalized proof.'" *Id*. (emphasis in original). In *Menocal II*, those circumstances included; (1) a single uniform policy; (2) the detainee received notice of the policy "including possible sanctions for refusing to clean;" and (3) "the detainee performed housing unit cleaning work for GEO when assigned to do so." 882 F.3d at 920-21. No such "glue" holds

together this proposed class's reasons to "labor," but even if the Court applies "the more lenient 'reasonable person' standard here," "there is no *uniform* reasonable person" in this case. *Apex*, 2021 WL 4487985 at *11 (citation and internal punctuation omitted). Like *Apex* this case involves a "wide array" of practices and reasons that might compel the individual. *Id*. at 10. There is a threshold issue of whether the residents experienced forced labor or treatment that was "tied back into their individual treatment plan[s]," as noted above. Next, there are varied issues of what constitutes compulsion e.g. step-ups: (1) are step-ups coercion? (2) if yes were they imposed to get the resident to work or was it for something like "looking at a boy in church" as stated by Anna Gozun? (3) if the resident was unlawfully compelled to "labor," did the Defendants benefit from it? and (4) Which Defendants benefitted? The only way to answer is via individual analysis of each claim, including records and testimony. Finally, there are different employees, varied involvement by the Woodward, and changing program components like animals, irrigation, and "fire shifts" over the years. For all these reasons, "individualized proof persists with respect to the causation analysis." *Apex* 2021 WL 4487985 at 12. Plaintiffs fail to prove predominance by a preponderance of the evidence.

**F. Typicality is Absent**

Typicality and commonality "proceed[] from a different perspective: the commonality inquiry focuses on what characteristics are shared among the whole class while the typicality inquiry focuses on the desired attributes of the class representative." 1 Newberg on Class Actions § 3:31 (5th ed.) ("Newberg"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "The typicality requirement is more exacting because it requires sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." Newberg,

at § 3:31. "A class representative's claim is 'typical' if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *See Baricuatro v. Indus. Pers. & Mgmt. Svcs. Inc.,* 2013 WL 6072702, at *7 (E.D. La. Nov. 18, 2003).

The named Plaintiffs' claims are not even typical of each other, much less typical of the claims of the class. The inconsistencies within their declarations make it difficult to ascertain which of the alleged facts they claim to have personally experienced, but the absence of typicality is clear enough. For example, as discussed above, Ms. Gozun and Ms. Nash did not experience "the Chair" nor were they threatened with it. Ms. Nash was not at TTS when "fire shifts" were happening. Ms. Gozun is the only one of the three whose program was modified due to her physical (ankle) issues, whereas Ms. Nash was "physically capable" owing to her "background of sports" as discussed above. Ms. Sherman is the only one of the three claiming; (1) to have had a conversation with TTS staff about being restrained; (2) to have two TTS residencies; (3) to have had communication of any substance with Angela Woodward; and (4) to have been dropped a level for physical contact with another resident.

The addition of the declarations introduces further atypicality. Five residents (Jensen, Lovering, Willis, Sadberry, and minor child) have post-2016 admission dates. None of those individuals could have participated in lambing shifts. [Ex. 16 Plaintiffs Declaration Table; Ex. 5 Woodward Dec. ¶ 13]. Ms. Sadberry was admitted in 2020. So, she would not have participated in irrigation. [Ex. 16 Plaintiffs Declaration Table] [Ex. 5 Woodward Dec. ¶7(c)] As discussed above, Ms. DiTroilio would have been in the Young Adult Program of the past. The evidence demonstrates that this proposed class is full of truly personalized and unique experiences, and the Court will be required to conduct separate inquiries for each one. Typicality, therefore, fails.

**G. Superiority Fails Because A Class Action Here is Unmanageable**

Plaintiffs offer conclusory assertions of superiority. As discussed above, "the factual and legal issues requiring individual determination are numerous." *Baricuatro*, 2013 WL 6072702 at *11. Additionally, "plaintiffs have proffered no serious plan for rendering their adjudication manageable" e.g. a procedure to determine class membership and to ascertain valid claims. *Id.* Clearly, declarations are insufficient. For this additional reason, the Court should deny class certification.

