Craig A. Edgington (TN Bar #36205)
Brice M. Timmons (TN Bar #29582)
Bryce W. Ashby (TN Bar #26179)
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
craig@donatilaw.com
brice@donatilaw.com
bryce@donatilaw.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com

Frank L. Watson, III, *(Pro Hac Vice)*
William E. Routt, III, *(Pro Hac Vice)*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN**, **ANNA GOZUN**; and **AMANDA NASH** on behalf of themselves and all similarly situated persons,<br><br>        Plaintiffs,<br><br>vs.<br><br>**TRINITY TEEN SOLUTIONS, INC.,** a Wyoming corporation; **ANGELA C. WOODWARD**; **JERRY D. WOODWARD**; **KARA WOODWARD**; **KYLE WOODWARD**; and **DALLY-UP, LLC,** a Wyoming limited liability corporation,<br><br>        Defendants. | Civil Doc. No. 2:20-cv-215-SWS |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS CERTIFICATION**

## I.   INTRODUCTION

On June 9, 2022, Plaintiffs issued their First Set of Interrogatories and Requests for Production to Defendants Trinity Teen Solutions, Inc. ("TTS"), Angela C. Woodward, ("Ms. Woodward") Jerry D. Woodward, and Dally-Up, LLC (collectively "Defendants").

Plaintiffs took issue with Defendants' complete lack of a response to Interrogatory No. 3, which sought to have Defendants' identify each person housed at Defendants' facility which provided "manual labor" during the class period, and Defendants' lack of documents responsive to Requests for Production Nos. 1-11. Plaintiffs' Requests for Production Nos. 1-11 sought relevant documents from randomly selected residents between 2011 to 2020 which were proportional to the needs of the case.

On August 9, 2022, the Court held an informal telephonic discovery conference to discuss Plaintiffs' concerns with Defendants' discovery responses and ultimately issued a ruling forcing Defendants to substantially comply with Plaintiffs' discovery requests. The Court ultimately ordered "Defendants [to] produce the discovery as soon as possible and . . . on a rolling basis." (ECF No. 209, Page#4). The Court additionally granted Plaintiffs leave to file this supplement to their motion for class certification. (Id.) On Friday, August 12, 2022, Plaintiffs' filed their Motion for Class Certification. (ECF Nos. 215, 216.) In further support of their motion for class certification Plaintiffs state as follows:

## II. STATEMENT OF ADDITIONAL FACTS
## IN SUPPORT OF CLASS CERTIFICATION

### A.  <u>LABOR</u>

On August 24, 2022, Defendants provided their First Supplemental Response to Plaintiffs' Interrogatory No. 3, which identified two-hundred and fifty-one (251) total residents at TTS since November 27, 2010. Furthermore, of those two-hundred and fifty-one (251) putative class members, Defendants only identified five (5) from 2016 to present who did not participate in the activities to which Plaintiffs defined as manual labor.

On September 8, 2022, Ms. Woodward, who founded Trinity Teen Solutions in 2002, testified at her deposition that the following activities were typical duties of a ranch hand: shoveling manure, loading and unloading hay, clearing fields, conducting irrigation, mending broken fences, cleaning buildings, installation of new fence, disposing of dead animals, administration of vaccines to animals, castration of animals, cleaning of vehicles, and feeding of animals. (*See* Dep. Tr. of Angela Woodward ("A. Woodward Dep."), pp. 46:5 - 48:18.) She testified that cooking was not a typical duty of a ranch hand. (Id., p. 47:17-22.) However, she testified that female mental health residents of Trinity Teen Solutions conducted between ten (10) and all thirteen (13) of the aforementioned duties, including cooking, each year since 2010. (Id., pp. 49:21- 52:19)  A copy of Ms. Woodward's deposition is hereto attached as **EXHIBIT 1**.

