Melissa J. Stewart (TN Bar #40638)
Brice M. Timmons (TN Bar #29582)
Craig A. Edgington (TN Bar #36205)
Bryce W. Ashby (TN Bar #26179)
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
melissa@donatilaw.com
brice@donatilaw.com
craig@donatilaw.com
bryce@donatilaw.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com

William E. Routt, III *(Pro Hac Vice)*
Frank L. Watson, III, *(Pro Hac Vice*)
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN**, **ANNA GOZUN**; AND **AMANDA NASH** ON BEHALF OF THEMSELVES AND ALL SIMILARLY SITUATED PERSONS,<br><br>                    PLAINTIFFS,<br><br>VS.<br><br>**TRINITY TEEN SOLUTIONS, INC.**, A WYOMING CORPORATION; **ANGELA C. WOODWARD**; **JERRY D. WOODWARD**; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL DOC. NO. 2:20-CV-215-SWS<br>)<br>) |

1

| | |
|---|---|
| **KARA WOODWARD**; **KYLE WOODWARD**; AND **DALLY-UP, LLC,** A WYOMING LIMITED LIABILITY CORPORATION,<br><br>           DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' SUPPLEMENTAL BRIEF ON CLASS CERTIFICATION

Plaintiffs Carlie Sherman, Anna Gozun, and Amanda Nash, on behalf of themselves and all similarly situated persons, (hereinafter "Plaintiffs"), respectfully submit their Supplemental Brief on Class Certification.

**I.   Whether Plaintiffs Have Proposed an Impermissible Fail-Safe Class Definition**

   **A.  Plaintiffs have not proposed a fail-safe class definition.**

In their Motion for Class Certification, Plaintiffs proposed the following class definition:

From November 27, 2010, to the present, Plaintiffs, and all similarly situated person who received treatment from Defendant Trinity Teen Solutions, Inc. and were subjected to the provision of "agricultural labor" (as defined 26 CFR § 31.3121(g)(1)) or any other manual labor to one or more of the Defendants without payment for said labor.

ECF 215 at PageID 12. Defendants incorrectly claim that Plaintiffs' proposed class has created a "fail-safe class." Specifically, at the Court of Appeals, Defendants argued that since "the class membership depends on whether the individual was 'subjected to . . . labor,'" it creates a fail-safe class. Circuit courts are split on whether a fail-safe class definition is an independent reason to deny class certification, and the Tenth Circuit has not yet addressed the issue. This Court need not address this unsettled question of law, because Plaintiffs have not proposed a fail-safe class here.

A class is fail-safe when "determining membership turns on the merits of the individual class members' claims." *Stallbaumer v. Nextera Energy Res., LLC*, No. 22-CV-04031-HLT-ADM, 2023 U.S. Dist. LEXIS 86756 (D. Kan. May 17, 2023). *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012); *In re. White*, 64 F.4th 302, 313 (DC Cir. 2023).

Consider a simple hypothetical in which plaintiffs alleging sex discrimination in violation of Title VII define the class as, "all women who experienced unlawful discrimination on the basis of sex while they were employed at Company X." This definition is circular. The purpose of the litigation is to determine whether Company X unlawfully discriminated against employees on the basis of sex. Membership in the class requires a determination on the merits.

A truly fail-safe class raises several concerns that are not present here. The first concern is that "if membership in a class depends on a final resolution of the merits, it is administratively difficult to determine class membership early on." *In re White*, 64 F.4th at 313. That is not an issue in the present case, where the record is replete with Defendants' admissions detailing the agricultural and other labor that residents at TTS performed. Defendant Kyle Woodward, who has served as the assistant director of Trinity Teen Solutions since 2015, testified at his deposition that he witnessed TTS residents conducting the following typical duties of a ranch hand at TTS since 2015: loading and unloading hay, clearing fields for planting, conducting irrigation, mending broken fences, cleaning buildings on the ranch, cooking, disposing of dead animals, the administration of vaccines, the castration of animals, cleaning of ranch vehicles, the feeding of animals, and the grooming of animals. ECF 216-3, pp 23:20-25:24; 28:12-31:20. Defendant Jerry Woodward, administrative director and owner of TTS since its inception in 2002, testified that the above-enumerated duties were typical of a ranch hand, with the exception of cooking and the addition of installing new fences. ECF 216-4, pp. 38:1-39:24. Defendant Jerry Woodward also testified that between 2010 and 2018, TTS residents conducted between five and twelve of the listed typical duties in a given year, depending on which animals the ranch maintained at any given time. *Id.* pp. 44:1-45:19. Finally, Defendant Angela Woodward testified that over the entire ten-year class period, no more than three residents would have been exempted from this labor for any

reason. She was unable to identify any specific residents. ECF 235-1, 46:5-48:18; 49:21-52:19; 79:23-80:18.

