

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **CARLIE SHERMAN, ANNA GOZUN,** and **AMANDA NASH**, on behalf of themselves and all similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>**TRINITY TEEN SOLUTIONS, INC.**, a Wyoming corporation; **ANGELA C. WOODWARD; JERRY D. WOODWARD; KARA WOODWARD; KYLE WOODWARD**; and **DALLY-UP, LLC**, a Wyoming limited liability company,<br><br>Defendants. | Case No. 2:20-CV-215-SWS |

---

## ORDER GRANTING CLASS CERTIFICATION FOLLOWING REMAND

---

This matter is back before the Court on Plaintiffs' request for class certification (ECF 215) and Defendants' opposition. The Court previously denied class certification (ECF 247), from which Plaintiffs took an interlocutory appeal. The Tenth Circuit vacated the class certification denial and remanded the matter for further consideration by this Court. *Sherman v. Trinity Teen Solutions, Inc.*, 84 F.4th 1182 (10th Cir. 2023). Following remand, the parties submitted supplemental briefing on the issue. (ECF 277, 279.) Having further considered the issue under the Tenth Circuit's guidance, the Court finds and concludes class certification is warranted.

## INTRODUCTION

Plaintiffs' putative class action alleges the parents of "troubled teen" female minors

paid to send their children to a working ranch in northern Wyoming where the teens were supposed to receive various forms of traditional and cutting-edge therapy and schooling to address their misbehavior.  Plaintiffs are the former teenaged residents of the ranch, and they contend the ranch was light on the education and therapy, and instead largely forced the teenagers to labor for many hours per day under horrible conditions.  They allege each Defendant was either directly involved with the scam or knowingly benefitted from the forced labor.  Plaintiffs assert three federal causes of action under the Trafficking Victims Protection Reauthorization Act (TVPRA) for: (1) knowingly providing or obtaining unlawful forced labor under 18 U.S.C. § 1589(a), (2) knowingly benefitting from unlawful forced labor under 18 U.S.C. § 1589(b), and (3) knowingly trafficking a person for unlawful forced labor under 18 U.S.C. § 1590(a).

The Wyoming ranch is owned and operated by Defendant Trinity Teen Solutions, Inc. (Trinity).  Named Plaintiffs are three women whose parents/guardians sent them to Trinity (at significant cost to the parents/guardians) at various times during the Named Plaintiffs' teenage years for behavioral modification.  The other defendants in this case owned and operated Trinity, worked in a supervisory capacity at Trinity, and/or allegedly benefited from the forced labor.

On interlocutory appeal, the Tenth Circuit set forth the relevant factual history, which was drawn from Plaintiffs' amended complaint, motion for class certification, and evidence submitted by the parties, and it is accepted as true for purposes of this class certification determination:

Jerry and Angela Woodward, a married couple, opened Trinity in 2002, as a

residential treatment center integrated with their ranch in Park County, Wyoming. Angela was a licensed registered nurse and, prior to opening Trinity, had worked at her father's ranch-based group home, Mount Carmel. Jerry had no experience in mental health treatment prior to opening Trinity but had experience working on ranches. Like Angela, Jerry had previously worked at Mount Carmel. Together, they opened Trinity with the goal of providing treatment to troubled girls in a non-traditional setting. Jerry's and Angela's adult children, Kyle and Kara Woodward, also worked at Trinity. Together, the Woodwards co-owned, managed, and were members of Dally-Up LLC, which in turn owned the land where Trinity was located.

Trinity advertised itself as a treatment center that "challenge[d] young women to create healthier lives and make appropriate choices which honor God, self, and others" in a "wilderness ranch setting" using "animal assisted therapy and [] individual care plan[s]." Trinity's handbook stated that it treated residents with a holistic approach, using ranch work, school, therapy, nutrition, physical exercise, and spiritual exercises to help residents change their behaviors. The minimum stay at Trinity was forty-five days, but typical stays ranged from twelve to eighteen months. Plaintiffs allege Trinity arranged with parents for girls to enter its treatment program, often utilizing a "legal kidnapping" transportation method, where girls would be taken from their homes, with their parent's or guardian's consent, to Trinity with no notice. Prior to their children being admitted at Trinity, parents signed informed consent forms which described the nature of Trinity's program. Specifically, the consent forms stated:

> I/We understand that my daughter will be involved in all activities that occur on any working ranch. This includes and is not limited to: Horseback riding in the mountains, irrigating, fence building, building structures, cleaning barns and corrals, feeding, watering, and exercise of animals, veterinary medicine and all the care related to working with livestock (doctoring, immunizing, roping, branding, labor and delivery, breeding, feeding, watering, pushing and loading in chute) etc.

Parents also acknowledged by signature that they "underst[ood] that [Trinity's] program is physically demanding, rigorous, dangerous, stressful and psychologically, emotionally and spiritually challenging for the student."

Once residents arrived at Trinity, their contact with their parents was limited to supervised telephone calls and letters reviewed by Trinity staff members. Trinity operated on a six-level system, where residents started at level one and were considered ready to graduate once they reached level six. Residents

who did not comply with program requirements faced the possibility of demotions in level. Residents' daily routines at Trinity included preparing and eating three meals a day; schoolwork; journaling; spiritual study assignments; physical exercise assignments; indoor chores like cooking, cleaning, and doing laundry; and ranch chores such as stacking hay, caring for animals, and moving irrigation lines.

