**KAREN V. FUKUTAKI, M.D.**
DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
ADDED QUALIFICATIONS IN FORENSIC PSYCHIATRY
P.O. BOX 460541, GLENDALE STATION, DENVER, CO  80246-0541
303.667.3249
fukutakimd@gmail.com

December 2, 2022

Ms. Lillian Alves
Ms. Lindsey Romano
Gordon Rees Scully Mansukhani
555 Seventeenth Street, Suite 3400
Denver, CO  80202

                                              RE:       *Sherman, et al. v. Trinity Teen Solutions, et al.*
                                              Case No.:  20-cv-00215-SWS
                                              Independent Psychiatric Evaluation

Dear Ms. Alves and Ms. Romano:

I reviewed the following additional documents.
- November 14, 2022 Response authored by Sara Boyd, Ph.D.
- Curriculum Vitae for Sara Boyd, Ph.D.

### PERTINENT INFORMATION FROM DR. BOYD'S CV:

Dr. Boyd was awarded her doctoral degree in August 2013.  Her doctoral dissertation was titled "Personality and Personality Disorder in Adults with Intellectual Disabilities."  Her CV documents her professional work since earning her doctorate has primarily consisted of performing evaluations.

Her clinical/treatment experience documented on her CV appears limited to prior to her obtaining her doctoral degree.
- She was involved in a predoctoral internship from July 2012 to July 2013, during which she rotated through a treatment center for survivors of trauma and abuse and a program for individuals with developmental disabilities.  Her CV does not specify how many weeks or months she spent providing therapy in either program during that year.  Her CV does not indicate the size of the clinical load she carried during either rotation.  Interns usually carry limited clinical patient loads.
- She provided individual psychotherapy for clients with a variety of disorders as a graduate student therapist from July 2007 to July 2011.  Her CV does not indicate how many clients she treated during that time period or how much of her time was spent in providing therapy.

1

- She co-facilitated "a manualized skills-based intervention group for children with social impairments" from September 2008 to December 2008. Her CV does not document how frequently this group was held or the number of children involved in the group.
- She provided crisis counseling at a community agency serving survivors of sexual assault from September 2005 to September 2006. Her description suggests she might have only had crisis contact with these clients rather than providing longer term therapy.
- She provided group and individual therapy to children and adults who experienced domestic violence as a trainee from January 2006 to May 2006. Her CV does not specify how much of her time was spent leading groups or providing therapy, the size of the groups she led, or how often the groups were held.

Dr. Boyd's CV does not document she worked as a treatment team member in an inpatient or residential facility.

**INFORMATION FROM DR. BOYD'S NOVEMBER 2022 RESPONSE AND OPINIONS RELATED TO HER RESPONSE:**

Dr. Boyd asserts that psychiatrists are not trained in psychological testing, which is accurate. She further asserts that psychiatrists do not have the capacity to competently interpret psychological test results. Her assertion is accurate if she is referring to analysis of raw data from psychological testing. Her assertion is not accurate if she is referring to reports of psychological testing prepared by psychologists who performed the testing.

Dr. Boyd does not appear to be aware that it is not uncommon for psychiatrists to consult with psychologists and/or review reports of psychological testing performed by psychologists in assessing individuals for forensic or treatment purposes. It is not "a remarkable overreach" to incorporate results of psychological testing in formulating an impression of an individual being evaluated. It is standard practice to incorporate psychological testing results when such information is available.

Dr. Boyd implies that I did not personally interview the Plaintifs by choice. She states, "…Dr. Fukutaki could have asked Ms. Sherman that question…" I agree that being afforded the opportunity and availing oneself of the opportunity of in-person evaluations is desirable.

It is common practice to review available records in formulating an assessment of individuals prior to meeting with them. This is true both in treatment settings and in conducting forensic evaluations. Historical records are quite useful in determining diagnoses and formulating treatment strategies in treatment settings and useful in addressing the forensic question or questions posed when performing a forensic evaluation.

Point-in-time evaluations conducted without review of prior medical and psychiatric records is usually limited to crisis evaluations and to evaluations where medical records are not available. It is usually considered practicing below the standard of care to

2

evaluate and treat individuals without reviewing available medical records. Psychiatric records are medical records.

I reviewed thousands of pages of records from TTS and from other treatment providers. Written treatment assignments and letters written to families were included in the records reviewed. It is unclear how Dr. Boyd came to the conclusion that I "extensively" relied on written correspondence, by which she indicates she means the letters written by the identified Plaintiffs, given the numbers of records I reviewed.

Dr. Boyd takes issue with my not providing examples of the individualized treatment plans formulated by TTS for their clients. Formulation of a treatment plan starts with the identified diagnoses and/or problem areas to be addressed in treatment.

