# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

CARLIE SHERMAN, ANNA GOZUN, and
AMANDA NASH, on behalf of themselves and all
similarly situated persons,
Plaintiffs,

v.                                                          Case No.:  20-CV-215-SWS

TRINITY TEEN SOLUTIONS, INC., a
Wyoming corporation; ANGELA C. WOODWARD;
JERRY D. WOODWARD;  KARA WOODWARD;
KYLE WOODWARD; and DALLY-UP, LLC, a
Wyoming limited liability company,
Defendants.


**Supplemented Expert Report of Dr. Kimberly Mehlman-Orozco**
**CEO of Break the Chain LLC**
**P.O. Box 678**
**Gainesville, VA 20156**
**(703) 362-9405**


**SUBMITTED BY DR. KIMBERLY MEHLMAN-OROZCO under penalty of perjury. September 24, 2024[1].**



---

[1] I may prepare graphic or illustrative exhibits based on the information reviewed and/or my analyses for use at trial. I reserve the right to amend my analysis, opinions, and this report should additional information be made available.

## Table of Contents

I.       OVERVIEW ....................................................................................................... 5

II.      DEFINITIONS .............................................................................................. 12

III.     SUMMARY OF OPINIONS ........................................................................ 16

IV.      HUMAN TRAFFICKING SUMMARY ...................................................... 19
         BACKGROUND........................................................................................................ 19
         OVERVIEW .............................................................................................................. 20

V.       SECONDARY EXPLOITATION ............................................................... 23
         OVERVIEW.............................................................................................................. 23
         TRAFFICKING TO THE RESCUE?............................................................................. 24
         CONCERNS REGARDING PRESENT CASE................................................................. 27

VI.      HUMAN TRAFFICKING PARAMETERS................................................ 30
         SENSITIVITY AND SPECIFICITY .............................................................................. 30
         HUMAN TRAFFICKING OPERATIONAL INDICATORS .............................................. 30
         EVIDENCE-BASE ON HUMAN TRAFFICKING IDENTIFICATION ............................... 32
         POTENTIAL FOR ERRONEOUS APPLICATION ........................................................... 33
         WITHIN THE PARAMETERS OF HUMAN TRAFFICKING ........................................... 35
         BEYOND THE PARAMETERS OF HUMAN TRAFFICKING........................................... 36

VII.     TROUBLED TEEN INDUSTRY AND CRIMINOLOGICAL THEORY ............. 39
         ORIGINS OF THE TROUBLED TEEN INDUSTRY ....................................................... 39
         EFFICACY OF THE TROUBLED TEEN INDUSTRY ..................................................... 40
         IMPETUS FOR THE MODERN TROUBLED TEEN INDUSTRY AND APPLICATION OF
         CRIMINOLOGICAL THEORY .................................................................................... 41
         TROUBLED TEEN INDUSTRY SERVICES FOR SURVIVORS OF SEX TRAFFICKING ...... 45

VIII.    CURRENT CASE ......................................................................................... 48
         OVERVIEW .............................................................................................................. 48
         SPECIFIC ALLEGATIONS AND COUNTERVAILING INFORMATION............................. 50

IX.      RESPONSE DR. SARA BOYD ................................................................. 59
         REBUTTAL ............................................................................................................... 59
         RESPONSE TO SARA BOYD'S REBUTTAL OF DR. MEHLMAN-OROZCO ........................... 62
         RESPONSE TO SARA BOYD'S REBUTTAL OF DR. FUKUTAKI ......................................... 64

XI. CONCLUSION .................................................................................................. 70

APPENDICIES.......................................................................................................... 72
         APPENDIX A. – CURRICULUM VITAE....................................................................... 72
         APPENDIX B. EXPERT WITNESS TESTIMONY.......................................................... 93
         APPENDIX C. – DELPHI SURVEY HUMAN TRAFFICKING INDICIA............................ 98
         APPENDIX D. ACKNOWLEDGEMENT OF PRO BONO WORK FOR HUMAN TRAFFICKING
         SURVIVORS ............................................................................................................. 99
         APPENDIX E. LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY FOR PROSECUTION
         .............................................................................................................................. 100

APPENDIX F. LETTER OF RECOGNITION FROM THE OFFICE OF JUSTICE PROGRAMS, NATIONAL INSTITUTE OF JUSTICE (NIJ) FOR THE FY 2022 RESEARCH ON TRAFFICKING IN PERSONS .................................................................................................................... 101

APPENDIX G. LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY FOR EMONIE MURPHY IN PENNSYLVANIA FEDERAL COURT ....................................................... 102

APPENDIX H. LETTER OF REFERENCE ON EXPERT WITNESS TESTIMONY FOR PLAINTIFF IN VIRGINIA FEDERAL CIVIL COURT ............................................................................. 103

APPENDIX I. – MATERIALS REVIEWED AND CONSIDERED .................................................. 104

APPENDIX J. – SAMPLE OF CASES INVOLVING CHILDREN HELD IN MODERN FORMS OF SLAVERY ....................................................................................................................... 105

    *United States v. Theresa Mubang* .................................................................... *105*

    *United States v. Abdel Nasser Youssef Ibrahim* ............................................... *105*

    *United States v. Adaobi Stella Udeozor* ........................................................... *106*

    *United States v. Louisa Satia* .......................................................................... *106*

APPENDIX K. – SUMMARY OF DR. MEHLMAN-OROZCO'S EXPERTISE ON BOTH LABOR AND SEX TRAFFICKING ........................................................................................................ 107

**TABLE OF TABLES**

Table 1. Length of Dr. Boyd's Interviews ........................................................................ 27
Table 2. Maryland Scientific Methods Scale (SMS) ........................................................ 32
Table 3. Strong Trafficking Indicators Applied to the U.S. Military ............................... 34
Table 4. Sample of Named Plaintiff Testimony on Schooling while at TTS ................... 55
Table 5. Sample of Named Plaintiff Testimony on Chores while at TTS ........................ 57
Table 6. Dr. Boyd's Criticism of Dr. Fukutaki and Dr. Mehlman-Orozco's Response..... 64

# I.    OVERVIEW

I, Dr. Kimberly Mehlman-Orozco, am the Chief Executive Officer (CEO) of Break the Chain, LLC. I have been engaged by the attorneys for TRINITY TEEN SOLUTIONS, INC.[2], in the above-captioned action to provide opinions as applicable. My compensation for this engagement is $550/hour for research, review, and consultation; $750/hour for deposition and trial testimony; and $350 for portal to portal travel. My compensation is not contingent upon offering any specific opinions or on the outcome of this matter.

The scope of my assignment was to evaluate the evidence and testimony in the present matter and provide expert opinions that would be probative to the trier of fact. My opinions are based on my education, training, and experience in the field of criminology and social scientific research, as well as the materials that I reviewed in this matter, which are cited throughout and listed in Appendix C. The opinions I have presented in this report are based on state-of-the-science research and are founded upon reliable methods, techniques, and approaches that are generally accepted by the criminology and social scientist research communities.

Over the past fifteen years, I have accumulated a variety of work experiences that contribute to my qualifications as an expert on human trafficking (see Appendix A for a copy of my Curriculum Vitae). As the CEO of Break the Chain, LLC and former CEO of Mahn, Mehlman & Associates, LLC, I regularly serve as an expert witness for human trafficking cases (see Appendix B for list of cases). I also regularly provide *pro bono* expert witness services to survivors of human trafficking. For example, in application for T-Visas (see, for example, Appendix D), in defense of erroneous criminalization, and in civil litigation involving TVPRA claims (see, for example, Appendix H). I also currently serve on the advisory network for anti-trafficking non-profit Empowered Network, where I assisted in building the qualitative measurement tools used by their organization for the last five years.

I am the author of a book on the different forms of human trafficking, which is entitled *Hidden in Plain Sight: America's Slaves of the New Millennium*. For this book, I performed extensive primary and secondary research, including:

> (1) A systematic review of over 300 human trafficking cases;
> (2) Content analyses on more than 1,000 media reports of human trafficking arrests;
> (3) Qualitative interviews of human trafficking victims;
> (4) Qualitative interviews of convicted human traffickers;
> (5) Qualitative interviews of consenting sex workers; and
> (6) Qualitative interviews of commercial sex consumers.

My book was incorporated into the he three-day Advanced Human Trafficking Law Enforcement Class curriculum used by ERASE Child Trafficking to train law

---

[2] Herein referred to as Defendant or Defendants.

enforcement in the United States on human trafficking identification and investigation[3]. The book also received a variety of advanced praise from experts within the field[4].

In addition, I formally served as an adjunct human trafficking subject matter expert for RAND Corporation, a nonprofit institution that helps improve policy and decision-making through research and analysis, where I worked on three study proposals:

> (1) Research design to evaluate the National Human Trafficking Hotline;
> (2) Development of an evidence based human trafficking risk assessment tool for organizations working with minors; and
> (3) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

In these capacities, I have had the opportunity to train various law enforcement agencies around the country on my human trafficking research for investigations, including Homeland Security Investigations in Buffalo, NY; Montebello Police Department in Montebello, California; the North Carolina State Bureau of Investigation; and the Royal Canadian Mounted Police in Halifax, Nova Scotia, among others. I have also presented my research at various human trafficking summits and conferences and served on the Greater Prince William County Human Trafficking Task Force (GPWCHTTF) as the data collection sub-committee chair, as well as on the Prince George's County Human Trafficking Task Force. In 2019, I served as an invited Panelist for the Police Executive Research Forum's *Critical Issues in Policing Conference—The Police Response to Human Trafficking*, which led to a published report in 2020. [5]

I have conducted primary research into recruitment and control schemes, advertisements, the mechanics of commercial sex exchanges, and the distinction between sex trafficking and consenting commercial sex. Various aspects of my research have been presented to law enforcement agencies, including but not limited to special agents for Homeland Security Investigations in Buffalo, New York; fire marshals in Fairfax, Virginia; and law enforcement officers in Martin County and Palm Beach County, Florida.

In addition to my work on human trafficking, I have received formal training, as well as quantitative and qualitative research experience, during my graduate coursework at George Mason University. Specifically, I served as a research associate on the Trinidad and Tobago Crime Reduction Project, which involved government-sanctioned surveys of both police officers and members of the community in Trinidad. I also led participant outreach for the Office of Juvenile Justice and Delinquency Prevention (OJJDP) Census

---

[3] For example, San Bernadino County Sheriff's Department, San Bernardino Police Department, City of Fontana Police Department, and Redlands Police Department.

[4] For example, from Louise Isobel Shelley, University professor and Omer L. and Nancy Hirst Endowed Chair at the Schar School of Policy and International Affairs at George Mason University in Virginia and John Cotton Richmond, Former Federal Human Trafficking Prosecutor and Founding Director of the Human Trafficking Institute.

[5] *How Local Police Can Combat the Global Problem of Human Trafficking: Collaboration, Training, Support for Victims, and Technology Are Keys to Success*, Police Executive Research Forum (PERF) (2020), retrieved from: https://www.policeforum.org/assets/CombatHumanTrafficking.pdf.

of Juveniles on Probation and served as the Clinical Trial Search Coordinator for the Cochrane[6] Justice Health Field.

In addition to my practical and research experience, I also formally taught about human trafficking as part of my course material at George Mason University and at University of Maryland, College Park, the #1 criminology department in the nation[7].

I hold a Ph.D. in Criminology, Law and Society from George Mason University, as well as a M.S. in Justice, Law, and Crime Policy and a B.S. *cum laude* in Administration of Justice.

My research on the efficacy of anti-trafficking interventions has been published in the *Journal of Social Inclusion*[8], which was guest edited by leading human trafficking expert Siddharth Kara, a Harvard University Lecturer and author of "Sex Trafficking: Inside the Business of Modern Slavery." My qualitative interviews with convicted human traffickers were also published in the journal *Trends and Organized Crime*[9]. My research has also been published through magazines such as the Diplomatic Courier[10] and in media outlets,

---

[6] The Cochrane Library is a collection of high-quality, independent evidence to inform healthcare decision-making.

[7] While at University of Maryland, College Park, I contributed to and was named as a faculty member for the U.S. Department of Homeland Security, U.S. Customs and Border Protection, CBP Leadership Institute grant proposal, which was awarded in 2014.

[8] Kimberly Mehlman-Orozco, *Safe Harbor Policies for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice*, 3 Social Inclusion 52 (2015).

[9] Kimberly Mehlman-Orozco, *Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers*, 23 Trends in Organized Crime 95, 105-106 (2017).

[10] See, for example, Kimberly Mehlman-Orozco, *America's Symbolic, Not Effective, Anti-Trafficking Policy*, Diplomatic Courier (May 31, 2016), retrieved from: https://www.diplomaticourier.com/posts/americas-symbolic-not-effective-anti-trafficking-policy; Kimberly Mehlman-Orozco, *Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital*, Diplomatic Courier (May 4, 2016), retrieved from: https://www.diplomaticourier.com/posts/sex-slaves-prostitutes-human-trafficking-hidden-plain-sight-americas-capital; or Kimberly Mehlman-Orozco, *Devoid of Research: An Evaluation of Human Trafficking Interventions*, Diplomatic Courier (Mar. 18, 2014), retrieved from: https://www.diplomaticourier.com/posts/devoid-of-research-an-evaluation-of-human-trafficking-interventions.

such as USA Today[11], Politico[12], The Houston Chronicle[13], The Hill[14], The Washington

---

[11] See, for example, Kimberly Mehlman-Orozco, *Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen*, USA Today (July 10, 2019), retrieved from: https://www.usatoday.com/story/opinion/2019/07/10/jeffrey-epstein-alexander-acosta-donald-trump-sex-trafficking-agreement-column/1686687001/ ; Kimberly Mehlman-Orozco and William Snyder, *Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie*, USA Today (Apr. 4, 2019), retrieved from: https://www.usatoday.com/story/opinion/2019/04/04/robert-kraft-lawyers-sex-trafficking-conviction-difficult-column/3325857002/; and Mehlman-Orozco, Kimberly (2023). 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors? USA Today. Retrieved from: https://www.usatoday.com/story/opinion/2023/08/04/sound-freedom-trafficking-secondary-exploitation/70464194007/.

[12] See, for example, Kimberly Mehlman-Orozco, *How to Fight Sex Trafficking*, Politico (Feb. 24, 2019), retrieved from: https://www.politico.com/magazine/story/2019/02/24/sex-trafficking-225203/.

[13] See, for example, Kimberly Mehlman-Orozco and Simon Hedlin, *Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking*, The Houston Chronicle (Jan. 19, 2017), retrieved from: https://www.houstonchronicle.com/opinion/outlook/article/Mehlman-Orozco-Hedlin-Stop-criminalizing-10869881.php.

[14] See, for example, Kimberly Mehlman-Orozco and William D. Snyder, *Legalizing prostitution could end sex-trafficking investigations*, The Hill (Mar. 19, 2019), retrieved from: https://thehill.com/opinion/criminal-justice/434272-legalizing-prostitution-could-end-sex-trafficking-investigations/#:~:text=Research%20suggests%20that%20legalization%20would,it%20would%20hamper%20trafficking%20investigations; Kimberly Mehlman-Orozco, *Trafficking victims get lost under unjust criminal convictions*, The Hill (Dec. 8, 2017), retrieved from: https://thehill.com/opinion/civil-rights/363902-trafficking-victims-get-lost-under-unjust-criminal-convictions/; Kimberly Mehlman-Orozco, *Decriminalize sex work to bring trafficking victims out of the shadows*, The Hill (Oct. 21, 2017), retrieved from: https://thehill.com/opinion/civil-rights/356512-decriminalize-sex-work-to-bring-trafficking-victims-out-of-the-shadows/; Kimberly Mehlman-Orozco, *Sex Trafficking is often hidden in plain sight*, The Hill (Oct. 21, 2016), retrieved from: https://thehill.com/blogs/pundits-blog/immigration/302150-sex-trafficking-is-often-hidden-in-plain-sight/; and Kimberly Mehlman-Orozco, *What happens after a human trafficking victim is 'rescued'?*, The Hill (July 29, 2016), retrieved from: https://thehill.com/blogs/congress-blog/judicial/289709-what-happens-after-a-human-trafficking-victim-is-rescued/.

Post[15], The Baltimore Sun[16], The Crime Report[17], Thomson Reuters[18], and others. Moreover, I am frequently interviewed and consulted by the media on topics related to human trafficking; for example, most recently in *Forbes*,[19] as well as by CNN, NBC, CBS, Fox News, among others.

---

[15] See, for example, Kimberly Mehlman-Orozco, *Decriminalizing sex work would help bring victims out of the shadows*, The Washington Post (Dec. 20, 2017), retrieved from: https://www.washingtonpost.com/opinions/decriminalizing-sex-work-would-help-bring-victims-out-of-the-shadows/2017/10/20/4b7d8be8-b38a-11e7-9b93-b97043e57a22_story.html; and Kimberly Mehlman-Orozco, *Vilifying Backpage.com won't help fight sex trafficking*, The Washington Post (July 18, 2017), retrieved from https://www.washingtonpost.com/opinions/vilifying-backpagecom-wont-help-fight-sex-trafficking/2017/07/18/101b0d34-6b12-11e7-abbc-a53480672286_story.html.

[16] See, for example, Kimberly Mehlman-Orozco, *Sex trafficking bill likely to do more harm than good*, The Baltimore Sun (March 22, 2018), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0323-fosta-trafficking-20180322-story.html; Kimberly Mehlman-Orozco, *What every parent should know about sex trafficking*, Baltimore Sun. (Mar. 28, 2017), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20170328-story.html; and Kimberly Mehlman-Orozco, *Consenting prostitutes or trafficked victims?*, Baltimore Sun (June 19, 2016), retrieved from: https://www.baltimoresun.com/opinion/op-ed/bs-ed-sex-trafficking-20160619-story.html.

[17] See, for example, Jennifer Lowery-Keith and Kimberly Mehlman-Orozco, *'Justice Denied': A Sex Trafficking Survivor Tells Her Story*, The Crime Report (Feb. 28, 2022), retrieved from: https://thecrimereport.org/2022/02/28/justice-denied-a-sex-trafficking-survivor-tells-her-story/; Kimberly Mehlman-Orozco and Greg Bristol, *Suing Social Media Sites Won't Curb Sex Trafficking: Advocates*, The Crime Report (Nov. 30, 2021), retrieved from: https://thecrimereport.org/2021/11/30/suing-social-media-sites-wont-curb-sex-trafficking-advocates/; Kimberly Mehlman-Orozco and Marisa Trasatti, *Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?*, The Crime Report (Aug. 31, 2021), retrieved from: https://thecrimereport.org/2021/08/31/does-nirvana-lawsuit-undermine-struggle-against-trafficking/; Kimberly Mehlman-Orozco, *The 'Racialization' of Sex Trafficking in America*, The Crime Report (May 4, 2021), retrieved from: https://thecrimereport.org/2021/05/04/1294014/; Kimberly Mehlman-Orozco, *COVID-19, the Commercial Sex Industry and Sex Trafficking*, The Crime Report (Mar. 22, 2021), retrieved from: https://thecrimereport.org/2021/03/22/covid-19-the-commercial-sex-industry-and-sex-trafficking/; Kimberly Mehlman-Orozco, *Why the Stop Enabling Sex Traffickers Act is the Wrong Solution*, The Crime Report (Sept. 13, 2017), retrieved from: https://thecrimereport.org/2017/09/13/why-the-stop-enabling-sex-traffickers-act-is-the-wrong-solution/; Kimberly, Mehlman-Orozco, *Child Trafficking: The Tragedy of 'Princess'*, The Crime Report (July 10, 2017), retrieved from: https://thecrimereport.org/2017/07/10/child-trafficking-the-tragedy-of-princess/; Kimberly Mehlman-Orozco, *Hunting the Internet's Sex Predators*, The Crime Report (June 14, 2017), retrieved from: https://thecrimereport.org/2017/06/14/hunting-the-internets-worst-predators/; Kimberly Mehlman-Orozco, *Sex Trafficking: A Surprising Rescue Story*, The Crime Report (May 17, 2017), retrieved from: https://thecrimereport.org/2017/05/17/sex-trafficking-a-surprising-rescue-story/; and Kimberly Mehlman-Orozco, *Why Do We Criminalize Young Victims of Sex Trafficking?*, The Crime Report (Jan. 17, 2017), retrieved from: https://thecrimereport.org/2017/01/17/why-do-we-criminalize-young-victims-of-sex-trafficking/.

[18] Kimberly Mehlman-Orozco, *Why cracking down on websites won't stop online sex trafficking*, Thomson Reuters Foundation (Mar. 2, 2018), retrieved from: https://news.trust.org/item/20180302174534-se03q/; Kimberly Mehlman-Orozco, *Why we should question the FBI's recent human trafficking sting*, Thomson Reuters Foundation (Oct. 24, 2017), retrieved from: https://news.trust.org/item/20171024161910-x96o5; Kimberly Mehlman-Orozco, *To sue or not to sue third-party businesses for sex trafficking?*, Thomson Reuters Foundation (July 3, 2017), retrieved from: https://news.trust.org/item/20170703203545-k6b8z; and Kimberly Mehlman-Orozco, *Will shutting down Backpage.com end the scourge of child sex trafficking in America?*, Thomson Reuters Foundation (May 30, 2017), retrieved from: https://news.trust.org/item/20170530154532-pjag0.

[19] Thomas Brewster, *Sex Traffickers Used America's Favorite Family Safety App To Control Victims*, Forbes (Apr. 6, 2023), retrieved from: https://www.forbes.com/sites/thomasbrewster/2023/04/06/sex-traffickers-use-parenting-apps-like-life360-to-spy-on-victims/?sh=92d15c864c3a.

I also serve as a peer-reviewer for empirical research articles on human trafficking, for example with the *Journal of Human Trafficking* and *American Journal of Evaluation*. I also serve as a peer-reviewer for grant applications for human trafficking research. Most recently, I was invited by the *Journal of Human Trafficking* to review a manuscript entitled "*A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign.*" Additionally, in June 2022, I served as an invited peer-reviewer for the U.S. Department of Justice, Office of Justice Programs, National Institute of Justice Research and Evaluation on Trafficking in Persons. Previously, I was invited by the Office of Justice Programs and National Institute of Justice to serve as a peer-reviewer for FY 2020 Research on Law Enforcement Responses to Sex Trafficking of Minors.

At present, I have testified in court for a total of eleven cases[20]:

1. Five criminal cases in California state court;
2. One criminal case in federal court in California;
3. One criminal case in federal court in New Mexico;
4. One criminal case in New York state court;
5. One criminal case in Virginia state court;
6. One civil case in federal court in Virginia; and
7. One criminal case in federal court in Arizona.

I have also sat for depositions for a total of eleven cases:

1. Four civil cases in state court in Georgia;
2. Two civil cases in federal court in New York;
3. One civil case in federal court in Virginia;
4. Two civil cases in federal court in California;
5. One civil case in federal court in Oklahoma; and
6. One civil case in federal court in Ohio.

Additionally, there are four orders recognizing the admissibility of my expert witness testimony:

1. One civil case in federal court in Virginia[21];
2. Two criminal cases in federal court in New Mexico[22];
3. One criminal case in federal court in California[23]; and
4. One case in federal civil court in Georgia[24].

---

[20] See Appendix A and Appendix B for lists of cases.
[21] Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA). Virginia Eastern District.
[22] United States v. Bhula. 645 F. Supp. 3d 1228 (D.N.M. 2022) District of New Mexico and United States v. Galloway. No. 1:17-cr-01235-WJ District of New Mexico.
[23] United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO
[24] W.K. et. al., v. Red Roof Inn, et. al. Civil Action Number 1:20-cv-5263.VHC. Georgia.

For example, in *United States v. Matthew Woods*, case number 1:17-cr-01235-WJ United States District Court, District of New Mexico , where I was proffered as an expert on behalf of the prosecution, Chief United States District Judge William P. Johnson issued an Order on November 5, 2020 that read in part "*Dr. Mehlman-Orozco considers herself a leading expert in cases on sex trafficking and the Court agrees with that self-description*." This is one of several instances where I have been retained as a human trafficking expert in criminal matters both by state and federal prosecutors. I have also consulted on dozens, if not hundreds, more.

## II.   DEFINITIONS

In order to facilitate precision in language, which is undoubtedly important when evaluating the present claims, I proffer the following definitions, which reflect commonly accepted understanding of key concepts in the human trafficking literature or social scientific research.  In addition, I may also from time-to-time use terms that are defined in the United States Code.  I am not a lawyer and these definitions do not and are not intended to supplant the Court's legal interpretations.  I am not offering, and do not intend to offer, any legal opinions.

**Labor trafficking**: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[25]

**Involuntary Servitude:** a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury or by the use or threat of coercion through law or the legal process.[26]

**Coercion:** the term "coercion" means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of the legal process.[27]

**Serious Harm:** any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.[28]

**Abuse or Threatened Abuse of Law or Legal Process:** the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.[29]

---

[25] 22 U.S.C. § 7102.(11)(B).
[26] This definition encompasses cases in which the defendant holds the victim in servitude by placing him or her in fear of such physical restraint or injury or legal coercion. *United States v. Kozminski*, 487 U.S. 931, 952 (1988).
[27] *Ibid*; 22 U.S.C. § 7102.(3).
[28] 18 U.S. Code § 1589 (c)(2)).
[29] 18 U.S.C. §1589(c)(1).

**Secondary Exploitation:** the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon.[30]

**Recruiter:** Those who facilitate migrant workers to find employment.
Trafficking: Article 3 of the UN Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (2000):

> "(a) 'Trafficking in persons' shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;

> (b)  The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph (a) of this article shall be irrelevant where any of the means set forth in subparagraph (a) have been used;

> (c)  The recruitment, transportation, transfer, harbouring or receipt of a child for the purpose of exploitation shall be considered 'trafficking in persons' even if this does not involve any of the means set forth in subparagraph (a) of this article;

> (d)  'Child' shall mean any person under eighteen years of age[31]."

**Antisocial Behavior:** a broad construct that encompasses not only delinquency and crime, but also disruptive behavior of children, such as aggression, below the age of criminal responsibility[32].

**Deterrence:** the antisocial prevention effects of the threat of consequence; a theory of choice in which individuals balance the benefits and costs of antisocial behavior or crime[33].

---

[30] See, for example, Mehlman-Orozco, Kimberly (2024). Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery. *International Journal of Academic Research in Public Policy and Governance*; Mehlman-Orozco, K., *Hidden in Plain Sight: America's Slaves of the New Millennium*, Praeger (2017); Cojocaru, Claudia. *My experience is mine to tell: Challenging the abolitionist victimhood framework*. Anti-Trafficking Review 7 (2016): 12-38; and Mehlman-Orozco, Kimberly. 2023. 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors?. *USA Today*.

[31] Pearson, Elaine, et. Al. (2006) The Mekong Challenge: Underpaid, Overworked and Overlooked. International Labor Organization. Retrieved from: http://www.ilo.org/wcmsp5/groups/public/---asia/---ro-bangkok/documents/publication/wcms_bk_pb_67_en.pdf

[32] Pulkkinen, L. 2001. Antisocial Behavior in Childhood and Adolescence. International Encyclopedia of the Social & Behavioral Sciences. https://www.sciencedirect.com/science/article/pii/B008043076701737X

[33] Adapted from National Institute of Justice. 2016. Five Things About Deterrence. Department of Justice. https://nij.ojp.gov/topics/articles/five-things-about-deterrence

**General Deterrence:** the effects of legal consequence or punishment on the general public (potential antisocial offenders)[34].

**Specific Deterrence:** the effects of legal consequence or punishment on those individuals who actually undergo the consequence or punishment[35].

**Ecological Fallacy:** an error of attributing the characteristics of a population to an individual.

**Fallacy of Composition**: The error of assuming that what is true of a member of a group is true for the group as a whole.

**Methodology:** The specific methods, procedures, or practices needed to derive or interpret data within the scope of a particular discipline.

**Reliability:** The degree to which the result of a methodology can be depended on to be accurate (e.g., through the overall consistency of a measure by using a statistical approach).

