

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2025 SEP 23  PM 4: 45

MARGARET BOTKINS, CLERK
CASPER

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| CARLIE SHERMAN, and AMANDA NASH; on behalf of themselves and all similarly situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> TRINITY TEEN SOLUTIONS, INC., a Wyoming corporation; ANGELA C. WOODWARD; JERRY D. WOODWARD; KARA WOODWARD; KYLE WOODWARD; and DALLY-UP, LLC, a Wyoming limited liability company, <br><br> Defendants. | Case No. 2:20-CV-215-SWS |

---

## ORDER GRANTING FINAL SETTLEMENT APPROVAL OF CLASS ACTION

---

This matter comes before the Court on the Plaintiffs' Motion for Final Approval of the Class Action Settlement. (ECF 353.) The Court held a final fairness hearing under Fed. R. Civ. P. 23(e)(2) on September 11, 2025. (ECF 370.) As discussed below, the Court hereby (1) overrules the objections to the settlement, (2) grants final approval of the settlement with slight modification to the appeal bond, (3) approves the incentive awards for the current and former class representatives, (4) approves the requested payment to the claims administrator, and (5) approves Class Counsel's request for attorney fees and litigation expenses.

### INTRODUCTION

A more complete history of the events and proceedings in this case was set out in

the parties' Memorandum in Support of Joint Motion for Preliminary Approval of Class Settlement, which the Court finds to be accurate and hereby adopts and incorporates. (ECF 342 pp. 3-8.) The Court sets forth the following background only as a brief summary.

In this class action, Plaintiffs alleged the parents of "troubled teen" female minors paid to send their children to a working ranch in northern Wyoming where the teens were supposed to receive various forms of traditional and cutting-edge therapy and schooling to address their misbehavior. Plaintiffs and the class members are the former teenaged residents of the ranch. They contend the ranch was light on the education and therapy, and instead largely forced the teenagers to labor for many hours per day under horrible conditions. They allege each Defendant was either directly involved with the scam or knowingly benefitted from the forced labor. Three federal causes of action were alleged under the Trafficking Victims Protection Reauthorization Act (TVPRA) for: (1) knowingly providing or obtaining unlawful forced labor under 18 U.S.C. § 1589(a), (2) knowingly benefitting from unlawful forced labor under 18 U.S.C. § 1589(b), and (3) knowingly trafficking a person for unlawful forced labor under 18 U.S.C. § 1590(a).

The Wyoming ranch was owned and operated by Defendant Trinity Teen Solutions, Inc. (Trinity). The other defendants in this case owned and operated Trinity, worked in a supervisory capacity at Trinity, and/or allegedly benefited from the forced labor. The class members are women whose parents/guardians sent them to Trinity (at significant cost to the parents/guardians) at various times during their teenage years for behavioral modification.

The parties vigorously litigated this case for over four years. A number of motions

to dismiss were briefed and decided, with Plaintiffs' TVPRA claims surviving but other claims being dismissed. (*See* ECF 163.) Extensive discovery took place. The Court originally denied Plaintiffs' motion for class certification (ECF 247), but Class Counsel successfully appealed that decision to the Tenth Circuit, which vacated and remanded the question of class certification for additional consideration (ECF 265). Upon further submissions from the parties, the Court certified the following class:

> From November 27, 2010, to the present, Plaintiffs, and all similarly situated persons who received treatment from Defendant Trinity Teen Solutions, Inc. and were subject to the provision of "agricultural labor" (as defined [in] 26 CFR § 31.3121(g)(1)) or any other manual labor to one or more of the Defendants without payment for said labor.

(ECF 286 p. 30.) The certified class consisted of a total of 264 class members with two members who opted out, rendering a final class comprised of 262 adult women who are former residents of Trinity. And with the remand from the Tenth Circuit, discovery and motions practice resumed. (*See* ECF 342 p. 6.)

Despite class certification, numerous unresolved issues remained and created uncertainty for the litigation outcome. (*See id.*) The parties considered the possibility of settlement through mediation. They engaged in a total of three mediations with three different mediators during the life of this lawsuit

With the help of the Honorable Irma Gonzalez, retired U.S. District Judge, the parties' third mediation, held on February 27, 2025, resulted in a resolution of the dispute. The settlement sees Defendants' insurance carrier creating a non-reversionary settlement fund totaling $2.3 million in exchange for the dismissal of Plaintiffs' claims.

The Court preliminarily approved the proposed settlement (ECF 344), and notice of

the settlement with directions on how to submit a claim were sent out to the class members

(ECF 360). The issue of final approval for the class settlement under Federal Rule of Civil

Procedure 23(e) is now before the Court following the final fairness hearing.

## STANDARD OF ADJUDICATION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

Federal Rule of Civil Procedure 23(e) requires court approval of a class action

settlement. Approval of a class action settlement may be had only if the Court determines

the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2) sets

forth the following factors to assist with that determination:

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

Similarly, the Tenth Circuit has noted the following four considerations may assist a court

when assessing whether a proposed class action settlement is fair, reasonable, and adequate

(several of which overlap with Rule 23(e)(2)):

(1)    whether the proposed settlement was fairly and honestly negotiated;

(2)    whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3)    whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4)    the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). "It is well-settled, as a matter of sound policy, that the law should favor the settlement of controversies." *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969).