**H. Named Plaintiffs do not adequately represent the putative class members.**

In assessing the adequacy of class representatives, courts analyze whether a plaintiff: (1) is knowledgeable as to the status and underlying legal basis of the action; (2) is willing and able to pay notification and other costs; (3) will diligently pursue the claims in the case; and (4) has interests that are antagonistic to those of the class." *Jordan v. Maxim Healthcare Services, Inc.*, 2017 WL 4407940 at *4 (D. Colo., July 6, 2017) (citing *In re Storage Tech. Corp. Secs. Litig.*, 113 F.R.D. 113, 117 (D. Colo. 1986). Ms. Gozun, Ms. Nash, and Ms. Sherman do not meet these requirements.

Ms. Gozun has demonstrated a lack of knowledge of the status and underlying legal basis of the action. She created a TikTok account called "@exposingtts." [Ex. 7 Gozun 281:5-8].[15] She is also a member of a private Facebook group called "The Unofficial TTS Network." [*Id*. 286:6-19]. She communicates frequently with putative class members. [*Id*. 287:2-6, 289:3-15]. Ms. Gozun's social media posts frequently discuss her TTS experience as "abuse" or "abusive."[16]

---

[15] https://www.tiktok.com/@exposingtts (last visited Aug. 20, 2022)
[16] *See e.g.*
https://www.tiktok.com/@exposingtts/video/7099246155250584878?is_from_webapp=v1&item_id=70992461552
50584878&web_id=7132167369116845614 (last visited Aug. 20, 2022);
https://www.tiktok.com/@exposingtts/video/7100684127514479914?is_from_webapp=v1&item_id=710068412751
4479914&web_id=7132167369116845614 (last visited Aug. 20, 2022);

These posts mix in content referencing the lawsuit and flashing "forced labor" or "human trafficking" across the screen. [17] Abuse claims alone are not a proxy for forced labor. *Toviave*, 761 F.3d at 625. Ms. Gozun persists in a public narrative that is likely to confuse other putative plaintiffs who may not understand, based on her representations, that if they join the lawsuit they are limited to forced labor claims.

There is additionally a record that Plaintiffs Sherman and Nash might not diligently pursue the claims of this case. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████ She may never return to the United States. [*Id.* at 13:9-14:13]. Ms. Nash's mother testified to her understanding that Ms. Nash only intended to provide testimony, not to sue TTS.  [Ex. 1 Bischof 38:1-40:1]  Ms. Nash's mother indicated that Ms. Nash asked if she could retract her statement, but was told that if she did so, "she'd have to pay for the fees."  [*Id.*] When asked about this in her subsequent deposition, Ms. Nash stated that it was *her mother* who did not want to participate, not her, and that she explained to her mother that she (Ms. Nash) "would have to pay" if she were to withdraw from this litigation. [Ex. 8 Nash 276:25-277:23]. She does not suggest her mother lied and her explanation does not account for the level of detail in her mother's statements. The record does not support that Ms. Nash will diligently pursue the claims in the case.

---

https://www.tiktok.com/@exposingtts/video/7119222754968112427?is_from_webapp=v1&item_id=711922275496
8112427&web_id=7132167369116845614 (last visited Aug. 20, 2022);
[17] *See e.g.*
*https://www.tiktok.com/@exposingtts/video/7104396073678146862?is_from_webapp=v1&item_id=710439607367
8146862&web_id=7132167369116845614*  (last visited Aug. 20, 2022)

## III.  Conclusion.

For the reasons set forth above, Defendants respectfully request that Plaintiffs' motion to certify the class described above be denied.

Respectfully submitted this 1st day of September, 2022.

/s/ *Thomas B. Quinn*
/s/ *Lillian Alves*
/s/ *Lindsey Romano*
Thomas Quinn (WY: #5-2630)
Lillian L. Alves (Pro Hac Vice)
Lindsey M. Romano (Pro Hac Vice)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
tquinn@grsm.com
lalves@grsm.com
lromano@grsm.com

***Attorneys for Defendants Trinity Teen Solutions, Angela Woodward, Jerry Woodward, Kyle Woodward, Kara Woodward, and Dally-Up, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 1st day of September 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such to all attorneys of record.

/s/ *Fran Aragon Eaves*
For Gordon Rees Scully Mansukhani, LLP