Plaintiffs' counsel uncovered Trinity Teen Solutions' Ranch Safety Manual in preparation for Ms. Woodward's deposition buried deep in discovery documents, and marked only as TTS_033775. The document speaks for itself, and as such a copy of the Ranch Safety Manual is hereto attached as **EXHIBIT 2**.

A copy of the Ranch Safety Manual was provided to each female resident of TTS before they were forced to conduct any labor at TTS. (*See* A. Woodward Dep., p. 63:5-12), and Ms. Woodward approved the final version of the Ranch Safety Manual. (Id., p. 63:13-15.) Some of the

highlights of the manual labor the putative class members were forced to conduct are captured within this manual as follows:

> 1.    Pages two (2) through six (6) provide step-by-step instructions for female mental health residents of TTS on how to fix a fence;
> 2.    Pages six (6) through nine (9) of the manual provide step-by-step instructions on how to conduct irrigation;
> 3.    Pages ten (10) through thirteen (13) provide step-by-step instructions on how to care for animals;
> 4.    Pages twelve (12) through thirteen (13) of the manual provide step-by-step instructions on how to properly lamb;
> 5.    Pages thirteen (13) through fourteen (14) provide step-by-step instructions on how to stack hay; and
> 6.    Pages twenty-five (25) through thirty-one (31) provide step-by-step instructions on how to handle and properly prepare food for consumption.

 (Id., pp. 63:16-64:15).

Another deeply buried, yet wholly important document set which was not produced for over a year and a half into this litigation was TTS's orientation packet, which was only labeled as TTS_032424. The document set speaks volumes, specifically in its opening paragraph which states in part,

> Welcome to Trinity Teen Solutions. Just so you know right from the beginning: THIS IS NOT HORSE CAMP!!! This is not a vacation, and this is not a neat opportunity to learn some new survival skills. You chose to be here. Whether you knew you were coming or not, whether you were awoken in the middle of the night by a transport service or you got on the airplane for your own free will – YOU HAVE BEEN CHOOSING TO COME HERE FOR A VERY LONG TIME!!

A copy is hereto attached as **EXHIBIT 3**.

During the last ten years this orientation packet or some close version of it was provided to every female resident of TTS upon arrival at the facility, and it was developed by Ms. Woodward (*See* Id., pp. 20:16-21:1). It is doubtful that one could put it much more directly than when Defendants' orientation packet informed every single putative class member over the last ten years that they would:

be assigned outside chores and duties according to your abilities and the needs of the ranch. All chores must be done . . . please refer to the Ranch Safety Manual . . . The indoor and outdoor chores around the ranch are important, they matter, and if you shirk off during chores, you will be **held accountable** . . . you will be assigned other chores as needed.

(Exhibit 2, p. 3)(emphasis added).

When asked directly if Trinity Teen Solutions was a working ranch, Ms. Woodward initially flatly stated, "No." (A. Woodward Dep., p. 19:17-21.) When questioned if Trinity Teen Solutions advertised itself as a working ranch, Ms. Woodward stated, "There might have been in older terms, yes." (Id., p. 19:19-21.) Later when pushed on this subject, Ms. Woodward again testified, "No. it's a hobby ranch." (A. Woodward Dep., p. 37:16-24.) Despite these false statements, TTS's orientation packet informed every putative class member that "Trinity Teen Solutions was a "working ranch"  (Exhibit 2, p. 9) and that it was up to the putative class members "to begin the fight for [their] life." (Exhibit 2, p. 11). It was not until Ms. Woodward was confronted with TTS's orientation packet against her false statements that she conceded that TTS is a working ranch. (*See e.g.*, A. Woodward Dep., pp. 40:3 – 43:3).

Unfortunately, the fight for the putative class members' lives involved physical consequences, interventions, and discipline. When asked if any TTS employee had ever disciplined a resident for failing to conduct their chores Ms. Woodward responded that there were consequences for failing to participate and engage in a patient's treatment, including longer term in treatment. (*See* A. Woodward Dep. p. 23:6-18.) When asked what interventions in general a behavioral health assistant could assign to a putative class member if they failed to do their chores, Ms. Woodward deflected and merely stated that "if they failed to do chores they would just watch and [not] participate." (Id., pp. 23:25-24:6.)