Additionally, Defendants kept records and written policies regarding the labor performed by residents. The TTS Ranch Policies and Procedures manual explains how to fix fencing, manually irrigate fields, care for sick and injured animals, lamb, stack hay, and more. *See generally,* ECF 235-2. The TTS Orientation packet states that residents "will be assigned outside chores and duties according to your abilities and the needs of the ranch." ECF 235-3, p. 3. Defendants also maintained Daily Supervision Checklists, where staff tracked the daily activities of residents, including when they were doing hay runs, irrigation, or working on neighboring ranches. *See generally*, ECF 235-5. In light of Defendants' own testimony and records, the Court would have little problem determining membership in the class. Everyone who attended TTS during the ten-year limitations period should be deemed a class member, and the onus should be placed on Defendants to identify the alleged three or fewer individuals who would not be part of this class of hundreds.

The second concern is that, if the only members of the class are those who succeed on the merits, then either "the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). When a plaintiff loses on the merits, she is "defined out of the class, escaping the bars of *res judicata* and collateral estoppel." *In re White*, 64 F.4th at 313. Put simply, a fail-safe class permits a plaintiff to seek resolution through the class action, and if she loses, she may subject the defendant to further litigation on the same grounds.

That concern is not present here, because a determination that a Plaintiff conducted labor is not a finding of Defendants' liability. Liability under the TVPRA requires much more than the

4

mere *occurrence* of labor. To succeed on the merits of their claim, Plaintiffs must demonstrate that Defendants:

> knowingly provide[d] or obtain[ed] the labor or services of a person by any one of, or by any combination of, the following means—
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint . . . .

18 U.S.C. § 1595(a). Or they must prove that Defendants:

> knowingly benefit[ted], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

18.U.S.C.§1589(c)(2).

The labor clause in the proposed class definition does not require a determination of merits but of *standing*. As Defendants explained to the Tenth Circuit on appeal, class membership "includes only those individuals injured by the allegedly unlawful conduct." Appellee Br. at p 28. Defendants are correct, because an injury traceable to the defendant's alleged conduct is the Article III threshold requirement of *all plaintiffs*, individually or as a class. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("Every class member must have Article III standing in order to recover individual damages."). Showing that a plaintiff did in fact perform labor is a necessary – but not a sufficient – condition for liability under the TVPRA. If Defendants show that a specific resident at TTS did not conduct any labor, then that plaintiff would drop out of the class.

But that plaintiff would not have standing to bring an individual forced labor claim against Defendants in this case. There is minimal risk that the plaintiff will "subject the defendant to another round of litigation." *Banks v Cent. Refrigerated Servs.*, No. 2:16-CV-356-DAK, 2017 U.S. Dist. LEXIS 67423 (D. Utah May 2, 2017) (quoting *Mullins v. Direct Digital, LLC.*, 795 F.3d 654, 660 (7th Cir. 2015)).

To the contrary, because of the uniquely long statute of limitations contained in the TVPRA and the passage of time during this litigation, virtually any other claims of TTS residents arising under the alleged facts would be time barred or will be by the time of a trial on the merits. By contrast, all TVPRA claims are tolled for the very purpose of permitting this Court to resolve *all* TVPRA claims against Defendants to avoid multiple rounds of litigation. As the Supreme Court held in *China Agritech, Inc. v. Resh,* "*American Pipe* tolls the limitation period for individual claims because economy of litigation favors delaying those claims until after a class-certification denial. If certification is granted, the claims will proceed as a class and there would be no need for the assertion of any claim individually." 584 U.S. 732, 740 (2018).

This case does not present the concerns courts seek to avoid by rejecting fail-safe classes. Indeed, without the labor clause, Plaintiffs would risk an overbroad definition, inclusive of members who would not have standing to bring the case on their own behalf. *See Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 654, 660 (7th Cir. 2015) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant."). Plaintiffs have crafted a definition that requires standing as a threshold for membership but does not depend on a finding of liability. Thus, it is not a fail-safe class.