Upon arrival, new residents were given a Ranch Policies and Procedures Manual that included instructions on how to fix fences, irrigate, take care of animals, birth lambs, stack hay, feed hay, use the wood burning stove, safely prepare food, and wash dishes. New residents were also informed, through an introductory packet entitled the Holy Cowgirl Manual, that they would be "assigned outside chores and duties according to [their] abilities and the needs of the ranch.... The indoor and outdoor chores around the ranch are important, they matter, and if [the residents] shirk[ed] off during chores, [they] [would] be held accountable." Typically, all residents at Trinity worked on the ranch and on household chores like cooking meals, cleaning dishes, and doing laundry. When they failed to complete assigned tasks, residents were given consequences such as having to do push-ups, run up and down a hill, or being demoted a level and, accordingly, facing a longer stay at Trinity. Plaintiffs' lawsuit focuses on the ranch and household chores Trinity assigned to its residents, and the consequences they faced for not doing these tasks.

Plaintiffs Carlie Sherman, Anna Gozun, and Amanda Nash were all sent as minors to Trinity by their parents. Ms. Sherman participated in Trinity's program twice, once from May 2012 through July 2013, and a second time from July 2014 through October 2015. Ms. Gozun was a resident at Trinity from February 2012 through July 2012. Ms. Nash was a resident at Trinity from May 2015 through November 2015. Plaintiffs' proposed class includes residents who participated in Trinity's program from November 27, 2010, to the present.

*Sherman*, 84 F.4th at 1188–90 (footnote and citations to appellate record omitted)

(alterations in original).

## **PROCEDURAL BACKGROUND**

Plaintiffs filed this lawsuit in November 2020, which sets forth three causes of action under the TVPRA. Count 1 asserts liability as a primary offender under 18 U.S.C.

§ 1589(a) for knowingly providing or obtaining illegal forced labor against Trinity Teen

Solutions, Inc. ("Trinity"), Angela Woodward, Jerry Woodward, Kara Woodward, and

Kyle Woodward (but not Dally-Up LLC).  Count 2 asserts venture liability against all

Defendants under 18 U.S.C. § 1589(b) for knowingly benefiting from illegal forced labor.

Finally, Count 3 asserts liability under 18 U.S.C. § 1590(a) against all Defendants for

knowingly trafficking a person for forced labor or services.

> In August 2022, Plaintiffs filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs claimed they and putative class members were taken to Trinity based on a false promise to their parents that they would receive a variety of therapies but instead were forced "to labor from early morning until late at night, without pay, under the constant threat of physical and emotional punishment and further confinement."  Plaintiffs proposed certification of a class consisting of "Plaintiffs, and all similarly situated persons who received treatment from [Trinity] and were subjected to the provision of 'agricultural labor' ... or any other manual labor to one or more of the Defendants without payment for said labor" from November 27, 2010, to the present....  Plaintiffs argued their proposed class satisfied all requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) such that class certification was appropriate.

> In support of class certification, Plaintiffs submitted declarations from themselves and thirty-four putative class members, alleging similar experiences at Trinity.... Plaintiffs later supplemented their motion for class certification, citing additional support based on Angela's deposition and Trinity's (1) Policies and Procedures Manual, instructing residents on how to complete various ranch tasks; (2) Holy Cowgirl Manual, explaining the indoor and outdoor chores residents were expected to complete; (3) supervision checklists, showing where residents were at different times of day; (4) consequence charts, listing consequences given to residents; and (5) 2012 chore list, outlining chores required of residents in 2012.

> Defendants opposed class certification, arguing Plaintiffs had "advance[d] a vague, unascertainable, and impermissible fail-safe class definition" and failed to demonstrate the proposed class satisfied any of the Rule 23(a) or Rule 23(b)(3) criteria for class certification.  Defendants also challenged the reliability of Plaintiffs' evidence, pointing to inconsistencies between Plaintiffs' declarations and their deposition testimony.

*Sherman*, 84 F.4th at 1190-91 (citations to appellate record omitted) (alterations in original).

## LEGAL STANDARD FOR CLASS CERTIFICATION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal-Mart Stores, Inc., v. Dukes*, 131 S. Ct. 2541, 2550 (2011)). Federal Rule of Civil Procedure 23 "sets forth the standards for certifying a class action and requires that all four prerequisites of Rule 23(a) and at least one of the three prerequisites of Rule 23(b) are satisfied." *Felps v. Mewbourne Oil Co., Inc.*, 336 F.R.D. 664, 668 (D.N.M. 2020). The party seeking class certification "bears the burden of proving that all the requirements of Rule 23 are met." *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004).

First, Rule 23(a) requires the party seeking certification to demonstrate all four of the following elements:

(1)   numerosity ("the class is so numerous that joinder of all members is impracticable");
(2)   commonality ("there are questions of law or fact common to the class");
(3)   typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and
(4)   adequacy ("the representative parties will fairly and adequately protect the interest of the class").

*Felps*, 336 F.R.D. at 669; Fed. R. Civ. P. 23(a).

Second, in addition to establishing Rule 23(a)'s requirements, a party seeking class certification "must also satisfy through evidentiary proof at least one of the provisions of

Rule 23(b)." *Felps*, 336 F.R.D. at 669 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Here, Plaintiffs rely on Rule 23(b)(3), which says:

> (b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
>> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>> (D) the likely difficulties in managing a class action.

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). "Further, the district court has an independent obligation to conduct a 'rigorous analysis' before concluding that Rule 23's requirements have been satisfied. Often that analysis requires looking at the merits of a plaintiff's claims." *XTO Energy, Inc.*, 725 F.3d at 1217 (internal citations omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## DISCUSSION

Plaintiffs propose the following class definition best identifies their putative class members:

> From November 27, 2010, to the present, Plaintiffs, and all similarly situated persons who received treatment from Defendant Trinity Teen Solutions, Inc. and were subject to the provision of "agricultural labor" (as defined [in] 26 CFR § 31.3121(g)(1)) or any other manual labor to one or more of the Defendants without payment for said labor.