The TTS records document such plans were formulated:
- TTS 026572    Anna Alsup/Gozun: The treatment plan lists her identified problems as 1. Oppositional Defiant, 2. Academic Underachievement, Adoption, Anger Management, Anxiety, ADHD, Depression, Grief/Loss Unresolved, Low Self-Esteem, Sexual Acting Out. A letter to "Sissy" (TTS 027024) indicates she was expected to comply with an "extremely structured and strict" program at TTS, which is one treatment strategy used for those with Oppositional Defiant Disorder. Her TTS records suggest she made little progress in treatment at TTS and had difficulty remembering and/or an unwillingness to utilize imparted information.
- TTS 1692    Carlie Sherman: Her diagnoses listed during her first admission to TTS included Generalized Anxiety Disorder, Oppositional Defiant Disorder, and recurrent Major Depression. Her writings indicate she focused on her negative thinking and attitude during her first TTS stay. A weekly progress note (TTS 4981) documents Ms. Sherman was observed to become defensive and argumentative when told to do something differently, with this addressed by TTS staff.
- TTS 17769, 17498    Carlie Sherman's second TTS admission evaluations noted her report she had been physically and emotionally abused by her mother and the conflict between her biologic parents. She was prescribed sertraline to address her anxiety (TTS 13909) in January 2015. A report was made to DCFS based on Ms. Sherman's allegations regarding her mother and stepfather (TTS 15737). Ms. Sherman's transcribed calls with her father on June 17, 2015 (TTS 10771) and on July 15, 2015 (TTS11027) document that Ms. Sherman's relationship with her mother was a focus, if not a major focus, in her therapy during her second TTS admission.
- TTS 18799    Amanda Nash: Her problems were identified on admission as depressed mood, oppositional behavior, and anger-management problems. Treatment goals were established, and planned interventions documented. Her progress in meeting her treatment goals during her time in residence at TTS is documented in her TTS records. The TTS records document she established a goal of not cutting corners by September 2015 (TTS 20026). Her therapy assignments in September (TTS 21263, 21269) document she was addressing her feelings of failure and incompetence. Her records indicate the loss of her biologic father was addressed in therapy during the latter part of her TTS stay (TTS18405).

Each of the identified Plaintiffs entered treatment at TTS with a unique history, but with overlap regarding the behaviors identified as problematic by the parent or parents who sought their child's admission to TTS.  All three identified Plaintiffs were assessed as exhibiting oppositional-defiant behavior and depression.

Dr. Boyd questions the importance of noting any of the Plaintiffs' sexual orientations.  The TTS documents I received and reviewed do not document any of the Plaintiffs was asked about her sexual orientation or gender identification around the time of admission.  One of Ms. Alsup/Gozun's identified problems was sexual acting out.  Ms. Sherman's history prior to her first TTS admission was significant for sexual perpetration and sexual activity with other minors.  Inquiring about sexual orientation is a normal question in compiling social history in adolescents and adults, especially if there is a history of what is thought to be inappropriate sexual behavior.

Dr. Boyd's comments about mandatory reporters suggest she might not have understood the reasons I found the lack of abuse reports of significance.  Not only do there appear to be no reports on record from mandatory reporters who reportedly assessed Ms. Alsup/Gozun or the other Plaintiffs as having suffered abuse specifically perpetrated by TTS, no records documenting these clinical contacts have been produced, despite having been requested.  Such records would bolster the claims made by the Plaintiffs, which raises the question as to why they have not been produced.

Dr. Boyd states that she believes I have had little experiencing evaluating survivors of abuse, neglect, and other trauma.  This is an inaccurate conclusion.  I have engaged in therapeutic work with survivors of various forms of trauma since I began practicing as a psychiatrist in 1985 and have been involved in clinical work since completing my psychiatric residency.  It is not clear to me how she failed to discern this from my CV.

I have worked as a treatment provider in a number of treatment and correctional facilities with survivors of childhood physical and sexual abuse and survivors of interpersonal violence and other trauma.  I have worked with crisis evaluation teams in Colorado and for years with treatment teams at community mental health centers in Colorado (Denver, Boulder, and Aurora), in Phoenix (Arizona), in Los Angeles (California), and in Sacramento (California).  The clients served by these community mental health centers had often experienced trauma in their lives.  I was the main psychiatrist in the Colorado Department of Corrections, in which thousands of inmates were housed, for more than four years.  A large number, if not the majority, of the men I treated had histories of experiencing various forms of interpersonal violence and trauma.  I worked for more than four years in a number of Colorado youth correctional facilities, where the majority of the adolescents I treated had experienced violence and trauma.  I was the main psychiatrist in a Denver hospital Infectious Disease clinic for 14 years, where the focus was on providing medical and psychiatric care for more than 1500 men and women infected with HIV.  Many of my clients in this clinic had suffered trauma in their lives.  One of my more recent jobs involved working with teenage girls in a residential facility in Salinas, California who were assessed as being survivors of abuse and/or trafficking.

4

I found it interesting that Dr. Boyd chose to remark on her perception I have a lack of clinical experience given the paucity of clinical, treatment experience she documents on her CV.

Dr. Boyd appears to have understood that I commented on the effectiveness of social learning programs in forensic treatment settings because I was insinuating that the TTS residents are or were violent offenders. This was not my point. My point was that treatment approaches similar to those utilized at TTS have been shown to be therapeutically effective.

Dr. Boyd appears to believe that her assessments were sufficiently thorough to support the opinions she rendered. I continue to question exactly what she asked during her assessments, given that she chose to not document the information she obtained from each of the individuals she interviewed. She did not document she reviewed any medical or psychiatric records for any of the individuals she interviewed and does not explain in her response why she chose to not review the available records. I assume she was afforded access to the records made available to me. She offers opinions without documentation of the data she obtained supporting those opinions and without consideration of the medical/psychiatric histories of any of the individuals she evaluated.

Sincerely,

/s/ *Karen Fukutaki, M.D.*

Karen Fukutaki, M.D.