**Confirmation Bias:** The tendency to process information by looking for, or interpreting, information that is consistent with an existing belief.

**Hindsight Bias:**[36] The *ex post* tendency to overestimate the *ex ante* likelihood of an outcome, relative to what one would have actually guessed before the event. Because most legal judgments are made *ex post*, they are vulnerable to this bias, as documented in a variety of experimental studies.[37]

**Epistemic Trespassing:** Epistemic trespassers are thinkers who have competence or expertise to make good judgments in one field, but move to another field where they lack competence—and pass judgment nevertheless. We should doubt that trespassers are reliable judges in fields where they are outsiders.[38]

**Chore:** assistance such as heavy housework, yard work, or sidewalk maintenance provided on an intermittent or one-time basis to assure health and safety[39].

---

[34] Adapted from Stafford, M.C. and M. Warr. Reconceptualization of General and Specific Deterrence. *Journal of Research in Crime and Delinquency Volume*: 30 Issue: 2, Pages: 123-135

[35] *Ibid.*

[36] In the present matter, this can also be understood as the tendency, upon learning an outcome of a criminal case to overestimate a third party's ability to have foreseen the crime.

[37] See, for example, R. MacCoun, in International Encyclopedia of the Social & Behavioral Sciences, 2001; Rachlinski, J. J. (1998). A positive psychological theory of judging in hindsight. The University of Chicago Law Review, 65(2), 571-625; Harley, E. M. (2007). Hindsight bias in legal decision making. Social Cognition, 25(1), 48-63; and Arkes, H. R., & Schipani, C. A. (1994). Medical malpractice v. the business judgement rule: Differences in hindsight bias. *Or. L. Rev.*, *73*, 587.

[38] Ballantyne, Nathan. Knowing Our Limits. Oxford University Press (2019).

[39] For example, see Department of Human Services Aging and People with Disabilities Oregon Administrative Rules. Retrieved from: https://www.oregon.gov/dhs/SENIORS-DISABILITIES/SUA/AAABusinessTraining/411-032.pdf

**Work:** the performance of services for which remuneration is payable[40].

**In Loco Parentis:** A Latin term meaning "in [the] place of a parent" or "instead of a parent."  Refers to the legal responsibility of some person or organization to perform some of the functions or responsibilities of a parent.[41]

**Exploitation:** the illegal or improper use of a person, for labor or sex, and for the purpose of another's profit or advantage[42].

**Sensitivity:** the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive).

**Specificity:** the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

---

[40] For example, see U.S. Department of Labor. Unemployment Insurance Program Letter No. 18-92. Retrieved from: https://oui.doleta.gov/dmstree/uipl/uipl92/uipl_1892.htm
[41] As defined by Cornell Law School. Retrieved from: https://www.law.cornell.edu/wex/in_loco_parentis
[42] Although the term "exploitation" is not explicitly defined in the Trafficking Victims Protection Reauthorization Act (TVPRA), this term is generally accepted to convey this definition as discussed in greater depth in the sections of below.

# III.   SUMMARY OF OPINIONS[43]

Given my extensive research, experience, education, and training on human trafficking, including specifically labor trafficking[44], as well as my review of the materials and evidence in this case, I opine to a reasonable degree of social scientific probability[45] as follows:

    **I.**      **The congressional intent of human trafficking laws is to address modern slavery.**

    **II.**      **Human trafficking is often conflated with other forms of crime and victims are frequently misidentified.**

    **III.**      **Extant human trafficking cases illustrate a clear pattern on what falls within the legal parameters of modern slavery.**

    **IV.**      **Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking, even if the Plaintiffs' specific allegations were all accepted as true, the actions described are not consistent with human trafficking indicia or legal precedent that falls within the scope of human trafficking.**

        **i.**    **Key hallmarks of labor trafficking are markedly absent from the Plaintiffs' descriptions of their interactions with the Defendants.**
        **ii.**    **The Plaintiffs' description of the activities they may have performed during their time with the Defendants can more fairly be described as chores and/or program-related activities designed for alternative therapy rather than trafficked labor.**
        **iii.**    **The Plaintiffs maintained regular access to education and health care during their time with the Defendants and the Trinity handbook clearly notified participants of the "ranch work" component of the therapeutic program.**

    **V.**      **The Plaintiffs' allegations, even if all accepted as true and countervailing evidence is ignored or rejected as false or unreliable, are atypical and inconsistent with standard labor trafficking patterns and indicia.**

---

[43] All of my opinions are stated to a reasonable degree of social scientific certainty in my profession as an expert in human trafficking and Ph.D. educated criminologist.

[44] Summary of labor trafficking expertise included in Appendix K.

[45] Within the social scientific and criminological communities, it is now deemed more appropriate to speak in terms of probability as opposed to certainty. See, for example, Karl Popper's Theory of Falsifiability and Rakoff, J. S. (2008). Science and the law: uncomfortable bedfellows. *Seton Hall L. Rev.*, *38*, 1379.

**VI.     Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking, it is reasonable to infer that the Defendants did not benefit from labor trafficking.**

**VII.    Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking, it is reasonable to infer that the Defendants did not facilitate labor trafficking.**

**VIII.   Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking, it is reasonable to infer that the Defendants did not recruit, entice, solicit, advertise, harbor, transport, provide, obtain or maintain the Plaintiffs for the purpose of labor servitude.**

**IX.     Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking, it is reasonable to infer that the Defendants did not knowingly benefit financially or receive anything of value from his alleged recruiting, enticing, soliciting, advertising, harboring, transporting, providing, obtaining or maintaining the Plaintiffs for the purpose of labor servitude.**

**X.      Based on the evidence and testimony in the present matter, as well as my expertise on human trafficking,  it is reasonable to infer that the Plaintiffs were not labor trafficked by the Defendants.**

**XI.     Based on my review of the evidence and testimony in this case, as well as my research, education, and experience, Dr. Boyd's opinions are rooted in misinformation, unsupported speculation or subjective belief, ecological fallacies, or fallacies of composition, and are counterfactual.**

The following sections of this report provide a summary and further explanation as to the evidentiary, empirical, and theoretical basis for each of the aforementioned opinions:

*Section IV. Provides a background on the impetus for modern human trafficking law and barriers to identification;*

*Section V. Discusses the concept of secondary exploitation, which explains the motivation behind false claims of human trafficking;*

*Section VI. Explores the indicia of human trafficking, as well as issues with sensitivity and specificity (misidentification), before examining what types of allegations are consistent with trafficking cases and what types of allegations are atypical;*

17

*Section VII. Proffers the origins and impetus of the troubled teen industry, as well as presents three criminological theories and the alignment of the Defendants' consequence strategies to curtail antisocial behavior;*

*Section VIII. Explains the allegations of the current case and examples of countervailing information;*

*Section IX. Examines Dr. Sara Boyd's credentials, report, and rebuttal; and*

*Section X. Summarizes the findings of this report in a conclusion.*

# IV.   HUMAN TRAFFICKING SUMMARY

## Background

Anti-trafficking efforts in the United States began with the 13th amendment to the U.S. Constitution. Passed by Congress on January 31, 1865, and ratified on December 6, 1865, the 13th amendment abolished slavery in the United States and provides that "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."[46]

Although the 13th amendment is credited for abolishing slavery in the United States, in reality it ended the overt buying and selling of people as chattel or personal property. Covert forms of enslavement continued and, until the passage of the Trafficking Victims Protection Act (TVPA[47]) in 2000, were prosecuted as forced labor.

The Trafficking Victims Protection Act (TVPA) was adopted in response to *United States v. Kozminski*, 487 U.S. 931 (1988). In that case, the Kozminskis recruited two men with noticeable mental incapacities for the primary purpose of living and working on their farm, where they each received $15 per week for their labor, working **seven days a week, for up to 17 hours a day in squalorous conditions**. Eventually, the men received no pay at all for their work, sustained actual or threatened physical abuse, and threats of re-institutionalization if they did not comply with the Kozminskis. In addition, the Kozminskis made "efforts to isolate the men from contact with the outside world through a pattern of verbal and physical abuse." The Kozminskis were convicted in District Court, but appealed the decision to the Sixth Circuit Court of Appeals, asserting that the District Court erred in broadly defining the term "involuntary servitude" to include psychological coercion.

The Sixth Circuit agreed with the Kozminskis, reversed the District Court, and remanded the case to be heard once again in Federal District Court with amended language to aid in determining the definition of involuntary servitude. Per the Sixth Circuit's decision, in order to convict the Kozminskis on the basis of psychological coercion, the U.S. Government had to prove that Robert and Louis were members of a vulnerable class – a minor, an immigrant, or mentally incompetent. However, before the case could be heard, the U.S. Government appealed the Sixth Circuit's decision to the U.S. Supreme Court, challenging the scope of the involuntary servitude's application.

The Supreme Court doubled down on the decision of the Sixth Circuit, preventing the prosecutors from expanding the definition of involuntary servitude to require threat of or sustained physical coercion. In doing so, the United States Supreme Court reversed the decision of the District Court and reversed the convictions of the Kozminskis for involuntary servitude, requiring

---

[46] National Archives. America's Historical Documents. 13th Amendment to the U.S. Constitution: Abolition of Slavery. https://www.archives.gov/historical-docs/13th-amendment
[47] The TVPA was later reauthorized as the Trafficking Victims Protection Reauthorization Act (TVPRA), both acronyms may be referenced herein.

clarifications to the jury instructions.

This case set precedent that the type of involuntary servitude prohibited by the Thirteenth Amendment is limited to that "enforced by the use or threatened use of physical or legal coercion." The legislative history reveals that, in enacting § 1589, Congress sought to expand Kozminski's limited definition of coercion under § 1584, stating that "[s]ection 1589 will provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski."   *See* H.R. Conf. Rep. No. 106-939, at 101, as reprinted in 2000 U.S.C.C.A.N. 1380, 1393.[48]

## Overview

Human trafficking generally refers to the recruitment, transportation, transfer, harboring or receipt of persons, by means of threat, force, coercion, abduction, fraud, or deception, for the purpose of exploitation. This definition encompasses two general forms of human trafficking: labor trafficking and sex trafficking.

Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

Sex trafficking, on the other hand is defined as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age.

The modern concept of human trafficking did not start becoming internationally popularized until the year 2000.

On October 28, 2000, the U.S. Congress enacted the Trafficking Victims Protection Act (TVPA)[49], which set up formidable actions to combat trafficking in persons. Specifically:

1. Coordinate and monitor anti-trafficking activities through an interagency task force;
2. Prevent human trafficking through vocational training, education, and human trafficking public awareness campaigns;
3. Protect human trafficking survivors by not detaining them in correctional facilities, providing them with medical care and other assistance, and protecting them and their families from revictimization and/or deportation; and

---

[48] Recognized by the Tenth Circuit in *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008).
[49] Trafficking Victims Protection Act of 2000 (TVPA), Pub. L. No. 106- 386. The TVPA was amended by the following: (1) the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA 2003), Pub. L. No. 108-193; (2) the Trafficking Victims Protection Reauthorization Act of 2005 (TVPRA 2005), Pub. L. No. 109-164; (3) the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA 2008), Pub. L. No. 110-457; (4) the Trafficking Victims Protection Reauthorization Act of 2013 (TVPRA 2013), Pub. L. No. 113-4; (5) the  Justice for Victims of Trafficking Act of 2015 (JVTA), Pub. L. No. 114-22.

4. Strengthening prosecution and punishment of human traffickers[50].

Less than two months after the TVPA was adopted in the United States, the United Nations met in Palermo, Italy, and adopted the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime—colloquially known as the Palermo Protocol. The purpose of the protocol was threefold:

1. To prevent and combat trafficking in persons, paying particular attention to women and children;
2. To protect and assist the victims of such trafficking, with full respect for their human rights; and
3. To promote cooperation among states' parties in order to meet those objectives[51].

Since 2000, there has been a substantial increase in public awareness of human trafficking. There are more anti-trafficking task forces, hotlines, and survivor services than ever before. However, there are still critical gaps between the human trafficking narrative, reality, and policy.

Although more people are aware of the human trafficking concept, few understand how this crime manifests in real life, and there is little empirical data to support generalizable information. Typically, victims are coerced, defrauded, and deceived for the purpose of exploitation[52] and are manipulated into complacency. Many organizations and anti-trafficking authorities provide information on how to identify "red flags" of human trafficking, which have yet to be empirically tested, and even trained law enforcement and service providers frequently misidentify victims.

As a result, while the congressional intent behind the TVPA[53] is clear— to combat trafficking in persons, a contemporary manifestation of slavery—the modern legal application is not without challenges to interpretation. Many experts agree that "the anti-trafficking field is a strikingly 'rigor-free zone' when it comes to defining the concept's legal parameters[54]. It is believed that key aspects of the legal definition were intentionally left vague in order to achieve consensus, but this has resulted in the indiscriminate conflation of legal concepts and misidentification of victims[55].

Even the International Labor Organization recognizes:

> There are questions concerning what is meant by terms such as "coercion", "deception", "fraud", "abuse of power or of a position of vulnerability", "control over another person"

---

[50] Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. H.R. 3244 (2000). http://www.state.gov/j/tip/laws/61124.htm
[51] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime. (2000).
[52] As defined above: the illegal or improper use of a person, for labor or sex, and for the purpose of another's profit or advantage
[53] Later reauthorized as the Trafficking Victims Protection Reauthorization Act (TVPRA).
[54] Chuang, Janie A. (2014). Exploitation Creep and the Unmaking of Human Trafficking Law. *The American Journal of International Law*. (108) 4: 609-649.
[55] *Ibid.*

Case 2:20-cv-00215-SWS   Document 307-4   Filed 09/27/24   Page 22 of 110

*and "exploitation". Without further clarification there is a risk that interpretations of these terms may continue to diverge widely from one country to another or even within countries, from one researcher or practitioner to another. Without clear operational indicators there is also a risk that researchers and practitioners may not recognize trafficking when they see it – **or see trafficking where it does not exist**[56]."*

---

[56] ILO. (2009). Operational indicators of trafficking in human beings: Results from a Delphi survey implemented by the ILO and the European Commission. Retrieved from:
http://www.ilo.org/wcmsp5/groups/public/@ed_norm/@declaration/documents/publication/wcms_105023.pdf

# V.    SECONDARY EXPLOITATION[57]

*Overview*

Given the increased international attention on human trafficking, more service providers, practitioners, and politicians are becoming involved in the movement for modern-day abolitionism. However, the incentive for assisting victims of human trafficking is not always altruistic. Qualitative data suggest that there are an increasing number of third parties who are secondarily exploiting human trafficking survivors, as well as persons erroneously identified as victims, and the topic of human trafficking in general.

Secondary exploitation can take many forms[58]. As previously discussed, it can be defined as the act of making use of or benefiting from a human trafficking survivor's victimization or the human trafficking phenomenon[59]. For example, a human trafficking survivor could be exploited by a third party who wants to tell the victim's story in order to draw attention to themselves or their organization[60]. Politicians also use human trafficking and/or the stories of victimizations to help themselves get elected[61].

As a human trafficking expert witness, I've found that an increasing number of tort attorneys are filing lawsuits against innocent businesses for "human trafficking" or "facilitating human trafficking" when the facts do not support these accusations. Both Plaintiff and Defense attorneys have attempted to recruit my expert witness services in these types of cases. Some situations do not

---

[57] It should be noted that on one occasion there was an order excluding my ability to testify only on the narrow issue of secondary exploitation due to relevance in that particular case (See *W.K. v. Red Roof Inns* in Atlanta). However, the concept of secondary exploitation has been acknowledged by the academic community and since this ruling my article on this topic—entitled Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery— was accepted for publication in the peer reviewed International Journal of Academic Research in Public Policy and Governance. Additionally, there are some clear distinctions between the prior case and the present matter. For example, W.K. was a case involving third party liability of a hotelier, with associated criminal complaints against the alleged trafficker(s). Moreover, I believe this concept is absolutely germane to the present matter because of the nature of the activities, which were even described by the Plaintiffs as "chores" at times.

[58] For example, as discussed in: Mehlman-Orozco, Kimberly. (2023). 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors?. USA Today. https://www.usatoday.com/story/opinion/2023/08/04/sound-freedom-trafficking-secondary-exploitation/70464194007/

[59] Mehlman-Orozco, Kimberly. (2017). *Hidden in Plain Sight: America's Slaves of the New Millennium*. Praeger.

[60] While there are not reliable data on the prevalence of this phenomenon, its existence is generally accepted within the field. For example, see: Bernstein, E., & Shih, E. (2014). The erotics of authenticity: Sex trafficking and 'reality tourism' in Thailand. Social Politics: International Studies in Gender, State and Society, 21(3), 430–460; Wylie, G. (2016). The international politics of human trafficking. London: Palgrave; Cojocaru, C. (2016). My experience is mine to tell: Challenging the abolitionist victimhood framework. Anti-Trafficking Review, 7, 12–38; Gregoriou, C., & Ras, I. A. (2018). Representations of transnational human trafficking: A critical review. Representations of Transnational Human Trafficking: Present-day News Media, True Crime, and Fiction, 1-24; among others.

[61] Mehlman-Orozco, Kimberly. (2017). In Virginia race, human trafficking must be more than a talking point. *The Hill*. Retrieved from: http://thehill.com/opinion/campaign/358814-in-virginia-race-human-trafficking-must-be-more-than-a-talking-point

involve human trafficking and in cases where human trafficking is found to have occurred, I find that many Defendants are truly unwitting to the human trafficking situation and certainly did nothing to facilitate it, suggesting that the lawsuits may be motivated by money, as opposed to culpability.

Human traffickers should undoubtedly be held criminally and civilly accountable for their crimes and human trafficking survivors should be provided with services and protected from revictimization and erroneous criminalization. However, persons who are not survivors of human trafficking—a modern form of slavery—should not engage in secondary exploitation and falsely claim to be victims for the sole purpose of litigation strategy.

### Trafficking to the Rescue?

Unfortunately, across the country Plaintiff attorneys are admittedly pleading non-trafficking cases as trafficking claims. For example, as explained in an article entitled *Trafficking to the Rescue?* (attached as Exhibit II), which was published November 2020 in the *UC Davis Law Review*, civil litigators are confronted with imperfect legal responses to gender-based harms. Essentially, the author argues that in cases that don't involve trafficking, such as domestic violence and sexual assault, civil litigators are circumventing judicial hurdles by reframing the crimes as acts of "human trafficking."

The author, Ms. Julie Dahlstrom, describes that civil litigators invoke the TVPRA because:

1. Statutes of limitations are short in domestic violence and sexual assault cases;
2. It allows for Plaintiffs to file claims against third parties who knowingly benefit from a "venture;" and
3. TVPRA provides an avenue for civil litigators to circumvent existing insurance exclusions that deny coverage for intentional torts, including many domestic violence and sexual assault cases.

Ms. Dahlstrom acknowledged that the ***proper avenue for addressing these judicial hurdles for gender-based harms is through legislative change***. In fact, some legislators have already begun to make changes to address these issues for gender-based crimes like sexual assault. For example, in February 2019 New York Governor Andrew Cuomo signed into law the Child Victims Act, loosening the tight statute of limitations for state sexual assault cases, and providing victims with a one-year window in which to file previously time-barred civil claims.

Similarly, pertinent to the present case, new state laws are aiming to regulate the "troubled teen industry[62]" and critics of the "troubled teen industry" argue that a federal statute should be enacted to ensure equal protections across states lines that will prevent private hospitals from admitting youth without meeting the admission criteria for civil commitments[63].

---

[62] Evans, Cameron. 2022. State laws aim to regulate 'troubled teen industry,' but loopholes remain. USA Today. https://www.usatoday.com/story/news/health/2022/01/19/troubled-youth-industry-regulations-loopholes/6568554001/?gnt-cfr=1
[63] Trevino, Laura. "It's No Breakfast Club: A Look at the Due Process Requirements of Children in Private Residential Treatment Centers." *Available at SSRN 3718094* (2020).

Yet, Plaintiff attorneys are continuing to circumvent judicial hurdles in sexual assault cases by pleading them as violations to the TVPRA instead. For example, in Ms. Dahlstrom's published article, she cited a Zoom interview with one Plaintiff attorney, Jonathan Little, where he was quoted as stating, "I tell clients . . . get a copy of the policy, look at it, and figure out how I am going to get coverage here. That's what it all boils down to[64]". He went on to state that "blue states are good, red states aren't good" for victims of sexual abuse in state civil claims and for that reason, "We are always looking at federal law.[65]"

Another Plaintiff Attorney, Dan Lipman was quoted as stating, "judges can perceive that plaintiffs' attorneys are filing TVPRA claims to get around the two year statute of limitations but using the TVPRA is not an **"end run"** or **"trickery"** because **"we're using a law that's been made available to us.**[66]" Mr. Lipman was also directly quoted as saying, "[T]he benefit of the TVPA . . . [is] there are no artificial state tort reform caps. There's no caps at all.[67]" While Mr. Lipman may perceive his "use" of the TVPRA as innovative, others may perceive this as secondarily exploitive, deceptive to judges, and in contrast with the congressional intent.

A third Plaintiff Attorney, Larkin Walsh, was quoted as stating, finding a federal cause of action "just seems to open up a lot of doors…" and "I will say at least in the [TVPRA] cases we are pursuing, the perpetrators are judgment proof. Institutions, if you have the right institution, they have assets or they have significant insurance[68]."

A fourth Plaintiff Attorney, Ryan Hudson, was quoted as stating, "statutes of limitations are a major problem — in fact, the number one problem— for a plaintiff trying to proceed under state law claims" for sexual assault victims.[69] Mr. Hudson also stated, "statutes of limitations are reasons one through thirty [why to invoke the TVPRA] because you lose any state law claim in any state that hasn't extended in."[70] Mr. Hudson went on to claim, "("You have a floor of 150,000 dollars [in liquidated damages] per [TVPRA] violation. And attorney's fees under Section 1595. Those don't exist under state law claims, and they're powerful incentives to bring these claims, which is what Congress intended.[71]"

As mentioned previously, human traffickers should undoubtedly be held criminally and civilly accountable for their crimes and human trafficking survivors should be provided with services and protected from revictimization and erroneous criminalization. However, the topic of modern slavery and the protections afforded by the TVPRA, as well as other state-level trafficking statutes, should not be secondarily exploited by persons who are not victims of human trafficking. To this effect, even critics perceive the allegations against the "trouble teen industry," if all are accepted as true and countervailing evidence is ignored or rejected as false or unreliable, as being

---

[64] Page 27 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[65] Page 28 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[66] Page 28 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020). Emphasis added for this report.
[67] Page 25 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[68] Page 26-27 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[69] Page 28 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[70] Page 59 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).
[71] Page 25 of Julie Dahlstrom, *Trafficking to the Rescue?*, 54 U.C. Davis Law Review 1 (2020).

suggestive of physical, mental, and/or sexual abuse[72], not human trafficking. ***"Trafficking" claims are not intended to "rescue" non-trafficked persons, as certain Plaintiff attorneys suggest[73]; making use of or benefiting from the human trafficking phenomenon is the very definition of secondary exploitation.***

The concept of secondary exploitation has been acknowledged by the academic community and most recently my article on this topic—entitled _Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery_— was accepted for publication in the peer reviewed International Journal of Academic Research in Public Policy and Governance.

Ultimately, the Congressional intent behind anti-trafficking laws is to combat modern slavery, not to create a secondarily exploitative avenue for civil liability. Allegations that are exaggerated and/or inconsistent with typical trafficking cases may be a sign of secondary exploitation. False or overstated claims diminish the true harm suffered by actual victims of human trafficking.

---

[72] Younis, Yasmin L. "Institutionalized Child Abuse: The Troubled Teen Industry." (2021).
[73] Julie Dahlstrom, _Trafficking to the Rescue?_, 54 U.C. Davis Law Review 1 (2020).

***Concerns Regarding Present Case***

When asked why she is suing Trinity Teen Solutions, Plaintiff Sherman testified:

> *"Well, if I had a better understanding of the law a few years ago, I would have filed a personal injury lawsuit for all of the abuse I experienced there, **<u>but obviously the statute of limitations on that ran out, and so we filed a human trafficking/forced labor lawsuit…[74]</u>***"

This can be interpreted as a concession that the present action is not a human trafficking case.

This is consistent with testimony from the other named Plaintiffs, which makes clear that they consider their treatment at Trinity Teen Solutions to be "abuse" not "trafficking." Utilizing the TVPRA law because of the litigation advantages it offers, namely, longer statute of limitations, is suggestive of possible secondary exploitation.

Moreover, it should be noted that the Plaintiffs' own named expert witness, Dr. Sarah Boyd, lacks any formal education, research or practical experience, or specialized knowledge on trafficking issues and did not appear to have performed interviews that are appropriate for "survivors of trafficking." Based on my experience in interviewing victims of human trafficking, trauma-informed interviews take no less than five hours to complete and can take well over ten hours, across multiple days, depending on the complexity of the case and sensitivities of the survivor. Dr. Boyd, however, only spent 60 minutes to 105 minutes with each interviewee and merely had follow-up interviews with three alleged victims—A.G., G.L., and S.W. (see Table 1). Some of this time was consumed with Dr. Boyd's own overview of the evaluation purpose and process, which included her describing her role, their rights, evaluation procedures, limits of confidentiality, and likely uses of information gathered during the evaluation.

**Table 1. Length of Dr. Boyd's Interviews**

| Alleged Victim | Day 1 Interview Minutes | Day 2 Interview Minutes | Total Minutes |
|---|---|---|---|
| A.G. | 60 | 45 | 105 |
| C.S. | 90 | — | 90 |
| A.N. | 60 | — | 60 |
| G.L. | 60 | 20 | 80 |
| I.J | 60 | — | 60 |
| S.W. | 50 | 45 | 95 |

---

[74] Carlie Sherman Deposition. Page 111, 24-25 and Page 112, 1-4.

Yet, despite the relatively short interview times[75], all of the Plaintiffs, according to Dr. Boyd, allegedly disclosed avoidance symptoms, disordered eating, mood disorder symptoms, sleep disruption, damage to family relationships, and educational disruption[76]. Some or most of the Plaintiffs, according to Dr. Boyd, allegedly disclosed intrusion symptoms, self-destructive tension reduction behaviors, and/or somatic complaints.[77]

Dr. Boyd also claims that during these relatively short interviews, she traversed the topics of:

1. Communication;
2. Physical labor;
3. Punishments;
4. Privacy;
5. Living arrangements;
6. Sleep patterns;
7. Eating patterns;
8. Hygiene;
9. Criticism;
10. Nightmares;
11. Transportation;
12. Childhood sexual abuse; and
13. Medical care, among others.

If the Plaintiffs allegations are accepted as true, and countervailing evidence is rejected as false or unreliable, it would be impossible to perform trauma-informed interviews appropriate for alleged victims of trafficking with any degree of reliability, traversing this number topics, in less than two hours.

According to the Office for Victims of Crime, Training and Technical Assistance Center (OVC TTAC):

1. Building rapport is the first step in interviewing human trafficking victims in a trauma-informed way;
2. Any trauma-informed interview approach toward a suspected victim should be a *gradual*;
3. Trauma-informed interviews should avoid interrogation methods.
4. It is best to use a conversational approach rather than a rapid series of questions;
5. ***Interviewers should not expect victims to go into detail about their trafficking experiences during the first interview. In fact, it might take many interviews to get the victims comfortable enough to share details of their trafficking;*** and

---

[75] My interviews of human trafficking survivors generally take a minimum of five hours, but more frequently 10 hours or more, across multiple days.
[76] Boyd Report. Pages 2-3.
[77] *Ibid.*

6.  ***It will take time and trust to develop the facts of a case[78].***

As such, given the time allotted to each Plaintiff and the number of topics traversed, Dr. Boyd's questioning did not appear to be consistent with "trauma-informed" human trafficking interviews; instead, Dr. Boyd's short interviews of the Plaintiffs appear to be more consistent with questioning performed for the purpose of secondary exploitation.