The Rule 23(e) inquiry is intended to protect the unnamed class members from settlements that affect their rights but might tend to benefit or satisfy only the class representatives. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The burden to show a settlement is fair, reasonable, and adequate rests with the proponents of the settlement. *See Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993), *overruled in part on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## THE CORE SETTLEMENT TERMS

The executed settlement agreement has been identified by the parties as required by Rule 23(e)(3) and filed with the Court. (ECF 341-1.) The essential terms of the parties' settlement agreement are summarized here and, of course, play a central role in determining fairness, reasonableness, and adequacy.

1.    Defendants' insurance carrier, Markel Insurance Company, will create a non-reversionary settlement fund totaling $2.3 million.

2.    Plaintiffs will dismiss with prejudice all claims asserted against Defendants or that could have been asserted against Defendants.

3.    Markel Insurance Company will dismiss with prejudice its claims asserted in a separate lawsuit filed against Defendants (*Markel Ins. Co. v. Trinity Teen Solutions, Inc., et al.*, D. Wyo. Civil Action No. 24-CV-181-SWS) in which Markel Insurance Company was seeking a declaratory judgment holding that it owed no duties of defense or indemnity to Defendants within this lawsuit, and Defendants will dismiss their counterclaims against Markel Insurance company in that separate lawsuit.

4.      Defendants deny any wrongdoing or liability.

5.      Plaintiffs (including all class members) cannot not make any disparaging statements about Defendants or Defendants' agents, but Plaintiffs remain permitted to make true statements about their experiences.

(ECF 341-1, 341-3.)

The requested distribution of the $2.3 million settlement fund is as follows:

- $1,185,000 (about 51.5%) for distribution to all class members who submit a claim, to be paid out on a pro rata basis based upon a class member's total number of days spent at the ranch;

- $920,000 (40%) to Class Counsel as payment for attorneys' fees and litigation expenses;

- $45,000 (about 2%) as an incentive award to the two current class representatives and one former class representative, with ,00,000 to each; and

- $150,000 payment (about 6.5%) as payment to the claims administrator.

(ECF 341-1; ECF 353 pp. 4-5.)

## ANALYSIS

The Court will examine the various factors weighing on fairness, reasonableness, and adequacy before turning to the objections that were lodged against the proposed settlement.

### 1.    **The proposed settlement satisfies the various fairness factors and considerations.**

An examination of the factors suggests the settlement is fair, reasonable, and adequate.

#### 1.1     *The settlement was fairly and honestly negotiated at arm's length.*

To begin, the Court finds the settlement was fairly and honestly negotiated at arm's

length. As touched on above, this lawsuit has been strongly contested from the beginning, with numerous motions to dismiss having been adjudicated, a class-certification denial having been successfully appealed by Plaintiffs, extensive and contentious discovery having taken place, and various other motions practice having been litigated or in the process of being litigated at the time of settlement. Consequently, the Court was not surprised to learn from the mediator that the parties' third mediation "was an extremely hard-fought negotiation from beginning to end." (Decl. of Judge Gonzalez ¶ 9.)[1]

While the Court was not surprised by the contested nature of the mediation, the Court finds Judge Gonzalez's declaration describing the fair and honest nature of the negotiation to weigh heavily on this factor and in the Court's overall determination of fairness, reasonableness, and adequacy. She described a mediation where "the negotiations between the parties were vigorous and conducted at arm's-length and in good faith" and where "the parties exchanged several rounds of settlement demands and offers." (Decl. of Judge Gonzalez ¶¶ 8, 9.) She also reported that "the advocacy on both sides of the case was excellent. All counsel zealously and capably represented their respective clients." (*Id.* ¶ 11.) With the help of Judge Gonzalez's declaration, the Court has little difficulty finding the proposed settlement was fairly and honestly negotiated by the parties at arm's-length.

### 1.2 *Considering the risks of continued litigation in this case, the settlement offers adequate, equitable relief for the class members.*

Next, the Court confirms that serious questions of fact and law remain in this lawsuit as well as in the related lawsuit between Defendants and their insurance carrier, both of

---

[1] ECF 341-2.

which placed the ultimate outcome of this lawsuit in doubt. In this action, Plaintiffs had lost their damages expert witness due to a conflict of interest, and the parties were litigating the question of whether Plaintiffs should be allowed to designate a replacement expert. (ECF 308, 311, 312, 315, 325.) On the topic of damages, as the Court previously expressed in its earlier (now-vacated) order denying class certification (ECF 247), the damages claimed by each class member were different, potentially vastly different, and determining each class members' damages (assuming, for the moment, liability had been established) would likely entail individual miniature trials. And that's ignoring the summary-judgment fight that was soon to ensue absent a settlement at the third mediation.

As for the related lawsuit, the parties' counsel agreed that Defendants had few assets after the ranch closed down shortly after this lawsuit commenced; thus, any monetary relief for the class would have to come from Defendants' insurance carrier. Were the insurance carrier to prevail in the related action, it likely would render Defendants judgment-proof and leave the class unable to recover anything monetarily. And the longer this class action continued, the closer a final court decision in the insurance coverage lawsuit became. Based on the disputes remaining in this class action combined with the looming threat of the related insurance coverage lawsuit, the Court readily finds the ultimate outcome of this class action was in doubt.

For the same reasons that place the ultimate conclusion of this lawsuit in doubt, the immediate recovery offered by this settlement greatly outweighs the possibility of future relief after further litigation. With the related insurance coverage lawsuit and its possibility that Defendants would lose their current insurance coverage, there exists a substantial

possibility that future recovery in this class action would be nothing, even were Plaintiffs to prevail on the merits. This is a settlement where a bird in the hand is worth considerably more than the very real possibility of zero birds in the bush. The Court finds the value of an immediate recovery in this case strongly outweighs the potential future relief after continued litigation.