Despite establishing the consequences and interventions for the program, when asked if putative class members could receive push-ups, Ms. Woodward stated she did not "know of any specific circumstances exactly what would happen if [putative class members] didn't do chores." (Id., p. 24:7-13.) Eventually, Ms. Woodward admitted that push-ups, jumping jacks, sit-ups, sprints, hill runs, and a list of some other physical activities could be used as consequences for certain infractions. (Id., p. 26:9-27:9).

Through a cursory review of the discovery responses for five of the putative class members sixty-six (66) pages of consequence logs were discovered. Those logs are hereto attached as **<u>EXHIBIT 4</u>**. Those consequences include push-ups, sprints, pull-ups, hill runs (*see e.g,.* Exhibit 4, pp. 1 – 28, 30), step-ups for failing to adequately complete the "Tidy Cabins Chore List" (Exhibit 4, p. 30), planks (Exhibit 4, pp. 31, 36), silence (Exhibit 4, pp. 43-49 51), life review (a/k/a "The Chair," Exhibit 4, pp. 31, 36, 51), being dropped a level (Exhibit 4, p. 29), and being placed on a bland food diet for failing to complete daily tasks timely, such as failing to timely feed or water the dog, sheep, or even simply asking a staff member questions. (Exhibit 4, pp. 53, 54.) These logs even include what is believed to be a "challenge" where putative class members would recommend "Judicial Action" against their fellow putative class members consisting of the above consequences. (*See* Exhibit 4, pp. 55-65).

When asked if an individual who refused to do their outdoor chores that TTS classified as treatment, would not be allowed to progress to the next higher-level, Ms. Woodward responded, "Those outside chores are interventions. They're therapeutic interventions, and their lack of participation just showed that they weren't participating in their treatment." (A. Woodward Dep., p. 33:14-20.) Given the opportunity to describe how irrigating farming fields was therapeutic, Ms. Woodward stated, in part, "Irrigating the field . . . was designed to be an experiential therapy" (Id.,

p. 33:21-24), it was used as a part of therapy of female residents of TTS from 2004 till 2019 (Id.,
p. 34:18-24), and that it was therapeutic. (Id., p. 43:12-22).

During Ms. Woodward's deposition, separate group therapy notes were reviewed and
indicated that Plaintiffs Amanda Nash and Carlie Sherman were conducting group therapy during
the hours of 8:00 a.m. and 9:30 a.m. on August 31, 2015, when in fact Ms. Nash and six other
putative class members were actually in the fields conducting irrigation (*See e.g.,* Id., p. 128:2 –
129:24.) Ms. Woodward's response to this discrepancy in treatment was that "the irrigation is the
group therapy." (Id., p. 129:24).

Ms. Woodward further testified that if she had not had the female mental health residents
of TTS to conduct irrigation, either she would have needed to hire ranch hands or the Woodwards
would have had to conduct irrigation themselves. (Id., p. 68:19-23.) She confirmed that TTS had
to spend money on hay in the winter months and that TTS did not have to spend money on hay
during the spring, summer, and fall because the fields produced foliage for TTS's animals. (*See*
Id., pp. 131:24 – 132:11).

She further confirmed her husband's testimony that TTS had only had two part time ranch
hands since 2010. (Id., pp. 68:24-69:19.) She testified that prior to 2014, a hundred percent of the
female mental health residents of TTS participated in irrigation and, that from 2014 on to 2019,
there might be a **_few girls_** that could not participate. (Id., p. 83:1-8.)  She testified that TTS's fields
required irrigation as early as April and as late as September and irrigation lasted anywhere
between one to two hours per day. (Id., pp. 87:1-88:2).