### B. A fail-safe class definition should not independently defeat class certification.

Circuit courts are split on whether fail-safe class definitions are an independent cause for denying class certification. The Sixth and Eighth Circuits treat a fail-safe class definition as an independent bar to certification. *See Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (Noting that a fail-safe class is an independent ground for denying class certification.); *Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021) (Holding that fail-safe class definitions are an independent basis to reverse class certification). The Fifth, Seventh, and D.C. Circuit courts disagree. *See Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 n.1 (5th Cir. 1999) ("[T]he fact that the class is defined with reference to an ultimate issue of causation does not prevent certification."); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 235 (7th Cir. 2012) (Holding that a fail-safe class "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis."); *In re. White*, 64 F.4th 302, 313 (DC Cir. 2023) ("We hold that the court abused its discretion by denying the amended class certification motion based on a stand-alone and extra-textual rule against 'fail-safe' classes . . ."). The Tenth Circuit has not yet addressed whether fail-safe classes are an independent bar to class certification.

Should the Court determine that Plaintiffs *have* proposed a fail-safe class definition, that finding should not be independent grounds for denying class certification. The D.C. Circuit's reasoning in *In re White* is instructive. There, plaintiffs brought ERISA claims against their employer and moved to certify a class which included all employees who had "been denied vested rights to retirement benefits." *In re White*, 64 F.4th at 305. The district court determined that whether retirement benefits had vested under ERISA was a merits issue, and denied class certification.

On appeal, the D.C. Circuit acknowledged the "two main problems" which a fail-safe class presents: 1) it is difficult to determine class membership at the certification stage, and 2) class members who lose on the merits are not bound by the judgment. *Id.* at 313. However, the *White* court rejected a categorical rule against fail-safe class definitions, which it considered "a textually untethered and potentially disuniform criterion," and an impermissible departure from Rule 23's specific requirements. "[C]ourts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns." *Jones v. Bock*, 549 U.S. 199, 212 (2007). A fail-safe class definition "is only truly troubling to the extent it hides some concrete defect with the class." The D.C. Circuit held that "the protocol for determining if a class definition is proper is to apply the terms of Rule 23 as written. Doing so should eliminate most, if not all, genuinely fail-safe class definitions." *In re White*, 64 F.4th at 314.

The sound nature of this reasoning becomes readily apparent upon application. The first Rule 23(a) requirement is numerosity. The class, as defined at the certification stage, must be too numerous for the joinder of all individual class members to be practicable. Fed. R. Civ. P. 23(a)(1). Apply this to the hypothetical Title VII sex discrimination class, which was defined as, "all women who experienced unlawful discrimination on the basis of sex while they were employed at Company X." *See supra* at 2. It is impossible to determine how many members would comprise the class, because membership is determined by success on the merits. If no class member succeeds on the merits of her claims, then the class could have *zero* members. Thus, this class definition fails numerosity.

"Similarly, a circular class definition could reveal the lack of a genuinely common issue of law or fact." *In re White*, 64 F.4th at 314. In the Title VII hypothetical, it is not sufficient that the class members all suffered discrimination on the basis of sex; "Rule 23 does not allow for such a

30,000 foot view of commonality." *Id.* at 314. Rule 23's commonality requirement considers "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Title VII can be violated in any number of ways – improper hiring or promotion criteria, intentional discrimination, or official policies which cause a disparate impact. It is possible for dozens of employees at the same company to suffer violations of Title VII and still lack commonality or typicality. A fail-safe class definition which seeks to disguise these flaws may be properly disposed of by applying Rule 23.

Conversely, Plaintiffs here have alleged that all individuals who attended TTS during the proposed class period performed agricultural labor that violated the TVPRA. Plaintiffs have supported this with substantial evidence in the form of TTS records, affidavits of putative class members, and the testimony of Defendants themselves. Defendant Angela Woodward testified that only three unknown individuals might possibly fall outside of the class definition, allowing these issues to be resolved for the entire class in one fell swoop. This definition is not circular. It undisputedly includes nearly every TTS resident from the beginning of the statute of limitations to present. Should Plaintiffs lose on the merits, the judgment would bind any person who had standing to bring suit.

Should the Court determine both that that Plaintiffs have proposed a truly "fail-safe" class and that fail-safe classes are an independent bar to certification in the Tenth Circuit, Plaintiffs would ask that the Court alter the definition to eliminate the problem, either *sua sponte* or with guidance to and input from the parties. A fail-safe class "can and often should be solved by refining the class definition rather than flatly denying class certification on that basis." *Messner*, 669 F.3d at 825. Plaintiffs would not object to removing the labor clause from the class definition. In light of Defendant Angela Woodward's testimony that no more than "one to three" residents during the

statutory period were ever exempted from labor, the risk of an unmanageably overinclusive class are minimal, and could easily be dealt with after class certification. ECF 235-1, p. 80:4-13.