(ECF 215 p. 12.)

## 1.   General Class Ascertainability

As an initial matter, the Court considers the ascertainability of Plaintiffs' proposed class because Defendants have argued the proposed definition is too vague. "Although not specifically mentioned in the rule, an essential prerequisite to an action under Rule 23 is that there must be a class." *In re HomeAdvisor, Inc. Litig.*, 345 F.R.D. 208, 220–21 (D. Colo. 2024) (quoting *Edwards v. Zenimax Media Inc.*, No. 12-cv-00411-WYD-KLM, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012) (citation omitted)). "Class ascertainability is an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3)." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (internal quotations and citation omitted). Whether the stricter test of "administrative feasibility" is required or the more relaxed standard of "identifiable according to objective criteria" is applied in this case[1], Plaintiffs' proposed class is ascertainable by reference to, among other things,

---

[1] A split in the circuit courts of appeals has developed concerning how to determine whether a proposed class is sufficiently ascertainable, and the Tenth Circuit has yet to take a position on the matter. *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prod. Liab. Litig.*, No. MD 16-2695 JB/LF, 2023 WL 6121894, at *101-109 (D.N.M. Sept. 19, 2023).

Trinity's own business and treatment records.  Consulting Trinity's records can readily show who was a resident in the program during the relevant time and can also indicate, at least circumstantially, what labor they performed.  (*See, e.g.,* ECF 235-5 (daily supervision checklists logging the residents' locations, and circumstantially their activities, by time, showing for example their time spent in the irrigation field, at the main ranch, etc.).)  That Trinity may have to search its existing records to identify members of the class does not make it an unascertainable class requiring overly extensive and individualized factual inquiry to determine. *See Banks v. Cent. Refrigerated Servs., Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056, at \*6 (D. Utah May 2, 2017) ("Reviewing recruiter notes and specific codes on employment records is not overly extensive fact-finding.").  Additionally, using much the same evidence would allow Trinity to challenge a person's membership in the proposed class by suggesting a class member was not a resident during the relevant time or was not subjected to the provision of labor. *See Carrera*, 727 F.3d at 309 ("This argument fails because it does not address a core concern of ascertainability: that a defendant must be able to challenge class membership.").

With general class ascertainability satisfied[2], the Court turns to the explicit requirements of Rule 23 class certification.

## 2.    Rule 23(a) Requirements

"The plaintiff has the burden of proposing a class that meets the Rule 23 requirements." *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 409 (M.D. Fla.

---

[2]  The Court will consider Defendants' specific contention that Plaintiffs have proposed a fail-safe class definition, which also touches on class ascertainability, as part of its Rule 23(b)(3) analysis below.

2004).

### 2.1    F.R.C.P. 23(a)(1) - Numerosity

The Court previously found, "Plaintiffs have sufficiently established that their proposed class satisfies the numerosity requirement of Rule 23(a)(1)."  (ECF 247 p. 6.) Neither party challenged that determination in the interlocutory appeal, and the Court finds no reason presented to deviate from that earlier finding.  Accordingly, the Court continues to hold that Plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

### 2.2    F.R.C.P. 23(a)(2) - Commonality

Rule 23(a)(2) requires the plaintiff to show that "questions of law and fact are common to the class."  "In the principal case on Rule 23(a) commonality, *General Telephone Company of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the Supreme Court held members of a putative class must 'possess the same interest and suffer the same injury.'" *Trevizo v. Adams*, 455 F.3d 1155, 1163 (10th Cir. 2006).  Commonality does not require identical fact situations among the class members, and it demands "only a single question of law or fact common to the entire class." *Sherman*, 84 F.4th at 1192 (quoting *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 914 (10th Cir. 2018)).  "However, the mere raising of a common question does not automatically satisfy Rule 23(a)'s commonality requirement." *Wallace B. Roderick Revocable Living Tr.*, 725 F.3d at 1218.  The primary purpose of requiring a common question of law or fact is ensuring the answer to that common question will propel the class members' claims toward a conclusion.  "[P]laintiffs must show their claims rely on a 'common contention ... of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sherman*, 84 F.4th at 1192 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350).

> "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs contend the following common questions are central to the resolution of their claims:

> (1) whether Defendants obtained the labor of class members; (2) whether Defendants threatened class members with physical restraint, serious harm, or abuse of the legal process; (3) whether Defendants "knowingly" obtained class members' labor "by ... means of" these threats; and (4) whether Defendants knowingly recruited, harbored, transported, provided, or obtained by any means, any person for labor or services.

(ECF 215 pp. 14-15.) The first question is indeed common to the class as it is one of the characteristics qualifying a person to become a member of the class, per Plaintiffs' proposed class requiring each member to have been "subject to the provision of" agricultural labor or other manual labor. After all, performing labor is a key component of being unlawfully forced to perform labor under the TVPRA.

Additionally, this question's tendency to derive a common answer helps to propel the resolution of the litigation because each cause of action is tied to the putative class

member's provision of labor, whether directly obtaining forced labor under § 1589(a),

knowingly benefitting from forced labor under § 1589(b), or knowingly recruiting or

harboring class members for their labor under § 1590(a). And the same or similar evidence

answers this common question; most specifically, the deposition testimony of Defendant

Angela Woodward appears to answer the question:

> Q.   Okay. How many of those 255 approximate mental health residents did not participate in any of the 13 categories of labor discussed earlier?
>
> A.   I cannot give a number, but I -- from -- every year things change, starting in 2014. So it would depend on when the patient was in treatment.
>
> Q.   Out of the 255 approximate mental health residents that were identified by [Trinity] in interrogatories, were there any of those residents that did not conduct any of the 13 categories [of labor] listed previously?
>
> A.   I believe there -- there was, like, maybe one to three patients that just couldn't and wouldn't participate, and most of it was because of -- just because of either physical ailments, they weren't there long enough and needed to go to a higher level of care. So less than a handful I would say.
>
> Q.   So between 2010 and present, between -- let me take three off. That's what, 252. Between 252 and 254 mental health residents conducted one or more of the 13 listed categories of labor from earlier?
>
> A.   Yes.