---

[78] OVCTTAC. N.d. Trauma-Informed Victim Interviewing. Office of Justice Programs. Retrieved from: https://www.ovcttac.gov/taskforceguide/eguide/5-building-strong-cases/53-victim-interview-preparation/trauma-informed-victim-interviewing/

# VI.   HUMAN TRAFFICKING PARAMETERS

Given the trends in secondary exploitation, it is essential to rely upon reliable principles and scientific methods when assessing whether a claim is consistent with human trafficking. Although there is little reliable empirical data on human trafficking, some exploratory research has begun to establish themes on the nature of human trafficking crimes, although many of these methods have low rates of sensitivity and specificity.

## Sensitivity and Specificity

Herein, the term sensitivity is defined as the ability of law enforcement, service providers, and other third parties to correctly identify true victims of human trafficking (true positive). The term specificity refers to the ability of law enforcement, service providers, and other third parties to correctly identify persons who are not victims of human trafficking (true negative).

In regard to labor trafficking victim identification, low sensitivity of means that victims of human trafficking are at risk of being misidentified as non-victims, criminals, or co-conspirators. Low specificity means that persons who are not victims of labor trafficking are at risk of being misidentified as being possible victims.

Although the efficacy of purported "red flags" for labor trafficking victim identification is relatively unknown, to a reasonable degree of social scientific certainty I can hypothesize that many of the "red flags" will have low rates of sensitivity and specificity.

These hypotheses are informed by my background, training, and expertise on the high rates of misidentification of victims by even trained professionals, including law enforcement. Moreover, there is a growing body of civil litigation regarding misidentification resulting from misguided "red flag" training on human trafficking, as well as alternative explanations for the impetus of civil claims under the Trafficking Victims Protection Reauthorization Act (TVPRA).

## Human Trafficking Operational Indicators

One of the first protocols for methodically screening and identifying human trafficking was published in 2009 by the International Labour Office. The protocol (see Appendix C for example) was developed from a Delphi methodology, which involved two successive electronic surveys of human trafficking experts: a first survey in April 2008 to collect indicators from the expert group; and a second one in July 2008 to establish a rating of the indicators. Experts were selected from the 27 EU Member States from police, government, academic and research institutes, NGOs, international organizations, labor inspectorates, trade unions and judiciaries.

Findings from the survey suggested there are six "dimensions" of trafficking indicators: (1) deceptive recruitment, (2) coercive recruitment, (3) recruitment by abuse of vulnerability, (4) exploitive conditions of work, (4) coercion at destination, and (5) abuse of vulnerability at destination. The indicia for each dimension were ranked "strong," "medium," or "weak" for each type of trafficking: (1) trafficking of adults for labor, (2) trafficking of adults for sex, (3) trafficking of children for labor, and (4) trafficking of children for sex.

Each of the six dimensions of trafficking were assessed independently from the others and the result of the assessment was positive if the dimension included at least: (1) Two strong indicators, or (2) One strong indicator and one medium or weak indicator, or (3) Three medium indicators, or (4) Two medium indicators and one weak indicator.

After an assessment was done for each dimension, the final analysis involved combining the six elements to identify potential victims of trafficking—in the case of adults, the presence of deception, coercion, abuse and exploitation and in the case of children simply the presence of exploitation.

A full scale test of these indicators took place in Moldova in the second half of 2008, using a sample of migrants. The final analysis of the dataset gave the ratio of migrants to victims of deceptive or coercive recruitment, exploitation, and coercion at destination. Based on the results, migrants were qualified as successful migrants (no deception, no exploitation, no coercion), exploited migrants (exploitation without deception or coercion), victims of deception and exploitation (without coercion) and victims of trafficking for forced labor (deception, exploitation, and coercion).

A full list of the indicia for trafficking of children for labor exploitation from the Delphi Survey is included in Appendix C. A summary of "Strong Indicators," across all trafficking types, are listed below:

- *Deceptive recruitment:* being deceived about the nature of the job, location, or employer, or deceived about access to education opportunities.
- *Coercive recruitment:* violence, abduction, forced marriage, forced adoption or selling of the victim, debt bondage, or threats of violence.
- *Abuse of vulnerability:* no identified strong indicators.
- *Exploitation:* excessive working days, excessive working hours, or hazardous work.
- *Coercion at destination:* confiscation of documents, debt bondage, forced into illicit/criminal activities, forced tasks or clients, isolation, confinement, surveillance, threats of violence against victim, or violence against victim.
- *Abuse of vulnerability at destination:* dependency on exploiters.

However, given the dearth of empirical research on human trafficking "red flags" and indicia, it is important to consider the totality of the circumstances, as well as available qualitative research and evidence when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely

instead on abstract presumptions or unsupported generic allegations. Close examination of extant human trafficking cases in the United States reveals a clear theme in the types of actions that rise to the level of being tantamount to forced labor or modern slavery (for examples see the section below).

### *Evidence-Base on Human Trafficking Identification*

Although human trafficking identification protocols are innovative, at present the state-of-the science research suggests that many of these "indicia" have low rates of sensitivity and specificity. Moreover, they have yet to be empirically validated with reliable empirical methods.

Within the field of criminology, it is generally accepted that randomized controlled trials (experiments) are considered the gold-standard—the highest quality research—for evaluating the effectiveness of an intervention. In order to promote more evidence-based interventions to effectively combat crime, criminologists have taken a distinct "experimental turn" and the sheer number of quantitative experiments in criminology has increased dramatically in recent decades.[79] Most evidence-based criminological interventions have dozens of experiments supporting their efficacy. For example, Braga, Welsh, and Schnell (2015) conducted a meta-analysis of 30 randomized experimental and quasi-experimental tests of disorder policing.[80] However, there is remarkably less research evaluating the efficacy of human trafficking interventions focused on identification.

In order to be considered "high quality," a study would at least need to have a level 3 on the Maryland Scientific Methods Scale (SMS) (see Table 2).

**Table 2. Maryland Scientific Methods Scale (SMS)[81]**

| Level | Study Design |
|-------|--------------|
| 1 | Correlation between a prevention program and a measure of crime at one point in time. |
| 2 | Measures of crime before and after the program, with no comparable control condition. |
| 3 | Measures of crime before and after the program in experimental and comparable control conditions. |
| 4 | Measures of crime before and after the program in multiple experimental and control units, controlling for other variables that influence crime. |
| 5 | Random assignment of program and control conditions to units. |

At present, I am not aware of even a single published Level 1 study evaluating the efficacy of the human trafficking victim identification protocols.

---

[79] Sampson, R.J. Gold Standard Myths: Observations on the Experimental Turn in Quantitative Criminology. J Quantitative Criminology 26, 489–500 (2010). https://doi.org/10.1007/s10940-010-9117-3
[80] Braga, A. A., Welsh, B. C., & Schnell, C. (2015). Can Policing Disorder Reduce Crime? A Systematic Review and Meta-analysis. Journal of Research in Crime and Delinquency, 52(4), 567–588. https://doi.org/10.1177/0022427815576576
[81] Farrington, D. P., Gottfredson, D. C., Sherman, L. W., & Welsh, B. C. (2003). The Maryland Scientific Methods Scale. In Evidence-based crime prevention (pp. 27-35). Routledge.

## Potential for Erroneous Application

The reality is that certain types of relationships may ostensibly appear to reflect "strong trafficking indicators," but fall outside the scope of trafficking. For example, in the U.S. military, while Service Members are afforded the same rights to religious freedom as are American civilians, they willingly surrender on a temporary basis certain free exercise rights when it impinges on military discipline and the successful completion of a military objective[82]. Certain members of the military have made allegations that they were deceived about the nature of the job, location of the job, and access to education opportunities. Specifically, for example, these members allege that they were told by their recruiter that they could change their job after they enlist, that they would not be deployed, and that they would be denied access to college if they didn't follow through with enlisting, even if they were minors at the time. In boot camp and/or once enrolled, certain members report being subjected to acts of violence, explicit threats of violence, excessive working days, and excessive working hours. Moreover, the military recognizes members can feel isolated[83] and are subjected to periods of confinement, as well as surveillance while depending on the armed forces for housing, transportation, access to communication, and food.

Ultimately, the U.S. military ostensibly meets 13 of the 21 "strong trafficking indicators" (see Table 3). Even though the methods of certain military recruiters and supervising officers may be viewed as reprehensible (for example instances of military sexual assault, violence, and fraudulent methods of recruitment), overall these allegations are not consistent with trafficking and do not fall within the Congressional intent of the Trafficking Victims Protection Reauthorization Act (TVPRA).

Additionally, it should be noted that military housing has been accused of being "hazardous" and "squalid[84]," as well as dilapidated, too small, lacking in modern amenities, and/or substandard[85]—all of which are common allegations of TVPRA claims.

---

[82] U.S. Army Records Management Directorate Army Declassification Directorate. N.d. The First Amendment. Retrieved from: https://www.rmda.army.mil/civil-liberties/RMDA-CL-programs-first-amendment.html
[83] Military Health System. N.d. How to Combat Isolation and Loneliness. Retrieved from: https://health.mil/Military-Health-Topics/Centers-of-Excellence/Psychological-Health-Center-of-Excellence/Real-Warriors-Campaign/Articles/How-to-Combat-Isolation-and-Loneliness
[84] For example, see Joshua Schneyer on Reuters investigation that revealed hazardous, squalid housing of American military families. Thomson Reuters. Retrieved from: https://www.reutersagency.com/en/reutersbest/article/joshua-schneyer-on-reuters-investigation-that-revealed-hazardous-squalid-housing-of-american-military-families/
[85] For example, see Living on Base: Pros and Cons. Military.com. Retrieved from: https://www.military.com/pcs/living-on-base.html

Table 3. Strong Trafficking Indicators Applied to the U.S. Military

| Strong Trafficking Indicators | Military |
|---|---|
| Deception about the nature of the job | Allegations[86] |
| Deception on the location of the job | Allegations[87] |
| Deception about employer | — |
| Deception about access to education opportunities | Allegations[88] |
| Acts of Violence | Allegations[89] |
| Abduction | — |
| Forced Marriage | — |
| Forced Adoption | — |
| Selling of the Victim | — |
| Debt Bondage | — |
| Explicit Threats of Violence | Allegations[90] |
| Excessive Working Days | Allegations[91] |
| Excessive Working Hours | Allegations[92] |
| Hazardous Work | Undisputed Fact |
| Confiscation of Documents | — |
| Forced Criminal Activities | — |
| Forced Tasks or Clients | Law[93] |
| Isolation | Allegations[94] |
| Confinement | Allegations[95] |
| Surveillance | Allegations[96] |
| Dependency on Exploiters | Allegations[97] |

[86] A "slot lie" is when a soldier is told the army specialty they want, like becoming a registered nurse, has a waiting list. However, if the recruit will sign up for something else, like being a truck driver, they can just transfer when the coveted slot opens up. Hoff, John. December 11, 2006. Army recruiters tell deadly lies: Soldiers are put at risk of dying in combat, but did not really volunteer for the job they are doing. The Minnesota Daily. Retrieved from:  https://mndaily.com/226281/opinion/army-recruiters-tell-deadly-lies/

[87] Some members of the military allege that they were told by their recruiter that they would not be deployed, that deployments are only for infantry, and/or that middle east conflicts had ended. ABC News. 2006. Army Recruiters Accused of Misleading Students to Get Them to Enlist. Retrieved from: https://abcnews.go.com/GMA/story?id=2626032&page=1  Thalen, Mikael. July 6, 2022. 'Worst decision of my life': TikToker says recruiter lied to her and convinced her to join the Army. The Daily Dot. Retrieved from: https://www.dailydot.com/debug/tiktok-military-recruiter-tricked-joining-military/

[88] Some recruiters have defrauded delayed entry recruits into believing that the would be denied opportunities for higher education if they didn't follow through with the recruitment process. For example, see Martin, David. 2008. Army Recruiter Used Scare Tactics. CBS News. Retrieved from: https://www.cbsnews.com/news/army-recruiter-used-scare-tactics-28-07-2008/

[89] According to the Department of Defense's annual Report on Sexual Assault in the Military, it is estimated that there were 20,500 instances of "unwanted sexual contact" in the 2018 fiscal year, based on a survey of men and women across the Army, Navy, Air Force and Marines. That was an increase of 38 percent from the previous survey in 2016. Philipps, Dave. 2010. 'This Is Unacceptable.' Military Reports a Surge of Sexual Assaults in the Ranks. The New York Times. https://www.nytimes.com/2019/05/02/us/military-sexual-assault.html

[90] Members of the military report being threatened with violence. For example, one drill instructor allegedly threatened to "break" a recruits neck. Lamothe, Dan. 2019. Marine Corps punishes drill instructors and officers after hazing incidents. The Washington Post. Retrieved from: https://www.washingtonpost.com/national-security/2019/05/15/marine-corps-punishes-drill-instructors-officers-after-hazing-incidents/

[91] Some military personnel allege 100-hour work weeks. Haltiwanger, John. 2017. U.S. Military Is Overworked and It's Leading to 'Tragedies,' McCain Warns. Newsweek. Retrieved from: https://www.newsweek.com/us-military-overworked-and-its-leading-tragedies-mccain-warns-712001

**Within the Parameters of Human Trafficking**

While many purported "strong indicators" of trafficking may be present in non-trafficking relationships, such as in the military, there are certain indicia that are consistent across labor trafficking claims involving juveniles, which are less frequent in non-trafficking claims, especially when combined with terms of exploitation. Specifically, substantiated claims of labor trafficking involving minors typically include allegations of ***completely denied access to education***, combined with clear instances of uncompensated employment.

For example[98], in the case of *United States v. Abdenasser Ennassime*[99]. The Defendants Abdenasser and Tonya Ennassime—husband and wife—brought their 12-year-old niece to the United States in September of 2001. The victim was promised that she would receive an education. In exchange for lodging, the victim believed that she would assist with housework and childcare for Defendants' young son. Instead, the Defendants forced the victim to work a grueling daily schedule that included cooking, cleaning, and childcare. Additionally, the Defendants forced the victim to ***work at the couple's espresso stand on weekends and during the summer***. When the victim complained about her mistreatment,  Abdenasser Ennassime responded by ***physically assaulting her, and then pulling her out of school*** to work longer hours at the espresso stand. After the victim's temporary visitor's visa expired, the Defendants threatened to deport her if she did not work harder.  The victim escaped in July 2005 after being helped by friends and an immigrant rights group and Abdenasser Ennassime was sentenced to

---

[92] *Ibid.*

[93] Members of the military may be forced to perform their duties by law. According to 10 U.S. Code § 892 - Art. 92. Failure to obey order or regulation, Any person subject to this chapter who—

> (1) violates or fails to obey any lawful general order or regulation;
> (2) having knowledge of any other lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the order; or
> (3) is derelict in the performance of his duties;

shall be punished as a court-martial may direct.

[94] The U.S. Military recognizes that Deployments and Permanent Change of Station (PCS) may contribute to loneliness and social isolation. Health.mil. Retrieved from: https://health.mil/Military-Health-Topics/Centers-of-Excellence/Psychological-Health-Center-of-Excellence/Real-Warriors-Campaign/Articles/How-to-Combat-Isolation-and-Loneliness

[95] Active duty members are often subject to "liberty limits" which restrict their movement to the "general vicinity of the instillation." For example, those on liberty of 24 hours in duration will not proceed beyond 80 miles of their duty station without permission. For example, see U.S. Marine Corps Policy Letter. Retrieved from: https://www.hqmc.marines.mil/Portals/133/Policy%20Letter%203-18%20Leave%20and%20Liberty.pdf?ver=2018-12-19-154703-017

[96] While enlisted and living in barracks housing, members of the military are subject to surveillance and inspections of their living quarters. See, for example, Barracks Regulations. https://www.dcms.uscg.mil/Portals/10/DOL/BaseCapeCod/forms/pdf/ASCC_Barracks_Regs.pdf

[97] Members of the military are often dependent on the Department of Defense for housing, transportation, food, and healthcare.

[98] Additional examples of labor trafficking cases involving minors are summarized in Appendix J.

[99] *United States v. Abdenasser Ennassime,* United Nations Office on Drugs and Crime. https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/united_states_v._abdenasser_ennassime.html

six months electronic home detention, 240 hours community service, and three years of probation for violating 18 U.S.C. §1589(1).

Ultimately, substantiated labor trafficking cases involving minors typically involve accusations of education being completely denied and, as discussed in the section below, the absence of this key factor has been implemental in decisions where trafficking claims were not sustained.

## Beyond the Parameters of Human Trafficking

Certain civil claims demonstrably fall beyond the scope of human trafficking. For example, the case of *U. S. v. Toviave*[100] involved a man who immigrated to the U.S. in 2001 and, using false immigration documents, later brought four young relatives from Togo to live with him. He made the children cook, clean, and do laundry. He occasionally made the children babysit for his girlfriend and relatives. ***Toviave would beat the children if they misbehaved or failed to follow rules***. Toviave provided for the children by working two jobs and did yard work. Toviave bought the children sports equipment and let them play soccer. The children exercised with him and went on family trips together. ***Toviave emphasized education; many of his punishments stemmed from problems related to schoolwork.*** He hired a tutor to teach the children English. He imposed mandatory study periods. The children always attended school. Teachers began to suspect abuse. Michigan authorities investigated. The children were removed from the house. The Department of Homeland Security obtained a warrant and discovered false immigration documents in Toviave's home. Toviave pled guilty to visa and mail fraud charges, and the government dropped a human trafficking charge. Toviave was convicted of four counts of forced labor in violation 18 U.S.C. § 1589. The Sixth Circuit reversed, stating that ***Toviave's treatment of the children was "reprehensible," but was not forced labor.***

In ruling on *Toviave*, the court also pointed out the emphasis on education, as previously discussed, specifically stating — "Other cases in which forced labor has been found in the household context are also distinguishable in crucial ways. Most involve defendants that subjected their victims to more extreme isolation, and ***none of the defendants provided their victims with an education***." *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) (bold, underline, and italics added for emphasis). In support of this ruling the court, for example, cited In *United States v. Afolabi*, 508 Fed.Appx. 111, 113 (3d Cir.2013), where the Defendant—a Togolese woman—brought more than twenty young girls to the United States to work in hair-braiding salons. Despite promises of schooling upon arrival in the United States, the girls were forced to work 60 to 100 hours per week for several years and to hand over all earnings from the hair-braiding salons where they worked, while being ***denied the opportunity to attend school***.[101]

---

[100] *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014) https://casetext.com/case/united-states-v-toviave
[101] *USA v. Akouavi Afolabi.* 2013. United States Court of Appeals for the Third Circuit. Retrieved from: https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=2433&context=thirdcircuit_2013

Moreover, the court made it clear that:

1. *Forcing children to do household chores cannot be forced labor without reading the statute as making most responsible American parents and guardians into federal criminals;*
2. *Requiring a child to perform those same chores by means of child abuse does not change the nature of the work; and*
3. *If it did, the forced labor statute would federalize the traditionally state-regulated area of child abuse[102].*

Similar to the *Toviave* case, the Plaintiffs in present action were not denied access to education and in fact consistently testified to performing regular schoolwork and engaging in college preparation. In fact, some clients experienced grade improvements during and/or following their exit from the program. For example, Amanda Nash had two D's and two F's upon her admission to Trinity Teen Solutions, but only had one failing grade when she exited the program. In fact, Ms. Nash reported that she "probably excelled in the language classes" while at Trinity Teen Solutions[103].

Moreover, evidence and testimony suggests the Plaintiffs' activities while at the Defendants' property were more consistent with chores rather than employment and the Plaintiffs' parents consented to the chores.

For example, as discussed in the order denying class certification, during her deposition, Tanya Bischof—the mother of Named-Plaintiff Amanda Nash—testified concerning her expectations of Trinity Teen Solutions (TTS) and to what she consented for Ms. Nash, which included ranch-related labor:

> *Q.  And were you aware that Amanda would have to engage in what was referred to as ranch chores, like caring for the animals and doing chores around the ranch, prior to admission?*
> *A.  Yes, I was.*
> *Q. Were you aware that Trinity Teen Solution was a physically challenging program that would require exercise and physical activity throughout the day?*
> *A.  Yes.*
> *Q.  Did you have any concerns with the physical -- the physical component of the program?*
> *A.  No, I did not.*
> *Q.  And do you agree that you consented that Amanda would be involved in all activities that occur on any working ranch, including the activities that are listed here in paragraph 3?*
> *A.  Yes. Correct.*
> *Q. And do you agree that you consented to the program being physically demanding, rigorous, dangerous, stressful, and psychologically, emotionally, and spiritually challenging for the student?*

---

[102] *United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014)
[103] Amanda Nash Deposition. June 6, 2022. Page 253.

37

    *A.   Yes*[104].

    Therefore, as discussed further in the sections below, based on the evidence in this case, my expertise on the identification of human trafficking victims, and my review of extant human trafficking cases, the Plaintiffs' allegations, even if all accepted as true and countervailing evidence is ignored or rejected as false or unreliable, are atypical and inconsistent with standard labor trafficking patterns.

---

[104] (Doc. 225-1 pp. 3-4, Tanya Bischof Depo. 65:1-12, 102:16-25; see also Doc. 225-11 pp. 23-52 (consent forms and agreements as to PlaintiffNash).)

# VII.  TROUBLED TEEN INDUSTRY AND CRIMINOLOGICAL THEORY

## Origins of the Troubled Teen Industry

Many, if not most, experts with specialized knowledge on the topic of juvenile diversion programs point to the opening of a specialty program and so-called "emotional growth boarding school" known as CEDU as the origin of the "troubled teen industry"[105].

CEDU was founded in the late 1960s by a furniture store owner in Palm Springs, California named Mel Wasserman, after he met and befriended a "down-and-out" young man who was sitting on the steps of a building across the street from Mr. Wasserman's store. After Wasserman and his wife invited the young man to dinner, he began hosting intense, emotional get-togethers with approximately one dozen area teens (some of whom moved in with the Wassermans and helped with household chores). Wasserman eventually purchased a ranch in the hills east of Los Angeles and relocated there with his family and adolescent houseguests. Word about the community spread and parents and social service agencies began asking the Wassermans to accept their children as residents and some residents eventually became counselors themselves. The Wassermans called the program CEDU, because his philosophy was for teens to "*see* yourself as you are and *do* something about it." The concept was apparently founded from the humanistic psychology movement that was popular in the late 60s and early 70s, which supported the belief that humans, as individuals, are unique beings and should be recognized and treated as such by psychologists and psychiatrists. At CEDU, residents were encouraged to discuss their fears and traumas in frequent group sessions or "raps."

From this program, hundreds of different kinds of wilderness therapy programs, emotional growth boarding schools, therapeutic boarding schools, and residential treatment centers were borne. While some criticize the coordination, regulation, philosophy, efficacy, and methodology of these programs, the impetus for their existence is consistent—to provide families of struggling teens with a place of last resort after community based programs and services failed to curtail antisocial behavior (for example, counseling and psychotherapy, special education programs, alternative high schools, day treatment programs, foster care programs, home-based counseling and crisis intervention programs, juvenile and family court diversion programs, specialty drug and truancy courts, and mentoring programs were mentioned as failing to curtail antisocial behaviors).

Although the Defendants, as well as other owner-operators of so-called troubled teen industry facilities, may provide their own, individualized theories and concepts that inform their practices, which include religious, therapeutic, and so-called "best practices," among others, the impetus and end goal of these diverse programs is the

---

[105] Reamer, Frederic G., and Deborah H. Siegel. *Teens in crisis: How the industry serving struggling teens helps and hurts our kids*. Columbia University Press, 2008.

same—to reduce antisocial behaviors—and, perhaps more importantly, there is some empirical evidence to suggest that these programs can be successful in achieving this goal.

**Efficacy of the Troubled Teen Industry**

Anecdotally, these programs typically experience mixed reviews; some parents and participants praise the efficacy of their services, while others criticize and complain about the programs.

For example, some "troubled teen industry" participants, including the Plaintiffs in this case, criticize the use of forcible transport. However, a burgeoning body of research has found that "forcible transport" may be conducive to treatment[106] and at times necessary[107]. More importantly, one study found that when comparing those who were forcibly transported to a "troubled teen" program by professional agents to those who were delivered by their parents, there was no significant difference in perceived quality of experience[108]. Another study found no differences between transported and non-transported youth in changes over time, with all youth who attended wilderness therapy programs experiencing significant improvements with changes maintained post-discharge, regardless of transport status—concluding that transporting youth to treatment does not appear to interfere with the treatment outcome[109]. This finding was replicated in another study, which found that youth who participated in wilderness therapy programs improved significantly regardless of transport use; however, **transported youth were more likely to have larger *decreases* in mental health symptomatology than non-transported youth, suggesting that being transported did not have a negative impact on treatment outcomes**[110].

While the Plaintiffs have criticized the "troubled teen industry" *en masse*, there is a growing and reliable body of literature on the efficacy certain programs. For example, a meta-analysis based on 36 studies, totaling 2,399 participants receiving wilderness therapy, found medium **positive outcomes for self-esteem, locus of control, behavioral observations, personal effectiveness, clinical measures, and interpersonal**

---

[106] See, for example, Tucker, A., Bettmann, J., Norton, C., & Comart, C. (2015). The role of transport use in adolescent wilderness treatment: Its relationship to readiness to change and outcomes. Child & Youth Care Forum, 44(5), 671–686. https://doi.org/10.1007/s10566-015-9301-6 and Tucker, A. R., Combs, K. M., Bettmann, J. E., Chang, T., Graham, S., Hoag, M., & Tatum, C. (2018). Longitudinal outcomes for youth transported to wilderness therapy programs. Research on Social Work Practice, 28(4), 438–451. https://doi.org/10.1177/1049731 516647486.

[107] Gass, Michael, et al. "Involuntary youth transport (IYT) to treatment programs: Best practices, research, ethics, and future directions." *Child and Adolescent Social Work Journal* 39.3 (2022): 291-302.

[108] Chatfield, Mark M., et al. "Quality of experience in residential care programmes: Retrospective perspectives of former youth participants." *Child & Family Social Work* 26.1 (2021): 132-143.

[109] Tucker, Anita R., et al. "Longitudinal outcomes for youth transported to wilderness therapy programs." *Research on social work practice* 28.4 (2018): 438-451.

[110] Tucker, Anita R., et al. "The role of transport use in adolescent wilderness treatment: Its relationship to readiness to change and outcomes." *Child & Youth Care Forum*. Vol. 44. No. 5. Springer US, 2015.

**measures**[111]. However, when comparing graduates who completed treatment to nongraduates, there was a significant difference in perceived quality of experience—graduates reported significantly higher quality of experience than nongraduates[112].

## Impetus for the Modern Troubled Teen Industry and Application of Criminological Theory

Critics and proponents of "troubled teen industry" programs generally recognize that the impetus of these programs is to reduce antisocial behavior among participants, not to engage in labor trafficking. For example, these programs are described as being designed to control and minimize deviance among young people in their care[113] or serve a stunningly diverse array of adolescents grappling with many different educational, social, legal, behavioral, and mental health challenges.[114]

Similarly, during her deposition, Defendant Angela Woodward testified:

> *"The — the intention was that girls are going down a wrong path. They're having destructive behaviors prior to being admitted to Trinity. They're — I mean, multiple from sexual promiscuity to substance abuse to being abused by others, perpetrating others. The list goes on and on. So parents have tried to intervene multiple times…with no avail, so now it's time to fight for your life. You're precious and your life is worth it, so let's, you know — we're hoping that they'll engage to change their behavior because their life is worth it[115]."*

Defendant Angela Woodward described herself as the founder of Trinity Teen Solutions, who developed and implemented the mental health treatment program, but she also testified that she worked with multiple people through the development, for example the initial clinical director Dr. Ajakai Hassler—a marriage and family therapist, and Dr. Scott Pollard, who specializes in substance abuse.

According to Defendant Woodward it was through these collaborations that she decided to base the Trinity Teen Solutions programs on what she called "experiential therapy" or "hands-on therapy," which involved the activities that the Defendants call "chores" and the Plaintiffs refer to as "work" or "labor," even though, as previously discussed, there was no reported income from the irrigation, agriculture, or livestock activities.