Additionally, the proposed settlement treats each class member equitably relative to each other by tying each class member's recovery to the number of days they spent at the Trinity Teen Solutions ranch. The longer they were present at the ranch, the more unpaid manual labor they did, and the more monetary recovery they will receive. And the method for providing notice and processing class-member claims was appropriate. The Court-approved notice of the settlement was provided to the class members, and each class member desiring to make a claim to receive a share of the settlement could submit their claim through the U.S. Mail or via the website that had been set up by the claims administrator. (ECF 353 p. 3; ECF 360-1.) Upon final judgment and creation of the settlement fund, the claims administrator will issue payments to the class members who submitted a claim. (ECF 353 p. 12.) As of the final hearing, Class Counsel reported that based on current numbers, they expected a total of around 120 class members to submit claims to the settlement fund, which could potentially result in a payment of more than $9,000 to a class member who was at the ranch for the average (mean) amount of time ($1,185,000 ÷ 120).[2] In comparison to most class action lawsuits, this represents a

---

[2] This is only a rough estimate, of course, as final payouts will be based on the number of claimants and each claimant's number of days spent at the ranch.

significant monetary recovery for class-member claimants.

In sum, taking into account the risks associated with continued litigation and the monetary relief the settlement secures for the class members, the Court determines the settlement offers adequate, equitable relief for the class members.

**1.3**    ***Class Counsel has adequately represented the class, and the request for attorneys' fees and costs is reasonable and warranted.***

Next, the Court examines the quality of representation in this class action. Class Counsel brought significant class-action experience to this lawsuit and vigorously prosecuted the matter from the beginning. Class Counsel fended off multiple dispositive motions and secured a win on interlocutory appeal, which resulted in class certification. The parties conducted over a dozen depositions and exchanged over 300,000 pages of discovery. After more than four years of litigation, Class Counsel secured a substantial settlement on behalf of the class during the parties' third mediation. The Court agrees with Judge Gonzalez's assessment that "the advocacy on both sides of the case was excellent" and the attorneys "zealously and capably represented their respective clients." (Decl. of Judge Gonzalez ¶ 11.)

Of course, threatening to derail this lawsuit and potentially result in class decertification for the last year has been the misconduct of former class counsel, Brice Timmons. Upon learning of Attorney Timmons' misconduct toward former class representative Anna Gozun, the Court removed Attorney Timmons and his law firm from

the case and terminated Ms. Gozun's role as a class representative.[3] (ECF 322.) The Court

removed Attorney Timmons' and his law firm because it determined his misconduct had

created a conflict of interest that was, at least potentially, imputed to his entire law firm

under the Wyoming Rules of Professional Conduct. (*See* ECF 322 pp. 1-2.) Attorney

Timmons' misconduct is not an example of adequate representation; it is a pockmark on

this case and the legal profession. Nonetheless, the class remained represented by several

competent and dedicated lawyers after the removal of Attorney Timmons and his law firm.

(*See* ECF 322 p. 2.) And thankfully, with significant time and effort expended by all

remaining counsel, including defense counsel, this class action proceeded forward,

eventually resulting in the settlement under consideration here. Thus, the Court finds

current Class Counsel adequately represented the class and overcame the conflict of

interest created by Attorney Timmons.

As noted, Class Counsel requests an award of attorneys' fees and expenses that is

40% of the $2.3 million settlement fund ($920,000). Under the equitable "common fund"

doctrine, attorneys who create a common fund or benefit for a group of persons may be

awarded their fees and costs out of the fund, and their fees are often calculated as a

percentage of the total fund. *See Farley v. Family Dollar Stores, Inc.,* 2014 WL 5488897,

at \*3 (D. Colo. Oct. 30, 2014) ("The Tenth Circuit has recognized that attorney's fees may

---

[3] To be clear, the Court did not find Ms. Gozun to have done anything wrong. She was removed from her role as a class representative because her experience in this lawsuit became atypical of the class and it had the potential to focus attention away from the class as a whole (which it did for a while). Ms. Gozun remained a class member, and the class remained represented by the other two named plaintiffs.

appropriately be awarded from [a common] fund.") (citing *Gottlieb v. Barry,* 43 F.3d 474,

482 (10th Cir. 1994)). The Tenth Circuit prefers this percentage-of-the-fund approach in

common-fund cases over the lodestar analysis of multiplying the number of hours

reasonably spent on the litigation by a reasonable hourly rate. *Chieftain Royalty Co. v.

Enervest Energy Institutional Fund XIII-A, L.P.*, 888 F.3d 455, 458-59 (10th Cir. 2017).

The Tenth Circuit instructs that 12 factors can be helpful in determining what is a

reasonable percentage of the settlement fund for attorneys' fees, but not all factors apply

in all cases:

> [1] the time and labor required, [2] the novelty and difficulty of the question
> presented by the case, [3] the skill requisite to perform the legal service
> properly, [4] the preclusion of other employment by the attorneys due to
> acceptance of the case, [5] the customary fee, [6] whether the fee is fixed or
> contingent, [7] any time limitations imposed by the client or the
> circumstances, [8] the amount involved and the results obtained, [9] the
> experience, reputation and ability of the attorneys, [10] the "undesirability"
> of the case, [11] the nature and length of the professional relationship with
> the client, and [12] awards in similar cases.