A cursory review of the Daily Supervision Checklists for the month of August in each of
the following years 2011 - 2017 and July 2018 indicate that eighty (80) putative class members
conducted irrigation throughout those identified months ranging from thirty minutes to four hours

per session and sometimes occurred twice per day. Those indicated Daily Supervision Checklists are hereto attached as collective **EXHIBIT 5**.

Another example of the extensive daily indoor and outdoor "chores" required to be completed by the putative class members is hereto attached as **EXHIBIT 6**. This Cabin and Ranch Chores list captures the indoor, outdoor, and ranch "chores" of seven (7) putative class members and includes seventy (70) separate "chores" to be completed daily.

**B.  SCHEME**

Since filing its motion for class certification, discovery has revealed additional relevant information. In 2016, TTS sued three former residents of TTS for defamation. A copy of TTS's complaint is hereto attached as **EXHIBIT 7**[1]. Part of the allegations brought against these former residents were that they wrote defamatory Yelp reviews and created a Facebook page where survivors of TTS could talk to each other about their experiences (*see* A. Woodward Dep., p. 154:21 -154:23.) Other former residents in 2015 drafted negative reviews which were placed on the world wide web. (Id., pp. 155:25 – 156:3, 163:15 – 164:3.) Despite these other negative reviews, TTS selected these individual women because they were the most prevalent, had the most content out on the internet, and had the most in-depth recounting of their experiences at TTS. (Id., p. 156:4-17.) Despite these statements supposedly defaming TTS to the extent that TTS brought suit against these three former residents, Ms. Woodward could not remember the specific facts about the reviews that were defamatory. (Id., p. 156:18-21.)

Following these negative reviews on the internet, Ms. Woodward admittedly authorized Kyle Woodward to create a false 5-star review of Trinity Teen Solutions to be posted on Facebook on April 30, 2015. (Id., p. 159:15-21.) TTS, through its owners and agents, the Woodward's

---

[1] Plaintiffs file Exhibits 1-7 contemporaneously under seal in accordance with each of the protective orders filed in this case.

created a fictitious Facebook profile under the name Laura Anderson for the review. For the fake profile photo, Kyle Woodward used the photo of a murder victim taken from a newspaper and used this profile to create a false advertisement of a positive experience at TTS. (Id., pp. 159:22 – 161:1). Despite this information being uncovered and discussed with Defendants earlier in this litigation, this despicable false advertisement is still on TTS's website and used to entice putative class members to attend TTS. Attached hereto as **EXHIBIT 8** is a copy of TTS's website's testimonial page captured on September 13, 2022.

TTS's problematic advertisements do not end there. TTS specifically hired BirdEye, an advertisement service whose algorithm excludes all one and two-star reviews, yet collects and consolidates reviews from multiple sources across the internet. (*see* A. Woodward Dep., pp. 161:2-12, 162:3-10.) As of September 8, 2022, TTS had a 2-star rating on Yelp, a 3-star rating on the Chamber of Commerce's website, and unsurprisingly a 4.9-star rating on BirdEye. (Id., p. 168:5-11.) Ultimately, when pushed on the subject of misleading advertisements, Ms. Woodward agreed that advertisements found on TTS's website do not capture the total experience of every girl that attended TTS. (*See* Id., p. 166:11-18.)

TTS used false advertisements and misleading advertisements to recruit new labor, and even went so far as to use the legal system to combat the truth of the experiences endured by putative class members. Here Defendants were willing to desecrate the memory of a murder victim and continue to do so to this day in furtherance of a fraudulent advertising scheme. The Defendants' complete lack of credibility has bearing on this case given that they have argued for purposes of class certification that this Court should disregard the affidavits of putative class members on the basis of credibility.

## III.   ARGUMENT

### A.   Plaintiffs Satisfy the Requirements of Rule 23(a)

#### 1.   Numerosity

The proposed class is so "numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Where there are likely more than 40 class members, numerosity is presumptively satisfied.  NEWBERG § 3:12.  When analyzing numerosity, a district court uses its common sense. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012).  Only a "reasonable estimate" is required to establish numerosity.  *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 480 (S.D. Ohio 2004).