## II. Whether the Common Issues Predominate Over the Individual Issues

The predominance criterion "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). The Court must consider "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1194 (10th Cir. 2023) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal citations omitted)).

The Tenth Circuit has identified a two-step analysis: "First, for every issue related to the claim, the court must characterized it as common or individual." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 838 (10th Cir. 2023). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Bouaphakeo*, 577 U.S. at 453 (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-197 (5th ed. 2012)). Second, the court "must then weigh the issues to determine whether the common issues predominate." *Brayman*, 83 F.4th at 838. "It is not necessary for a plaintiff to show that all the elements of the claims entail questions of fact and law that are common to the class or that the answers to those common questions are dispositive." *Id.* (cleaned up; internal quotations omitted). "Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3) – even if there remain individual issues, such as damages, that must be tried separately." *Harrel's LLC v. Chaparral Energy, LLC (Naylor Farms, Inc.)*, 923 F.3d 779, 789 (10th Cir. 2019).

In considering whether a question is common or individual, the court should consider the specific elements of the underlying claim. *See Sherman*, 84 F.4th at 1195 (holding that a district court should evaluate each element of a claim to determine which elements are subject to class-wide proof, and which require individual proof). To succeed on their claim under § 1589(a), Plaintiffs would need to prove that Defendants (1) that Defendants knowingly (2) coerced class members by means of the use, threat of, or a scheme intended to threaten, serious harm or physical restraint (3) to perform labor. *See* 18 U.S.C. § 1589(a)(1)-(4); *Menocal*, 882 F.3d at 918. For their § 1589(b) claim, the proposed class would further need to show that Defendants "knowingly benefit[ted], financially or by receiving anything of value, from participation in a venture which has engaged" in the acts prohibited by § 1589(a). 18 U.S.C. § 1589(b). To show liability under § 1590(a), Plaintiffs would need to show Defendants "knowingly recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed] by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1195 (10th Cir. 2023). These elements are all amenable to class-wide resolution.

### A. Knowledge

In *Menocal v. GEO Grp.*, the Tenth Circuit found that because "evidence in the record shows GEO's agents drafted and had knowledge of the responsible policies, individualized review of each officers' specific actions is not required." *Menocal*, 635 F.Supp. at 1195. The same is true in this case. Defendants Angela and Jerry Woodward are the owners and directors of TTS. ECF 235-1, 97:14-16; ECF 216-4, 27:13-21. Defendant Kyle Woodward served as the Assistant Director of TTS. ECF 216-3, 17:1-2. Defendant Kara Woodward served as the Staff Supervisor at TTS. ECF 225-20, 73:14-20. Defendant Angela Woodward testified that she developed and approved the TTS Policies and Procedures Manual, which details how residents must perform

11

certain labor, including repairing fencing, manual irrigation, care of animals, stacking hay, lambing, and food preparation. ECF 235-1, 61:20-64:34. She also testified that every female resident of TTS has read the Manual. *Id.* at 63:8-10. Defendant Jerry Woodward testified that he is "responsible for the overall operations of field operations at TTS." ECF 216-4, 47:4-8. He also testified that between 2010 to 2022, TTS residents had performed between 5 and 12 different types of agricultural labor. *Id.* at 44:1-47:21. *See also*, ECF 216-3, 23:20-25:24; 28:12-31:20 (testifying that he witnessed female health residents of Trinity Teen Solutions conduct at least 12 different types of labor typical of the duties of a ranch hand). As Staff Supervisor, Kara Woodward was involved in making daily decisions about TTS residents, including what work they were tasked with performing and the consequences if they failed to do so. ECF 225-20, 70:18-71:12.

Defendants owned, managed, and operated the same program, using uniform policies and procedures known to staff, residents, and Defendants themselves. It would not be possible to own, operate, and manage TTS without knowing the basics about how TTS advertised and operated the program. Defendants knew what kind of marketing TTS used persuade parents to send their children to TTS; they knew that agricultural labor was a central element of the TTS program; that residents were minor children who were not there of their own free will; that residents faced punishments and prolonged stays if they refused to labor; and that TTS and Defendants all benefitted from the free labor. An individual plaintiff would rely on the same depositions, records, and circumstantial evidence as a certified class. Thus, the knowledge element of Plaintiffs' claims are susceptible to class-wide proof.