(Angela Woodward Depo. 79:23-80:18.) Thus, nearly every resident at Trinity during the

class period proposed by Plaintiffs performed some kind of manual labor that would qualify

under the proposed class definition.

Plaintiffs have proffered a common question of fact, whether Defendants obtained

the labor of class members, that derives a common answer and drives forward Plaintiffs' TVPRA claims involving unlawful forced labor.  As the commonality requires only a single common question, *Sherman*, 84 F.4th at 1192, the Court finds Plaintiffs have sufficiently established that their proposed class satisfies the commonality requirement of Rule 23(a)(2).

### 2.3    F.R.C.P. 23(a)(3) - Typicality

Typicality requires that the named representative's claims be typical of the class's claims. Fed. R. Civ. P. 23(a)(3).  "The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest."  *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 382 (D.N.M. 2015), *adhered to on reconsideration*, 312 F.R.D. 620 (D.N.M. 2015).  "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)) (internal quotations omitted).

"The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Gen. Tele. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  "Like commonality, typicality 'do[es] not require that every member of the class share a fact situation identical to that of the named plaintiff.'"  *Sherman*, 84 F.4th

at 1193 (quoting *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014)). "Typicality requires only that the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* (quoting *Menocal*, 882 F.3d at 924).

The Named Plaintiffs' claims are based on the same legal theory as the putative class members. Specifically, the central claim of all potential class members is that Defendants knowingly obtained or benefited from forced labor performed by the Trinity residents under threat and duress. The causes of action center on the primary allegation that Plaintiffs and the putative class members all performed labor for or benefitting Defendants not out of their own desire or in exchange for payment, but to avoid various punishments. Failure to complete assigned labor could result in consequences such as food or sleep deprivation, being required to sit in a folding chair facing a cabin wall for many hours, being required to run up and down a hill, or being demoted a level (thus increasing their time at Trinity). (Am. Compl. ¶ 15); *Sherman*, 84 F.4th at 1189. These punishments, whether threatened to obtain forced labor or whether incurred for failing to complete assigned labor, were consistent among Named Plaintiffs and putative class. For example, comparing the declaration of Named Plaintiff Carlie Sherman to the declaration of a putative class member reveals both were threatened with or suffered as consequences similar treatment, such as forced exercise (running up and down hills, sprints, push-ups, step-ups, etc.), being required to perform additional labor, being demoted, and being deprived of food or sleep or bathroom breaks. (*Compare* ECF 215-1 ¶¶ 4, 6 *with* ECF 216-1 ¶¶ 5, 7.) And the declarations of the Named Plaintiffs and putative class members

submitted by Plaintiffs do not present circumstances giving rise to different theories of liability.

Named Plaintiffs have shown their interests and legal theories are sufficiently aligned with those of the putative class members to satisfy the typicality requirement of Rule 23(a)(3).

### 2.4   F.R.C.P. 23(a)(4) - Adequacy

Rule 23(a)(4) demands the class representatives "fairly and adequately protect the interests of the class." "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).

The Court previously found, "the adequacy requirement of Rule 23(a)(4) is satisfied here." (ECF 247 p. 15.)  Neither party challenged that determination in the interlocutory appeal, and the Court finds no reason presented to deviate from that earlier finding. Accordingly, the Court continues to hold that Plaintiffs have satisfied the adequacy requirement of Rule 23(a)(4).

### 3.   Rule 23(b)(3) Requirements - Predominance and Superiority

Plaintiffs seek to proceed with a class action under Rule 23(b)(3), which requires common questions of law or fact to "predominate over any questions affecting only individual members" and the class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." "Predominance regularly presents the

greatest obstacle to class certification," *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014), because Rule 23(b)(3)'s "predominance criterion is far more demanding" than Rule 23(a)(2)'s commonality requirement, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Rule 23(b)(3)'s purpose is to "ensure[] that the class will be certified only when it would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re HomeAdvisor, Inc. Litig.*, 345 F.R.D. 208, 226–27 (D. Colo. 2024) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007)).

> To assess predominance, the district court must determine "'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" [*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)] (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:49 at 195–96 (5th ed. 2012)). Common, aggregation-enabling issues are those that are "susceptible to generalized, class-wide proof" or for which "the same evidence will suffice for each member to make a prima facie showing"; individual, aggregation-defeating issues are those for which "members of [the] proposed class will need to present evidence that varies from member to member." *Id.* (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50 at 196–97 (5th ed. 2012)).

*Sherman*, 84 F.4th at 1194.

The "nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). "The district court should carefully examine what facts are required to prove Plaintiffs' claims and then determine whether Plaintiffs have shown that they could establish those facts through common evidence." *Brayman v.*

*KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 839 (10th Cir. 2023).  Plaintiffs must "satisfy

through evidentiary proof" the requirement of Rule 23(b)(3).  *Comcast Corp. v. Behrend*,

569 U.S. 27, 33 (2013).

The predominance determination starts with the elements of the claims and involves

weighing the common issues against the individual issues.