---

[111] Bettmann, Joanna E., et al. "A meta-analysis of wilderness therapy outcomes for private pay clients." *Journal of Child and Family Studies* 25.9 (2016): 2659-2673.
[112] *Ibid.*
[113] Golightley, Sarah. "Troubling the 'troubled teen' industry: Adult reflections on youth experiences of therapeutic boarding schools." *Global studies of childhood* 10.1 (2020): 53-63.
[114] Reamer, Frederic G., and Deborah H. Siegel. *Teens in crisis: How the industry serving struggling teens helps and hurts our kids*. Columbia University Press, 2008.
[115] Deposition of Angela Woodward. Page 73, 2-14.

During her deposition, although Defendant Angela Woodward could not specifically point to any published peer-reviewed journal articles or scholars that would suggest doing what the Plaintiffs call "physical labor" is an appropriate intervention during therapy, she noted that there is research on "experiential therapy," which can include (according to the Defendant) ropes courses, equine-assisted psychotherapy, art therapy, and anything that engages the patient physically and mentally[116].

However, even if the Plaintiffs' conceptualization of these chores as "work" or "labor" were to be accepted as true and countervailing evidence is ignored or rejected as false or unreliable, *"work-therapy" is an internationally recognized concept that is published about in peer-reviewed journal articles. Work-therapy is based on the logic that "work" is a regenerator of a sick body and an ill mind and engaging in this form of therapy has the potential to turn young delinquents into future workers*[117].

In addition to the chores, which Defendant Woodward described as "experiential therapy," the Defendants also utilized a series of escalating consequences for the purpose of eliciting prosocial behaviors from the Plaintiffs and other similarly situated residents of the program. Specifically, the program was designed to have participants: (1) respect their environment, (2) respect property, (3) respect others, and (4) respect themselves, specifically:

1. Respecting the environment by:
    a. Refraining from wrestling, boxing, running, rough-housing, climbing, standing, or "plopping" on furniture;
    b. Refraining from building fires without permission;
    c. Refraining from misusing tools and tack; and
    d. Following the dress code.
2. Respecting property by:
    a. Refraining from touching the possessions of other persons without permission; and
    b. Putting things back where they belong.
3. Respecting others by:
    a. Refraining from touching others;
    b. Refraining from cursing or engaging in "dirty talk or actions:"
    c. Refraining from engaging in "smart-mouthing, badgering, or nagging:"
    d. Refraining from cheating, stealing, or lying;
    e. Refraining from smuggling contraband, such as:
        i. Cigarettes, alcohol, drugs, or paraphernalia; and
        ii. Weapons;

---

[116] Angela Woodward Deposition. Page 171, 3-6.
[117] For example, see Sosenski, S. "A remedy against delinquency: child labour in lock-up institutions in post-revolutionary Mexico City." *Asclepio; Archivo Iberoamericano de Historia de la Medicina y Antropologia Medica* 60.2 (2008): 95-118. and Pratt, Mike, et al. "Psychosocial treatment alternatives for adolescents with conduct problems." *Journal of Psychological Practice* (2003).

      f.  Refraining from discussing drugs, alcohol, or cigarettes;
      g.  Refraining from "ghetto or gang talk" or gang signs;
      h.  Refraining from blasphemous or sacrilegious talk or inappropriate behavior in Church;
      i.  Refraining from signing and/or talking about popular music or "rock stars:
      j.  Refraining from "inappropriate handshakes or hand signs";
      k.  Refraining from whispering or being secretive;
      l.  Refraining from homosexual actions or talk;
      m.  Refraining from "when I get out of here" talk;
      n.  Refraining from bullying or intimidation; and
      o.  Generally respecting others and animals at all times.
4.  Respecting yourself by;
      a.  Not drawing on yourself; and
      b.  Not engaging in self-mutilation.

***Implementing consequences for residents failing to respect their environment, respect property, respect others, and respect themselves is not consistent with trafficking.*** It is, however, potentially consistent with the criminological theories used to elicit prosocial behaviors from persons who have engaged in crime or at-risk of engaging in crime.

Developed criminological theories, such as Routine Activities Theory, Life Course Trajectory Theory, and Deterrence Theory can be used to provide further philosophical framework for understanding the impetus for these consequences and the other methods used to achieve the end goal of troubled teen industry programs, like the Defendants', which is reducing antisocial behaviors.

For example, Routine Activities Theory is predicated on the notion that crime occurs when three things converge in time and space:

    1. A likely/motivated offender;
    2. A suitable target; and
    3. Lack of a capable guardian[118].

While the Plaintiffs criticize the isolation, surveillance, consequences, and strict social controls utilized in the "troubled teen industry," it can be argued that these activities serve the purpose of increasing the capability guardianship, removing the presence of a suitable target, and reducing the motivation of the offender, thereby reducing the likelihood of antisocial behavior.

Alternatively, Life Course Trajectory Theory suggests that persons engaged in antisocial behavior fall into one of two categories:

---

[118] Cohen, L. E., & Felson, M. (1979). Social Change and Crime Rate Trends: A Routine Activity Approach. American Sociological Review, 44(4), 588–608. https://doi.org/10.2307/2094589

1. Life Course Persistent; or
2. Adolescence-Limited.

Life-course persistent offenders' antisocial behavior begins in childhood and continues persistently throughout the individual's life. This type of individual is rare.

Adolescence-limited offenders' antisocial behavior begins in adolescence and desists in young adulthood. This type of individual is common and near normative. Moreover, antisocial behavior is strongly associated with delinquent peers[119]. As such, while the Plaintiffs criticize the isolation, surveillance, consequences or punishments, and strict social controls utilized in the "troubled teen industry," it can be argued that these activities serve the purpose of limiting associations with delinquent peers and incapacitating youthful offenders so that they are unable to make poor choices that irreparably affect their life, until they naturally age out and/or are able to make better choices. In fact, as discussed in her deposition, this was a key impetus for Tanya Bischof—the mother of Named-Plaintiff Amanda Nash—bringing her daughter to Trinity Teen Solutions.

Additionally, Deterrence theory focuses on consequences for antisocial, delinquent, or criminal behavior and suggests that offenders are more likely to be deterred if consequences are certain, severe, and swift. General deterrence refers to the effects of legal consequence or punishment on the general public (potential offenders)[120] and specific deterrence refers to the effects of legal consequence or punishment on those individuals who actually undergo the consequence or punishment[121].

To this effect, the Trinity Teen Solutions philosophy attempted to deter recalcitrant and antisocial behavior by making an escalating set of consequences certain and swift. For example, consequences included jumping jacks, sit-ups[122], sprints and hill runs; which were initially discussed with Dr. Ajakai Hassler, a marriage and family therapist with experience using art therapy, animal therapy, and experimental therapy to help work with children and families.

The Defendant and Plaintiff provide contradictory testimony as to whether these consequences were "severe" and whether they were tantamount to "punishments[123]." However, regardless of whether these were considered consequences or punishments, and regardless of whether the consequences were considered "severe" or not, the impetus for them is consistent with criminological theory on deterrence and was reportedly effective. More importantly, these consequences are inconsistent with the punishments evidenced in trafficking situations, for example, I have personally interviewed survivors who have

---

[119] Moffitt, Terrie E. "A review of research on the taxonomy of life-course persistent versus adolescence-limited antisocial behavior." *Taking stock* (2017): 277-311.
[120] Stafford, M.C. and M. Warr. Reconceptualization of General and Specific Deterrence. *Journal of Research in Crime and Delinquency Volume*: 30 Issue: 2, Pages: 123-135
[121] *Ibid.*
[122] Angela Woodward Deposition. Page 26, 20-22.
[123] Note: The words "punish" or "punishment" are not used once during the deposition of Defendant Angela Woodward.

been shot[124], cut, burned, punched, raped, drugged, and imprisoned as punishment, among other things[125].

According to the Plaintiffs themselves, the consequences they received for violating the program rules and guidelines admittedly served as both a general deterrent in shaping the behavior of girls who didn't commit the act, but saw the consequence being applied in a readily observable fashion, as well as a specific deterrent, shaping the behavior of the individual girl who committed the prohibited act. As such, while the Plaintiffs criticize the "humiliating" and/or physically onerous consequences utilized in the "troubled teen industry," it can be argued that these responses served the purpose of being a general and specific deterrent, especially since these consequences pale in comparison to the punishments evidenced in trafficking situations.

*Even if these consequences were perceived as rising to the level of being considered abusive, that in and of itself does __not__ equate to trafficking.* During the Plaintiffs' residential placement at Trinity Teen Solutions, the Defendants acted *in loco parentis*, which means that they performed the functions or responsibilities of a parent and, as the testimony and evidence demonstrates, chores and consequences were administered in that capacity, not in association with any form of employment.

## Troubled Teen Industry Services for Survivors of Sex Trafficking

Troubled Teen Industry residential programs are often looked at as a placement of last resort for children who need protection from their self-harming choices and who are recalcitrant to typical social controls. In fact, given the risk-factors associated with troubled teens[126], parents are known to place these children in residential facilities to *prevent* trafficking[127].

Similarly, parents of survivors of sex trafficking are known to rely on the Troubled Teen Industry for suitable placement for their children following sex trafficking victimizations to *prevent* revictimization. As an example, after being allegedly trafficked from a Dallas Mavericks game to an out-of-state motel, one minor was placed in two

---

[124] For example, see Jennifer Lowery-Keith and Kimberly Mehlman-Orozco. 2022. 'Justice Denied': A Sex Trafficking Survivor Tells Her Story. The Crime Report. Retrieved from: https://thecrimereport.org/2022/02/28/justice-denied-a-sex-trafficking-survivor-tells-her-story/
[125] See Appendix J for examples of punishments consistent with labor trafficking of minors.
[126] See, for examples Hanna, C. (2002). Somebody's daughter: The domestic trafficking of girls for the commercial sex industry and the power of love. *Wm. & Mary J. Women & L.*, *9*, 1; Warpinski, S. (2013). Know your Victim: A key to prosecuting human trafficking offenses; Phelps, S. R., & Miyasaki, J. (2020). Commercial Sexual Exploitation of Children: Dane County Needs Assessment.
[127] See, Warpinski, S. (2013). Know your Victim: A key to prosecuting human trafficking offenses; Phelps, S. R., & Miyasaki, J. (2020). Commercial Sexual Exploitation of Children: Dane County Needs Assessment.

troubled teen industry facilities for her safety,  including a wilderness program in Layton, UT. Yet, she continued running away[128].

The choice to place survivors of complex trauma and/or addiction in wilderness and/or "work therapy" residential programs is not a novel concept and has been used with other populations for decades. These programs are born from the idea that therapy can be more successful and self-harming behaviors can dissipate when a person is absorbed in an activity and not distracted by other thoughts and sensations except those required for achieving the task. Similarly, programs that incorporate camping and/or rustic living as part of the therapeutic experience attempt to elicit prosocial values in children and adolescents through real-life experiences in the wilderness[129]. More importantly, research suggests that adventures in outdoor environments can facilitate neurobiological regulation and empowerment.[130]

While regimented and involving alternative forms of therapy, as well as functional and/or structural isolation[131], these programs have historically been viewed as being preventative measures to protect recalcitrant children who have a history of making harmful choices, which may have devastating consequences if left unaddressed. Additionally, the functional and structural isolation evidenced in troubled teen residential placement centers is distinguishable from functional and structural isolation that can occur in trafficking situations. In fact, a similar but also distinguishable dynamic can be found among other authority figures and their subordinates, as this revolves around power dynamics[132] (e.g., as discussed herein regarding the military).

Although functional and structural isolation, as well as "staged kidnapping" transport have been discussed as "therapeutic concerns" or criticisms at some of these facilities, these subjective concerns and/or critiques are not tantamount to trafficking or modern slavery, but are rather leading to recommendations of "further research" and/or federal policies regarding functional oversight[133].

---

[128] Young, Morgan. (2022). North Texas teen trafficking victim found safe after going missing from Utah treatment facility. WFAA. Retrieved from: https://www.wfaa.com/article/news/local/north-richland-hills-teen-trafficking-victim-missing-again-utah-treatment-facility/287-ab5a3db3-0fc9-4f4d-83d1-1f842c214571
[129] Lynman, R. D., & Wilson, D. R. (1992). Residential and inpatient treatment of emotionally disturbed children and adolescents (2nd ed.). In Handbook of clinical and child psychology. E. E. Walker & M. C. Roberts, Eds. Oxford, England: Wiley.
[130] Pringle, G., Dobud, W. W., & Harper, N. J. (2021). The next frontier: Wilderness therapy and the treatment of complex trauma. In *Nature and health* (pp. 191-207). Routledge.
[131] Corsello, R. M., & Hayes, B. E. (2024). "When Can I Call Home?" Coercive Control, Structural Isolation, and Functional Isolation Among Attendees of Residential Behavioral Modification Programs. *Journal of interpersonal violence*, *39*(13-14), 2933-2958.
[132] *Ibid.*
[133] Corsello, R. M., & Hayes, B. E. (2024). "When Can I Call Home?" Coercive Control, Structural Isolation, and Functional Isolation Among Attendees of Residential Behavioral Modification Programs. *Journal of interpersonal violence*, *39*(13-14), 2933-2958. Gass, M., Hardy, C., Norton, C., & Priest, S. (2022). Involuntary youth transport (IYT) to treatment programs: Best practices, research, ethics, and future directions. *Child and Adolescent Social Work Journal*, *39*(3), 291-302.

However, with regards to these criticisms, institutions that employ licensed social workers, therapists, and/or behavioral specialists are viewed more favorably. Similarly, facilities that secure state licensure requirements are viewed as being more regulated and appropriate than those that claim exemptions and private accreditation[134]. It is important to note that in the present matter, Trinity not only employed licensed therapists and contracted with other licensed professionals but also had state certification.

Ultimately, while the forms of therapy and treatment available in the Troubled Teen Industry have garnered criticism by some, the reality is that these services are known to be sought out not only for trafficking prevention, but for residential placement for survivors to prevent re-victimization post-rescue. While the "strong arm treatment" strategies may be disagreeable to some and of questionable efficacy, the purpose is to provide social control to the serviced population, which includes a prevention of victimization, as well as criminalization[135].

---

[134] Corsello, R. M., & Hayes, B. E. (2024). "When Can I Call Home?" Coercive Control, Structural Isolation, and Functional Isolation Among Attendees of Residential Behavioral Modification Programs. *Journal of interpersonal violence*, *39*(13-14), 2933-2958. Gass, M., Hardy, C., Norton, C., & Priest, S. (2022). Involuntary youth transport (IYT) to treatment programs: Best practices, research, ethics, and future directions. *Child and Adolescent Social Work Journal*, *39*(3), 291-302.

[135]See, for example:  Mooney, H., & Leighton, P. (2019). Troubled affluent youth's experiences in a therapeutic boarding school: The elite arm of the youth control complex and its implications for youth justice. *Critical Criminology*, *27*(4), 611-626. Gass, M., Hardy, C., Norton, C., & Priest, S. (2022). Involuntary youth transport (IYT) to treatment programs: Best practices, research, ethics, and future directions. *Child and Adolescent Social Work Journal*, *39*(3), 291-302.

# VIII. CURRENT CASE

## Overview

The current case involves labor trafficking allegations against Trinity Teen Solutions—a faith-based, licensed residential treatment center that offers healing and therapeutic services to troubled girls between the ages of 12-17. The stated goal of the residential treatment center is to "help girls who have gotten off track in life to develop the emotional, social and intellectual skills needed to independently live, learn and work in the community[136]."

Trinity's handbook clearly stated that it treated participants through a holistic therapeutic approach, which involved ranch work, school, therapy, nutrition, physical exercise, and spiritual exercises. Documents in discovery and testimony make clear that the Plaintiffs did, in fact, receive all of the promised components of the program. The Plaintiffs' parents further acknowledged by signature that the understood the Trinity program was "physically demanding, rigorous, dangerous, stressful and psychologically, emotionally and spiritually challenging for the student."

Yet, despite this transparent discretion of the nature of the program, the Plaintiffs claim that they and their parents were defrauded by the Defendants because their parents were induced to pay substantial fees for residential treatment, under promises of the Plaintiffs receiving full-time cutting edge therapies and while maintaining proper education towards high school graduation. [137] The Plaintiffs claim they were not provided with cutting edge therapies received "zero and two hours of education daily which consisted only of online videos and coursework[138]."

Additionally, the Plaintiffs alleged that they were subjected to or threatened with:

1. Food deprivation;
2. Sleep deprivation;
3. Physical punishment;
4. Emotional abuse;
5. Humiliation (e.g., being tethered to other exploited girls, staff members, and/or farm animals)
6. Carrying around a folding chair as punishment for twenty-four (24) hours a day for months on end;
7. Forced silence for weeks at a time;
8. Being forced to run up and down a massive hill covered in sharp rocks and rattlesnakes;
9. Being forced to eat only small quantities of cold kidney beans for weeks at a time;

---

[136] Trinity Teen Solutions. https://www.trinityteensolutions.com
[137] Page 9, Paragraph 10 of the First Amended Complaint.
[138] *Ibid.*

10. Participation in "group therapy" without a licensed therapist with the sole purpose of staff and other exploited girls degrading and humiliating the participant.

The Plaintiffs further allege in their Complaint that this compelled their alleged "work" for the Defendants, such as:

1. Mucking out livestock stalls;
2. Irrigation;
3. Fixing damaged fence posts and restoring barbed wire fences on TTS and surrounding ranches;
4. Cleaning up after church events;
5. Cleaning multiple office buildings at TTS;
6. Cleaning all ranch equipment such as feeders, corrals, and troughs daily;
7. Cleaning the steel barn and animal barns;
8. Grooming all animals (cows, sheep, pigs, horses, dogs, goats, chickens, and cats) daily;
9. Physical animal showmanship;
10. Managing the fires at the ranch;
11. Splitting fire wood;
12. Cooking all meals;
13. Doing all laundry;
14. Cleaning all dishes for staff and other class members;
15. Cleaning all living areas; and
16. Washing the feet of staff and other class members nightly[139].

The Plaintiffs claim that they were compelled to continue allegedly "working" for the Defendants because they believed that, if they did not "work" for Defendants, they would suffer physical or emotional abuse and prolonged confinement.[140]

Based on these facts alleged in the Complaint, the Plaintiffs claim to be victims of human trafficking and made claim for relief under Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595.

The civil remedy provision of the TVPRA, Section 1595(a), provides: An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

Section 1595 thus requires an "underlying violation" of one of the TVPRA's criminal provisions. Even though the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation of Title 18 U.S.C. §§ 1589, 1590, 1593A, and 1594 (Complaint ¶ 106), it is important to note that there has been no indictment or

---

[139] Page 25, Paragraph 62 of the First Amended Complaint.
[140] *Ibid.*

conviction of the Defendants under any of these statutes in the ten years since the Plaintiffs left the Defendants residential placement center[141].

The Plaintiffs allege that the Defendants' engaged in a pattern and practice of human trafficking and forced labor in violation of 18 U.S.C. §§ 1589 & 1590.

Section (a) of Title 18 U.S.C. § 1589 outlines forced labor as:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).[142]

Title 18 U.S.C. § 1590 outlines criminal penalties with respect to Trafficking through peonage, slavery, involuntary servitude, or forced labor. While the Plaintiffs claim they are victims of forced labor, involuntary servitude and human trafficking in violation of Title 18 U.S.C. §§ 1590, it is important to note that the Defendants in this case have not been indicted or convicted for any criminal offense related to this statute. According to Title 18 U.S.C. §§ 1590:

> (a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.
> (b) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be subject to the penalties under subsection (a).[143]

## Specific Allegations and Countervailing Information

---

[141] Note: Preponderance of the evidence (standard for civil litigation) requires a finding of more likely than not, whereas probable cause (standard for criminal indictment) is a lower standard that requires reasonable grounds to believe. Seltzer, Richard, Canan, Russell F., Cannon, Molly, and Heidi L. Hansberry. 2016. Legal Standards by the Numbers. *Judicature*.
[142] https://www.law.cornell.edu/uscode/text/18/1589
[143] https://www.law.cornell.edu/uscode/text/18/1590

The Plaintiffs own testimony, testimony of the Plaintiffs' respective parent(s), and documents provided by the Defendants provide countervailing evidence to the claims contained in the present complaint.

First and foremost, the activities performed at the Trinity Teen Solutions property are most consistent with chores, as opposed to "work," especially considering that the Defendants did not substantively financially benefit from the chores; in fact, the chores appear to be a cost[144]. Income for the Defendants came predominately for the services they demonstrably provided as part of their program. For example, in 2012 the Trinity Teen Solutions Profit and Loss statement reflected:

1. A total income of $1,285,669.28 of which $1,282,919.28 came from patient fees;

2. There was no income from anything associated with the irrigation, agriculture, or livestock chores performed by the residents;

3. The expenses reflected the services that were provided to the residents, including the Plaintiffs. For example:

   a. Wages ($514,215.06);
   b. Care of animals that the Plaintiffs and other similarly situated residents regularly interacted with ($16,973.60);
   c. Automobiles that were used to transport the residents to town, church, camping, and medical treatment ($84,116.27);
   d. Cabins where the residents resided ($6,430.80);
   e. Education fees and materials used for the residents ($31,845.28);
   f. Gifts for clients ($3,215.73);
   g. Medical expenses, which were mostly derivative of victims that were provided to the residents ($12,335.28);
   h. Office expenses ($35,120.42);
   i. Groceries and cooking supplies ($128,525.59)
   j. Therapeutic tools for services provided to the residents ($8,631.43)
   k. Housing for staff ($13,540.93); and
   l. Utilities ($15,048.14) among many others.

This is not consistent with established patters regarding labor trafficking situations. Work provided by labor trafficked victims consistently and significantly financially benefits the trafficker. If this were a trafficking situation, as the Plaintiffs allege, I would expect to see substantial income from the irrigation, agriculture, or livestock activities performed by the Plaintiffs with disproportionately lower staffing expenses when compared to other similarly situated businesses.

---

[144] For example, see the Defendants' profit and loss statements and financial records.

Additionally, although there is disagreement about the quality or efficacy of the treatment provided to the residents, the Plaintiffs do not deny that the Defendants did in fact provide them with the items/services expensed:

1. Residential placement;
2. Food and water;
3. Medical care;
4. Education;
5. Therapy;
6. Transportation;
7. Clothing; and
8. Other supplies, such as notebooks, disposable cameras, computers, etc.

In fact, the Defendants provided clinical records and daily supervision checklists that described the activities performed in detail, as well as progress in therapy. For example, the supervision checklists, which were to be completed daily for each client, detailed (in thirty minute increments) whether the client was: at cook cabin, wash cabin, bear cabin, moose cabin, the storage shed, the porch, the hill, the church, the main ranch, bills ranch, the irrigation field, the school room, or on a home visit, in a family visit, at town, at a doctor appointment, or at an eye appointment. The daily supervision checklists described whether the resident was using the punching bag, at the fire ring, engaged in outdoor cooking or physical education, on fire shift, at the woodpile, performing a hay run chore, alone, riding, sleeping, or in a therapy session. For instance on Sunday December 30, 2012, Carlie Sherman was at church from 9:00am to 11:30am, in the school room from 3:00pm to 6:00pm, in cook cabin from 6:30pm to 9:00pm, and in Bear Cabin sleeping from 10:00pm to 5:30am the following day.

Moreover, while the Plaintiffs criticize the quality of services, in particular the quality of therapy they received, evidence and testimony suggests that the therapy received at Trinity Teen Solutions demonstrably benefited the Plaintiffs. Weekly progress notes detailed the problems being addressed; prior interventions, changes, and challenges; as well as overall client assessment and response to the objectives of the program. For example, on May 11, 2015, the Weekly Progress Note for Named-Plaintiff Amanda Nash detailed that Amanda was feeling overwhelmed with her first week at Trinity Teen Solutions; however, she began laughing and joking with other residents as she became acclimated to the program. It stated that Amanda did not believe that Trinity would be of much help to her and quoted Amanda as stating, "I think Trinity could help me with minor things and the behavioral stuff. But, I do not believe Trinity can help me with the major stuff." The document detailed how Amanda could not participate in ranch chores and related activities until she completed studying and took the Ranch Safety test.

Clinical records, completed by licensed professional counselors detailed progress notes from group psychotherapy as well as assessments of the residents on appearance, orientation, affect, mood, memory, motor activity, judgement, delusions, attitude, thought process, general knowledge, hallucinations, insight, speech, and behavior. Residents were

assessed for risk and modes of intervention were described (e.g., education, art therapy, group therapy, equine activities, and other physical activities). For example, the Clinical Records for Carlie Sherman completed on June 12, 2012, detailed that Carlie enjoyed the ranch chores because "she likes having things to do." During the session, Carlie revealed that her home relationships got worse after she was "molested by her friend" and then Carlie "molested her little brother." The therapist reported using active listening, Rational Emotive Behavior Therapy (REBT), and Christ Centered therapy during the session[145]. Carlie was reported as also engaging in the following activities: daily hygiene, journaling, group therapy, interventions, household chores, irrigation, physical activities, spiritual activities, challenges, and academic study.

Parents of the Named Plaintiffs provided testimony that they felt this therapy and the program were of assistance to their respective children. For example, Wesley Sherman—the father of Named-Plaintiff Carlie Sherman—testified that Plaintiff Carlie Sherman made allegations of physical and mental abuse from her mother, Jenny, during a therapy session at Trinity Teen Solutions, which prompted the Defendants to call the Division of Children and Family Services (DCFS)[146]. Trinity Teen Solutions catalyzed the intervention to the familial abuse by involving DCSF because of the "extreme physical and mental" abuse the Plaintiff experienced by her own mother, not the Defendants[147].

Given the therapeutic progress made while under the care of the Defendants during her first stay, Carlie Sherman returned to the Trinity Teen Solutions program for a second time. During her second stay, Plaintiff Sherman successfully worked through her feelings of hurt and anger, in part stemming from the emotional and physical abuse that she endured while in the care of her mother Jennifer Williams and step-father Jay Williams[148]. As her time continued at Trinity Teen Solutions, Plaintiff Sherman began to feel more positive about herself and her future.[149]

Similarly, Plaintiff Amanda Nash testified that she also benefited from the individual therapy that she received at Trinity Teen Solutions (TTS).[150]

Additionally, although the Complaint attempts to allege that the Plaintiffs received no education, each of the named Plaintiffs testified to aspects of their schooling while at TTS (for examples, see Table 4). Moreover, many former residents of TTS attended

---

[145] Clinical Record for Carlie Sherman completed on June 15, 2012 by Bernadette Schmitt. Marked as TTS_004933.
[146] *A. ...there was a time when Trinity did call their —we call it DCFS here—...because of stuff that had come out about what Jenny had done to Carlie in her care.*
   *Q. What where the things that came out about Jenny in her care of Carlie that you were concerned about?*
   *A. Physical and mental abuse.*
   *Q. And did that come out through the therapy at TTS?*
   *A. Yes.*
Wesley Sherman Deposition. Page 104, 3-16.
[147] Wesley Sherman Deposition. Page 197, 1-5.
[148] Wesley Sherman Deposition. Page 190, 16-25 and 191, 1-2.
[149] Wesley Sherman Deposition. Page 191, 3-9.
[150] Amanda Nash Deposition. Page 255, 22-25.

college following their residential placement and continued to be high achievers. For example, Plaintiff Carlie Sherman took AP classes[151] and attended the University of Iowa and reported having over a 3.8 GPA.[152] Ultimately, despite the information contained in the complaint, there is no evidence or testimony to suggest that any resident was completely restricted from receiving any education.

---

[151] Charlie Sherman Deposition. Page 34, 2-16.
[152] Charlie Sherman Deposition. Page 17, 12-13.