*Id.* at 458. "Courts have consistently held that the most important factor within this analysis

is what results were obtained for the class." *Lane v. Page*, No. CIV 06–1071 JB/ACT, 2012

WL 1940574, at *65 (D.N.M. May 22, 2012).

These factors favor Class Counsel's requested fee and expenses recovery. This case

was litigated for over four years before settlement was reached, including a successful

interlocutory appeal by Plaintiffs that resulted in class certification. Class Counsel were

already experienced in class action lawsuits, and their successes in motions practice and on

interlocutory appeal here demonstrate their legal skills. Class Counsel fought tooth-and-

nail to prosecute this action using a fairly novel approach of applying the TVPRA to a

"troubled teen industry" case. Defendants opposed Plaintiffs at all phases of the litigation, and multiple mediations were required to reach a settlement. As of the Motion for Final Approval of Class Action Settlement filed on August 12, 2025, Class Counsel had dedicated over 2,700 hours to this case, and that doesn't include the time and effort expended by paralegals and legal assistants. (ECF 353-1 pp. 6-7.) At the hourly rates submitted by Class Counsel, the lodestar calculation would be over $1.0 million dollars for attorney fees alone, which exceeds the combined request of $920,000 for attorney fees and litigation expenses (with Class Counsel having reported over $50,000 in costs/expenses).[4] (ECF 353-1 p. 7.)

Perhaps most importantly, the results obtained for the class strongly support the requested award. Despite Defendants' limited assets since closing the ranch and the looming threat of losing defense and indemnity coverage, Plaintiffs secured a sizeable settlement fund that looks like it will result in several thousands of dollars in recovery for each class member submitting a claim. Numerous cases exist approving attorney-fee awards in the same vicinty as this one. *See e.g., Cimarron Pipeline Const., Inc. v. Nat'l Council On Comp. Ins.,* Nos. CIV 89–22–T and CIV 89–1186–T, 1993 WL 355466, at *2

---

[4] The Court notes that most cases addressing the appropriateness of a percentage from the settlement fund concern only attorney fees and exclude expenses because expenses are often recovered from the fund separately. *See, e.g., Anderson v. Merit Energy Co.,* 2009 WL 3378526, at *3 (D. Colo. 2009) ("The customary fee to class counsel in a common fund settlement is approximately one-third of the economic benefit bestowed on the class."). In this case, while "40% of the settlement fund" may sound like it's on the high end of permissible attorney fee percentages, it's significant that over $50,000 of that will go toward reimbursing expenses; it's not all for attorney fees. The portion of the settlement fund actually going to attorney fees is closer to 37.5%. *See Russell v. United States,* 132 Fed. Cl. 361, 365 (2017) (approving attorney fees in a class action settlement that amounted to 37.5% of the settlement fund).

(W.D. Okla. June 8, 1993) ("Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."); *Moore v. United States*, 63 Fed. Cl. 781, 786 (2005) (contingent fee of "40% is within the acceptable range" with 50% being the upper limit); *Voth Oil Co., Inc. v. United States*, 108 Fed. Cl. 98, 105 (2012) (finding a 40% contingent fee reasonable).

The Court finds the proposed settlement is adequate, taking into account the requested attorneys' fees and litigation costs. Additionally, the Court finds Class Counsel's request for $920,000 (40% of the settlement fund) as payment for attorneys' fees and litigation expenses is reasonable and appropriate in this case.

### 1.4    *The class representatives adequately represented the class, and the request for incentive awards is reasonable and warranted.*

Turning to the adequacy of the class representatives, the Court finds the current class representatives, Carlie Sherman and Amanda Nash, as well as former class representative Anna Gozun have adequately represented the class. Specifically, they stepped forward to spearhead this lawsuit, which necessarily entailed each one sharing and reliving a painful and difficult time of their past while confined to the ranch. Each woman sat for a deposition, each had a parent deposed, each disclosed their medical and mental health treatment records for inspection by the opposing party, and each responded to discovery requests. (ECF 341-1 p. 10.) Thus, they more-than-adequately represented the class by each dedicating time and effort beyond that of the unnamed class members to advance this litigation.

The Court notes that both Carlie Sherman and Anna Gozun submitted written

objections to the proposed settlement (and were granted leave by the Court to observe the final fairness hearing via Zoom). Those objections will be addressed in more detail below. However, such objections do not nullify the adequacy of their representation because a class representative who held serious objections to a proposed settlement arguably would fail to represent the interests of the class by not raising those objections. *See Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008) ("Replacing class representatives for objecting to a proposed settlement appears inconsistent with the theory of class representatives. Class representatives are expected to protect the interests of the class.").

The settlement proposes incentive awards of $15,000 each for the two current class representatives and one former class representative, totaling $45,000. For the time and effort each woman dedicated to the prosecution of this lawsuit above and beyond that of the unnamed class members, the Court finds the requested incentive awards reasonable and appropriate. *See UFCW Local 880–Retail Food Employers Joint Pension Fund v. Newmont Mining Corp.,* 352 F. App'x 232, 235 (10th Cir. 2009) ("a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class"). The request for incentive awards of $15,000 each for the two current class representatives and one former class representative to be taken from the settlement fund is approved.[5]

2.    **The objections to the settlement are procedurally improper and are largely overruled on their merits.**

---

[5] Should any incentive award be waived, forfeited, or otherwise not paid out for any reason, it shall be returned to the settlement fund for pro rata distribution to the class members who have submitted a claim.