Again, the claims of the Plaintiffs and putative class members here should be certified under Rule 23.  Ms. Woodward herself estimated that between 250 and 300 girls came through TTS since 2010. (A. Woodward Dep., pp. 77:7 – 78: 79:22).

#### 2.   Commonality & Typicality

The proposed classes also meet the commonality requirement of Rule 23(a)(3).  Plaintiffs' claims are also "typical of the claims . . . of the class." Fed. R. Civ. Proc. 23(a)(3).   A representative's claim is typical if it arises from the same conduct that gives rise to the claims of other class members and if his or her claims are based on the same legal theory. *Beattie v. Century Tel., Inc.*, 511 F.3d 554, 561 (6th Cir. 2007); *Kerns*, 2007 WL 2044092, at *5.

Out of the estimated hundreds of putative class members, Ms. Woodward testified that "maybe one to three patients that just couldn't and wouldn't participate" in the thirteen categories of typical duties of a ranch hand discussed in her deposition. (Id., p. 80:4-13). The Court should grant class certification in this instance. While Defendants insist on using the term "chores" to mislead the Court as to the type of activities that the putative class was required to perform, if certified, the putative class will be required to prove that the "chores" constitute "forced labor" in

violation of the TVPRA. If successful, the Plaintiffs would have proved this element of their claim for every putative class member who performed any of these "chores." As a result, while Defendants admit that all "but a few" of the proposed class members performed "chores," the fact some residents may not have actually participated in any given "chore" at best implies a question of damages or might require a review of a specific document in a specific resident's individual file to determine whether they were one of the "maybe one to three patients who just couldn't or wouldn't participate." Questions of individual damages cannot serve to deny class certification of a TVPRA class. The fact that damage may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Menocal*, 882 F.3d at 922 (quoting *Roderick*, 725 F.3d at 1220)).  Furthermore, the damages to the class members as a whole is a simple mathematical calculation based upon the number of hours worked.

## IV.   THE COURT SHOULD APPOINT PLAINTIFFS' COUNSEL AS CLASS COUNSEL

Should the Court grant Plaintiffs' motion for class certification, it must appoint class counsel. Fed. R. C. P. 23(g). Plaintiffs' counsel request appointment as class counsel.

Again, collectively they have invested significant time in identifying and investigating potential claims in this action. The team of attorneys representing Plaintiffs has significant class action experience and many have served as class counsel. Moreover, the varied litigation experience of the team will be beneficial to the classes' pursuit of claims here. Furthermore, Plaintiffs' counsel are committed to advancing the costs of this litigation.  (*See generally* ECF Nos. 215-41, 215-38, Watson Decl. and Timmons Decl.).

WHEREFORE, Plaintiffs request that:

1.   The Court certify the class;
2.   The named Plaintiffs be named class representatives of the class;
3.   And that Plaintiffs' counsel be appointed as class counsel.

Dated: September 15, 2022.

Respectfully submitted,

**DONATI LAW, PLLC**

*/s/ Craig A. Edgington*
Craig A. Edgington (TN Bar #36205)
Brice M. Timmons (TN Bar #29582)
Bryce W. Ashby (TN Bar #26179)
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
craig@donatilaw.com
brice@donatilaw.com
bryce@donatilaw.com

William E. Routt, III *(Pro Hac Vice)*
Frank L. Watson, III, *(Pro Hac Vice)*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of September 2022, a true and correct image of the foregoing was served via the Court's ECF filing system and email upon the following:

Thomas Quinn (WY: #5-2630)
Lillian L. Alves (Pro Hac Vice)
Lindsey M. Romano (Pro Hac Vice)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
tquinn@grsm.com
lalves@grsm.com
lromano@grsm.com

*/s/ Craig A. Edgington*