### B. Labor

Whether Plaintiffs performed "labor" during their time at TTS is similarly amenable to class-wide proof. As explained above, Defendants developed and implemented the TTS Policies

and Procedures Manual, which instructs residents on how to perform certain types of labor. ECF 235-2. Additionally, Defendants kept some records of which ranch duties residents performed on a daily basis. ECF 235-5. Angela Woodward testified that no more than three residents were exempted from labor during their time at TTS; she could not identify any resident in particular. ECF 235-1, 46:5-48:18; 49:21-52:19. As previously discussed, if Defendants were able to show that a specific plaintiff did not perform any labor during her time at TTS, that plaintiff would drop out of the class and would lack standing to bring forced labor claims individually. The labor element of Plaintiffs' claims are common to the class.

### C. Coercion and Causation

The Tenth Circuit has held that "when a class member could individually establish causation based on circumstantial evidence, a court may likewise allow a class to rely on circumstantial evidence that the class shares to establish causation on a class-wide basis." *Menocal*, 882 F.3d at 919 (quoting *CGC Holding Co.*, 773 F.3d at 1091-92). *Menocal* was a forced labor class action brough by current and former detainees of a private immigration detention center, owned and operated by The GEO Group, Inc. (GEO). Plaintiffs alleged that GEO's "sanitation policy," which required detainees to clean common areas under disciplinary action, violated §§ 1589 and 1595 of the TVPA. The precise facts of each class member's experiences varied: they were detained for varying lengths of time, performed varying sanitation-related labor with varying frequency. However, all class members were held in the same facility, owned and operated by the same defendants. They all labored under force or threat of force, because of a single scheme or plan – GEO's sanitation policy. Therefore, the district court in *Menocal* granted class certification, and the Tenth Circuit affirmed. *Id.*

This case is closely analogous to *Menocal*. Plaintiffs were all residents at the same facility; they all underwent the same program; that program was marketed, owned, and operated by the same Defendants. Thus, if this case were litigated on an individual basis, each of the individual Plaintiffs would rely on the deposition testimony of Defendants regarding how TTS recruited residents; how the program was run; what labor was expected of residents; and whether that labor was obtained through coercive means prohibited by the TVPRA. Additionally, an individual plaintiff could rely on the following circumstantial evidence to prove that she performed labor because of force of threat of force:

1) TTS's Orientation materials, which state that if a resident chose not to cooperate, her time at TTS, "will be difficult and long." The manual states that "chores around the ranch are important, they matter, and if you shirk off during chores, you will be held accountable" and "will experience the consequences." Residents' compliance "will directly impact your progress through the level system," and the manual describes the program as "the fight for your life" ECF 235-3;

2) The 66 pages of consequence logs produced by Defendants through discovery. The recorded consequences include push-ups, sprints, pull-ups, hill runs, step-ups, silence, life review (i.e. "The Chair"), being dropped a level, and being placed on a bland food diet ECF 235-4; and

3) The Daily Supervision Checklists maintained by Defendants. ECF 235-5.

Because Defendants operated a single, uniform program which all class members participated in, the coercion and causation elements of Plaintiffs' claims are readily susceptible to classwide proof.

### D. Obtaining Labor

Finally, whether Defendants "recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed]" plaintiffs for labor is amenable to classwide proof. Families were promised quality education and cutting-edge therapies, including reality therapy, experiential therapy, strategic therapy, animal assisted therapy, group therapy, rational emotive behavioral therapy, eye movement desensitization reprocessing, cognitive restructuring, career counseling, and more. ECF

106-1 at 13. Plaintiffs allege that they never received legitimate mental health treatment or education. Instead, Defendants forced residents to work on the ranch for hours every day. Once a child arrived at TTS, her ability to advance through the program – and thus go home – was directly tied to her willingness to perform free labor for Defendants' benefit. *See generally*, ECF 235-3.

It is unnecessary to make an individual inquiry into whether each child was transported via "legal kidnapping" at the suggestion of Defendants, transported by Defendants themselves, or whether parents personally brought their child to TTS. Section 1590 does not require Defendants themselves to have physically transported Plaintiffs to TTS. Rather, Plaintiffs allege that Defendants used a uniform scheme of false advertising and fictional online reviews to recruit, harbor, and *obtain* the labor of vulnerable, minor children. There is no dispute that the Defendants engaged in a uniform scheme of advertising. There is no dispute that TTS "harbor[ed]" their residents, and whether the labor obtained violated § 1589 is subject to class-wide proof. Plaintiffs' § 1590 claims are also susceptible to class-wide proof.