> To determine which issues in the case are common and which are individual,
> the court must first "consider the class's underlying cause[s] of action and
> determine which elements are amenable to common proof." *Menocal*, 882
> F.3d at 915; *see also Black*, 69 F.4th at 1175 ("Sensibly, the predominance
> inquiry begins with the elements of the underlying cause of action." (internal
> quotation marks omitted)).  The court should "*characterize* the issues in the
> case as common or not, and then *weigh* which issues predominate." *CGC
> Holding Co., LLC*, 773 F.3d at 1087.  This often requires the court to consider
> the merits of putative class members' claims, but "[m]erits questions may be
> considered ... only to the extent ... that they are relevant to determining
> whether the Rule 23 prerequisites for class certification are satisfied." *Id.*
> (quoting *Amgen Inc.*, 568 U.S. at 466, 133 S.Ct. 1184).

*Sherman*, 84 F.4th at 1194–95.  Plaintiffs need not show all elements of a claim involve

questions of law or fact common to the class or that the common questions are necessarily

dispositive.  *Sherman*, 84 F.4th at 1194.  "[S]o long as at least one common issue

predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues,

such as damages, that must be tried separately." *Id.* (quotations and citations omitted).

### 3.1   <u>Elements of the TVPRA Claims</u>

"To show liability for their claim under § 1589(a), the class would need to prove (1)

that Defendants knowingly (2) coerced class members by means of the use, threat of, or a

scheme intended to threaten, serious harm or physical restraint (3) to perform labor."

*Sherman*, 84 F.4th at 1195 (citing 18 U.S.C. § 1589(a)(1)–(4), and *Menocal*, 882 F.3d at

918).  "Although the statute does not use the word 'cause,' to show a § 1589 violation,

plaintiffs must prove that an unlawful means of coercion caused them to render labor."

*Menocal*, 882 F.3d at 918.

"For their § 1589(b) claim, the proposed class would further need to show that

Trinity 'knowingly benefit[ted], financially or by receiving anything of value, from

participation in a venture which has engaged' in the acts prohibited by § 1589(a)."

*Sherman*, 84 F.4th at 1195 (quoting 18 U.S.C. § 1589(b)).  "Venture" for purposes of §

1589(b) effectively includes "any group of two or more individuals associated in fact,

whether or not a legal entity."  18 U.S.C. § 1591(e)(6); *see Bistline v. Parker*, 918 F.3d

849, 873 (10th Cir. 2019) (relying on persuasive authority from the First Circuit to apply

the definition of "venture" from § 1591(e)(6) to § 1589(b)).

"Finally, for their claim under § 1590(a), the class would need to show Defendants

'knowingly recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed] by any means,

any person for labor or services in violation of this chapter.'"  *Sherman*, 84 F.4th at 1195

(quoting 18 U.S.C. § 1590(a)).  This section "imposes liability for human trafficking."

*Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1132 (D. Colo. 2019)

### 3.2   Elements Common to All Three Claims: Residents' Provision of Labor, Defendants' Knowledge, and Residents' Damages

An element inherent in all three claims in this case is the allegation that Defendants

unlawfully obtained or benefitted from labor provided by the Trinity residents.   As

recounted above, though, Defendant Angela Woodward testified at a deposition that "less

than a handful" and "maybe one to three" Trinity residents out of approximately 255 did

not perform any manual labor during their time in the Trinity program. (Angela Woodward Depo. 79:20-80:18.) Thus, the provision-of-labor element is subject to classwide proof. Specifically, Defendant Angela Woodward's deposition is evidence that is common to the class that weighs on this element. And based on Plaintiff's proposed class definition, any resident who was not subjected to providing manual labor during their stay at Trinity would be disqualified from class membership. Consequently, this consideration weighs on the side of common and aggregation-enabling.

Also shared between all claims is that a defendant may only be liable when they "knowingly" participated in or benefitted from the alleged unlawful forced labor. Relying on the District of Colorado's decision in *Menocal v. GEO Group, Inc.*, 635 F. Supp. 3d 1151 (D. Colo. 2022)[3], Plaintiffs argue that individualized review of each Defendant's knowledge is not necessary because, acting in concert, they "owned, managed, and operated the same program, using uniform policies and procedures known to staff, residents, and Defendants themselves." (ECF 277 p. 12.) Thus, because each Defendant knew the Trinity program and helped operate it, their knowledge is susceptible to classwide proof, more specifically "the same depositions, records, and circumstances evidence." (*Id.*)

Defendants disagree, contending "each Plaintiff would have a different evidentiary presentation as to each individual TTS Defendant based on the differing roles of the individual defendant over the proposed class period and the wide range of interaction(s) each Plaintiff had with each individual TTS Defendant." (ECF 278 p. 11.)

---

[3] Plaintiffs mischaracterize this as a Tenth Circuit decision and provide an incorrect case citation for it. This case is persuasive but not binding on this Court.

In most cases, a defendant's knowledge cannot be directly determined and must be inferred from their conduct and the surrounding circumstances. For instance, a federal pattern jury instruction suggests a jury be advised of the following with regard to proof of knowledge or intent:

> The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts [done] [omitted] by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

1A *Fed. Jury Prac. & Instr.* § 17:07 (6th ed.).

In this case, the surrounding circumstances potentially weighing on each Defendant's knowledge are consistent enough to result in the knowledge element being susceptible to generalized, classwide proof. A jury could infer each Defendant's relevant knowledge based on their personal participation in creating and/or implementing the Trinity program[4] combined with the program's actual policies, procedures, and practices (*see, e.g.*, ECF 235-2), which Plaintiffs allege were designed to obtain unlawful forced labor from the program's residents. Accordingly, this evidence is common to the class rather than individual to its members. The knowledge element weighs as a common, aggregation-enabling issue rather than as an individual, aggregation-defeating issue.