**Table 4. Sample of Named Plaintiff Testimony on Schooling while at TTS**

| Named Plaintiffs | | |
|---|---|---|
| **Amanda Nash** | **Ann Gozun** | **Carlie Sherman** |
| Q. Going back to your schoolwork, were you responsible for keeping notebooks relating to all of your class — classes? **A. Yes. It was encouraged[153].** | "…my books and things that I carried around with me to the **schoolroom**…"[154] | Q. Do you know what Park City Independent[155] is? A. It's the — the **education service** they paid — or that they utilized, I guess, for us.[156] |
| "So what — like, say, if you were lazy, you know, what — what did lazy look like that day?· Was it not **getting schoolwork done**, et cetera?"[157] | Q. During the week, on Monday through Friday, how often on average would you be in the **school cabin**? A. I'd say around four or five. Q. And on average how long would you be in the **school cabin** for? A. Three hours, I would say, at most.[158] | |
| Q. Do you remember taking **algebra class**? A. Yes. Q. Do you remember taking **French class**? A. Yes. Q. Do you remember taking **geometry class**? A. Yes, I do. Q. Do you remember taking **English class**? A. Yes. Q. Were there any other classes that you took? A. There may have been a second **algebra class**, but other than that, no, I don't think so[159]. | "I got a good amount of **school work done today** which surprised me because we were doing so much work out in the field."[160] | |
| Q. What was the format of the online schooling that you had at TTS? A. Well, it was part video/part assignment, kind of **typical online schooling structure** where you had a chat box that you had option to chat with teachers, but we weren't allowed to use that part[161]. | "I know the computers were very limited, so we couldn't, you know, just go on the internet or something. But it was Park City, something like that. Yeah, it was **a lot of self study-type stuff**."[162] | |

---

[153] Amanda Nash Deposition. Page 158, 23-25 and Page 159, 1.
[154] Anna Gozun Deposition Volume II. Page 230, 14-16.
[155] Park City Independent is an online educational program, approved by Wyoming Public Schools and Wyoming Department of Family Services, for residential placement accreditation and utilized by the Defendants to provide educational services to the Plaintiffs.
[156] Carlie Sherman Deposition. Page 239, 9-11.
[157] Amanda Nash Deposition. Page 218, 15-17.

Moreover, while the Plaintiffs claimed that mucking out livestock stalls; irrigation; fixing damaged fence posts and restoring barbed wire fences; cleaning; grooming animals; managing fires; splitting fire wood; cooking; and laundry was "work," during their depositions the Plaintiffs and their respective parents repeatedly referred to these tasks as "chores," which were performed with parental notice and consent.

For example, Wesley Sherman—the father of Named-Plaintiff Carlie Sherman—testified:

> *Q. Did you consent that Carlie would be involved in all activities that occur on a working ranch?*
> **A. Yes. We were — we were — my assumption at the time was, yes, and she would be doing chores on the ranch, yes.**
>
> *Q. Okay. And at the time, based on reading this, did — were you aware and did you consent that the chores included horseback riding in the mountains, irrigating, fence building, building structures, cleaning barns and corrals, feeding, watering, and exercise of animals, veterinary medicine and all the care related to working with livestock (doctoring, immunizing, roping, branding, labor/delivery, breeding, feeding, watering, pushing and loading in the chute)?*
> **A. Yes.[163]**

Similarly, testimony from Named Plaintiffs Amanda Nash, Anna Gozun, and Carlie Sherman suggests that they perceived the tasks that they performed while at Trinity Teen Solutions as "chores" as opposed to "work" for which remuneration is payable (see Table 5 for examples). However, it should be noted that at times during their respective depositions, Plaintiffs Amanda Nash and Carlie Sherman would appear to catch themselves using the word "chore" and attempt to replace it with the words "job" or "work;" yet, even after correcting themselves, they continued using that the term "chore" throughout their respective depositions, suggesting that this was how they truly conceptualized these tasks.

---

[158] Anna Gozun Deposition Volume II. Page 265, 5-10.
[159] Amanda Nash Deposition. Page 147, 6-16.
[160] Anna Gozun Deposition Volume II. Page 180, 15-17.
[161] Amanda Nash Deposition. Page 147, 17-22.
[162] Anna Gozun Deposition Volume I. Page 126, 16-19.
[163] Wesley Sherman Deposition. Page 77, 7-22.

**Table 5. Sample of Named Plaintiff Testimony on Chores while at TTS**

| Named Plaintiffs | | |
|---|---|---|
| **Amanda Nash** | **Anna Gozun** | **Carlie Sherman** |
| "…we do *chores* very often on the ranch…[164]" | "Would you like me to go through all of the *chores*?"[165] | "I can remember — I was on the cooking *chore*…"[166] |
| "…essentially, chore check was making sure that everyone actually did their *chores*…[167]" | "It varied what kind of *chores* they gave you…usually I believe we would wake up, go to wash cabin and then go to cook cabin[168]." | "I was on, you know, the watering *chore* or something…[169]" |
| "…not doing one of the *chores* right, taking too long to do a chore…"[170] | "…we did *chores*, did some weeding and went out for irrigation. Since I can't walk around and carry pipes I just sit in the ranger, watch and take pictures[171]." | "And then I had to get them hay… like, basically a solitary *chore*…[172]" |
| "Those are a list of *chores* in the wash cabin."[173] | | Q. Were you ever on goat *chore*? A. Yes[174]. |
| "*Chores* on the ranch."[175] | | "…you would start the ranch *chores* later…"[176] |
| "…how long the *chores* took us…the transition from *chores* to dinner…"[177] | | "…I had some other *chore*, it would fit into a different time."[178] |
| "…at that time we would do any morning *chores*…one of the morning *chores* I had would be to take care of the goats…So some of those *chores* like that."[179] | | Q. And then here in the Chores section, it's divided into three areas. So did that indicate that you had three chores each day that you were responsible for? A. That is what — like, this — those —those are three *chores*…[180] |
| "The afternoon *chores*…cleaning up the horse stuff, and all their animals *chores* and ranch *chores*…"[181] | | "Then people who had more *chores* at the ranch would stop their letter…"[182] |
| | | "I think that's my *chore* checker log or something… I had to check everyone's *chores* and make sure they were done well enough, and then once I checked their *chore*, I checked it off my list.[183]" |
| | | "…waiting to either do the *chore*…"[184] |

---

[164] Amanda Nash Deposition. Page 184, 24.
[165] Anna Gozun Deposition Volume II. Page 232, 5-6.
[166] Carlie Sherman Deposition. Page 114, 11-12.
[167] Amanda Nash Deposition. Page 197, 24-25.
[168] Anna Gozun Deposition Volume II. Page 267, 4-7.
[169] Carlie Sherman Deposition. Page 119, 15 and Page 120, 1.
[170] Amanda Nash Deposition. Page 206, 22-24.
[171] Anna Gozun Deposition Volume II. Page 182, 3-6.
[172] Carlie Sherman Deposition. Page 165, 10-12.
[173] Amanda Nash Deposition. Page 224, 8-9.

***Ultimately, the Plaintiffs' testimony undermines their own allegations contained in the complaint, while providing additional details that the Plaintiffs' experiences were atypical and inconsistent with standard labor trafficking patterns and indicia***. For example, all three Named Plaintiffs testified that they were enrolled in online classes and received education while at Trinity Teen Solutions, although they criticized the level of interaction with online instructors and transferability of credits from the Wyoming state-approved educational program.

Moreover, the Named Plaintiffs testified to interactions that are atypical for labor trafficking situations, specifically related to their recreation, access to healthcare, and other resources and services. For example, Amanda Nash testified that she had a "water balloon fight[185]" with the staff at Trinity Teen Solutions and that while she wasn't particularly "close" with staff, she didn't have any "ill thoughts about" the staff, despite now claiming these same staff allegedly trafficked her[186]. Carlie Sherman does not claim that she was denied access to medical care, but instead testified that she was taken to the doctor during her time at TTS for yeast infections, cuts, and twisted ankles, illustrating that the Defendants sought medical care for the Plaintiffs when and if they needed it due to accidental injuries.[187] Anna Gozun was also taken to the doctor—an orthopedic surgeon—while at TTS[188]. Additionally, Anna Gozun testified that she, and other residents, were provided with disposable cameras[189], access to computers for education[190], and that she was expected to write her feelings in her journal[191], which is consistent with the Defendants profit and loss statements for services/items expensed. It should also be noted that the Plaintiffs do not allege that their identification documents were confiscated and not returned.

Given my research, experience, and education, I find that the Plaintiffs own testimony, testimony of the Plaintiffs' respective parent(s), and documents provided by the Defendants provide countervailing evidence to the claims contained in the present complaint and, as previously stated, are atypical and inconsistent with standard labor trafficking patterns and indicia.

---

[174] Carlie Sherman Deposition. Page 168, 23-24.
[175] Amanda Nash Deposition. Page 150, 12.
[176] Carlie Sherman Deposition. Page 172, 8-9.
[177] Amanda Nash Deposition. Page 151, 8-10.
[178] Carlie Sherman Deposition. Page 176, 18-19.
[179] Amanda Nash Deposition. Page 154, 3-11.
[180] Carlie Sherman Deposition. Page 180, 10-15.
[181] Amanda Nash Deposition. Page 155, 1-9.
[182] Carlie Sherman Deposition. Page 232, 9-10.
[183] Carlie Sherman Deposition. Page 249, 11-16.
[184] Carlie Sherman Deposition. Page 264, 22.
[185] Amanda Nash Deposition. Page 183, 7-9.
[186] Amanda Nash Deposition. Page 255, 1-4.
[187] Carlie Sherman Deposition. Page 120, 23-25.
[188] Anna Gozun Volume I Deposition. Page 93, 10-12.
[189] Anna Gozun Volume II Deposition. Page 197, 23-25.
[190] Anna Gozun Deposition Volume I. Page 126, 16-19.
[191] Anna Gozun Volume II Deposition. Page 199, 13-14.

## IX.  RESPONSE DR. SARA BOYD

***Rebuttal***

While I am not a medical or mental health professional, I do have experience in evaluating empirical research methods and findings across disciplines. Additionally, while in graduate school, I served as the Clinical Trial Search Coordinator for the Cochrane Justice Health Field and performed a meta-analysis of disease prevalence among incarcerated youth, as well as a number of other systematic reviews of medical and mental health research among justice-involved populations. More importantly, given my expertise on human trafficking, I have been called on by numerous other professionals, such as District Attorneys and psychologists to advise them on topics related to the psychology of trafficking.

For example, on November 7, 2017, Bronx County District Attorney Stephen Knoepfler contacted me via email about the topic of trauma bonding. Mr. Knoepfler specialized in prosecuting sex trafficking cases, and arranged to have a local New York psychologist and John Jay University professor, Dr. Citra Raghavan, testify as an expert witness in two cases: *The People of the State of New York v. Kareem Abdur-Razzaq and People of the State of New York v. Lemuel Skipper*. However, the court questioned whether trauma bonding was a "novel psychological concept" in the sex trafficking context and ordered a Frye hearing. As such, even though DA Knoepfler was working with Dr. Raghavan, who currently serves as a Professor of Psychology, Director of The Forensic Mental Health Counseling Program, and Coordinator of Victimology Studies in Forensic Psychology, he reached out to me, given my expertise in this area, to assist him in "formulating arguments" for the defense of a Frye motion regarding trauma bonding and coercive control in the sex trafficking context.

I later testified in those cases at the Frye hearing for psychologist Dr. Raghavan. In preparation for the Frye testimony, I provided Dr. Raghavan, through Mr. Knoepfler, with a list of studies that she should be familiar with regarding trauma bonding and recruitment and control methods utilized by sex traffickers. Through my assistance, Dr. Raghavan was eventually admitted to the court. In the order, Honorable Justice of the Bronx County Supreme Court, Steven Barrett, noted "Dr. Mehlman-Orozco's testimony mirrored Dr. Raghavan's testimony" regarding the studies and articles written that focused on the traumatic bonds formed between sex traffickers and victims in the commercial sex industry, demonstrating the reliability of my testimony in relation to the intersection of psychological concepts and trafficking.

It is through this lens, as well as my extensive formal education, training, and research experience on trafficking, that I rebut the Plaintiffs' named expert, Dr. Sarah Boyd.

Dr. Boyd holds a Certificate in Developmental Disabilities, Master of Science degrees in Counseling Psychology and Clinical Psychology, as well as a Doctor of Philosophy degree in Clinical Psychology. Dr. Boyd has been a licensed clinical psychologist for seven years (since 2014).

Dr. Boyd's last publication was a decade ago in 2012 and her prior research focus and area of expertise appears to be predominately focused on mental health issues affecting persons with disabilities—**The words "disability" or "disabilities" are mentioned in Dr. Boyd's CV 49 times, while the words "trafficking" or "trafficked" are not mentioned even once.**

Nine of Dr. Boyd's 14 publications[192] (including her dissertation), focused on populations with disabilities:

1. **Developmental disabilities**: improving competence in care using virtual patients;
2. Caring for children with **intellectual and developmental disabilities**: Virtual patient instruction improves students' knowledge and comfort level;
3. Improving student dentist competencies and comfort in delivering care to children with **developmental disabilities** using a virtual patient module;
4. Improving physician assistant competencies in **developmental disabilities** using virtual patient modules;
5. Virtual patient training to improve reproductive healthcare for women with **intellectual disabilities**;
6. Ethical challenges in the treatment of individuals with **intellectual disabilities**;
7. Five Factor Model personality functioning in adults with **intellectual disabilities**;
8. Virtual patient instruction for dental students: can it improve dental care access for persons with **special needs**?; and
9. Personality and Personality Disorder in Adults with **Intellectual Disabilities** (dissertation).

While Dr. Boyd's 13-page CV may adequately demonstrate her expertise on mental health issues affecting disabled populations, she appears to have no publications, training, formal education, or specialized knowledge on human trafficking or the mental health issues affecting trafficked populations.

It is no surprise that the words "trafficking" and "trafficked" appear nowhere in Dr. Boyd's six-page report. Instead, her report delivers a subjective[193] opinion on whether she considered the Defendants' facilities to be "therapeutic" and whether their methods fall within her perception of the "established norms of psychological intervention with adolescents[194]."

Dr. Boyd appears to completely ignore the fact that these girls were treated with psychological interventions that fit within her perception of the established norms for adolescents, but that treatment failed to curtail the issues they were experiencing, which

---

[192] Note: Although Dr. Boyd erroneously listed the following publication twice on her CV (on pages 8 and 9)— "Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level"— it is only counted as one publication herein.

[193] Dr. Boyd's report does not contain a single citation, reference, footnote, or endnote to any empirical literature to substantiate her opinions.

[194] Boyd Report. Page 6.

is why their parents pursued residential placement at the Defendants' facility in the first place. For example, during her deposition, Tanya Bischof—the mother of Named-Plaintiff Amanda Nash—testified:

> *"We tried counseling; we tried, you know, outpatient; we tried, you know, different meds, certain things[195]…but you know, it was kind of a struggle. I think some of the side effects made it difficult[196]…We obviously had a psychiatrist. We would do some counseling, discussions, work on the meds[197]."*

Dr. Boyd also neglects to mention the fact that some parents accredit the Defendants for "saving" their child's life. For example, Tanya Bischof—the mother of Named-Plaintiff Amanda Nash—testified:

> *Q. Do you think in a way TTS helped save your daughter's life?*
>
> *A. Yes. Like I said, I don't know if she would have been, you know, in the midst of drugs or pregnant or in jail or — you know, she certainly wouldn't have finished school[198].*

Ultimately, while Dr. Boyd may disagree with the practices employed by the Defendants and whether they should be considered "therapeutic" in nature, she fails to raise any argument that these methods were consistent with human trafficking and, more importantly, lacks the professional, educational, and empirical foundation to even attempt to do so. Moreover, Dr. Boyd ignores that residential placement centers for survivors of human trafficking have some similar policies, which the Plaintiffs criticize the Defendants for having. For example, one study found the majority (58%) of specialized residential placement centers for child trafficking victims did not allow access to cell phones or social media. This same study found that rural facilities (38%), like the Defendants', were praised for allowing youth to disconnect and reduce running behavior.[199] Another study found that survivors of trafficking criticize residential service providers for "overly restrictive security" measures, such as curfews; the many rules and **chores**; the need for exercising great self-control; the lack of privacy; and feeling compelled into participating in various classes and shelter-based activities.[200]

---

[195]Tanya Bischof Deposition. Page 42:23-125.

[196] Tanya Bischof Deposition. Page 43:6-8.

[197] Tanya Bischof Deposition. Page 43:19-21.

[198] Tanya Bischof Deposition. Page 204:6-9.

[199] Amy Farrell, Sarah Lockwood, Kelly Goggin, and Shannon Hogan. 2019. SPECIALIZED RESIDENTIAL PLACEMENTS FOR CHILD TRAFFICKING VICTIMS 2019. Retrieved from: https://bettercarenetwork.org/sites/default/files/CVR%20Webinar_Specialized%20Residential%20Placement%20for%20Child%20Trafficking%20Victims%20Report.pdf

[200] Aron, Laudan Y., Zweig, Janine M., and Lisa C. Newmark. 2006. Comprehensive Services for Survivors of Human Trafficking: Findings from Clients in Three Communities. https://www.urban.org/sites/default/files/publication/43051/411507-Comprehensive-Services-for-Survivors-of-Human-Trafficking.PDF

Additionally, it should be noted that some programs for human trafficking survivors even provide "work-therapy.[201]"


### Response to Sara Boyd's Rebuttal of Dr. Mehlman-Orozco

On November 14, 2022, proposed Plaintiff expert Dr. Sara Boyd issued a "Response to expert report disclosures from defense in Sherman et al. v. Trinity Teen Solutions, Inc., et al." In this six-page document, Dr. Boyd makes mention of me, Dr. Kimberly Mehlman-Orozco, nine times:

1. Three mentions were non substantive, simply regarding her task or section headings. Specifically she wrote:

    a. *"At your request, I now write in response to the Defense expert witness reports of Dr. Fukataki and **Dr. Mehlman-Orozco**. In so responding, I requested and received additional records relevant to the opinions offered by Drs. Fukataki and **Mehlman-Orozco**, including expert reports, treatment records, deposition transcripts, and expert disclosure materials submitted by the Defense in this case[202]."*

    b. *REPORT OF **DR. KIMBERLY MEHLMAN-OROZCO**, DATED OCTOBER 14, 2022[203]*

2. One mention was complementary. Specifically Dr. Boyd wrote:

    a. *"**Dr. Mehlman-Orozco**, who appears to have a stronger background in interpersonal violence victimization...[204]"*

3. Four mentions were regarding my critique of Dr. Boyd's length of interviews, while noting that I did not interview the Plaintiffs. Specifically she wrote:

    a. *"**Dr. Mehlman-Orozco's** report includes critiques of the length and number of interviews I conducted, yet as with Dr. Fukataki, **Dr. Mehlman-Orozco** determined that she could offer opinions without conducting any interviews at all."*

        i. First, the nature of my work does not require for me to conduct primary interviews with Plaintiffs. As with most experts in my field, I can rely upon state of the science research, deposition testimony, and evidence produced through discovery to reliably levy my expert opinions.

        ii. Second, if I were tasked with conducting interviews with the Plaintiffs, which are unnecessary, unlike Dr. Boyd, I would have conducted "trauma informed" and complete interviews. Given the

---

[201] For example, see Lamphere, Logan. June 21, 2022. Organization in Thornton Park helps sex trafficking survivors. https://www.yourcommunitypaper.com/articles/organization-in-thornton-park-helps-sex-trafficking-survivors/

[202] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 1.

[203] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 5.

[204] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 3.

methods used by Dr. Boyd, the reliability of her short interviews is questionable at best.

b. *"Given **Dr. Mehlman-Orozco's** lack of contact with or examination of the Plaintiffs, it is not possible for **Dr. Mehlman-Orozco** to determine if these particular youth required 'many interviews to get the victims comfortable enough to share details of their trafficking,' as she asserts 'might' be necessary on page 21 of her report."*

   i. To be clear, Dr. Boyd is claiming that I do not know if the Plaintiffs needed a trauma informed interview because I didn't interview the Plaintiffs. In making this preposterous assertion, she ignores the fact multiple organizations prescribe trauma informed interview procedures for ALL persons claiming to be victims of trafficking, including the Office of Victims of Crime (OVC). As previously stated: According to the Office for Victims of Crime, Training and Technical Assistance Center (OVC TTAC):

      1. Building rapport is the first step in interviewing human trafficking victims in a trauma-informed way;

      2. Any trauma-informed interview approach toward a suspected victim should be a ***gradual***;

      3. Trauma-informed interviews should avoid interrogation methods.

      4. It is best to use a conversational approach rather than a rapid series of questions;

      5. ***Interviewers should not expect victims to go into detail about their trafficking experiences during the first interview. In fact, it might take many interviews to get the victims comfortable enough to share details of their trafficking;*** and

      6. ***It will take time and trust to develop the facts of a case[205].***

   ii. Moreover, using Dr. Boyd's own flawed logic, how did she know whether the Plaintiffs needed a trauma informed interview, until after she interviewed them? She wouldn't have and therefore the default should have been to utilize interview methods that abided by the recommended, trauma-informed approach.

   iii. Given the arguments in her rebuttal report, Dr. Boyd essentially admits that she failed to conduct trauma-informed interviews of the Plaintiffs. Yet, she later states: *"However, **I am an expert in evaluating victims of abuse, and conducting trauma-informed interviews for the purpose of forensic assessment in civil and criminal cases**, and I am able to conduct focused interviews to address specific referral questions in **less time than is required** to conduct a full forensic evaluation aimed at answered a particular question."* However, Dr. Boyd failed to conduct a single trauma-

---

[205] OVCTTAC. N.d. Trauma-Informed Victim Interviewing. Office of Justice Programs. Retrieved from: https://www.ovcttac.gov/taskforceguide/eguide/5-building-strong-cases/53-victim-interview-preparation/trauma-informed-victim-interviewing/

informed interview for the present matter and expressly **ADMITS** that her interviews were conducted in **LESS TIME** than is **REQUIRED** to conduct a full forensic evaluation.

iv. Ultimately, Dr. Boyd's opinion is seriously misguided in suggesting that the Plaintiffs should not have received a trauma-informed or complete interview. The Plaintiffs are all claiming to be victims of human trafficking. The Plaintiffs each had psychological issues and traumas prior to entering the Defendants' treatment facility. For example, Plaintiff Carlie Sherman was the victim of child sexual abuse and later molested her own brother. As such, Dr. Boyd's lack of experience on human trafficking and failure to conduct a trauma-informed, complete interviews severely undermines the reliability of her opinions.

Ultimately, Dr. Boyd admits: ***"I do not assert myself as a human trafficking expert"[206]***—a fact made abundantly clear by the content of both her initial and supplemental reports.

### Response to Sara Boyd's Rebuttal of Dr. Fukutaki

Dr. Boyd spends the bulk of her Rebuttal document discussing the qualifications and opinions of Dr. Fukutaki (pages 1 through 5[207]). While I will defer to Dr. Fukutaki in defending her qualifications, I will comment on areas supported by my expertise. For examples, see Table 6.

**Table 6. Dr. Boyd's Criticism of Dr. Fukutaki and Dr. Mehlman-Orozco's Response**

| Dr. Boyd Criticism of Dr. Fukutaki | Dr. Mehlman-Orozco Response with Countervailing Research |
|---|---|
| "For example, the pejorative conclusion that Ms. Gozun "***might*** be motivated to be seen as a victim and as part of a victim group…she might gain some sense of identity and purpose from being a victim" (p. 19) is a remarkable overreach, especially given that Dr. Fukutaki did not personally examine Ms. Gozun and does not appear to be qualified to interpret an MMPI or MACI.[208]" | Stating that Ms. Gozun ***MIGHT*** be motivated to be seen as a victim or as part of a victim group does ***NOT*** require a personal interview or interpretation of a psychological test. Dr. Fukutaki's opinion was supported by the "documents received and reviewed."[209] Moreover, this possibility exists globally in social science; for example, as supported by various theories[210], and empirical research. Dr. Fukutaki was very clear in stating Ms. Gozun "***might*** be motivated to be seen as a victim and as part of a victim group"; nevertheless Dr. Boyd erroneously misstated this as a "pejorative |

---

[206] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 5.
[207] Note: only the second half of page 1 and first half of page 5.
[208] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 2. Bold, underline, and italic added for emphasis.
[209] Dr. Fukutaki Report Page 19.
[210] For instance, Social Identity Theory.

| | |
|---|---|
| | ***conclusion***." Additionally, Dr. Boyd's failure to acknowledge this as possibility, severely undermines the reliability of her opinions and methods. |
| "Dr. Fukutaki relied extensively on written correspondence that was reportedly drafted by the Plaintiffs in this case, without acknowledgement or discussion of the reports by the youth that their correspondence/communication with the outside world was surveilled and censored. Dr. Fukutaki did not note this as a limitation of the data, nor did Dr. Fukutaki note the absence of personal examination as a limitation with respect to the evaluation, despite the ethical guidelines' exhortation to be transparent regarding this limitation[211]." | Dr. Boyd appears to completely ignore the inconsistency in the statements made by the Plaintiffs. For example, predominately categorizing the tasks at Trinity Teen Solutions as "chores" during their depositions, but as "labor" in prepared documents such as responses to interrogatories. |
| "Dr. Fukutaki makes a number of comments in her report that strongly suggest she has a lack of experience with evaluating abuse, neglect, and interpersonal trauma[212]." | The claims in this case are not regarding abuse, neglect, or interpersonal trauma; the Plaintiffs are claiming that they were victims of human trafficking, for which Dr. Boyd has little to no documented experience. |
| "Regarding the behaviors of TTS staff toward the youth in their care, Dr. Fukutaki offered the disturbing observation that 'social learning programs have been successfully utilized in forensic settings with violent offenders to reduce levels of expressed violence and improve socialization skills and impulse control.' These children were not 'violent offenders,' nor were these forensic referrals, nor was TTS a forensic treatment setting. Applying the same interventions to suicidal and abused youth based on their efficacy with adjudicated violent criminal offenders is irrational and not based in any scientific findings that would suggest we ought to treat traumatized children as though they are violent criminals[213]." | This statement provides an excellent illustration of Dr. Boyd's severe lack of understanding on programs for at-risk youth, which even include survivors of human trafficking. First, in making this statement, as well as throughout both her initial and supplemental/rebuttal reports, Dr. Boyd completely ignores that the parents of the named Plaintiffs provided their children with access to the very same types of psychological services that Dr. Boyd supports PRIOR to their admission to Trinity Teen Solutions, but documents and testimony suggest that the types of therapy and programs that Dr. Boyd espouses were unsuccessful in addressing the Plaintiffs' mental health struggles and problematic behavior. Second, and more importantly, similar programs are available and used by survivors of sex trafficking. For example, most recently, a 15-year-old teenager named Natalie, who made headlines after she was allegedly trafficked while in attendance at a Dallas Mavericks game[214], was placed by her parents at Solstice West "a leading Residential Treatment Center for teens (ages 14-18) located in the foothills of the Wasatch Mountains in Layton, Utah." Natalie was placed there within four months of her alleged sex trafficking victimization; yet, since the facility was not in a |

---

[211] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 2.
[212] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 3.
[213] *Ibid*.
[214] Olivieri, Anthony. June 18, 2022. Parents of Texas teenager who left Dallas Mavericks game speak out on human trafficking case. ESPN. Retrieved from:
https://www.espn.com/espn/story/_/id/34109347/parents-texas-teen-speak-human-trafficking-case

| | rural location, Natalie ran-away from the facility and went missing[215]. This is the main reason why a rural location, like that of Trinity Teen Solutions, is desirable for residential placement centers servicing at-risk youth—rurality is thought to deter absence without leave and targeting by criminal elements, such as sex traffickers, who are known to recruit girls near foster homes and group homes.<br><br>It should also be noted that Solstice West provides "Adventure Therapy," which is described as: "an integrated part of the clinical program, designed to support each individual's therapeutic goals through outdoor recreation, experiential education, and community service. Weekly activities, overnight adventure trips, and community service provide opportunities for our students to apply the skills they're learning in groups and therapy sessions in a real life setting.<br><br>***Adventure based activities push physical and emotional limits.*** Students learn how to trust their abilities, overcome thoughts of self-doubt, build self-confidence, and learn patience and compassion for self and others. Lessons learned in adventure activities translate to other aspects of their process at Solstice such as academics, individual and family therapy, and peer relationships[216]." |
|---|---|
| "This could potentially serve as a framework for a behavior support plan for an adult client who has engaged in serious criminal behavior, but it is not consistent with evidence-based treatment for youth with psychiatric disorders/disabilities. We also know that punishment does not work nearly as effectively as positive behavior support approaches that aim to reinforce prosocial behaviors in children and adolescents."[217] | As noted in my initial report, while Dr. Boyd may disagree with the practices employed by the Defendants and whether they should be considered "therapeutic" in nature, she fails to raise any argument that these methods were consistent with human trafficking and, more importantly, lacks the professional, educational, and empirical foundation to even attempt to do so. Moreover, as pointed out earlier, Dr. Boyd ignores that residential placement centers for survivors of human trafficking have some similar policies, which the Plaintiffs criticize the Defendants for having. For example, one study found the majority (58%) of specialized residential placement centers for child trafficking victims did not allow access to cell phones or social media. This same study found that rural facilities (38%), like the Defendants', were praised for allowing youth to disconnect and reduce running behavior.  Another study found that survivors of trafficking criticize residential service providers for "overly restrictive security" |