The Court ordered that any objection had to be submitted in writing no later than 30 days prior to the final fairness hearing and each objector was to appear in person or through counsel at the final fairness hearing to address their objection. (ECF 344 pp. 3-5.) No objector appeared in person at the final fairness hearing. Indeed, the sole class member who appeared in person at the hearing, Class Representative Amanda Nash, confirmed her approval of the settlement on the record during the hearing. Thus, the Court finds each objection is procedurally improper. Nonetheless, the Court finds it appropriate to consider the merits of the objections raised.

### 2.1   *Objection from Mollie Lynch-Jelinek*

On April 16, 2025, even before the Court had preliminarily approved the proposed settlement, Class Member Mollie Lynch-Jelinek submitted a written objection to it. (ECF 336.) Ms. Lynch-Jelinek asserted that based on the allegations in the case and the alleged trauma sustained by the class members, this was "a case that ought not to be settled." (ECF 336 p. 2.) But, as noted earlier, "[t]he law actively encourages compromise and settlement of disputes." *Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972). And as the Court has discussed, this proposed settlement appears particularly appropriate considering the very real possibility of Defendants losing their insurance coverage and becoming judgement-proof.

Ms. Lynch-Jelinek, and the other objectors, also contends any settlement is insufficient if it lacks injunctive relief precluding Defendants from ever operating Trinity Teen Solutions, or another business like it, in the future. In both the motion for final approval and at the final fairness hearing, Class Counsel has accurately explained why

injunctive relief would not be available in this lawsuit. (ECF 353 pp. 16-17.) To have legal standing to obtain injunctive relief, the requesting party must show a likelihood that the requesting party will be similarly injured in the future unless an injunction is entered. For example, in *Los Angeles v. Lyons*, 461 U.S. 95 (1983), the plaintiff, Lyons, had been injured by a chokehold by police officers and sought an injunction precluding law enforcement from employing chokeholds in the future. But the U.S. Supreme Court held that Lyons lacked standing to seek such an injunction because he could not show a likelihood of being subjected to a police chokehold in the future.

> Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers. Count V of the complaint alleged the traffic stop and choking incident five months before. That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.

*Id.* at 105. Here, there is probably even less likelihood that any class member will be subjected again to mistreatment by Defendants because the class members are all adults now and Defendants' "troubled teen" ranch operations has been closed for about five years. And Plaintiffs lack legal standing to seek an injunction that would protect only people who are not parties to this action while doing nothing to protect Plaintiffs.[6] Consequently, the injunction desired by the objectors is not a remedy available in this lawsuit.

---

[6] In other words, in general, a plaintiff would have standing to seek an injunction that protects the plaintiff and also has the side effect of protecting others, but a plaintiff lacks legal standing to seek an injunction that has no effect on the plaintiff and only serves to protect others.

Ms. Lynch-Jelinek's objections are overruled.

## 2.2    *Objection from Anna Gozun*

With the Court's leave, former class representative Anna Gozun was permitted to file a tardy written objection to the proposed settlement. (ECF 358, 361.) Ms. Gozun takes issue with the settlement's lack of injunctive relief, which the Court has already addressed, as well as several other provisions of the settlement agreement.

First, Ms. Gozun challenges the non-disparagement provision, which says in relevant part:

> Representative Plaintiffs and Class Members shall not make any disparaging statements, verbal or written, about Releasees.... Nothing in this paragraph prevents the Representative Plaintiffs and Class Members from making true statements about their experiences.

(ECF 341-1 p. 11.) The settlement agreement also limits Defendants' relief for any disparaging statement to an injunction, but it expressly notes that any relief for violation of such a future injunction is not limited.

Ms. Gozun contends "[t]hese are unconstitutional gag provisions" and improper "speech restraints." (ECF 361 p. 3.) Not so. First, this is not a prior restraint on speech imposed by the government, so the Constitution does not offer any protections here. This is an agreement between private parties. Second, and more importantly, both Class Counsel (at the final fairness hearing) and Defense Counsel (ECF 350 p. 5) have described how this non-disparagement provision was negotiated during the mediation with the intention of balancing the interests of both sides. The Court finds it an appropriate compromise. The clause protects Defendants from smear campaigns while still allowing class members to

say true statements about their experiences and limiting any remedy against class members for improper disparagement to injunctive relief. This strikes the Court as a fair and reasonable limitation on both sides. And most significantly, it does not prohibit class members from making true statements about their experiences, so it does not improperly "gag" them. The Court does not find the inclusion of this non-disparagement provision renders the settlement unfair, unreasonable, or inadequate.

Second, the settlement agreement provides that it is not to be construed as an admission by Defendants of wrongdoing or liability. Ms. Gozun asks the Court to also impose a so-called "non-exoneration clause," which makes explicit that the settlement "may not be cited as exoneration in any civil, regulatory, or church forum." To begin, based on the First Amendment's separation between church and state, the Court strongly doubts it has the jurisdiction to control what may or may not be cited in a "church forum." Moreover, the Court does not see any need for a "non-exoneration clause" in this matter. Defendants are correct that no-admission clauses "have long been standard in settlement agreements for good reasons." (ECF 350 p. 5); *see Greystone Condo. at Blackhawk Owners Ass'n, Inc. v. AmGUARD Ins. Co.*, No. 19-CV-768-SLC, 2020 WL 9347664, at \*4 (W.D. Wis. Apr. 28, 2020) ("routine settlement terms of a release, no admission of liability, and confidentiality" are "common to every settlement"). They serve to assist parties in resolving disputes, which is the core function of the legal system. A settlement is simply a resolution by the parties of their dispute; it is not a determination of the merits of the case, so it does not determine liability or exoneration. The Court does not find that the inclusion of this no-admission provision renders the settlement unfair, unreasonable, or inadequate,

nor does the Court find that a counter "non-exoneration clause" is necessary.