\*\*\*

Each element of each of Plaintiffs' claims is amenable to classwide proof. Thus, the issues common to the class predominate over any individual questions in this matter.

### III. Whether Partial Class Certification is Warranted

Partial class certification is not warranted in this case, because individual damages may be efficiently determined by establishing an hourly or daily wage to compensate class members for the labor they were forced to perform. A trier of fact may also determine an additional *per diem* rate to compensate for the emotional distress which class members suffered during their time at TTS. Other triers of fact have awarded emotional distress damages to TVPRA victims in amounts ranging from $415 to $780 per day. *Ross v. Jenkins*, 425 F.Supp. 3d at 1174. *See also Gurung v.*

*Malhotra*, 851 F.Supp. 2d 583, 594-95 (S.D.N.Y. 2012). In *Ross*, the plaintiff had been held against her will and forced to labor for ten years – from the ages of 11 to 21. Certainly, the emotional harm she suffered over such an extensive period of time varied from day to day, and year to year. The conditions of her confinement may have been better in some years than in others; what harms an 11-year-old child may not have the same effect on a 20-year-old woman. Yet the court awarded a single, per-day rate to compensate plaintiff for all ten years of her suffering. *Ross*, 325 F.Supp. 3d at 1174.

The same logic applies in this case. Class members may have experienced different lengths of residency, and depending on the year and seasons they were at TTS, they may have performed varying kinds of agricultural labor. But Plaintiffs allege that *all* class members performed agricultural labor as part of the same, uniform scheme at TTS. They were subjected to the same program of labor across the board and faced the same or similar forms of coercion. Dr. Sara Boyd, the sole expert witness opinion on this issue in the record, stated in her report that the type and nature of the psychological trauma suffered by the various individuals she has interviewed are substantially similar. ECF 216-2 at 6. If Plaintiffs can prove their allegations, it would be reasonable for emotional damages to be awarded as a set, *per diem* rate that applies to the entire class.

Alternatively, following trial but before submission to the jury, the Court could make a determination among several options. The Court could instruct the jury to craft a *per diem* award, which Plaintiffs propose is likely the fairest to all class members; to make an overall award and either apportion the award itself or appoint a magistrate judge or a special master to do so; or modify the class in accordance with Fed. R. Civ. P. 23(c)(1)(C) to certify the class as to liability only and provide notice to class members of their entitlement to a trial as to damages. The final

option, at least, would remain open to the Court up until the entry of final judgment. Thus, limiting a class to partial certification at this point would be contrary to principles of judicial economy and would constrain rather than preserve the Court's discretion to act at a later time..

## CONCLUSION

For the foregoing reasons, Plaintiffs ask that this Court grant their Motion for Class Certification.

Respectfully submitted,

**DONATI LAW, PLLC**

*/s/ Melissa J. Stewart*
Melissa J. Stewart (TN Bar #40638)
Brice M. Timmons (TN Bar #29582)
Craig A. Edgington (TN Bar #36205)
Bryce W. Ashby (TN Bar #26179)
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38103
(901) 278-1004 – Phone
(901) 278-3111 – Facsimile
melissa@donatilaw.com
brice@donatilaw.com
craig@donatilaw.com
bryce@donatilaw.com

William E. Routt, III *(Pro Hac Vice)*
Frank L. Watson, III, *(Pro Hac Vice)*
Watson Burns, PLLC
253 Adams Avenue
Memphis, TN 38103
(901) 529-7996
fwatson@watsonburns.com
wroutt@watsonburns.com

Michael Rosenthal, WSB #5-2099
Nathan Nicholas, WSB #7-5078
Hathaway & Kunz, LLP
P.O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
Fax:  (307) 634-0985
mrosenthal@hkwyolaw.com
nnicholas@hkwyolaw.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of March, 2024, a true and correct image of the foregoing was served via the Court's ECF filing system and email upon the following:

Thomas Quinn (WY: #5-2630)
Lillian L. Alves (Pro Hac Vice)
Lindsey M. Romano (Pro Hac Vice)
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth Street, Suite 3400
Denver, CO  80202
Telephone: (303) 534-5160
tquinn@grsm.com
lalves@grsm.com
lromano@grsm.com

                                                        */s/ Melissa J. Stewart*