The requirement of compensable harm (damages) is also shared among all three

---

[4] Defendants Angela and Jerry Woodward were the owners and directors of Trinity at the relevant time, while Defendant Kyle Woodward was the Assistant Director of Trinity and Defendant Kara Woodward was the Staff Supervisor. (ECF 277 p. 11 and citations therein.)

causes of action. The Court previously discussed in some detail the potential need to individually assess each class member's injuries and/or damages. (ECF 247 pp. 9-12.) While the need for individual damages calculations by itself will not defeat predominance under Rule 23(b)(3), *Sherman*, 84 F.4th at 1195-96, it is an important consideration in the analysis. The Court continues to find the issue of determining each class members' alleged damages does not lend itself well to classwide proof and weighs as a non-common, individual issue.

### 3.3    § 1589(a) Remaining Element: Causation

Section 1589(a) prohibits obtaining labor "by means of" force, threats, abuse of law, or scheme. "Although the statute does not use the word 'cause,' to show a § 1589 violation, plaintiffs must prove that an unlawful means of coercion caused them to render labor." *Menocal*, 882 F.3d at 918. Plaintiffs here propose relying on circumstantial evidence to establish causation on a classwide basis (ECF 277 pp. 13-14), which is permissible.

> *CGC Holding* [*Co., LLC v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014),] said that, when a class member could individually establish causation based on circumstantial evidence, a court may likewise allow a class to rely on circumstantial evidence that the class shares to establish causation on a class-wide basis. *CGC Holding*'s reasoning applies with equal force to the facts of this case because (1) a court could permit an individual TVPA class member to establish causation through circumstantial evidence, and (2) the TVPA class members share the relevant evidence in common because their claims are based on allegations of a single, common scheme.

*Menocal*, 882 F.3d at 919.

Plaintiffs allege, and the evidence presented to date supports, that no resident of Trinity was there of her own volition. They were placed there by their respective parent or guardian, who had entered into an agreement with Trinity for the care and treatment of the

child.  And they were informed upon their arrival via the written orientation materials that their "choices and behaviors got [them] here ... and [their] choices and behaviors will get [them] out."  (ECF 235-3 p. 11.)  They were instructed about Trinity's level system, learning that they start at Level 1 and exit the program to return home at Level 6, and were told, "In order to move up in the level system, [they] will need to consistently abide by the rules and expectations of each level, and complete the necessary assignments and tasks." (*Id.*)  It's undisputed some of those tasks were unpaid ranch-type labor, such as fixing fence, irrigating fields, and caring for animals, as well as other types of labor.  (*See* ECF 235-2 pp. 3-17 (written orientation materials explaining fixing fence, irrigation, and animal care), pp. 34-35 (written instructions for washing dishes); ECF 235-5 (daily supervision checklists logging the residents' locations, and circumstantially their activities, by time, showing for example their time spent in the irrigation field, at the main ranch, etc.).)

Additionally, consequences for improper conduct or uncompleted tasks were a daily part of the residents' life and could preclude them from advancing through the level system and returning home.  (*See* ECF 235-4 (pages of consequence logs for various misconduct by a resident, primarily showing physical exercise as the resulting punishment).)  Indeed, the orientation materials included the possibility of "[d]ropping one level" and even "[d]ropping to level one."  (ECF 235-3 p. 19; *see also* Angela Woodward Depo. 32:23-33:20 (agreeing that failure to perform "outside chores" could preclude the resident from progressing through the level system and eventually leaving the Trinity program).)

Both Named Plaintiffs and class members are likely to point to much of this same circumstantial  evidence  to  advance  the  causation  element,  i.e.,  to  show  Defendants

obtained their labor "by means of" force, threats, or a scheme intended to cause the resident to believe they would suffer serious harm or physical restraint if they did not perform the demanded labor. *See* 18 U.S.C. § 1589(a)(1), (a)(4). This evidence is common to the class rather than individual to its members, and the causation element of § 1589(a) weighs as a common, aggregation-enabling issue rather than as an individual, aggregation-defeating issue.

### 3.4   § 1589(b) Remaining Element: Defendants' Benefit from Participation in Venture

For liability under § 1589(b), Plaintiffs must show Defendants benefitted, financially or by receiving something of value, from participating in a venture engaged in the acts prohibited by § 1589(a). Venture includes any two or more persons associated in fact, whether or not as a legal entity.

To prove this element, the Named Plaintiffs as well as the class members would likely rely on the same two things: (1) the monthly payments received from the residents' parents for participation in the Trinity program, and (2) the actual labor received on the ranch, which was labor Defendants did not have to perform. Proof of the first, monthly monetary payments, for all claimants can be had from Trinity's business and accounting records, and it lends itself well to classwide evidence.

The second—the actual labor performed—can also be largely gleaned from Trinity's records. For example, Trinity's Daily Supervision Checklists logged each resident's location, and at least suggest their activity associated with that location, for each half-hour of the day. (ECF 235-5 (logging the residents' locations, and likely activities, by

time, and showing, among other things, their time spent in the irrigation field, at the main ranch, etc.).)  Another log produced by Trinity showed the relative cabin and ranch chores, many of which were daily chores, and which resident was assigned to complete the chore. (ECF 235-6 (listing "daily chores" and "deep cleaning chores" for the various cabins and for the ranch).)  The labor allegedly provided for Defendants' benefit is mostly subject to classwide proof as it was largely charted in Trinity's records (ostensibly required to be kept as part of Trinity's license as a residential treatment center).  It is also important to note, though, that evidence of the labor performed by the residents is not limited to common, classwide proof, as individual inquiry into each resident's work can also be an important source of evidence, and counter-evidence, on this question.