---

[215] For example, see ABC 4 Utah, Missing Teen Girl from Layton Facility is Human Trafficking Survivor. Retrieved from: https://www.youtube.com/watch?v=wOh7L7Fuiok
[216] See Solstice West Website, Page on Adventure Therapy. Retrieved from: https://solsticertc.com/adventure-therapy/
[217] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 4.

|  | measures, such as curfews; the many rules and chores; the need for exercising great self-control; the lack of privacy; and feeling compelled into participating in various classes and shelter-based activities. Additionally, Dr. Boyd completely omits the fact that the Plaintiffs were placed with services that Dr. Boyd would likely consider "evidence based" prior to their placement with Trinity Teen Solutions; these services failed to curtail the Plaintiffs' problematic behavior or adequately treat their mental health issues. Finally, Dr. Boyd ignores that certain testimony suggests that Plaintiffs benefited from the services they received at Trinity Teen Solutions. For example, as previously mentioned, Tanya Bischof—the mother of Named-Plaintiff Amanda Nash—testified: |
|---|---|
|  | *Q. Do you think in a way TTS helped save your daughter's life?*<br>*A. Yes. Like I said, I don't know if she would have been, you know, in the midst of drugs or pregnant or in jail or — you know, she certainly wouldn't have finished school[218].* |
| "TTS aggregated troubled children in a single setting, with adults who modeled withholding, neglectful, and abusive behavior. This is contrary to the social learning model principles, which tell us that children will imitate the behaviors of those around them."[219] | Throughout both her report and her supplemental report, Dr. Boyd fails to acknowledge that the Defendants are not charged with "withholding, neglectful, or abusive behavior." The Plaintiffs have alleged that they were victims of human trafficking. Dr. Boyd's repeated use of these terms, as opposed to human trafficking, suggests that any psychological diagnoses or symptoms that Dr. Boyd may opine upon are not tied to the present allegations of human trafficking. |
| "This is contrary to the social learning. model principles, which tell us that children will imitate the behaviors of those around them. The social learning model is a counterpoint to residential treatment settings that collect youth with psychiatric and learning disabilities in congregate settings, segregated from their communities and families. On the whole, Dr. Fukutaki's comments regarding the treatment interventions reportedly utilized at TTS are conclusory and do not cite to information showing that TTS demonstrated fidelity to evidence-based psychological practice." | Dr. Boyd in this very same section fails to cite to any information showing that the "social learning model is a counterpoint to residential treatment settings that collect[220] youth with psychiatric and learning disabilities in congregate settings." Moreover, throughout both her report and her supplement, Dr. Boyd repeatedly claims that it is inappropriate to use the same approaches for persons in correctional and non-correctional settings; yet, the ***social learning model is used in*** |

---

[218] Tanya Bischof Deposition. Page 204:6-9.
[219] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 4.
[220] Note: I find this to be a poor word choice. I contend that residential placement centers should not "collect" youth, but rather "service" or "treat."

| | *correctional settings[221]*. |
|---|---|
| "On the whole, Dr. Fukutaki's comments regarding the treatment interventions reportedly utilized at TTS are conclusory and do not cite to information showing that TTS demonstrated fidelity to evidence-based psychological practice." | I find this statement to be entirely unfounded. In Dr. Fukutaki's report, she discusses the treatment interventions utilized by Trinity Teen Solutions as being "more experiential than didactic[222];" This is hardly "conclusory." Moreover, similar to my assessment, Dr. Fukutaki noted that Trinity Teen Solutions was "not the first treatment experience for any of the three plaintiffs named in this lawsuit"; a fact largely ignored by Dr. Boyd. |
| "In Dr. Fukutaki's summaries of the histories of the Plaintiff's (sic)[223], she described the youth has having histories of interpersonal abuse, head injuries, eating disorders (which can be fatal), suicidality, severe mood disorders, self-injurious behavior, neuropsychological impairment, and damaged attachment with their caregivers. These are serious psychological problems that warranted evidence-based treatment and careful consideration of how to avoid further traumatizing and injuring the children."[224] | Again, Dr. Boyd completely ignores that these histories of psychological issues and abuse can be challenging to treat. Hence why Trinity Teen Solutions was not the first treatment experience for any of the three plaintiffs named in this lawsuit. Prior treatments had attempted to address their mental health issues and problematic behaviors to no avail; despite being within the spectrum of what Dr. Boyd considers "evidence-based." |
| "The pre-existing psychological conditions do not undercut the subsequent claims of injury by these children, and instead represent the vulnerabilities that they brought into a facility that lacked the staffing, training, and fidelity to evidence-based treatment needed to keep the children safe and alleviate their symptoms.[225]" | Again, Dr. Boyd completely ignores the fact that the Plaintiffs are claiming that they were victims of human trafficking. Pointing out that, in Dr. Boyd's opinion, the facility allegedly lacked staffing, training, and fidelity to evidence-based treatment needed to keep the children safe and alleviate their symptoms is not related to allegations of human trafficking. Moreover, Dr. Boyd's contention again neglects the fact that Trinity Teen Solutions was not the first treatment experience for any of the three Plaintiffs named in this lawsuit. Prior treatments had attempted to address their mental health issues and problematic behaviors to no avail; despite being within the spectrum of what Dr. Boyd considers "evidence based" and "well-staffed" with adequately trained individuals to "keep the children safe and alleviate their symptoms." |

In conclusion, Dr. Boyd attempts to defend her short interviews of the Plaintiffs, which were admittedly not trauma-informed and were conducted in LESS TIME than is REQUIRED to conduct a full forensic evaluation, by claiming that she was not tasked with offering diagnoses, but rather to "answer the questions (she) identified on the first

---

[221] For example, see Shelton, Sarah. June 15, 2021. THE APPLICATION OF SOCIAL LEARNING THEORY TO THE CORRECTIONAL SETTING BY CASE EXAMPLES. International Association for Correctional and Forensic Psychology. Retrieved from: https://www.myiacfp.org/2021/06/15/the-application-of-social-learning-theory-to-the-correctional-setting-by-case-examples/
[222] For example, see Pages 7 and 8 of Dr. Fukutaki's report.
[223] Should be Plaintiffs', not Plaintiff's.
[224] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 4.
[225] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Pages 4-5.

page of (her) report."[226] The questions on the first page of her report are as follows:

1. What is the nature of the psychological injuries, if any, described or demonstrated by the individuals (she) interviewed?
2. To what degree are the injuries reported by these youth and young adults similar?
3. How similar is the conduct alleged by the individuals (she) interviewed?

Each of these questions appears to be related to motion for class certification, as opposed to levying an expert opinion on the case. Each of these questions appears to rely heavily on assuming that each of the Plaintiffs is entirely credible, which is a task for the trier of fact. Dr. Boyd fails to use any reliable method in attempt to draw causal inference between the psychological injuries and any act by the Defendants, as opposed to the Plaintiffs' caregivers, abusers, or prior service providers. Dr. Boyd further fails to use any reliable method to connect any purported psychological injury or symptom experienced by the Plaintiffs to any allegation of human trafficking.

---

[226] Dr. Sara Boyd Rebuttal Report, Dated November 14, 2022, Page 5.

# XI. CONCLUSION

Ultimately, based on the evidence in this case, my expertise on the identification of human trafficking victims, and my review of extant human trafficking cases, I conclude that the Plaintiffs' allegations, even if all accepted as true and countervailing evidence is ignored or rejected as false or unreliable, are atypical and inconsistent with standard labor trafficking patterns and indicia. Testimony and evidence suggests that the intent of the chores performed was therapeutic in nature and the intent of the consequences was to curtail antisocial behavior of the residents. Moreover, it is important to be mindful that what may have been considered therapeutic and appropriate during the alleged trafficking period in the present matter going back to November 2010, could be different from what is therapeutic in 2024. As such, it is important to refrain from evaluating the present matter through the lens of hindsight bias. Moreover, regardless of whether the chores are considered therapeutic or not, does not mean that they are consistent with trafficking. In fact, key hallmarks of labor trafficking are markedly absent from the Plaintiffs' descriptions of their interactions with the Defendants, as discussed throughout the report and summarized further below.

The congressional intent of the Trafficking Victims Protection Reauthorization Act (TVPRA) is unequivocally to combat modern slavery. This intent is echoed in legislation and judicial decisions, as well as by anti-trafficking experts and advocates across the United States. The allegations in this present case, even if accepted as true and countervailing evidence is ignored or rejected as false or unreliable, are objectively not consistent with reliable principles and scientific methods on the indicia of human trafficking—a form of modern slavery.

First and foremost, the Plaintiffs were not placed in the residential placement center for the purpose of employment and were never employed by the Defendants, but perhaps more importantly, testimony and evidence suggests the Defendants did not financially benefit from the chores performed by the Defendants. As such, the Plaintiffs allegations are not consistent with exploitation. While the Plaintiffs did have their housing, food, transportation, and communication controlled and/or monitored by the Defendants in a manner suggestive of trafficking, this was solely because they were acting *in loco parentis* and were attempting to address the Plaintiffs' antisocial behaviors.

The Plaintiffs, as part of the program, were required to perform chores and follow the center's rules, or face consequences. Courts have found that even if chores are compelled, that does not change the nature of the "work," which is not consistent with modern slavery. Moreover, although the Plaintiffs complained about the chores and the consequences (for example running or being tethered to a goat), they do not allege physical or sexual abuse consistent with human trafficking during their placement at Trinity Teen Solutions or by the Defendants.

As courts continue to hear TVPA/TVPRA cases, it becomes increasingly important to recognize that the congressional intent behind human trafficking laws is aimed at combating modern slavery. Judicial decisions on human trafficking cases provide ample precedent on the types of allegations that fall within the scope of the Trafficking Victims Protection Act. Specifically, labor trafficked juveniles are typically completely denied access to any education, which is not alleged in this case. Instead, the students were enrolled in an online educational program that confirmed with Wyoming state licensing requirements.

Categorizing the allegations in this complaint as human trafficking is not in any way based in reality, congressional intent, or legal precedence. The redress afforded under the TVPA/TVPRA is intended for survivors of human trafficking and that is who it should be limited to. As an anti-trafficking advocate, I fear that using the TVPA/TVPRA as a means to an end for non-trafficking allegations, which some may view as a form of secondary exploitation, could create litigation barriers for actual victims of modern slavery in the future.

# APPENDICIES

## APPENDIX A. – Curriculum Vitae

### DR. KIMBERLY B. MEHLMAN-OROZCO

(703) 362-9405 ▪ kim@mehlmanorozco.com ▪ www.mehlmanorozco.com

EDUCATION

**Doctor of Philosophy**                              Criminology, Law and Society
                                                      George Mason University
*Dissertation:* The "Crimmigration" Affect: An Analysis of 287(g) and Latino/a Representation in the
U.S. Juvenile Justice System
*Expertise:* Human Trafficking, Human Smuggling, Immigration, Survey Methods and Systematic
Review

**Master of Arts**                                    Justice, Law, and Crime Policy
                                                      George Mason University
*Thesis:* Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in
Northern Virginia

**Bachelor of Science**                               Administration of Justice
                                                      George Mason University
*Cum Laude*

TEACHING EXPERIENCE

**Surviving and Thriving Beyond Sex Trafficking**   SP18
                                                      Ph.D. Research Course
                                                      Sustainability Education
                                                      Prescott College

**CRIM307 Social Inequality, Crime, and Justice**   FA17
                                                      Criminology, Law and Society
                                                      George Mason University

**CRIM405 Law and Justice Around the World**        SP17, SP18
                                                      Criminology, Law and Society
                                                      George Mason University

**CRIM308 Human Rights and Justice**                FA16
                                                      Criminology, Law and Society
                                                      George Mason University

**CCJS100 Intro to Criminal Justice**               FA12-SP14
                                                      Department of Criminology & Criminal Justice
                                                      University of Maryland College Park

**CCJS370 Race and Crime**                    FA12–SP14
                                              Department of Criminology & Criminal Justice
                                              University of Maryland College Park

**CCJS432 Law of Corrections**                FA12
                                              Department of Criminology & Criminal Justice
                                              University of Maryland College Park

**CCJS418J Foreign Nationals and Crime**      FA12–SP13
                                              Department of Criminology & Criminal Justice
                                              University of Maryland College Park

**CRIM490 Foreign Nationals and Crime**       SU09, SU10, SU11, SU12
                                              Criminology, Law and Society
                                              George Mason University

**GED, Work Place Essential Skills,**
**and Adult Basic Education**                 SU05–SU06
                                              Adult Detention Center
                                              Prince William County


RESEARCH EXPERIENCE

**CEO**                                       FA19– Present
                                              Break the Chain

**Executive Director**                        WI18– Present
                                              Freedom Light

**Partner/Human Trafficking Expert Witness**  FA16– WI18
                                              Mahn, Mehlman & Associates

**Human Trafficking Subject Matter Expert**   SU16–FA17
                                              RAND Corporation

**Executive Director/Human Trafficking Consultant**  WI12– FA16
                                              The Justitia Institute

**Director**                                  FA10 – WI12
                                              Latino Policy Institute
                                              Roger Williams University

**Research Associate**                        SU11 – WI12
                                              Cochrane Collaboration College for Policy
                                              George Mason University

**Lead Clinical Trials Search Coordinator**   SU10 – WI12
                                              Justice Health Field
                                              The Cochrane Collaboration

**Senior Research Associate**                 SU08 – SU11
                                              OJJDP Census of Juveniles on Probation
                                              George Mason University

| | |
|---|---|
| **Graduate Research Assistant** | SU10 – FA10<br>Violence and Victimization Research Division<br>National Institute of Justice (On Contract)<br>Office of Justice Programs |
| **Senior Fellow** | SU08 – FA10<br>The Lloyd Society |
| **Graduate Research Assistant** | SU06 – SU08<br>Trinidad & Tobago Crime Reduction Project<br>George Mason University |
| **Graduate Research Assistant** | WI07-SP07, SP08<br>OJJDP Vaccines for Children Project<br>George Mason University |

ACADEMIC BOOKS/BOOK CHAPTERS

**Mehlman-Orozco, Kimberly** (In Progress). <u>Lies, Damn Lies, and Sex Trafficking Statistics: The Truth Behind America's Failing War Against Sex Trafficking</u> (*Tentative Title*)

**Mehlman-Orozco, Kimberly B.** (2019). <u>The Jihadi Next Door: How ISIS is Forcing, Defrauding, and Coercing Your Neighbor into Terrorism</u>. SkyHorse.

**Mehlman-Orozco, Kimberly B.** (2017). <u>Hidden in Plain Sight: America's Slaves of the New Millennium</u>. ABC-CLIO/Praeger.

Martinez, Ramiro, and **Mehlman-Orozco, Kimberly B.** (2014). "Hispanic Immigration and Crime". <u>Oxford Handbook of Ethnicity, Crime, and Immigration</u>. Eds. Michael Tonry and Sandra Bucerius. Oxford University Press.

PEER REVIEWED JOURANALS

**Mehlman-Orozco, Kimberly** (In Progress). Human Trafficking Hotline Reporting: Do Mandatory Training and Public Awareness Campaigns Make A Difference?

**Mehlman-Orozco, Kimberly** (2024). Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery. International Journal of Academic Research in Public Policy and Governance.

**Mehlman-Orozco, Kimberly B.** (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." *Trends in Organized Crime*.

Syme, Sheryl, Camardese, Susan, and **Mehlman-Orozco, Kimberly B.** (2017). "Identifying Victims of Human Trafficking." *Dimensions of Dental Hygiene*.

Syme, Sheryl, Camardese, Susan, and **Kimberly Mehlman-Orozco.** (2017). "Human Trafficking: Red Flags for Dental Professionals." *Decisions in Dentistry*.

**Mehlman-Orozco, Kimberly B.** (2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. *Social Inclusion*.

<u>MAGAZINES</u>

**Mehlman-Orozco, Kimberly B.** (2016). "The Plight of Sex-Trafficking Survivors." *The Gay and Lesbian Review Worldwide.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Slaves or Prostitutes?: How Human Trafficking is Hidden in Plain Sight in America's Capital." *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2016). "America's Symbolic, Not Effective, Anti-Trafficking Policy. *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B.** (2015). "Tor and the Bitcoin: An Exploration into Law Enforcement Surveillance Capability Online". *Diplomatic Courier.*

**Mehlman-Orozco, Kimberly B**. (2014). "Human Trafficking in the Philippines: A Blemish on Economic Growth". *Diplomatic Courier, Recovery in the Philippines.*

**Mehlman-Orozco, Kimberly B.** (2014). "Devoid of Research: An Evaluation of Human Trafficking Interventions". *Diplomatic Courier, Special Issue: Breaking the Cycle of Human Trafficking.*

<u>OPINION EDITORIALS</u>

**Mehlman-Orozco, Kimberly** (2024). Sex trafficking and prostitution are happening all over Atlanta. *Atlanta Journal-Constitution.*

**Mehlman-Orozco, Kimberly** (2023). 'Sound of Freedom' is a box office hit. But does it profit off trafficking survivors? *USA Today.*

Lowery-Keith, Jennifer and **Kimberly Mehlman-Orozco** (2022). 'Justice Denied': A Sex Trafficking Survivor Tells Her Story. *The Crime Report.*

**Mehlman-Orozco, Kimberly B** and Greg Bristol. (2021). Suing Social Media Sites Won't Curb Sex Trafficking: Advocates. *The Crime Report.*

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti.  (2021). "Does 'Nirvana' Lawsuit Undermine Struggle Against Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B** and Marisa A. Trasatti.  (2021). "Britney Spears, human trafficking and the law." *New York Daily News.*

**Mehlman-Orozco, Kimberly B**.  (2021). "The 'Racialization' of Sex Trafficking in America." *The Crime Report.*

**Mehlman-Orozco, Kimberly B**.  (2021). "COVID-19, the Commercial Sex Industry and Sex Trafficking." *The Crime Report.*

**Mehlman-Orozco, Kimberly B**.  (2019). "Jeffrey Epstein's deal with Alexander Acosta wasn't out of line with what I have seen." *USA Today.*

**Mehlman-Orozco, Kimberly B.** and Sheriff William D. Snyder.  (2019). "Robert Kraft spa scandal: Sex trafficking is hard to prove, that doesn't mean it's a lie." *USA Today.*

**Mehlman-Orozco, Kimberly B.** and William D. Snyder. (2019). "Legalizing prostitution could end sex-trafficking investigations." *The Hill*.

**Mehlman-Orozco, Kimberly B.** (2019). "How to Fight Sex Trafficking." *Politico*.

**Mehlman-Orozco, Kimberly B.** (2018). "Sex trafficking bill likely to do more harm than good." *The Baltimore Sun*.

**Mehlman-Orozco, Kimberly B.** (2018). "Why cracking down on websites won't stop online sex trafficking." *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2018). "Legislation Aiming to Stop Sex Trafficking Would Hurt Investigations." *Homeland Security Today*.

**Mehlman-Orozco, Kimberly B.** (2017). "Trafficking victims get lost under unjust criminal convictions." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Why we should question the FBI's recent human trafficking sting." *Thomson Reuters*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalize sex work to bring trafficking victims out of the shadows." *The Hill*.

**Mehlman-Orozco, Kimberly**. (2017). "Decriminalizing sex work would help bring victims out of the shadows." *The Washington Post*.

**Mehlman-Orozco, Kimberly B.** (2017). "Why the Stop Enabling Sex Traffickers Act is the Wrong Solution." *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "Vilifying Backpage.com won't help fight sex trafficking" *The Washington Post*.

**Mehlman-Orozco, Kimberly B.** (2017). "Child Trafficking: The Tragedy of 'Princess'" *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "To sue or not to sue third-party businesses for sex trafficking?" *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2017). "Hunting the Internet's Sex Predators." *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "Will shutting down Backpage.com end the scourge of child sex trafficking in America?" *Thomson Reuters Foundation*.

**Mehlman-Orozco, Kimberly B.** (2017). "Sex Trafficking: A Surprising Rescue Story." *The Crime Report*.

**Mehlman-Orozco, Kimberly B.** (2017). "What every parent should know about sex trafficking." *Baltimore Sun*.

**Mehlman-Orozco, Kimberly B.** and Simon Hedlin**.** (2017). "Mehlman-Orozco, Hedlin: Stop criminalizing victims of sex trafficking." *The Houston Chronicle.*

**Mehlman-Orozco, Kimberly B.** (2017). "Why Do We Criminalize Young Victims of Sex Trafficking?" *The Crime Report.*

**Mehlman-Orozco, Kimberly B.** (2016). "Sex Trafficking is often hidden in plain sight." *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "Will Legalized Prostitution End the Sex Trafficking Scourge?" *The Huffington Post.*

**Mehlman-Orozco, Kimberly B.** (2016). "What happens after a human trafficking victim is rescued?" *The Hill.*

**Mehlman-Orozco, Kimberly B.** (2016). "The Reality of Sex Trafficking in Washington's Red Light District." *Baltimore Sun.*

**Mehlman-Orozco, Kimberly B.** (2016). America's Anti-Trafficking Efforts: Hollow victories for public accolade. *Connection Newspapers*: Chantilly, Centerville, Great Falls, Herndon, McLean, & Vienna.

**Mehlman-Orozco, Kimberly B.** (2015). "My nail salon may be a front for a brothel." *The Washington Post.*

**Mehlman-Orozco, Kimberly B.** (Contributing Author) (2010) "Breaking It Down: Justice, Law & Society Abstracts for Policymakers and Practitioners". *Center for Justice Law and Society.*

REPORTS

**Mehlman-Orozco, Kimberly B.** (2011). The Effects of In-State Tuition for Non-Citizens: A Systematic Review of the Evidence. *Latino Policy Institute at Roger Williams University.* http://www.rwu.edu/depository/lpi/lpi-report.pdf

**Mehlman-Orozco, Kimberly B.** (2008). Race and Reporting Burglary, Robbery, and Assault in Trinidad and Tobago. (Completed under a grant from the Trinidad and Tobago Government*).*

SCHOLARLY/ PRACTITIONER PRESENTATIONS

**Mehlman-Orozco.** (Forthcoming). Invited Speaker.  Lies, Damn Lies, and Statistics: The Truth Behind America's Failing War Against Sex Trafficking and Opportunities for Innovative Evidence-Based Prevention.  ASIS International Crime Prevention Council.

**Mehlman-Orozco.** (Forthcoming). Invited Panelist.  The Real Face of Child Trafficking in the United States: Understanding how all states are impacted by trafficking and coercion tactics. Public Policy Exchange.

**Mehlman-Orozco, Kimberly**, Elisa Batista (UltraViolet), Renee Williams (National Center for Victims of Crime), et. al. (2024). Invited Presenter and Panelist. Public Policy Exchange Webinar: Forced Marriage.

Connor, James and **Kimberly Mehlman-Orozco.** (2023). X Stage Presentation: Ambient.AI and Sex Trafficking. Global Security Exchange (GSX).

**Mehlman-Orozco, Kimberly.** (2023). Lies, Damn Lies, and Human Trafficking Statistics: The Truth Behind America's Failing War Against Modern Slavery.  Global Security Operations Security Leadership Conference.

**Mehlman-Orozco, Kimberly B.** and Greg Bristol. (2023). Lies, Damn Lies, and Human Trafficking Statistics: The Truth Behind America's Failing War Against Modern Slavery. International Association of Professional Security Consultants' (IAPSC) 38th Annual Conference.

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B**. (2022). Hotel Industry and Human Trafficking. South Carolina Bar Convention.

Trasatti, Marisa, Harvey, Brittany, Loyal, John and **Mehlman-Orozco, Kimberly B.** (2021). Human Trafficking: A Hidden Crime- Civil Litigation, Resolution Of These Claims And The Countermeasures Going Forward. Will Work For Food.

Trassati, Marisa, **Mehlman-Orozco, Kimberly B.**, and Loyal, John. 2021. Human Trafficking: The Silent Risk. Surplus Line Association (SLA) of California.

Trasatti, Marisa and **Mehlman-Orozco, Kimberly B.** (2021). Human Trafficking Is Growing Exponentially: What your Corporation and Clients Need to Know about the Evolving Litigation Landscape. Lawyers for Civil Justice Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Harvey, Brittany. (2021). Human Trafficking: The Silent Risk. RIMS Annual Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Yesowitch, Irene, Vorndran, Maryann, and Miller, Graham. (2020). Training to Combat Human Trafficking at Your Commercial Premise. Cyber, Management & Professional Liability Conference.

Trasatti, Marisa, **Mehlman-Orozco, Kimberly B.**, Clark, Fran, et. al. (2020). Training to Combat Human Trafficking at your Commercial Premise– Learn the Emerging Risks, Litigation Issues and Preventative Measures. Claims and Litigation Management Alliance Conference.

Trasatti, Marisa, Harvey, Brittany, **Mehlman-Orozco, Kimberly B.**, Ewing, Lance. (2020). Human Trafficking: The Silent Risk. Claims and Litigation Management Alliance Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Freedom Light QAISC Training.  Quantico Area Industrial Security Council (QAISC).

**Mehlman-Orozco, Kimberly B.** (2019). Keynote Speaker: National Capital Region Threat Intelligence Consortium  (NTIC) Human Trafficking Seminar.

**Mehlman-Orozco, Kimberly B.** (2019). Law Enforcement's Role in Combating Human Trafficking and Assisting Victims. Police Executive Research Forum (PERF).

**Mehlman-Orozco, Kimberly B.** and Marisa Trasatti (2019). Human Trafficking: The Silent Risk. The RIMS (Risk Management Society) Conference.

**Mehlman-Orozco, Kimberly B.** (2019). Social Policy and Justice Panelist. Harvard College Project of Asian and International Relations. Harvard University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking for the Canadian Police College Human Trafficking Investigator's Course, Royal Canadian Mounted Police and Halifax Regional Police, Canada.

**Mehlman-Orozco, Kimberly B.** (2018). Women in Homeland Security Human Trafficking Symposium Panelist. Marymount University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Trainer on Human Trafficking Provided to the Advancing the Business of Healthcare Medical Coding Chapter in Woodbridge, Virginia (2 CEUs).

**Mehlman-Orozco, Kimberly B.** (2017). Human Trafficking Symposium Panelist. Liberty University School of Law.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker on Mapping Suspected Human Trafficking Networks through Advertisements. Homeland Security Investigations, DHS, Buffalo, NY.

Martin, Favian, **Mehlman-Orozco, Kimberly**, and Wooditch, Alese. (2014). Mexican Migration to the United States: An Exploratory Study into Illegal Border Crossings. Academy of Criminal Justice Sciences. Philadelphia, PA

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Systematic Review Methods," Presented at the annual colloquium of the Cochrane and Campbell Collaborations: Keystone, CO.

**Mehlman-Orozco, Kimberly B.** (2010). "Open Access Systematic Reviews for Juvenile Probation Information," Presented at the first annual OJJDP Probation Summit: Washington, D.C.

**Mehlman-Orozco, Kimberly B.,** Chirieleison, J., Sebold, C. M., Douds, A., Gallagher, A.M., and Gallagher, C.A. (2010). "Characteristics of Juveniles on Probation: Collecting Data from Atlantic to Pacific". Presented at the 2010 American Probation and Parole Association Conference: Washington, D.C.