Third, Ms. Gozun says the release contained in the settlement agreement extends too far in scope by including "affiliates, successors, and rebrands—including religious nonprofits and Boys' Ranch entities that are not paying into this settlement." The release does explicitly include, among a host of people and entities, "affiliates" and "successors." (ECF 341-1 pp. 13-15.) There is nothing about "rebrands." Regardless, while the release language is certainly broad, the Tenth Circuit has said

> it is not improper for a class-action settlement to release claims against nonparties. "[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled."

*Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1175 (10th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005)).

Such a release appears appropriate here. Under the settlement agreement, the parties (and their heirs, agents, etc.) release each other from claims and demands "of any kind whatsoever that could have been raised or that arise in any way out of, relate to any facts that were alleged, or are in connection with the Action from November 27, 2020 – to the date of Final Judgment." And "Action" is defined as this specific lawsuit, *Sherman v. Trinity Teen Solutions*, 2:20-CV-215-SWS. So this release applies to claims related to this lawsuit. The Court finds this release complies with Tenth Circuit caselaw and does not find it to be overbroad. The Court does not find the release provision renders the settlement unfair, unreasonable, or inadequate.

Fourth, Ms. Gozun contends the appeal bond instituted by the settlement "is

punitive, designed to prevent appeals, and inconsistent with objector rights[.]" (ECF 361

p. 3.) The settlement agreement says, "Pursuant to Rule 7 of the Federal Rules of Appellate

Procedure … any objector who seeks to appeal any ruling of the District Court … [is]

required to file a bond in the amount of $92,000 (4% of the Gross Settlement amount) in

order to protect this Settlement."

> Rule 7 provides in pertinent part that, "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount *necessary to ensure payment of costs on appeal*." (Emphasis added.) The purpose of a Rule 7 appeal bond is to ensure that the appellant, if he is unsuccessful on appeal, can pay the "costs on appeal" incurred by his opponent. *See* 16A Wright et al., *Federal Practice & Procedure* § 3953. Thus, "[c]osts for which a Rule 7 bond can be required include only costs relating to the appeal," *id.*; that is, costs which "the appellee stands to have reimbursed" should he prevail on appeal, *Adsani v. Miller*, 139 F.3d 67, 75 (2d Cir.1998).

*Tennille v. W. Union Co.*, 774 F.3d 1249, 1254 (10th Cir. 2014).

The Court agrees with Ms. Gozun that there are problems with the $92,000 appeal

bond set forth in the settlement agreement. For starters, as *Tennille* makes clear, an appeal

bond is intended to ensure the payment of appellate costs, not "to protect" a settlement.

Additionally, the parties have tied the amount of the bond to anticipated appellate costs in

only the loosest of fashion.

At the final fairness hearing, Class Counsel advocated that, based on Second Circuit,

Sixth Circuit, and Eleventh Circuit[7] caselaw, the inclusion of attorney fees should be

factored into the costs on appeal in this case because the TVPRA at 18 U.S.C. § 1595(a)

---

[7] Class Counsel inadvertently suggested it was the Ninth Circuit rather than the Eleventh Circuit, but *In re Cardizem CD Antitrust Litigation*, 391 F.3d 815, 817 (6th Cir. 2004), adopted caselaw from the Second and Eleventh Circuits.

provides for the recovery of reasonable attorney fees for a successful plaintiff. The Court is unpersuaded, though. Section 1595(a) says in relevant part, "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator [or conspirator] ... and may recover damages and reasonable attorneys fees." The Court finds it exceedingly doubtful that Ms. Gozun or another class member-objector (who are the alleged TVPRA victims here) could be held liable for the payment of attorney fees to Class Counsel or Defendants (none of which is a TVPRA victim) under § 1595(a); such would require quite the strained reading of the statute. Accordingly, despite the fee-shifting allowance in § 1595(a), the Court does not find it appropriate to include likely appellate attorney fees in a Rule 7 appeal bond in this case.

In *Tennille*, the Tenth Circuit applied its sister circuit courts' consistent definition of "'costs on appeal' for Rule 7 purposes as appellate costs expressly provided for by a rule or statute." *Tennille*, 774 F.3d at 1255. Counsel did not provide much information for the Court to decipher what the reasonable appellate costs might be in this case. Nor did Ms. Gozun. However, based upon three pieces of information, the Court concludes that a reasonable appeal bond in this case is $40,000. The Court bases this figure on the following:

(1)    As of August 12, 2025 (before the final fairness hearing), Class Counsel had incurred more than $54,000 in expenses in litigating this case. (ECF 353-1 p. 7.) To be sure, this includes the expenses related to the interlocutory appeal as well as a lawsuit that has lasted more than four years, which is why the Court determines a figure smaller than $54,000 is warranted. But it's a good starting point.

(2)    In *Tennille*, the Tenth Circuit set the appeal bond at $5,000, as conceded to by the objector, "to cover printing, copying, and record preparation costs."

*Tennille*, 774 F.3d at 1257. That was more than a decade ago and costs of these services are now significantly higher. Further, there are costs beyond printing, copying, and record preparation that are recoverable by a prevailing party, such as filing fees. *See* Fed. R. App. P. 39(e)(4). So a figure higher than $5,000 is warranted.