The evidence of Defendants' involvement in a "venture" can also be found in classwide proof, mostly from Trinity's business entity records and from Defendants' depositions, where they confirmed their various positions and job duties at Trinity.  (*See, e.g.*, Jerry Woodward Depo. 14:9-13[5] (Jerry and Angie Woodward cofounded Trinity); 94:7-10 (Kara Woodward does reviews with the insurance companies and Kyle Woodward handles the billing); Kyle Woodward Depo. 17:1-2 (Kyle Woodward is the assistant director of Trinity), 58:1-5 (Kara Woodward manages Trinity's Facebook page); Decl. of Dana Bowden ¶ 22[6] (Kara Woodward was a nurse at the ranch).)

Evidence of Defendants' alleged benefit from their participation in the venture is subject to both classwide and individual examination.  However, Plaintiffs and class

---

[5] ECF 261-4.
[6] ECF 215-12.

members can more readily rely on common evidence, such as Trinity's records, to establish this element. Thus, Defendants' alleged benefit from their participation in the venture weighs more as a common, aggregation-enabling issue rather than as an individual, aggregation-defeating issue.

### 3.5 § 1590(a) Remaining Element: Recruited, Harbored, Transported, Provided, or Obtained Person for Labor

Finally, to establish that Defendants are liable under § 1590(a), Plaintiffs can likely rely on classwide proof to show Defendants recruited, harbored, transported, provided, or obtained Plaintiffs for labor. Again, at least some of the most significant evidence on this question will come from Trinity's own records. For example, to show recruitment for labor, Plaintiffs might rely on Trinity's online marketing materials encouraging parents to send their troubled teen to Trinity for care and treatment. (*See, e.g.*, Kyle Woodward Depo. 17:3-19:21 (describing responsibilities as Trinity's marketing director as including making sure the website was operational and allowed interested parents to contact Trinity), 22:17-23:7 (describing marketing strategies employed).) Plaintiffs will have to connect that recruitment to labor, but that might be done by pointing to Trinity's advertising as a "working ranch." (Angela Woodward Depo. 42:5-25.)

To show harboring for labor, Plaintiffs could consult Trinity's records establishing when each resident attended the program and their tasks/chores. For example, Trinity's Parent Handbook explained, "The girls walk 4-6 miles per day as they are training and exercising animals; they also chop wood, build fence, ride horses and other various forms of good old-fashioned ranch work." (ECF 106-1 p. 23; *see also* ECF 235-5 (daily

supervision checklists logging the residents' locations, and circumstantially their activities, by each half-hour).)  And Defendant Angela Woodward testified that Kyle Woodward reviewed a combination of Trinity records in determining a total of about 255 residents had attended the Trinity program since 2010.  (Angela Woodward Depo. 77:7-19.)

Much of the evidence weighing on Named Plaintiffs' and the class members' § 1590(a) claim is likely to come from Trinity's own business and treatment records; it is therefore primarily subject to classwide determination.  This weighs as a common, aggregation-enabling issue rather than as an individual, aggregation-defeating issue.

### 3.6    Individualized Assessments of Parental Consent

As the Court reviewed in its prior class-certification consideration, each potential class member was sent to Trinity by their respective parent or guardian for reform based on the troubled teenager's misconduct and the parent/guardian's inability to effect positive changes at home.  The Court understands Plaintiffs strongly disagree, but the Court remains concerned that

> the scope of consent given by each parent/guardian and the extent of each parent/guardian's knowledge of what labor/chores would be expected of their child are core issues in this lawsuit that will require a fact-specific inquiry of each parent/guardian. *See, e.g.*, 29 U.S.C. § 213(c)(1)(B)-(C) (exempting from standard child labor law "any employee employed in agriculture outside of school hours" who is 14 years or older, or is 12 or 13 years old with parental consent).

(ECF 247 p. 7.)  The Court continues to find that this issue, perhaps better described as a potential defense, does not lend itself well to classwide proof.  It weighs as an individual, aggregation defeating issue.

### 3.7    Class Action Superiority

In determining whether, under Rule 23(b)(3), the class action is the superior method for adjudicating this case, the Court weighs the common, aggregation-enabling issues against the individual, aggregation-defeating issues. *Sherman*, 84 F.4th at 1195. Based on the foregoing discussion, the Court finds the common issues outweigh those requiring individual assessment. Most of the issues, including most of the elements of Plaintiffs' causes of action, are amenable to classwide proof and common evidence. And the likely areas needing individualized assessment, such as damages, do not "inevitably overwhelm questions common to the class." *Comcast Corp.*, 569 U.S. at 34.

Additionally, under Fed. R. Civ. P. 23(b)(3)(A), the Court finds a number of potential class members have shown an interest in joining this existing litigation rather than controlling the prosecution of separate actions. (*See* ECF 215-4 through 215-36 and 216-1 (declarations of putative class members); Timmons Decl. ¶ 6[7] ("approximately 80 [potential class members] have expressed a desire to actively participate in this suit").) The Court has been presented no evidence concerning any other litigation already commenced by or against the potential class members. *See* Fed. R. Civ. P. 23(b)(3)(B). And concentrating the litigation of the claims in this forum is logical and desirable under Rule 23(b)(3)(C) because the Trinity ranch, where most or all of Defendants' alleged actions took place, is in Park County, Wyoming. (Am. Compl. ¶ 4.) Finally, the Court does not find insurmountable practical difficulties in managing this lawsuit as a class action. *See* Fed. R. Civ. P. 23(b)(3)(D); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) ("this

---

[7] ECF 215-38.

consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit"). The difficulties referenced earlier concerning the potential assessment of individual damages may demand separate determinations, but the Court finds even that would not destroy the Court's ability to manage this matter as a class action (at least as to liability). *See Sherman*, 84 F.4th at 1196 (discussing the possibility of partial certification to determine liability on a classwide basis while leaving class members to pursue their own damages claims).