**Mehlman-Orozco, Kimberly B.** (2010). "Justice Health Search Methods: PubMed and More," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

Gallagher, C.A., Douds, A.S., **Mehlman-Orozco, Kimberly B.,** Chirieleison, J., and Olaghere, A. (2010). "Justice Health Bibliographic Data Mapping," Presented at the International Network for Justice Health Meeting: Scottsdale, AZ.

**Mehlman-Orozco, Kimberly B.** (2010). "Smuggling and the Likelihood of Detention among Undocumented Migrants," Law and Society Association Conference: Chicago, IL.

Douds, Anne S. and **Mehlman-Orozco, Kimberly B.** (2010). "FASD in Justice Facilities: What does the research tell us?", Meeting of the Interagency Coordinating Committee on Fetal

Alcohol Spectrum Disorders: Rockville, MD.

Gallagher, Catherine, Taxman, Faye, Kinner, Stuart, Doyle, Jodie, Pardo-Rengifo, Monica, **Mehlman-Orozco, Kimberly B.**, Olaghere, Ajima, Royle, Nick, Gabriel Cuervo, Luis. (2009). "Knowledge mapping for research prioritization: examples from the Network for Justice Health". 17th Cochrane Colloquium, Singapore.

**Mehlman-Orozco, Kimberly B.** (2009). "Justice Health Systematic Review Methods," Presented at the International Network for Justice Health Meeting: Orlando, FL.

**Mehlman-Orozco, Kimberly B.** (2008). "Foreign Nationals and Crime: An Exploratory Analysis of Undocumented Migrants in Northern Virginia," American Society of Criminology Conference: St. Louis, MO.

### OTHER PRESENTATIONS

**Mehlman-Orozco, Kimberly B.** (2018). Invited Annual Speaker for the College of Humanities and Social Sciences Degree Celebration, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2018). Invited Presenter for the Well Library Honors Event, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Training Presentation on Human Trafficking Red Flags for Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A).

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker for Human Trafficking Awareness Event with Kappa Delta Phi International Sorority, George Mason University.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Mother's Union International Conference Human Trafficking Forum.

**Mehlman-Orozco, Kimberly B.** (2017). Invited Guest Speaker at the Keeping Our Youth Safe Conference. Bernadette's House.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for Girls at High-Risk of Sex Trafficking. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Woodbridge Woman's Club.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Soroptimist International, Alexandria Chapter.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking. Republican Women of Clifton.

**Mehlman-Orozco, Kimberly B.** (2016). Invited Guest Speaker on Human Trafficking in Northern Virginia. Westminster at Lake Ridge.

**Mehlman-Orozco, Kimberly B.** (2016). Keynote Speaker. Soroptimist Human Trafficking Awareness Event.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker on Human Trafficking. Trinity Episcopal Church.

**Mehlman-Orozco, Kimberly B.** (2015). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2014). Invited Guest Speaker for TEAM Summer Quest: High-Risk Youth Diversion Program. Manassas City Police Department.

**Mehlman-Orozco, Kimberly B.** (2013). Exhibitor. Governor's Summit on Human Trafficking. Richmond, VA.

**Mehlman-Orozco, Kimberly B.** (2013). Invited Guest Speaker on Labor Trafficking. St. Francis of Assisi Catholic Church.

**Mehlman-Orozco, Kimberly B.** (2011). Keynote Speaker. First Annual Quetzal Award Gala. Guatemalan Center of New England.

EXPERT WITNESS CASES—CONSULTATION[227] AND/OR TESTIMONY

| | |
|---|---|
| 2024 | AJ and QC v. MASP. Case No. LLC. 1:23-cv-04247-JPB |
| 2024 | T.S. v. G6 et. al. Civil Action No. 01208 |
| 2024 | Ramsbottom et. al. v. Lorin Ashton. Case No.:  3:21-cv-00272 |
| 2024 | N.J. v. G6 Hospitality Property LLC d/b/a Motel 6—Charleston North; and, G6 Hospitality Property LLC d/b/a Motel 6—Columbia. Civil Action No. 2:22-cv-03180-BHH |
| 2024 | J.M. v. Choice Hotels International and Red Roof Inns Corporation. Case No. 1:23-cv-00871 |
| 2024 | R.C. v. Choice Hotels et. al., Case No. 5:23-cv-00872 |
| 2024 | Karla Norambuena et. al. v. Western Iowa Tech Community College et. al. |
| 2023 | A.P. vs. K&S of Aiken, Inc. DBA Kozy Kort Motel, et. al. 2020CP0201021 |
| 2023 | S.C. v Wyndham Hotel & Resorts, Inc.; Days Inns Worldwide, Inc.; La Quinta Franchising, LLC; Choice Hotels International, Inc.; Six Continents Hotels, Inc.; Holiday Hospitality Franchising, LLC; Crowne Plaza, LLC; |

---

[227] Disclosed consultation only.

|      |      |
|------|------|
|      | Red Roof Inns, Inc.; and Red Roof Franchising, LLC, (N.D. Ohio) 23-cv-00871 |
| 2023 | M.A. v. WYNDHAM HOTELS & RESORTS, INC. et. al., 19-cv-00849 |
| 2023 | U.S.A. v. Lacey CR-18-00422-001-PHX-DJH |
| 2023 | E.M. v. Tucker Inn Inc. 1:22-cv-02559-WMR |
| 2023 | D.H. v. Tucker Inn Inc. 1:22-cv-03419-JPB |
| 2023 | H.B. v. Red Roof Inns, Inc.; FMW RRI I, LLC; and RRI West Management LLC, 1:22-cv-01181-JPB |
| 2023 | J.C. as mother and legal guardian of I.R. (a minor), v. Skye Hospitality, LLC d/b/a Southside Inn, 1:22-CV00849-MLB |
| 2023 | J.C. as mother and legal guardian of I.R. (a minor), v. RITI, INC d/b/a AMERICAN INN & SUITES, 1:22-cv-00848-MHC |
| 2023 | G.W. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05232-JPB |
| 2023 | A.G. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05231-JPB |
| 2023 | Free Speech Coalition, et al., v. Angela Colmenero, In Her Official Capacity as Interim Attorney General for the State of Texas |
| 2023 | Expert Report for Community Legal Services of Ottawa file No. 20220503-C-0015992R. |
| 2023 | Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR |
| 2023 | Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR |
| 2023 | People of the State of California v. Angelina Avila Case No. BA508653-02 |
| 2023 | M.H. v. G6 Hospitality LLC, et. al. United States District Court Eastern District of Texas Sherman Division. 4:22-cv-198 |
| 2023 | United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. |

| | |
|---|---|
| | Case No. 1:19-cr-01631-DHU |
| 2023 | United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO |
| 2023 | Jane Doe v. Fairfax County Police. 1:21cv1150(AJT/JFA). |
| 2022 | Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle |
| 2022 | K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552 |
| 2022 | C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355 |
| 2022 | B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356 |
| 2022 | K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926 |
| 2022 | T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994 |
| 2022 | V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997 |
| 2022 | Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS |
| 2022 | N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642 |
| 2022 | G.D. v. Knights of Trevose, et. al. Civil Action Number 02631 |
| 2022 | Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR |
| 2022 | W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC |
| 2022 | J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT |
| 2022 | Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP |
| 2022 | S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES |
| 2022 | S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608 |
| 2022 | C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629 |

| | |
|---|---|
| 2022 | C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631 |
| 2022 | People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312 |
| 2021-2023 | Casilao et. al. v. Hotelmacher LLC  United States District Court Western District of Oklahoma. Case No.: CIV-17-800-SLP |
| 2021-2022 | Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB |
| 2021-2022 | The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232 |
| 2021 | Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe,  v. U.S.A Taekwondo, Inc., District of Colorado |
| 2019-2021 | United States v. Matthew Woods, United States District of New Mexico |
| 2019 | United States v. Adonis Baker, United States District of New Mexico |
| 2019 | United States v. Cornelius Galloway, United States District of New Mexico |
| 2018 | Woodhull Freedom Foundation et al. v. United States. |
| 2018 | RCMP Federal Serious and Organized Crime R vs. Downey & Beals C/O Human Trafficking 2016-465660, Halifax, Canada |
| 2018 | United States of America vs. Savanah April Via, U.S. District Court for the District of Arizona |
| 2018 | Commonwealth of Virginia v. Corey Cardoza, Henrico County |
| 2018 | People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, and People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County |
| 2017-2020 | United States of America v. Miguel Scott Arnold, Terrence Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez, United States District Court for the Middle |

| | |
|---|---|
| | District of Pennsylvania. |
| 2017- 2018 | Doe v. Subh Properties, et al., Civil Litigation, State of Maryland |
| 2017-2018 | State of Ohio v. Michael Moore, Lucas County Court |
| 2017-2018 | People of the State of California Plaintiff v. Tracy Sims Superior Court of California, County of Los Angeles |
| 2017 | Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California |
| 2017 | In re: REFLEX MEDIA, INC., a Nevada corporation, Claimant, vs. VIBE MEDIA, INC. d/b/a CityVibe.com, a California corporation; SOPHIA THOMPSON, an individual; PEAKRIDGE d/b/a SugarModels.com, an Anguilla company; DANIEL ROMAN a/k/a Daniel Romanesse, an individual; ALI ASKARI, an individual; and DOES 1 through 10, inclusive |
| 2016-2017 | J.S., S.L., and L.C. v. Village Voice Media Holdings LLC, Supreme Court of the State of Washington |
| 2016-2017 | People of the State of California Plaintiff v. James Joseph, et. Al.   Contra Costa County Court |
| 2016 | People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles |
| 2016 | People of the State of California Plaintiff v. Mixon-Givens     Santa Clara County Court |

SELECTION OF MEDIA

| | |
|---|---|
| July 27, 2024 | Canadian Center for Women's Empowerment. International awareness can prevent trafficking coerced debt, economic abuse and raise economic empowerment. |
| April 29, 2024 | NBC. 101 West: Invisible Chains, exploring human trafficking in the Valley. |
| June 20, 2023 | CBS. St. Charles police arrest five people in connection with human trafficking enterprise. |
| April 6, 2023 | Forbes. Sex Traffickers Used America's Favorite Family Safety App To Control Victims. |

| | |
|---|---|
| January 10, 2023 | U.S. News & World Report. Jury Hears Case Alleging 4 Cops Enabled Prostitution Ring. |
| September 1, 2022 | Court TV. Only Fans Model Murder Case. |
| July 31, 2022 | CGTN. Kimberly Mehlman-Orozco on the role of internet in human trafficking. |
| July 22, 2022 | Court TV. Crystal Kizer: Sex Trafficking Murder Case. |
| December 16, 2021 | NPR. The Facts Of, The Myths About, And The Solutions For Child Trafficking. |
| April 24, 2021 | CBS News. Manhattan District Attorney's office to stop prosecuting prostitution cases. |
| April 10, 2021 | Fox News. Human smugglers using social media to transport migrants to US: Reports. |
| April 4, 2021 | Forbes. Inside the $4.5 Billion Erotic Massage Parlor Economy. |
| July 4, 2020 | CBS News. Epstein's alleged accomplice Ghislaine Maxwell set to be arraigned next week. |
| January 23, 2020 | Skift. Opening Closed Doors: Can Hotels Do More to Fight Human Trafficking? |
| August 9, 2019 | ABC. This Week with George Stephanopoulos. Panel discussion on Jeffrey Epstein. |
| July 9, 2019 | CBS News. Sex trafficking expert discusses Jeffrey Epstein case and sexual abuse. |
| May 19, 2019 | The Special Report with Areva Martin. |
| May 10, 2019 | Hollywood Reporter. Sex Trafficking mars the Mystique of Cannes Film Festival. |
| April 12, 2019 | The Hill. Expert says it's 'very unlikely' Robert Kraft prostitution case would yield human trafficking convictions. |
| March 21, 2019 | CBS. Robert Kraft solicitation charge puts spotlight on sex trafficking. |
| March 4, 2019 | The Washington Post. Surveillance cameras, suitcases and billionaires: How an investigation into massage parlors unfolded in Florida. |

| | |
|---|---|
| March 1, 2019 | USA Today. From harmful fetishes to sex trafficking, Robert Kraft case highlights risks facing Asian women. |
| February 24, 2019 | CNN. Robert Kraft allegations: A sex trafficking expert weighs in. |
| January 11, 2019 | The Seattle Times. Documentary puts new attention on R. Kelly sex allegations. |
| August 22, 2018 | The Crime Report. Backpage Founders: We're Victims of Attack on Free Speech. |
| May 5, 2018 | Delaware Online. Human Trafficking Court shut down, to be merged with other treatment courts in Delaware. |
| May 1, 2018 | Delaware Online. Despite good intentions, Delaware slow to address human trafficking. |
| April 24, 2018 | ABC. Will new law protect women from sex trafficking? |
| April 23, 2018 | The Ringer. How Sex Ads Became a Battleground for the Future of the Internet. |
| April 22, 2018 | Miami Herald. He pimped a minor at Santa's Enchanted Forest. He got slapped with federal prison. |
| April 13, 2018 | Yahoo Lifestyle. Women's March lambasted for criticizing shutdown of Backpage.com. |
| April 10, 2018 | Miami Herald. Florida's sex industry 'in a panic' after feds shut down notorious Backpage website. |
| April 9, 2018 | The Crime Report. With Backpage Closed, Where Will The Sex Slave Trade Go? |
| March 22, 2018 | Washington Post. Bill enabling prosecutors, victims to pursue websites that host sex traffickers heads to White House. |
| March 2, 2018 | Governing. 3 Cities Lead Fight Against Human Trafficking. |
| February 1, 2018 | Vanity Fair. The Republican Party is Having Another Todd Akin Fiasco. |
| February 1, 2018 | New York Magazine. Missouri GOP Senate Hopeful Goes Off the Deep End on the Sexual Revolution and Human Trafficking. |
| January 31, 2018 | Kansas City Star. Josh Hawley blames sex trafficking on 'sexual revolution' of 1960s in leaked audio. |

| | |
|---|---|
| January 25, 2018 | Homeland Security Today. Expert Delves Into Real Face of Human Trafficking: Victims and Perpetrators. |
| January 23, 2018 | Huffington Post. Study Finds More Than 9,000 Brothels Masquerading As Legit Businesses. |
| January 11, 2018 | International Business Times. Human trafficking: Why we are all guilty of supporting the modern slave trade. |
| January 8, 2018 | Majority Report Radio. America's Slaves of the New Millennium with Dr. Kimberly Mehlman-Orozco. |
| December 21, 2017 | Fast Company. Hotels Are Key In The Fight To End Human Trafficking. |
| December 12, 2017 | WNPR. The Colin McEnroe Show. Child Labor In America And Abroad. |
| November 4, 2017 | C-SPAN. Hidden in Plain Sight Book Talk. |
| September 22, 2017 | Gray Media. Interview by Kyle Midura. Sex Trafficking Internet Crackdown Proposal. |
| August 8, 2017 | i24 news. Interview for Stateside with David Shuster. Model allegedly kidnapped for dark web auction. |
| August 2, 2017 | Newsy. Interview for "The Why" on human trafficking on the Internet. |
| July 30, 2017 | Al Jazeera. Segment Produced by Ruairi Casey. World Day Against Human Trafficking. |
| July 25, 2017 | Fox News Radio. Interviewed by Eben Brown. "Security America" segment on human smuggling deaths in San Antonio. |
| July 25, 2017 | Dallas News. Interviewed by Sarah Mervosh. New trick of the sex trade: Pimps can use retail gift cards to buy Backpage.com ads. |
| July 24, 2017 | WJLA. Interviewed by Stephen Loiaconi. Human smuggling deaths underscore need for immigration reform, experts say. |
| July 18, 2017 | The Washington Post. Interviewed by Tom Jackman. Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ. |
| June 11, 2017 | PJ Media. Interviewed by Karl Herchenroeder. Expert Notes Gap in Human-Trafficking Laws as Senators Press for Fund Renewal. |

| | |
|---|---|
| April 19, 2017 | WYPR. Interviewed by Tom Hall. Misinformation Sparked #DCMissingGirls Outrage, But It Highlights Real And Overlooked Issues. |
| March 30, 2017 | CBS. Interviewed by Jennifer Earl. Mom's warning about "human trafficking" at IKEA goes viral; what you need to know. |
| March 29, 2017 | Women's Health. Interviewed by Korin Miller.  This Mom Claims She Encountered Human Traffickers At IKEA And People Are Freaking Out. |
| February 10, 2017 | Miami Herald. Interviewed by David Ovalle. Florida lawsuit targets website decried as hub for human trafficking. |
| February 3, 2017 | Miami Herald. Interviewed by David Ovalle. The 'adult' section might be closed but Miami sex workers still on the job. |
| January 1, 2017 | OutSmart Magazine. Interviewed by Dr. Laura McGuire on Human Trafficking. Hidden in Plain Sight: Researcher Dr. Mehlman-Orozco Discusses the Realities of Human Trafficking. |
| August 15, 2013 | USA Today, Interviewed by Yamiche Alcindor. Dozens of States Pass Laws to Fight Human Trafficking. |
| June 6, 2013 | USA Today. Interviewed by Yamiche Alcindor. Blue Campaign by DHS aims to combat human trafficking. |
| June 2, 2010 | Style Weekly. Interviewed for a human trafficking story by Peter Galuszka, "The New Slavery: Virginia becomes haven for human trafficking." |

OTHER PROFESSIONAL CONFRENCES/SUMMITS/TRAININGS

**No Room for Trafficking Summit**                     AHLA Foundation
Summer 2023                    Summit

**Intelligence Community Conference**                     Traffik Analysis Hub
Summer 2021                    Conference

**Transportation Industry Against Human Trafficking**     U.S. Department of Commerce
Fall 2020                    Presentation

**"Freedom Together" D.C., M.D., and V.A. Regional**     D.C., M.D., and V.A. Task Forces
**Anti Human Trafficking Task Force Conference**
Spring 2018                    Conference

**Virginia Forum on Human Trafficking**                     Dept. of Criminal Justice Services
Fall 2015                    Conference

| | | |
|---|---|---|
| **Regional Conference of Human Trafficking Task Forces**<br>Fall 2015 | Conference | DMV Anti-Trafficking Working Group |
| **Maryland Freedom Conference**<br>Winter 2015 | Conference | Towson University |
| **Sharing Lessons, Sharing Responsibility: Combating Human Trafficking**<br>Spring 2013 | Conference | Migration Policy Institute |
| **Freedom Network Annual Conference**<br>Spring 2013 | Conference | Freedom Network |
| **Human Trafficking Panel Discussion**<br>Spring 2013 | Working Group | George Washington Law |
| **Analytic Statistics and Meta Analysis**<br>Spring 2011 | Paid Training | Stata |
| **Systematic Review and Meta Analysis**<br>Spring 2009, Fall 2010 | Independent Graduate Study | GMU |
| **PubMed, NLMGateway, ToxNet and ClinicalTrials.gov**<br>Summer 2009 | Search Certifications | National Library of Medicine |
| **Ovid, ProQuest, and Web searches**<br>Summer 2009 | Search Certifications | AHRQ |
| **Introduction to ArcGIS Workshops**<br>Fall 2009-Summer 2010 | | George Mason University |
| **Hand Searching Systematic Review Workshop**<br>Fall 2009 | Search Certifications | Cochrane Collaboration |

A<small>WARDS</small>

*Independent Publisher Award, 2019*    Silver Medal for Current Events (Jihadi Next Door).

*Independent Publisher Award, 2018*    Bronze Medal for Social Issues/Humanitarian (Hidden in Plain Sight: America's Slaves of the New Millennium).

*Dissertation Completion Award, 2012*    George Mason University, College of Humanities and Social Sciences.

*Deans Challenge Award, 2009*    George Mason University, College of Humanities and Social Sciences.

S<small>ERVICE</small>

Peer Reviewer    Office of Justice Programs (OJP), 2020-Present

90

| | |
|---|---|
| Panel of Expert Witnesses | Los Angeles Superior Court, WI2017-Present |
| Reviewer | Journal of Human Trafficking, FA2014-Present |
| Invited Peer Reviewer | Office of Justice Programs, SP2020-Present |
| Advisory Board Member | Empower Her Network, FA2017- Present |
| Volunteer | Prince William County Police Santa Cops, WI2021 & WI 2022 |
| Advisory Board Member | Dressember (Anti-trafficking foundation), SP2017-SU2021 |
| Reviewer | Taylor & Francis Books, SP2021 |
| Reviewer | Justice Quarterly, WI2018- FA2019 |
| Survey Methodologist Advisor | United Against Slavery, FA2017-FA2019 |
| Member | Prince William County Human Trafficking Task Force, SU2013-SU2018 |
| Member | Prince George's County Human Trafficking Task Force, SU2012-SU2014 |
| Member and Former President | Soroptimist International of Woodbridge, FA2015-SP2018 |
| Reviewer | American Journal of Evaluation, FA2014-FA2015 |
| Member | Prince George's County Human Trafficking Task Force, SU2013-2015 |
| Reviewer | Columbia University Press, FA2013 |
| President and Founding Officer | Student Center for Immigration Research, George Mason University, FA2008 – FA2010 |
| Member | Criminology, Law & Society Student Association, George Mason University, FA2009 – WI2012 |
| Volunteer | Prince William County Jail, Classification Department, 500 hours, SP 2005 |

SAMPLE OF PEER REVIEW SERVICE

| | |
|---|---|
| 2024 | "That's not the Point of This" Complicating and Critiquing Coercive Humanitarianism in the Practice of Service Providers in the U.S. Anti-Trafficking Movement. *Journal of Human Trafficking.* |

| 2024 | "Where do we Start?" Utilizing GIS to visualize the Wage and Labor Compliance Action Dataset to Inform Proactive Law Enforcement Efforts and Social Service Outreach in Combatting Labor Trafficking in Mississippi." *Journal of Human Trafficking.* |
| 2023 | A Quasi-Experimental Intervention Trial to Test the Efficacy of a Human Trafficking Awareness Campaign: The Blue Campaign. *Journal of Human Trafficking.* |
| 2023 | Survivor Women's Experience on the Pathways of Trafficking in Bangladesh. *Journal of Human Trafficking.* |
| 2021 | Sex Trafficking Myths and Realities. *Journal of Human Trafficking.* |
| 2020 | Modern Slavery or Forced Labour? Mechanisms of power and the criminal family firm in the United Kingdom. *Journal of Human Trafficking.* |
| 2018 | Commercial Sexual Exploitation and Sex Trafficking of Children in South East Asia: A Review of the Literature. *Journal of Human Trafficking.* |
| 2017 | Preparedness to Serve Commercially Sexually Exploited Children (CSEC): An Integrative Review. *Journal of Human Trafficking.* |
| 2016 | Evaluation of a Curriculum for Healthcare Professional Training on Child Sex Trafficking. *Journal of Human Trafficking.* |
| 2015 | Women and Child Trafficking in Nigeria: What Progress? *Journal of Human Trafficking.* |
| 2015 | Experiences of survivors of human trafficking of non-sexual purposes. *Journal of Human Trafficking.* |

PROFESSIONAL MEMBERSHIP

National Society for Collegiate Scholars
Phi-Alpha Delta Pre-Law Fraternity
Alpha Chi Honors Fraternity
American Society of Criminology
National Criminal Justice Honors Fraternity
Alpha Phi Sigma Honors Society

**APPENDIX B. Expert Witness Testimony**

*I have testified and/or issued a report in the following cases, but have been retained in many others:*

**Criminal Prosecution**

United States of America v. Kamal Bhula, et al. United States District Court, For the District of New Mexico. Case No. 1:19-cr-01631-DHU

People of the State of California Plaintiff v. Mixon-Givens Santa Clara County Court

People of the State of California Plaintiff v. Joseph, et. Al. Contra Costa County Court (Case No: 5-160639-1)[228]

People v. Kareem Abdur-Razzaaq, Ind. No. 3154/2013, Bronx County[229]

People v. Lemuel Skipper, Ind. No. 2409/2015, Bronx County[230]

Commonwealth of Virginia v. Corey Cardoza, Henrico County[231]

United States v. Cornelius Galloway, United States District of New Mexico[232]

State of Ohio v. Michael Moore, Lucas County Court (Case No. CR 16-3191)

**Criminal Defense**

United States v. Lacey, United States District of Arizona CR-18-00422-001-PHX-DJH

United States of America v. Mei Xing, United States District Court for the Central District of California. No. 2:20-CR-0228(A)-FMO

People of the State of California v. Angelina Avila, Superior Court of the State of California, in and for the County of Los Angeles (Case No. BA508653-02)

United States of America v. Emonie Murphy, U.S. District Court for the Middle District of Pennsylvania

---

[228] Testified at grand jury on 4/13/2016 and at trial on 7/12/2017. Prosecutor's name is Aron DeFerrari: ADeFerrari@contracostada.org.
[229] Testified at Frye motion for another expert witness on behalf of the prosecution.
[230] Testified at Frye motion for another expert witness on behalf of the prosecution.
[231] Testified at Daubert hearing and prevailed as an admitted expert. Case settled before trial.
[232] Testified at Daubert hearing and prevailed as admitted expert.

People of the State of California Plaintiff v. Young Kyung Cho Superior Court of California, County of Los Angeles (Case No: 6CJ10198-01)[233]

United States of America v. Landrum et. Al. Via. U.S. District Court for the District of Arizona (Case No. 4:16-cr-01560-RM-JR)

The People of the State of California v. Rachele Eschenburg. Case Number: FCR350232

People of the State of California v. Diane Mirabal. Superior Court of the State of California for the County of Santa Clara. Case No.: 98312[234]

**Civil Defense**

AJ and QC v. MASP. Case No. LLC. 1:23-cv-04247-JPB

T.S. v. G6 et. al. Civil Action No. 01208

Rachel Ramsbottom, Alexis Bowling, and Jenna Houston v. Lorin Ashton. Case No.: 3:21-cv-00272

T.S. v. Eighty Eight, L.P.; Eight, Inc.; G6 Hospitality Franchising LLC.; G6 Hospitality LLC; and Ramara, Inc., individually, and d/b/a North American Motor Inns Civil Action No. 01208

N.J. v. G6 Hospitality Property LLC d/b/a Motel 6—Charleston North; and, G6 Hospitality Property LLC d/b/a Motel 6—Columbia. Civil Action No. 2:22-cv-03180-BHH

J.M. v. Choice Hotels International and Red Roof Inns Corporation. Case No. 1:23-cv-00871

R.C. v. Choice Hotels et. al., Case No. 5:23-cv-00872

Karla Norambuena et. al. v. Western Iowa Tech Community College et. al. 5:20-cv-04054

A.P. vs. K&S of Aiken, Inc. DBA Kozy Kort Motel, et. al. 2020CP0201021

S.C. v Wyndham Hotel & Resorts, Inc.; Days Inns Worldwide, Inc.; La Quinta Franchising, LLC; Choice Hotels International, Inc.; Six Continents Hotels, Inc.; Holiday Hospitality Franchising, LLC; Crowne Plaza, LLC; Red Roof Inns, Inc.; and Red Roof Franchising, LLC, (N.D. Ohio) 23-cv-00871

M.A. v. Wyndham Hotels and Resorts, Inc. et. al., 19-cv 00849

---

[233] Testified in trial on 11/7/2016 and 12/2/2017.
[234] Declaration only, not report.