(3)     At the final fairness hearing, Defense Counsel noted that the interlocutory appeal costs submitted by Class Counsel totaled more than $40,000. While the Court finds this figure likely included some amount for attorney fees (because Class Counsel has claimed a total of $54,000 in litigation expenses, most of which was probably not the interlocutory appeal), it also notes that both Plaintiffs and Defendants would incur costs in defending the settlement in a subsequent appeal because both sides entered into this settlement and want to see it executed, potentially doubling the recoverable appellate costs. Additionally, as Defense Counsel noted at the final fairness hearing and the Court agrees, the administrative costs associated with submitting an appellate brief to a circuit court of appeals are significant.

Accordingly, the Court exercises its discretion in determining an appeal bond of $40,000 is warranted in this lawsuit under Fed. R. Civ. P. 7. This portion of the class action settlement agreement is modified accordingly, and with that modification, the Court does not find the appeal bond to render the class action settlement unfair, unreasonable, or inadequate.

Fifth, Ms. Gozun takes issue with Class Counsel's request for attorney fees. As the Court has already determined Class Counsel's representation was adequate in this lawsuit and their request for attorney fees and litigation expenses is reasonable, this objection is overruled.

Ms. Gozun's objection to the appeal bond being set at $92,000 is well-taken, and the Court reduces the amount of the appeal bond to $40,000. The remainder of Ms. Gozun's objections and other requests for relief from the settlement are overruled.

### 2.3    *Objection from Carlie Sherman*

Carlie Sherman is a named Plaintiff and class representative. Her earlier written objection, subsequent withdrawal of that objection, and then resubmission of a written objection the day before the final fairness hearing is enough to induce whiplash.

On April 16, 2025, well before the Court had preliminarily approved the settlement, Ms. Sherman filed a pro se request for the Court to deny settlement approval, where her primary complaint was that she felt lied to by Class Counsel and was forced to accept the settlement despite wanting to continue the litigation. (ECF 335.) On May 29, 2025, still before the Court preliminarily approved the settlement, Ms. Sherman filed a statement under penalty of perjury seeking to withdraw her earlier objection, which she said had been submitted out of frustration and the emotional toll of this lawsuit. (ECF 343.) Understanding Ms. Sherman no longer opposed the settlement, the Court preliminarily approved it (ECF 344) and granted her request to withdraw the objection (ECF 349).

On the afternoon before the final fairness hearing, Ms. Sherman filed a pro se "Motion for Protective Relief and Court Oversight of Class Counsel" (ECF 367) as well as a "Notice of Filing Under Seal and Request for In Camera Review" (ECF 368). In brief, she asserts the following: (1) she was coerced by Class Counsel into withdrawing her earlier objection; (2) she believes Class Counsel has inadequately represented the class and any fee they receive from the settlement should be reduced or denied completely; (3) she opposes a settlement that does not include injunctive relief; and (4) the settlement amount and recovery for each class member is inadequate, and she generally opposes settlement

and wants to continue the litigation.[8] The Court denied Ms. Sherman's motions at the final

fairness hearing and will overrule Ms. Sherman's objections to the settlement (to the extent

they are such).

Taking first things first, Ms. Sherman claims she was coerced into withdrawing her

earlier objection because Class Counsel told her they could not continue representing her

if she did not withdraw the objection. (ECF 368 p. 3.) Assuming without deciding the truth

of this allegation, the Court does not find Class Counsel's statements to be unreasonable

or incorrect, let alone improper coercion. Her earlier objection accused Class Counsel of

various representation failures. (ECF 335.) Considering the settlement that Class Counsel

had fought to obtain, it would be reasonable for Class Counsel to believe their

representation of the class had become adverse to Ms. Shermans' desire to continue the

litigation. *See* Wyo. R. Prof. Conduct 1.7(a). Continuing as her attorneys likely could only

be possible under the Wyoming Rules of Professional Conduct if she withdrew her

objection to remove the conflict of interest she had created. Giving her the option of

withdrawing her objection or proceeding without Class Counsel representing her was not

unlawful coercion; it was a choice she had brought upon herself and needed to make. The

Court does not find Ms. Sherman's claims of improper coercion to be well supported.

---

[8] In both her earlier objection and her eleventh-hour motions, Ms. Sherman asserted she was
speaking on behalf of both herself and the other class representative, Amanda Nash. (ECF 335 p.
2; ECF 367 p. 1; ECF 367-3 p. 1; ECF 368 p. 2.) Aside from Ms. Sherman's lack of standing to
press an objection on another class member's behalf, the Court already noted that Class
Representative Amanda Nash appeared in person at the final fairness hearing and informed the
Court on the record that she supported the settlement. The Court observed Ms. Nash's interactions
with Class Counsel in the courtroom and has no concerns that she was improperly coerced into
supporting the settlement.

As for the adequacy of Class Counsel's representation and their requested fee, the Court has already considered it at length above. Nothing Ms. Sherman has written has caused the Court to reconsider its finding that Class Counsel adequately represented the class and has requested a fair and reasonable recovery of fees and expenses.

The Court also already considered the objection to the lack of injunctive relief in the settlement agreement. It is very unlikely that injunctive relief could have been awarded in this case. Consequently, the Court cannot say the settlement is unfair, unreasonable, or inadequate due to the lack thereof.