In sum, the Court finds the common, aggregation-enabling issues present in this lawsuit predominate over the individual, aggregation-defeating issues, and litigating this controversy as a class action is the superior alternative to numerous similar lawsuits, each involving one or a few potential class members. Accordingly, the Court concludes Plaintiffs have established the requirements of Rule 23(b)(3).

4.   **Fail-Safe Class**

Defendants have argued Plaintiffs cannot pursue this matter as a class action because they have proposed a fail-safe class definition.[8] "A class definition creates a fail-safe class when the class definition bases membership in the class on the validity of the plaintiff's claims." Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 Fordham L. Rev. 2769, 2782 (2013). A fail-safe class

> is defined so that whether a person qualifies as a member depends on whether
> the person has a valid claim. Such a class definition is improper because a

---

[8] The circuit courts of appeal disagree whether a fail-safe class definition can be an independent bar to class certification. *See Sherman*, 84 F.4th at 1191 n.6. The Court considers this issue separately, but it need not weigh in on whether a fail-safe class definition bars class certification independently (even where Rule 23 might otherwise be satisfied) because it does not find a fail-safe class definition to be proposed here.

class member either wins or, by virtue of losing, is defined out of the class
and is therefore not bound by the judgment.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "The key

to avoiding this problem is to define the class so that membership does not depend on the

liability of the defendant." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir.

2015).

Defendants contend Plaintiffs' decision to define the class as Trinity residents

"subjected to the provision of labor ... without payment for said labor" renders it a fail-

safe class definition. (ECF 278 pp. 2-8.) Plaintiffs' proposed class definition indeed invites

dispute about its fail-safe character in light of its requirement that a resident must have

been subjected to performing unpaid labor. Examining the evidence in the record and

peeking into the merits solely as they relate to class certification, though, reveals no

concerns that accompany a fail-safe class definition in this case.

The class's members are largely defined already. As recounted above, Defendant

Angela Woodward's testimony established there were approximately 255 residents at

Trinity during the time in question, and "maybe one to three" residents and "less than a

handful" did not perform any manual labor during their time at the ranch. (Angela

Woodward Depo. 76:23-78:2, 79:20-80:18.) Further, as already noted, Trinity can consult

its own records to challenge the small number of residents who may not meet the proposed

class definition. Most significantly, though, the liability of Defendants does not control

membership in the class because the class members' provision of unpaid labor establishes

membership into the class but does not, by itself, render Defendants liable for unlawful

forced labor, benefitting from unlawful forced labor, or human trafficking. The remaining elements of the claims, such as knowing coercion, knowing benefit, and knowing recruitment or harboring for labor purposes, are independent of class membership. The Court determines Plaintiffs in this case have defined the proposed class "so that membership does not depend on the liability of the defendant," *Mullins*, 795 F.3d at 660, and therefore Plaintiffs have not proposed a fail-safe class definition.

## CONCLUSION AND ORDER

Plaintiffs' proposed class is ascertainable and not a fail-safe class definition. They have also satisfied the requirements of Rule 23(a) and (b)(3)(B) for class certification.[9] The Court will certify the action for all purposes at this time, but either side may request certain issues be assessed individually, such as parental consent or damages, if those issues prove too impractical for classwide determination.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Class Certification Under Rule 23(b)(3) and Appointment of Class Counsel Under Rule 23(g) (ECF 215) is **GRANTED**. The certified class is defined as proposed by Plaintiffs:

> From November 27, 2010, to the present, Plaintiffs, and all similarly situated persons who received treatment from Defendant Trinity Teen Solutions, Inc. and were subject to the provision of "agricultural labor" (as defined [in] 26 CFR § 31.3121(g)(1)) or any other manual labor to one or more of the Defendants without payment for said labor.

This class is certified as to Plaintiffs' three TVPRA causes of action: (1) knowingly

---

[9] Plaintiffs submitted the expert report of Dr. Sara Boyd in support of their motion for class certification (ECF 216-2) and discussed her report and anticipated expert testimony at the class certification hearing. Defendants have objected to and moved to strike the expert designation of Dr. Boyd. (ECF 236.) For purposes of this Order, the Court did not consider Dr. Boyd's report and anticipated testimony. The Court will issue a separate ruling on that matter.

providing or obtaining unlawful forced labor under 18 U.S.C. § 1589(a), (2) knowingly benefitting from unlawful forced labor under 18 U.S.C. § 1589(b), and (3) knowingly trafficking a person for unlawful forced labor under 18 U.S.C. § 1590(a).  All elements of all claims are certified for consolidated litigation within the class action, but upon a party's motion the Court will consider separately trying certain issues, such as damages and/or parental consent, if they prove too unwieldy for consolidated disposition.

**IT IS FURTHER ORDERED** that, under Fed. R. Civ. P. 23(c)(1)(B), Plaintiffs Carlie Sherman, Anna Gozun, and Amanda Nash are named as representatives of the plaintiff class.

**IT IS FURTHER ORDERED** that, under Fed. R. Civ. P. 23(c)(1)(B) and 23(g), Attorneys Melissa J. Stewart; Brice M Timmons; Craig A. Edgington; Bryce W. Ashby; William E. Routt, III; Frank L. Watson, III; Michael Rosenthal; and Nathan Nicholas are appointed as class counsel.

**DATED:** April _22nd_, 2024.

Scott W. Skavdahl
United States District Judge