E.M. v. Tucker Inn Inc. 1:22-cv-02559-WMR

D.H. v. Tucker Inn Inc. 1:22-cv-03419-JPB

H.B. v. Red Roof Inns, Inc.; FMW RRI I, LLC; and RRI West Management LLC, 1:22-cv-01181-JPB

Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

Jane Doe 1 v. JP Morgan Chase & Co. Case No. 1:22-cv-10019-JSR

J.C. as mother and legal guardian of I.R. (a minor), v. RITI, INC d/b/a AMERICAN INN & SUITES, 1:22-cv-00848-MHC

G.W. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05232-JPB

A.G. v. Northbrook Industries, Inc. D/B/A United Inn and Suites. Civil Action No. 1:20-cv-05231-JPB

Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A. and JP Morgan Chase Bank, N.A. v. James Edward Staley Case No. 22-cv-10904-JSR

Jane Doe 1 v. JP Morgan Chase & Co. 1:22-cv-10019-JSR

M.H. v. G6 Hospitality LLC, et. al. 4:22-cv-198

Charity Pearrow v. ESA P Portfolio LLC, et. al. 21-cv-62276-BLOOM/Valle

K.R. v. 4200 Roosevelt LLC, et. al. Case Number 00552

C.A. v. 4200 Roosevelt LLC, et. al. Case Number 03355

B.H. v. 4200 Roosevelt LLC, et. al. Case Number 03356

K.C. v. 4200 Roosevelt LLC, et. al. Case Number 01926

T.E. v. 4200 Roosevelt LLC, et. al. Case Number 00994

V.S. v. 4200 Roosevelt LLC, et. al. Case Number 00997

Sherman, Gozun, and Nash v. Trinity Teen Solutions, Inc. Case Number 20-CV-215-SWS

N.Z. v. Knights of Trevose, et. al. Civil Action Number 02642

G.D. v. Knights of Trevose, et. al. Civil Action Number 02631

Jane Doe 1-4 v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-04278-WMR

W.K., et. al. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:20-cv-5263-VHC

J.A. v. Red Roof Inns, Inc., et. al. Civil Action Number 1:21-cv-03655-TWT

Casilao et. al. v. Hotelmacher LLC, et. al. Case No.: CIV-17-800-SLP

S.Y. v. Inn of Naples Hotel LLC and Inn of Naples, LLC. Case No.: 2:20-cv-00609-JES

S.Y. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00608

C.S. v. Inn of Naples Hotel, LLC and Inn of Naples, LLC 2:20-cv-00629

C.S. v. Naples Hotel Company and the Gulfcoast Inn of Naples Owners Association, Inc. 2:20-cv-00631

M.B. v. Roosevelt Inn LLC (MARCH TERM, 2017 NO.: 00712)

Keo Ratha; Sem Kosal; Sophea Bun; Yem Ban; Nakry Phan; and Sok Sang v. Phatthana Seafood Co., Ltd; S.S. Frozen Food Co., Ltd.; Doe Corporations 1-5; Rubicon Resources, LLC; and Wales & Co. Universe, Ltd. United States District Court for the Central District of California.[235]

Jane Doe v. TRX Insurance Services, Inc and Richard Metz. United States District Court for the Eastern District of Pennsylvania. Civil Action No. 2:20-cv-04095-MMB

Heidi Gilbert, Amber Means, Mandy Meloon, Gabriela Joslin, and Kay Poe, v. U.S.A Taekwondo, Inc. and Steven Lopez. United States District Court for the District of Colorado. Civil Action No. 1: 18-cv-00981-CMA-MEH

**Civil Plaintiff**

Free Speech Coalition, et al., v. Angela Colmenero, In Her Official Capacity as Interim Attorney General for the State of Texas[236]

Woodhull Freedom Foundation et al. v. United States[237]

---

[235] I was also deposed in this case. Dismissed on summary judgement.
[236] Not an expert witness report, but rather a declaration.
[237] Not an expert witness report, but rather a declaration: https://www.eff.org/document/declaration-dr-kimberly-mehlman-orozco-support-woodhull-et-al-motion-preliminary-injunction

Jane Doe v. Fairfax County Police 1:21cv1150(AJT/JFA)[238]

---

[238] Pro Bono case, which has received national media attention. See, for example:
https://www.newsweek.com/virginia-cops-protected-sex-trafficking-ring-return-free-sex-victims-lawsuit-1661937

**APPENDIX C. – Delphi Survey Human Trafficking Indicia**

## Indicators of trafficking of children for labour exploitation

*The Palermo Protocol specifically states that, in the case of children under 18, there is no need to prove "the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability" in order to establish the crime of trafficking. Nevertheless, it was decided to retain indicators of deception, coercion and abuse of vulnerability in order to analyse trafficking in children with harmonised tools within Europe*

**INDICATORS OF DECEPTIVE RECRUITMENT**

Strong Indicator

Deceived about access to education opportunities

Deceived about the nature of the job, location or employer

Medium Indicators

Deceived about conditions of work

Deceived about content or legality of work contract

Deceived about family reunification

Deceived about housing and living conditions

Deceived about legal documentation or obtaining legal migration status

Deceived about travel and recruitment conditions

Deceived about wages/earnings

Deceived through promises of marriage or adoption

**INDICATORS OF COERCIVE RECRUITMENT**

Strong Indicators

Abduction, forced marriage, forced adoption or selling of victim

Debt bondage

Threats of violence against victim

Violence on victims

Medium Indicators

Confiscation of documents

Isolation, confinement or surveillance

Threat of denunciation to authorities

Threats to inform family, community or public

Violence on family (threats or effective)

Withholding of money

**INDICATORS OF RECRUITMENT BY ABUSE OF VULNERABILITY**

Medium Indicators

Abuse of cultural/religious beliefs

Abuse of difficult family situation

Abuse of illegal status

Abuse of lack of education (language)

Abuse of lack of information

Control of exploiters

Difficulties in the past

Difficulty to organise the travel

Economic reasons

False information about successful migration

Family situation

General context

Personal situation

Psychological and emotional dependency

Relationship with authorities/legal status

**INDICATORS OF EXPLOITATION**

Strong Indicators

Excessive working days or hours

Medium Indicators

Bad living conditions

Hazardous work

Low or no salary

No access to education

No respect of labour laws or contract signed

Very bad working conditions

Wage manipulation

**INDICATORS OF COERCION AT DESTINATION**

Strong Indicators

Confiscation of documents

Debt bondage

Forced into illicit/criminal activities

Forced tasks or clients

Isolation, confinement or surveillance

Threats of violence against victim

Under strong influence

Violence on victims

Medium Indicators

Forced to act against peers

Forced to lie to authorities, family, etc.

Threat of denunciation to authorities

Threat to impose even worse working conditions

Threats to inform family, community or public

Violence on family (threats or effective)

Withholding of wages

**INDICATORS OF ABUSE OF VULNERABILITY AT DESTINATION**

Medium Indicators

Dependency on exploiters

Difficulties in the past

Difficulty to live in an unknown area

Economic reasons

Family situation

Personal characteristics

Relationship with authorities/legal status

## APPENDIX D. Acknowledgement of Pro Bono Work for Human Trafficking Survivors



Jose Marin Law
Address: 2537 Irving Street
San Francisco, CA 94122
Phone: (415) 753-3539
Web: www.JoseMarinLaw.com
E-Mail: Jose@JoseMarinLaw.com

Jose Z. Marin
Attorney at Law

March 16, 2021

Dr. Kimberly Mehlman-Orozco
15920 Fairway Drive
Dumfries, Virginia 22025

Dear Dr. Mehlman-Orozco,

I wanted to thank you for your unparalleled commitment to working with human trafficking survivors. It is rare to find an expert who is willing to dedicate this much of her time, share her analysis and insights into the case, and provide such detailed, persuasive expert reports—all pro bono. This type of philanthropy truly stands out.

Your passion for educating the institutions that have power over survivors' fates is inspirational. The expert report you contributed to a recent T-Visa case was instrumental to our success! You had a lasting impact on our client and her children's lives. They now have a path toward permanent residency and citizenship in the United States after surviving terrible trauma from human trafficking.

It was wonderful to work with you and I look forward to collaborating on future cases. I would recommend you to any attorney who assists human trafficking survivors.

Sincerely,

Melanie Kehr, Esq.

99

**APPENDIX E. Letter of Reference on Expert Witness Testimony for Prosecution**



OFFICE OF THE
COMMONWEALTH'S ATTORNEY FOR HENRICO COUNTY

Shannon L. Taylor
Commonwealth's Attorney

June 7, 2018

Dr. Kimberly Mehlman-Orozco
3721 Dalebrook Drive
Dumfries VA 22025

      RE: Commonwealth v. Corey Cardoza
          CR17-2160F
          Trial Date: June 5, 2018 – Convicted of Two Counts of Commercial Sex Trafficking

Dear Dr. Mehlman-Orozco:

      On behalf of the Henrico County Commonwealth Attorney's Office, I am writing to sincerely thank you for your invaluable service and commitment to our successful prosecution of Corey Cardoza. Without your capable and professional testimony, I am certain we would not have been able to convince the jury to convict Mr. Cardoza. Your wiliness to come to our jurisdiction on several occasions sets you apart from many experts I have dealt with in the past, and I look forward to working with you in the future.

      I have enclosed the Supreme Court form for your List of Allowances. The form should be self-explanatory, but if you need assistance please do not hesitate to contact me. From what I understand, you must attach an itemized list of your expenditures upon returning the form to our office.

      Once again, I thank you for your outstanding service to our community and, moreover, to the victims in this matter.

                          With Sincere Gratitude,

                          B.J. McGee
                          Assistant commonwealth's Attorney

CC: BQS, File

## APPENDIX F. Letter of Recognition from the Office of Justice Programs, National Institute of Justice (NIJ) for the FY 2022 Research on Trafficking in Persons



**U.S. Department of Justice**

Office of Justice Programs

*Washington, D.C. 20531*

Dear Reviewer:

Thank you for your recent participation as a peer reviewer for the Office of Justice Programs' (OJP), National Institute of Justice's (NIJ) FY 2022 Research and Evaluation on Trafficking in Persons. While OJP receives many worthwhile proposals, it is crucial that only the strongest applications that soundly adhere to the purposes of the solicitation as well as the goals of NIJ and OJP are selected.

We appreciate your commitment and your ability to dedicate your time to participate in OJP's peer review activities. If you have any feedback regarding NIJ's peer review process, please let us know as we continue to examine and make improvements to it.

Again, thank you for your participation. This process could not have happened without your important help. We greatly appreciate all the time and energy you devoted to this task.

Thank you.

Sincerely,

Nancy La Vigne, Ph.D.
Director, National Institute of Justice

**APPENDIX G. Letter of Reference on Expert Witness Testimony for Emonie Murphy in Pennsylvania Federal Court**



FEDERAL PUBLIC **DEFENDER**
MIDDLE DISTRICT OF PENNSYLVANIA

September 11, 2020

**Chief Federal Public Defender**
Heidi R. Freese

**First Assistant**
**Federal Public Defender**
Ronald A. Krauss

**Chief, Trial Unit**
Lori J. Ulrich

**Chief, Appellate Unit**
Frederick W. Ulrich

**Senior Litigator**
Thomas A. Thornton

**Assistant**
**Federal Public Defenders**
Ari D. Weitzman
Quin M. Sorenson
Melissa B. Porter

**HARRISBURG OFFICE**
100 Chestnut Street, Third Floor
Harrisburg, Pennsylvania 17101
Tel.: 717-782-2237
Fax: 717-782-3881

**Assistant**
**Federal Public Defenders**
Leo A. Latella
   Manager, Scranton Operations
Elliot A. Smith
Brandon R. Reish

**SCRANTON OFFICE**
201 Lackawanna Avenue, Ste. 317
Scranton, Pennsylvania 18503
Tel.: 570-343-6285
Fax: 570-343-6225

**Assistant**
**Federal Public Defender**
Gerald A. Lord

**Staff Attorney**
Tammy L. Taylor

**WILLIAMSPORT OFFICE**
330 Pine Street, Ste. 302
Williamsport, Pennsylvania 17701
Tel.: 570-323-9314
Fax: 570-323-9836

Dr. Kimberly Mehlman-Orozco
15920 Fairway Drive
Dumfries, Virginia 22025

Dear Dr. Mehlman-Orozco:

I wanted to reach out and thank you for the exceptional work you did on behalf of our client, Emonie Murphy. Ms. Murphy was facing a guideline range of 30 years to life and a mandatory minimum sentence of fifteen years for a sex trafficking conviction. As a result of her cooperation and your testimony regarding her victimization in the sex trafficking ring, the Court imposed a sentence of 72 months.

I personally wanted to thank you as I know we hired you just weeks before sentencing. I sent you probably a thousand pages of documents, including, transcripts, witness statements, client proffer, and client records. You had to read, understand, and analyze all of that in a very short period of time. It was obvious to me that you read all of it, understood it, and put together a very comprehensive report including the facts of our case and your conclusions that the evidence was consistent with Ms. Murphy being a victim. I was very impressed with your thorough report and equally as impressed with your testimony at our sentencing.

I would not hesitate to recommend you to others who may be similarly situated and in need of a good expert. Good experts, in my opinion, are hard to find. So, thank you again for all your work in this case. I wish you the best.

Sincerely,

Lori J. Ulrich
Chief of the Trial Division
Assistant Federal Public Defender

## APPENDIX H. Letter of Reference on Expert Witness Testimony for Plaintiff in Virginia Federal Civil Court[239]

Victor M. Glasberg *&* Associates ATTORNEYS

121 South Columbus Street  Alexandria VA 22314  telephone: (703) 684-1100  fax: (703) 684-1104
www.robinhoodesq.com

Victor M. Glasberg
vmg@robinhoodesq.com

Nickera S. Rodriguez
nsr@robinhoodesq.com

*Of Counsel*
Stephen G. Cochran
Bruce A. Fredrickson

*Paralegals*
Cora C. Martin, R.N., B.S.N.
cmartin@robinhoodesq.com

Douglas Bradley
doug@robinhoodesq.com

*Office Manager*
Deborah L. Robinson
dlr@robinhoodesq.com

September 11, 2022

To whom it may concern:

I write to recommend Kimberly Mehlman-Orozco as an expert witness on human sex trafficking.  Dr. Mehlman-Orozco is currently serving as an expert for me in a pending federal case against former police officers accused of securing services from and protecting a sex trafficking ring.   The ring was taken down after my client, one of the trafficked women, blew the whistle on the operation.  To my client's great fortune, Dr. Mehlman-Orozco, having read of the case in the press, volunteered her services *pro bono* on behalf of my client,

I have been practicing civil rights law for over 45 years, and have had occasion to secure the services of numerous experts along the way.  I find Dr. Mehlman-Orozco to be an outstanding expert.  Her report, addressing the case at hand in the context of a broader overview of trafficking, was extraordinarily comprehensive in scope, well organized, and well supported by citations to evidence of record.   At her deposition, she had pertinent facts at her fingertips, and ably handled opposing counsel's questions intended to challenge her analyses or conclusions.  She has spent a great deal of time on this case, and it shows.  Should this case go to trial, she may well be my first witness.  I am happy to recommend her as an expert witness.

Sincerely,

Victor M. Glasberg

---

[239] See, for example, Davis, Ayumi. December 21, 2021. Virginia Cops Protected Sex Trafficking Ring in Return for Free Sex From Victims: Lawsuit. Retrieved from: https://www.newsweek.com/virginia-cops-protected-sex-trafficking-ring-return-free-sex-victims-lawsuit-1661937

## APPENDIX I. – Materials Reviewed and Considered

*In addition to the materials specifically cited or mentioned in my report, I considered the following documents in forming my opinions:*

Video Deposition, Transcript and Exhibits of Plaintiff Gozun's father Bryce Alsup
Video Deposition, Transcript and Exhibits of Plaintiff Nash's mother Tanya Bischof
Transcripts and Exhibits for Plaintiff Sherman's father Wesley Sherman
Video Deposition, Transcript and Exhibits of Plaintiff Anna Gozun
Video Deposition, Transcript and Exhibits of Plaintiff Amanda Nash
Video Deposition, Transcripts and Exhibits of Plaintiff Carlie Sherman
Deposition Transcript of Justin McColl with exhibits
Deposition Transcript of Jerry Woodward with exhibits
Deposition Transcript of Jenna Neve with exhibits
Deposition Transcript of Kyle Woodward
Deposition Transcript of Angela Woodward and exhibits
Wyoming Department of Family Services records on Trinity Teen Solutions
Pacific Quest records for Plaintiff Gozun
Motion for Class Certification and Exhibits
Opposition to Class Certification and Exhibits
Court Order on Class Certification
Profit and Loss Statements for Trinity Teen Solutions
Trinity Teen Solutions Clinical Records
Trinity Teen Solutions Daily Supervision Checklists
Peer-reviewed journal articles and books on the troubled teen industry
Second Interrogatory Responses for Carlie Sherman
Second Interrogatory Responses for Anna Gozun
Second Interrogatory Responses for Amanda Nash
Defendant Expert Witness Report and CV for Dr. Karen Fukutaki
Defendant Expert Witness Report and CV for Jim Fryer
Plaintiff Expert Witness Supplement for Dr. Sara Boyd
Order Granting Class Certification Following Remand

**APPENDIX J.** – **Sample of Cases Involving Children Held in Modern Forms of Slavery**

### *United States v. Theresa Mubang*

In the case of *United States v. Theresa Mubang*[240], Defendant Mubang, a naturalized US citizen, originally from Cameroon, kept a minor girl from Cameroon in involuntary servitude for approximately two years. Defendant Mubang took the girl from her parents in Cameroon, promising them that the girl, Evelyn Chumbow, would receive American education and would lead a better life than in Cameroon.  Mubang then transported the girl through London using a false passport for Chumbow. Once at Defendant's home in Greenbelt, Maryland; however, Chumbow was forced to serve as a nanny to Defendant's sons, was required to cook and clean, and was isolated from the Maryland community and never allowed to speak with her family back in Cameroon.  Chumbow slept on the floor and cared for the children around-the-clock.  Defendant Mubang prohibited her from opening the door of the house or leaving the house for any reason other than the completion of specific household tasks.  Chumbow was ***never sent to school*** or allowed to communicate with children her age.  Defendant Mubang subjected Chumbow to continued verbal and physical abuse, often ***beating her with belts and high-heel-shoes to the extent that the girl would start bleeding or the girl's skull would ooze bodily fluids from the hits with the high-heel shoe***. Chumbow escaped from Defendant's house while Defendant Mubang was at a weekend conference. Mubang fled the United States after she was convicted, but before sentencing took place.  She was sentenced to 17.5 years in prison in absentia.  In May, 2005, she was caught in Cameroon and sent back to the United States to serve her sentence.

### *United States v. Abdel Nasser Youssef Ibrahim*

In the case of *United States v. Abdel Nasser Youssef Ibrahim*[241]. The Defendants, who were formerly husband and wife, are Egyptian nationals who purchased the victim from her parents in Egypt. The sale was made after the Defendants' threatened to turn over the victim's sister to the Egyptian police for allegedly stealing. The Defendants used a fraudulently-obtained temporary visitor's visa to bring the victim—then 10 years-old—into the United States in August of 2000. The Defendants controlled the victim's passport at all times while she was in Defendants' custody. The Defendants forced the victim to clean their home, located in a gated community in Orange County, California, and to cook and care for the Defendants' five children. The victim slept on a dirty, fold-up mattress in a small, windowless converter room in Defendants' garage. The victim received no compensation for her 20 months of work and she was ***not permitted to attend***

---

[240] *United States v. Theresa Mubang,* United Nations Office on Drugs and Crime. https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/2004/united_states_v._theresa_mubang.html
[241] *United States v. Abdel Nasser Youssef Ibrahim,* United Nations Office on Drugs and Crime. https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/2006/united_states_v._abdel_nasser_youssef_ibrahim.html?lng=en

*school* or religious services. The Defendants verbally abused the victim and ***physically assaulted*** her on at least three occasions.

### United States v. Adaobi Stella Udeozor

In the case of *United States v. Adaobi Stella Udeozor*[242] Defendants George and Adaobi Udeozor, husband and wife, smuggled a young girl from Nigeria to the United States to work for them as a domestic slave.  In September 1996, George Udeozor traveled to Nigeria and falsely promised to the victim's family that the Udeozors would adopt their daughter—who was 14 years old at the time— and provide her with a better education in the United States. George Udeozor smuggled the victim into the United States using his oldest daughter's passport. Once in the United States, the Udeozors forced the young girl to care for their children, prepare meals, and perform a number of other household tasks. The victim was also forced to work in Dr. Adaobi Udeozor's medical office. The victim did not receive any compensation for her work, ***nor was she allowed to attend school***. To maintain control over the victim, the defendants subjected her to ***physical and emotional abuse and George Udeozor raped the victim on multiple occasi***ons. The Defendants also used the threat of arrest by immigration authorities as a means of controlling the victim. The victim was rescued in October 2001 after calling local enforcement.  In November 2004, Adaobi Udeozor was convicted following a jury trial and sentenced to 87 months in prison for conspiracy to commit involuntary servitude and harboring an alien for financial gain.

### United States v. Louisa Satia

In the case of *United States v. Louisa Satia*[243] the Defendants brought two then-teenage girls (age 14 and age 17) to the United States from Cameroon. Defendants told the girls and their families that, in exchange for performing light housework, the girls would have the opportunity to attend school in the United States. Once here, defendants used threats and ***physical violence, including sexual abuse***, to force the victims to work long days as domestic servants and nannies. The defendants also controlled and manipulated the girls by threatening to deport them. The victims received no compensation and ***were not permitted to attend school***. Vivian Satia and Etiondem Daniel Achamorfaw pleaded guilty to trafficking-related charges. A federal jury convicted Louisa Satia and Kevin Nanji of involuntary servitude, conspiracy to illegally harbor and induce an alien to enter the United States, and harboring an alien for financial gain. Satia was also convicted of conspiracy to commit marriage fraud and passport fraud.

---

[242] *United States v. Adaobi Stella Udeozor,* United Nations Office on Drugs and Crime. https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/2008/united_states_v._adaboi_stella_udeozor.html?lng=en&tmpl=htms

[243] *United States v. Louisa Satia,* United Nations Office on Drugs and Crime. https://sherloc.unodc.org/cld/case-law-doc/traffickingpersonscrimetype/usa/united_states_v._louisa_satia_criminal_case_no._00-590.html

## APPENDIX K. – Summary of Dr. Mehlman-Orozco's Expertise on Both Labor and Sex Trafficking

I have trained law enforcement[244] on how to identify both labor trafficking and sex trafficking, including:

• Royal Canadian Mounted Police in Nova Scotia, Canada
• Homeland Security Investigations in Buffalo, New York
• Homeland Security Investigations in Raleigh, North Carolina
• North Carolina State Bureau of Investigations in Raleigh, North Carolina
• Montebello Police Department in Montebello, California

I have taught both labor trafficking and sex trafficking material to students at George Mason University and University of Maryland, College Park, including, but not limited to, as part of the following courses:

Spring 2018: CRIM 405: Law and Justice Around the World
Fall 2017: CRIM 307: Social Inequality, Crime, and Justice
SPRING 2017: CRIM 405: Law and Justice Around the World
FALL 2016: CRIM 308: Human Rights and Justice
SUMMER 2012: CRIM 490: Foreign Nationals and Crime
SUMMER 2011: CRIM 490: Foreign Nationals and Crime
SUMMER 2010: CRIM 490: Foreign Nationals and Crime
SUMMER 2009: CRIM 490: Foreign Nationals and Crime

I have trained service providers and the public on both labor and sex trafficking, including:

• Victim Assistance Academy of Nevada
• Soroptimist International of the Americas, Inc.
• Prevent Abuse and Neglect through Dental Awareness (P.A.N.D.A)
• Kappa Delta Phi International Sorority
• Bernadette's House
• Westminster at Lake Ridge
• Trinity Episcopal Church
• Stern Symposium
• Women in Homeland Security Human Trafficking Symposium
• Human Trafficking Symposium Panelist at Liberty University School of Law

I have been interviewed by the media on human trafficking, including the following outlets, and am consulted for stories on both labor trafficking and sex trafficking:

---

[244] I have also been an invited speaker/panelist for law enforcement conferences that discuss labor trafficking. For example, see attached report from the Police Executive Research Forum (PERF).

- CNN
- CBS
- ABC
- NBC
- Fox News
- BuzzFeed
- The News Journal
- Gray TV
- The Ringer
- Miami Herald
- The Washington Post
- The Crime Report
- Governing
- Kansas City Star
- Homeland Security Today
- International Business Times
- Majority Report
- WNPR
- I24 News
- Al Jazeera
- USA Today

I have authored research on human trafficking published in peer-reviewed journals, including:

- Mehlman-Orozco, K. (2024). Sex Trafficking or Secondary Exploitation: The Truth Behind America's Failing War Against Modern Slavery. International Journal of Academic Research in Public Policy and Governance.

- Mehlman-Orozco, Kimberly B. (2017). "Projected Heroes and Self-Perceived Manipulators: Understanding the Duplicitous Identities of Human Traffickers." Trends in Organized Crime.

- Syme, Sheryl, Camardese, Susan, and Mehlman-Orozco, Kimberly B. (2017). "Identifying Victims of Human Trafficking." Dimensions of Dental Hygiene.

- Syme, Sheryl, Camardese, Susan, and Kimberly Mehlman-Orozco. (2017). "Human Trafficking: Red Flags for Dental Professionals." Decisions in Dentistry.

- Mehlman-Orozco, Kimberly B.(2015). "Safe Harbor Legislation for Juvenile Victims of Sex Trafficking: A Myopic View of Improvements in Practice. Social Inclusion.

I have authored a book on human trafficking, Hidden in Plain Sight: America's Slaves of the New Millennium, which received overwhelming praise from anti-trafficking experts and is used to train law enforcement on both labor trafficking and sex trafficking.

I have served as a peer-reviewer for human trafficking journal articles published in Justice Quarterly, Journal of Human Trafficking, and American Journal of Evaluation, which includes evaluation of journal articles discussing labor trafficking and sex trafficking. For example:

February 2021: "Bringing Justice:  Building Human Trafficking Cases that Endure." *Taylor and Francis*.
June 2020: "Modern Slavery or Forced Labour? Mechanisms of power and the criminal family firm in the United Kingdom" *Journal of Human Trafficking*. JHT-D-20-00029
June 2018: "Too afraid to stay: Measuring the impact of criminal victimization on the intent to migrate" *Justice Quarterly*. RJQY-2018-0110
November 2015: "Experiences of survivors of human trafficking of non-sexual purposes" *Journal of Human Trafficking*. JHT-D-15-00059
November 2015: "Approaches to evaluating anti-human trafficking interventions." *American Journal of Evaluation*. AJE-15-03-0002
September 2015: "Women and Child Trafficking in Nigeria: What Progress?" *Journal of Human Trafficking*. JHT-D-15-00036
July 2015: "Approaches to human trafficking support program evaluations." *American Journal of Evaluation*. AJE-15-03-0002

I received my B.S. cum laude in administration of justice from George Mason University in 2005, my M.A. in justice, law, and crime policy in 2010, and my Ph.D. in criminology, law and society in 2012. I certify that my coursework includes multiple graduate[245] level courses on both law and human trafficking, as well as courses on research methods and analysis, such as:
Behavior of Law[246]
International Migration-Comparative Perspectives
Law and Social Control
Human Smuggling and Trafficking[247]
Migration, Global Economy, and Public Policy
Advanced Statistical Methods for Policy Analysis
Qualitative Research Methods
Independent Study on Meta-Analysis

I previously served as an adjunct human trafficking subject matter expert for RAND Corporation, a nonprofit institution that helps improve policy and decision-making through research and analysis. In that capacity, I worked on three study proposals, which covered labor and sex trafficking:
(i) Research design to evaluate the National Human Trafficking Hotline;

---

[245] I also took undergraduate courses that involved the review of legal cases and taught by licensed attorneys, such as "Constitutional Law: Civil Rights and Liberties."
[246] Taught by Jon Gould, Ph.D. Political Science, University of Chicago, J.D., Harvard Law School, cum laude, M.P.P. Harvard University, John F. Kennedy School of Government
[247] Taught by Human Trafficking Expert Dr. Louise Shelley. Dr. Shelly, CV attached, also provided an endorsement for my book on labor trafficking and sex trafficking, attached.

(ii) Development of an evidence based human trafficking risk assessment tool for organizations working with minors; and
(iii) Evaluating the outcomes of housing services for adult and juvenile human trafficking survivors.

I currently serve as the Executive Director of an anti-trafficking non-profit organization—Freedom Light, which trains businesses and service providers on labor and sex trafficking, and as a human trafficking expert witness on both labor and sex trafficking cases for Break the Chain, LLC.