Finally, Ms. Sherman contends the settlement amount does not fully compensate class members for all the hours of labor actually worked at the ranch (ECF 368 p. 7), and settling the case now is a "disservice to the truth and the gravity of what happened" (ECF 367-3 p. 2). Based on the realities of the situation, this is a bit of a contradiction. Ms. Sherman essentially argues the settlement fund should be increased or trial and recovery of nothing against a potentially judgment-proof defendant should be pursued.

To break it down a little, the Court does not for a second believe that this settlement fully compensates class members for the hours of labor or the deplorable conditions they described in their amended complaint. But a settlement is a compromise where each side gives up some of what it seeks in order to resolve the dispute and move on with their lives. Under the proposal here, class members are unlikely to receive full compensation, but they will receive an equitable share of something, whereas continuing the lawsuit involves a very real chance of collecting nothing even if prevailing. Like it or not, money is the remedy available in this lawsuit, and this settlement secures a fair, reasonable, and adequate

recovery for the class in the face of significant risks of recovering nothing.

As for Ms. Sherman's assertion that the case should not be settled at all, she seems to suggest that proceeding to a trial and potentially securing a pyrrhic victory from a judgment-proof defendant is the preferred course of action. However, more than 100 class members have submitted claims seeking their equitable share of the settlement without objecting to the settlement, thus at least suggesting those class members might prefer to avoid the hollow triumph.

The Court does not find Ms. Sherman's objections demonstrate the proposed settlement is unfair, unreasonable, or inadequate. Therefore, her objections are overruled.

3.    **Except for Ms. Sherman's overruled objections, the parties and the mediator agree the settlement is fair and reasonable.**

One of the two class representatives, Amanda Nash, expressed her approval of the settlement, saying at the final fairness hearing that she felt it was the best outcome for the class at this time. Additionally, all counsel and the mediator agree the settlement is fair, reasonable, and adequate. "Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Montgomery v. Cont'l Intermodal Group-Trucking LLC*, No. 19-940 GJF, 2021 WL 1339305, at *10 (D.N.M. Apr. 9, 2021) (quoting *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 695 (D. Colo. 2006)). As noted earlier, Class Counsel are experienced in class action litigation, and both sides' counsel are very knowledgeable about the claims, defenses, and practical realities at issue in this lawsuit. Moreover, the mediator, Judge Gonzalez, is experienced in presiding over and mediating complex civil litigation, including TVPRA lawsuits and class actions, and she believes "the Settlement represents

a recovery and outcome that is reasonable and fair for the Settlement Class and all parties involved." (Decl. of Judge Gonzalez ¶ 10.) As discussed earlier, the Court places great weight in her independent assessment of the matter.

Thus, except for the objections from Class Representative Carlie Sherman, which have been overruled, the parties, counsel, and the mediator agree the settlement if fair and reasonable.

## CONCLUSION AND ORDER

Having considered the various factors under Ruel 23 and Tenth Circuit caselaw, the Court concludes that the parties' settlement is fair, reasonable, and adequate. The Court makes a single modification to it: The appeal bond will be reduced from $92,000 to $40,000. No other modification is warranted, and with that relatively minor change, the Court will grant final approval of this class action settlement under Rule 23(e).

**IT IS THEREFORE ORDERED** that Plaintiffs' Unopposed Motion for Final Approval of the Class Action Settlement (ECF 353) is **GRANTED**.

**IT IS FURTHER ORDERED** that the appeal bond amount allowed under Fed. R. App. P. 7 is hereby reduced to **$40,000**. All other written objections submitted in opposition to the settlement are **OVERRULED**.

**IT IS FURTHER ORDERED** that: (i) the request for $1,185,000 from the common settlement fund to be paid on a pro rata basis to each class member who submitted a claim thereto is **GRANTED**; (ii) Class Counsel's request for attorney fees and litigation expenses totaling $920,000 to be paid from the common settlement fund is **GRANTED**; (iii) the request for incentive awards of $15,000 each to the two current class

representatives and the one former class representative to be paid from the common settlement fund is **GRANTED**[9]; and (iv) the request for payment of $150,000 to the claims administrator to be paid from the common settlement fund[10] is **GRANTED**.

**IT IS FINALLY ORDERED** that, incorporating the appeal bond reduction, the parties shall take all steps necessary to perform and enforce the settlement in accordance with its terms, including moving for dismissal of all claims and causes of action (with the Court reserving jurisdiction over the performance and enforcement of the settlement) at the appropriate time.

**DATED:** September 23rd, 2025.

Scott W. Skavdahl
United States District Judge

---

[9] Any incentive award waived, forfeited, or otherwise not paid out for any reason, shall be returned to the settlement fund for pro rata distribution to the class members who have submitted a claim.

[10] The Court notes there is a conflict in the parties' settlement agreement concerning payment to the claims administrator. Section 1.18 defines "Net Settlement Amount" (which essentially is the portion of the common settlement fund to be paid to the class member-claimants) to exclude the claims administrator costs. (ECF 341-1 p. 5.) But Section 3.3.2 states the claims administer costs "shall be paid from the Net Settlement Amount." (ECF 341-1 p. 10.) Based upon the parties' requests and their breakdown of the figures, though, the Court determines the parties clearly intended the claims administrator costs to be paid from the settlement fund separate from the amount to be paid to the class member-claimants. (*See* ECF 353 pp. 4-5.) The Court also finds this distribution to be the most fair, reasonable, and adequate to the class member-claimants because payment to the claims administrator should not come from the portion of the settlement fund going to the class member-claimants.